**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE**

| | |
|---|---|
| **LEAGUE OF WOMEN VOTERS OF NEW HAMPSHIRE, LEAGUE OF WOMEN VOTERS OF THE UNITED STATES, NANCY MARASHIO, JAMES FIESEHER, AND PATRICIA GINGRICH,** | Civil Action No. 1:24-cv-73 |
| Plaintiffs, | |
| v. | **COMPLAINT** |
| **STEVE KRAMER, LINGO TELECOM, LLC, and LIFE CORPORATION,** | |
| Defendants. | |

**NATURE OF THE CASE**

1.      Plaintiffs League of Women Voters of New Hampshire ("LWV-NH"), League of Women Voters of the United States ("LWV-US"), Nancy Marashio, James Fieseher, and Patricia Gingrich (collectively, "Plaintiffs") bring this action to protect the right to vote free from intimidation, threats, or coercion, which was unlawfully infringed upon as a result of the actions and threatened actions of Defendants Steve Kramer, Lingo Telecom, LLC, and Life Corporation (collectively, "Defendants").

2.      On January 21, 2024, two days before the 2024 New Hampshire Presidential Primary Election ("the New Hampshire Primary"), Defendants sent thousands of robocalls (the "New Hampshire Robocalls") to people they thought were likely Democratic voters, including, but not limited to, members of Plaintiffs LWV-US and LWV-NH.  The New Hampshire Robocalls featured a voice generated with artificial intelligence ("AI"), also known as a "deepfake,"[1] that

---

[1] "Deepfake" is "an image or recording that has been convincingly altered and manipulated to misrepresent someone as doing or saying something that was not actually done or said." Deepfake, Merriam-Webster, https://www.merriam-webster.com/dictionary/deepfake#dictionary-entry-1 (last visited Mar. 13, 2024).

simulated the voice of President Joe Biden.  To add to the deception, at least some of the New Hampshire Robocalls "spoofed" a personal phone number associated with a prominent former state Democratic Party leader known to be a supporter of President Biden.[2]  The New Hampshire Robocalls urged recipients not to vote in the primary in order to "save" their vote for the November 2024 U.S. Presidential Election (the "General Election"), falsely and maliciously stating that casting a vote in the New Hampshire Primary would "only enable[] the Republicans in their quest to elect Donald Trump again."

3.      Defendants sent the New Hampshire Robocalls to New Hampshire voters for the purpose of intimidating, threatening, or coercing, or attempting to intimidate, threaten, or coerce them, into not voting in the New Hampshire Primary.

4.      This is an action pursuant to Section 11(b) of the Voting Rights Act (52 U.S.C. § 10307(b)), the Telephone Consumer Protection Act (47 U.S.C. § 227(b)), and the New Hampshire Election Laws (RSA 664:14-a, 664:14-b) for declaratory and injunctive relief, and damages, for the unlawful infringement of voting rights and the distribution of unlawful robocalls.

5.      Plaintiffs are individual United States citizens who reside in New Hampshire and organizations that are incorporated in or have chapters in New Hampshire.

6.      As described below, Defendants orchestrated a deceitful and malicious scheme, bolstered by artificial intelligence and caller ID spoofing, to suppress Democratic voter participation in the New Hampshire Primary.  The Defendants sent robocalls to thousands of New Hampshire residents, falsely insinuating that they could lose their ability to vote if they participated in the New Hampshire Primary.

---

[2] "Spoofed" is defined as deliberately falsifying the information transmitted via caller ID display to disguise the caller's identity.  *See* FCC, Caller ID Spoofing, https://www.fcc.gov/spoofing (last visited Mar. 13, 2024).

7.     The Defendants' actions must be declared unlawful, punished, and enjoined nationwide to prevent Defendants from engaging in the same deception in other elections, and to prevent irreparable harm to voters in advance of the General Election.

## JURISDICTION

8.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 because this action arises under federal law, specifically Section 11(b) of the Voting Rights Act of 1965, 52 U.S.C. § 10307(b), and the Telephone Consumer Protection Act, 47 U.S.C. § 227(b).

9.     This Court has authority to issue declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202.

10.     This Court has supplementary jurisdiction over the state law claims alleged herein pursuant to 28 U.S.C. § 1367(a) because the state claims are related to the federal claims and form part of the same case or controversy.

## PARTIES

11.     Plaintiff LWV-US is a nonpartisan, non-profit civic engagement organization with the mission to encourage informed and active participation in government, increase understanding of major public policy issues, and influence public policy through education and advocacy.  LWV-US's chapters in all 50 states and Washington, D.C. conduct state and local advocacy, voter registration and engagement, civic education, and member enrichment programs.  Because the LWV-US is nonpartisan, it neither supports nor opposes candidates or political parties at any level of government, but always works on vital civic issues of concern to members and the public. LWV-US has over 70,000 dues-paying members in over 700 state and local chapters throughout the United States.  At least some of its members received the New Hampshire Robocalls.  Because voter suppression is a fundamental issue of concern to LWV-US members and the public, LWV-

US has had to divert money, time, and other resources from its critical election-year civic engagement and election support programs to address Defendants' threatening, intimidating, and coercive tactics.

12.     Plaintiff LWV-NH is the LWV-US's affiliate in New Hampshire.  LWV-NH has over 300 dues-paying members across 3 local chapters.  At least some of its members received the New Hampshire Robocalls.  LWV-NH shares LWV-US's nonpartisan mission to encourage informed and active participation in government, increase understanding of major public policy issues, and influence public policy through education and advocacy.  Because voter suppression is a fundamental issue of concern to LWV-NH members and the public, LWV-NH must similarly divert money, time, and other resources to address Defendants' threatening, intimidating, and coercive tactics.

13.     During the relevant period, Plaintiff Nancy Marashio was a lawfully registered voter in New London, New Hampshire, and a member of LWV-NH and LWV-US.

14.     During the relevant period, Plaintiff James Fieseher, M.D., was a lawfully registered voter in Dover, New Hampshire.

15.     During the relevant period, Plaintiff Patricia Gingrich was a lawfully registered voter in Barrington, New Hampshire, and a member of LWV-NH and LWV-US.

16.     Defendant Steve Kramer is a political consultant with over 20 years' experience organizing robocalls, ballot access initiatives, and voter turnout operations.  Based on information and belief, Kramer is a resident of New York.

17.     Defendant Lingo Telecom, LLC ("Lingo") is a voice and broadband provider headquartered in Michigan, with additional operations in Texas, Alabama, and Georgia.  Since 2016, Lingo has operated under at least eleven different corporate names.[3]

18.     Defendant Life Corporation ("Life Corp") is a Texas corporation that owns, operates, and hosts a telecommunication broadcasting platform, which broadcasts robocalls or pre-recorded telephone messages.

19.     Defendants Kramer, Lingo, and Life Corp have a track record of dishonesty, malfeasance, and/or disregard for the law.

20.     In April 2019, Kramer was the subject of a complaint filed with the New York City Campaign Finance Board by a compliance aide to a local campaign for New York City Public Advocate.[4]  The compliance aide grew suspicious upon receiving a $90,000 invoice from a Kramer-affiliated consulting firm the day after the campaign received $500,000 in public matching funds from New York City.  A subsequent media investigation of the allegations revealed that Kramer and his associates concealed the identities of the recipients of campaign funds, altered invoices to inflate the costs of services provided, falsified canvassing records to misrepresent the extent of the services provided, and failed to properly disclose the nature of certain services provided to the campaign, including the organization of robocalls.

---

[3] Lingo has previously operated under the following names:  Americatel, BullseyeComm, Clear Choice Communications, Excel Telecommunications, Impact Telecom, Lingo, Lingo Communications, Matrix Business Technologies, Startec Global Communications, Trinsic Communications, and VarTec Telecom.  *See* Mich. Dept. of Licensing and Regulatory Affairs, https://cofs.lara.state.mi.us/CorpWeb/UAA/UAAAssumedNames.aspx?CID=6C3UB4&PageType=VIEW  (last visited Mar. 13, 2024).

[4] Laura Nahmias and Dana Rubinstein, *With taxpayer dollars flowing in, Konst's public advocate campaign accused of fraud*, Politico (May 1, 2019), https://www.politico.com/states/new-york/city-hall/story/2019/05/01/with-taxpayer-dollars-flowing-in-konsts-public-advocate-campaign-accused-of-fraud-997007.

21.     In April 2021, Kramer was sued and accused of malfeasance by a former client who had paid him $80,000 to gather signatures to secure her appearance on the New York mayoral primary ballot.[5]  Nearly 90% of the signatures that Kramer submitted were later ruled invalid by the New York City Board of Elections, and, in the course of litigation, Kramer was able to produce timecards for only a fraction of the petitioners and person-hours worked that he promised under the contract.

22.     In September 2023, Kramer sent robocalls featuring an AI-generated voice of Senator Lindsey Graham to 300 South Carolina likely Republican primary voters asking whom they supported in the 2024 South Carolina Republican Presidential Primary.[6]  Based on information and belief, Kramer did not secure Senator Graham's permission to use his voice prior to distributing the robocalls to South Carolina voters.  Kramer has since claimed that the deepfake robocalls achieved a response rate four times higher than robocalls using a generic automated voice because Senator Graham's voice was familiar to South Carolina voters.

23.     In December 2023 and January 2024, the presidential campaign of U.S. Representative Dean Phillips paid Kramer's political consulting firm, Get Out The Vote, a total of $259,946.[7]  In February 2024, the Phillips campaign acknowledged that it paid Get Out The Vote to help produce and distribute robocalls.[8]  However, as of March 13, 2024, Federal Election

---

[5] *Sarah Tirschwell for Mayor, Inc. v. Kramer*, No. 154123/2021 (N.Y. Sup. Ct. Apr. 28, 2021), NYSCEF Doc. No. 1.

[6] Alex Seitz-Wald, *Democratic operative admits to commissioning fake Biden robocall that used AI*, NBC News (Feb. 25, 2024), https://www.nbcnews.com/politics/2024-election/democratic-operative-admits-commissioning-fake-biden-robocall-used-ai-rcna140402.

[7] Federal Election Commission, Dean 24, Inc. Disbursements to Get Out The Vote (SK) https://www.fec.gov/data/disbursements/?data_type=processed&committee_id=C00854778&recipient_name=Get+Out+The+Vote&two_year_transaction_period=2024&min_date=01%2F01%2F2023&max_date=12%2F31%2F2024 (last accessed March 13, 2024).

[8] Alex Seitz-Wald, *A New Orleans magician says a Democratic operative paid him to make the fake Biden robocall*, NBC News (Feb. 23, 2024), https://www.nbcnews.com/politics/2024-election/biden-robocall-new-hampshire-strategist-rcna139760.

Commission filings do not disclose any payments to Get Out The Vote for the production or distribution of robocalls.[9]

24.     Lingo has been the subject of multiple investigations concerning illegal robocall traffic.  On August 1, 2022, the Anti-Robocall Multistate Litigation Task Force (the "Multistate Task Force")[10] issued a Civil Investigative Demand to Lingo to identify, investigate, and mitigate suspected illegal call traffic transmitting from its network.[11]  On August 23, 2022, the Federal Trade Commission issued Matrix Telecom, LLC (one of Lingo's prior corporate names) a Cease-and-Desist Demand that identified numerous illegal calls that the company was reportedly transmitting.[12]  On November 3, 2023, the Multistate Task Force demanded that Lingo take steps to protect its network after observing that Lingo continued to transmit suspected illegal traffic.[13]

25.     Life Corp has been cited for failing to comply with federal laws and regulations governing the dissemination of robocalls.  On July 29, 2003, the Federal Communications Commission ("FCC") issued an official citation to Life Corp, stating that Life Corp had delivered one or more prerecorded unsolicited advertisements to residential telephone lines without a valid exemption in violation of Section 503(5) of the Communications Act of 1934.[14]  The FCC letter

---

[9] *See supra* n. 7.

[10] The Anti-Robocall Multistate Litigation Task Force is a 51-member collective of State Attorneys General, which is focused on actively investigating and pursuing enforcement actions against various entities in the robocall ecosystem that are identified as being responsible for significant volumes of illegal and fraudulent robocall traffic routed into and across the country.

[11] *See* Letter from Tracy Nayer, Special Deputy Attorney General, North Carolina Dept. of Justice, to Lingo Telecom, LLC (Nov. 3, 2023), https://ncdoj.gov/wp-content/uploads/2023/11/State-AG-Task-Force-NOTICE-Letter-to-LINGO.pdf.

[12] *See* Letter from Jon Miller Steiger, Regional Director, Bureau of Consumer Protection, Fed. Trade Comm'n, to Matrix Telecom, LLC (Aug. 23, 2022), https://www.ftc.gov/system/files/ftc_gov/pdf/pointofnoentry-matrixtelecomcdletter.pdf.

[13] *See supra* n. 11.

[14] Citation from Kurt Schroeder, Deputy Chief, Enforcement Bureau, to Life Corporation (July 29, 2003), https://docs.fcc.gov/public/attachments/DOC-237113A1.pdf.

further stated that Life Corp had failed to disclose required information in its prerecorded messages and telephone solicitations in violation of 47 C.F.R. § 64.1200(e)(2)(iv).

## BACKGROUND

26.     "[S]ince the right to exercise the franchise [of voting] in a free and unimpaired manner is preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized."  *Reynolds v. Sims,* 377 U.S. 533, 562 (1964).  It is essential that voters be able to exercise their right to vote free of deception, coercion, threat, intimidation, or any attempt thereof, to safeguard all other rights guaranteed by the Constitution.  *See McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 191 (2014) ("There is no right more basic in our democracy than the right to participate in electing our political leaders.").

27.     While bad faith actors have long sought to undermine the electoral process through threats, intimidation, and coercion, the Defendants' malicious use of artificial intelligence poses a novel and dangerous threat to American democracy.  Using inexpensive and widely available technology, Defendants were able to send a message seemingly from the President of the United States, and *de facto* leader of the Democratic Party, to thousands of voters, threatening the loss of their right to vote in the General Election if they participated in the New Hampshire Primary.  To compound the deception, Defendants spoofed the call by misappropriating the identity of a local Democratic party leader.

28.     If Defendants' deceptive and coercive tactics are not immediately declared unlawful, enjoined, and punished, citizens' ability to exercise their right to vote free and unimpaired—the linchpin of all other civil and political rights—will be imperiled.  Defendants have demonstrated that they are capable of executing a mass voter suppression scheme, less than 48 hours before an election, at minimal costs.  Unless enjoined, Defendants can be expected carry

on with business as usual and engage in future intimidating, threatening, and coercive schemes, impacting even more consequential elections, with even more devastating consequences.

**The Scheme to Suppress Democratic Voter Participation in the New Hampshire Presidential Primary Election**

29.    Based on information and belief, in or around the fall of 2023, Steve Kramer began receiving requests from unspecified consultants, corporations, political action committees ("PACs"), and Super PACs requesting that Kramer use AI-generated robocalls in connection with unspecified campaigns.[15]   Around this time, Kramer was introduced to Paul Carpenter through mutual acquaintances.  Carpenter is a transient magician and self-described "digital nomad" with no fixed address.[16]  Carpenter also provides freelance social media and web design services and has some familiarity with AI technology.

30.    In January 2024, shortly before the New Hampshire Primary, Kramer commissioned Carpenter to create a deepfake recording impersonating the voice of President Joe Biden.  On Saturday, January 20, 2024, Kramer emailed Carpenter a script for the robocall.  Carpenter used publicly available software developed by Elevenlabs to generate the deepfake of President Biden's voice.[17]  According to Carpenter, creating the deepfake took less than 20 minutes and cost only $1.[18]

31.    Kramer directed Carpenter to Kramer's father, Bruce Kramer, to receive payment for generating the deepfake of President Biden's voice.  On January 20, 2024, a Venmo account belonging to Bruce Kramer sent two wires totaling $150 to Carpenter.

---

[15] *See* Marcia Kramer, *Steve Kramer explains why he used AI to impersonate President Biden in New Hampshire*, CBS News (Feb. 26, 2024), https://www.cbsnews.com/newyork/news/steve-kramer-explains-why-he-used-ai-to-impersonate-president-biden-in-new-hampshire/.

[16] *See supra* n. 8.

[17] ElevenLabs is a software company that specializes in developing natural-sounding speech synthesis and text-to-speech software, using AI and deep learning.

[18] *See supra* n. 8.

32.     Kramer subsequently hired Life Corp to distribute thousands of robocalls to likely Democratic voters in New Hampshire.  Kramer provided Life Corp the deepfake recording of President Biden's voice, and Life Corp relied on Lingo's services to disseminate the robocalls. Lingo provided certain of the calls A-level STIR/SHAKEN attestations,[19] which asserted that Life Corp had the legal right to utilize the phone number that appeared on recipients' caller IDs.

33.     Life Corp and Lingo were aware or should have been aware of the false information reflected in the call but nevertheless failed to prevent the message's broadcast.  Instead, Life Corp and Lingo sent the deceptive and coercive robocalls to thousands of phone numbers in New Hampshire in a short amount of time.  Indeed, certain of the calls exhibited patterns that were consistent with a Telephony Denial of Service or 'TDoS' attack.[20]

34.     On Sunday, January 21, 2024—two days before the New Hampshire Primary— thousands of individuals received robocalls, including on residential landlines, that played the deepfake prerecorded message of President Biden's voice.  The caller identification information showed that the calls were coming from the phone number of the spouse of Kathy Sullivan, a former New Hampshire Democratic Party chair.  At that time, Ms. Sullivan was running an independent Super PAC, Granite for America, that was leading a public effort to ask Democrats to write in President Biden's name in the New Hampshire Primary.[21]

---

[19] STIR/SHAKEN digitally validates the handoff of phone calls passing through the complex web of networks, allowing the phone company of the consumer receiving the call to verify that a call is in fact from the number displayed on Caller ID.  *See* FCC, *Combating Spoofed Robocalls with Caller ID Authentication*, https://www.fcc.gov/call-authentication (last visited Mar. 13, 2024).

[20] A Telephony Denial of Service or 'TdoS' attack is an intentional attack on the telephony/voice service communications system of an organization intended to disrupt service by flooding the network with multiple and malicious inbound calls.  *See* DHS Science and Technology (S&T) Directorate, Telephony Denial of Service, https://www.dhs.gov/sites/default/files/publications/508_FactSheet_DDoSD_TDoS%20One%20Pager-Final_June%202016_0.pdf (last visited Mar. 13, 2024).

[21] President Joe Biden's name did not appear on the New Hampshire primary ballot due to a conflict between the Democratic National Committee's primary calendar and New Hampshire state law.

35.     The New Hampshire Robocalls warned potential Democratic voters against participating in the upcoming primary election:

> This coming Tuesday is the New Hampshire Presidential Preference Primary.  Republicans have been trying to push nonpartisan and Democratic voters to participate in their primary.  What a bunch of malarkey.  We know the value of voting Democratic when our votes count.  It's important that you save your vote for the November election.  We'll need your help in electing Democrats up and down the ticket.  Voting this Tuesday only enables the Republicans in their quest to elect Donald Trump again.  Your vote makes a difference in November, not this Tuesday.  If you would like to be removed from future calls, please press two now.  Call [personal cell phone of Kathy Sullivan] to be removed from future calls.

36.     On Monday, January 22, 2024, following an NBC News report on the New Hampshire Robocalls, Kramer texted Carpenter a link to the story and the message, "Shhhhhhh."[22]  Carpenter responded, "Gtfooh," an acronym for "Get the f*** out of here."[23]   Carpenter subsequently spoke with Kramer over the telephone.  On the call, Kramer admitted to Carpenter that he had spoofed the New Hampshire Robocalls, or deliberately falsified the information transmitted via caller ID display to disguise their identity.[24]  Kramer also directed Carpenter to delete his emails concerning the robocalls.

## The New Hampshire Robocalls Deceived Voters

37.     On January 21, 2024, around 6:25 p.m., New Hampshire voter Gail Huntley received one of the New Hampshire Robocalls.  Huntley immediately recognized the voice on the call as President Biden, explaining, "I didn't think about it at the time that it wasn't his real voice.  That's how convincing it was[.]"[25]  Huntley initially believed that President Biden's words were

---

[22] *See supra* n. 8.

[23] *Id.*

[24] Liz Jassin, *'I never knew': Magician paid by Dem for fake Biden robocall*, NewsNation (Feb. 23, 2024), https://www.newsnationnow.com/cuomo-show/magician-fake-biden-robocall/.

[25] *See* Ali Swenson and Will Weissert, *New Hampshire investigating fake Biden robocall meant to discourage voters ahead of primary*, Associated Press (Jan. 22, 2024), https://apnews.com/article/new-hampshire-primary-biden-ai-deepfake-robocall-f3469ceb6dd613079092287994663db5.

being taken out of context.  Huntley only later realized the robocall was fraudulent because what Biden was saying, in her view, did not make sense.

38.     On January 21, 2024, around 6:30 p.m., Plaintiff James Fieseher received the robocall on his residential landline.  Fieseher had not consented to receiving telephone calls from Defendants.  Fieseher immediately recognized the voice of President Biden and assumed that the call was coming from President Biden's presidential campaign.  After listening for 15 to 20 seconds, Fieseher realized the call was not legitimate because the robocall was urging him not to vote.  At that time, Fieseher recognized that the robocall had used artificial intelligence to duplicate President Biden's voice and hung up.

39.     On January 21, 2024, around dinner time, Plaintiff Nancy Marashio received the robocall on her residential landline.  Marashio had not consented to receiving telephone calls from Defendants.  Marashio thought the voice on the robocall sounded like President Biden, but the content of the message did not make sense.  As a long-time member of the LWV-NH, Marashio was able to discern that the call was not legitimate, but was concerned that others without her experience would be taken in by the message.

40.     On January 21, 2024, around dinner time, Plaintiff Patricia Gingrich received the robocall on her residential landline.  Gingrich had not consented to receiving telephone calls from Defendants.  She recognized the voice as President Biden's voice, but as a consistent voter and Chair of the Barrington Democrats, she knew that the message was faked.

41.     On January 21, 2024, following the distribution of the New Hampshire Robocalls, Kathy Sullivan received at least a dozen calls from upset voters who believed that Sullivan was behind the New Hampshire Robocalls.[26]  The following day, Sullivan was forced to release a

[26] *Id.*

statement clarifying that the New Hampshire Robocalls were fake.  She also filed a complaint with the New Hampshire Attorney General's Office and spoke with New Hampshire Department of Justice officials concerning the New Hampshire Robocalls.

### The Unraveling of the New Hampshire Robocall Scheme

42.    On February 6, 2024, the Multistate Task Force issued a notice to Life Corp and its executives, outlining the company's involvement in suspected illegal robocall traffic and referencing the New Hampshire Robocalls.[27]  In its letter, the Multistate Task Force indicated that its investigation—based on 10 traceback notices from the US Telecom's Industry Traceback Group ("ITG")—identified Life Corp as the originator of all 10 calls traced by the ITG.  The letter further indicated that the calls were illegally spoofed, "likely in a further attempt to confuse potential voters."[28]  The letter explained that some portion of the calls had been marked with A-level STIR/SHAKEN attestations by Lingo.  By affixing an A-level attestation, "not only did Life Corp wrongfully use this calling number, but that Lingo improperly attested that Life Corp had the legal right to use the allegedly spoofed number."[29]  The Multistate Task Force further indicated that certain of the calls exhibited patterns consistent with a TDoS attack.[30]  The Multistate Task Force warned Life Corp that its actions may have violated the Telephone Consumer Protection Act, the Truth in Caller ID Act, and the Telemarketing Sales Rules, and that Life Corp. could be subject to damages, civil penalties, injunctions, and other available relief as a result.

---

[27] *See* Letter from the Multistate Task Force to Life Corp. (Feb. 6, 2024), https://oag.ca.gov/system/files/attachments/press-docs/State-AG-Task-Force-NOTICE-Letter-to-LIFE-CORP-Feb.-2024-1.pdf.

[28] *Id.* at 2.

[29] *Id.* at 3.

[30] *Id*.

43.     On February 6, 2024, the FCC issued a notice of suspected illegal traffic to Lingo, identifying Lingo as the originating provider for the New Hampshire Robocalls.[31]  The FCC letter indicated that Lingo had previously responded to the ITG's investigation of the calls, and in those responses, did not contest that the calls were illegal.  The FCC letter further noted that as a result of originating the illegal calls, Lingo potentially faced permissive blocking under 47 C.F.R. § 64.1200(k)(4), mandatory blocking under 47 C.F.R. § 64.1200(n), and potential removal from the Robocall Mitigation Database pursuant to 47 C.F.R. § 64.6305(g).

44.     On February 6, 2024, New Hampshire Attorney General John Formella held a press conference announcing that his office had launched a criminal investigation into the New Hampshire Robocalls.  He confirmed that the investigation—conducted in coordination with the FCC and Multistate Task Force—had identified Life Corp and Lingo as the originators of the robocalls.  Attorney General Formella stated that his office was in the process of issuing subpoenas and document preservation notices to Life Corp, Lingo, and other individuals and entities with information relevant to its investigation.

45.     In February 2024, upon learning of the New Hampshire Attorney General's criminal investigation, Carpenter contacted a reporter at NBC News and revealed his and Kramer's involvement in the New Hampshire Robocalls.

46.     On February 23, 2024, based on the information provided by Carpenter, NBC News published a story identifying Kramer as the architect of the voter suppression scheme.

47.     On February 25, 2024, Kramer released a self-serving statement acknowledging his involvement in commissioning and distributing the New Hampshire Robocalls but claiming that he orchestrated the scheme to raise awareness about the use of AI for "misleading and disruptive

---

[31] *See* Letter from Loyaan A. Egal, Bureau Chief, FCC Enforcement Bureau, to Lingo Telecom, LLC (Feb. 6, 2024), https://docs.fcc.gov/public/attachments/DOC-400264A1.pdf.

purposes," and the need for greater regulation of AI in political campaigns.[32]  He further claimed

that he was prompted to act after receiving multiple calls from companies and political

organizations to use artificial intelligence for nefarious purposes.[33]  Kramer asserted that he had

paid only $500 total to organize and distribute the New Hampshire Robocalls, and, as a result,

achieved a $5 million impact.[34]  Kramer also acknowledged that he tested the effectiveness of

deepfake robocalls in South Carolina prior to deploying them in New Hampshire.[35]

**The New Hampshire Robocalls Require**
**LWV-US and LWV-NH To Divert Resources**

48.    The New Hampshire Robocalls materially damage the LWV-US's mission by

requiring it to divert resources to address and defend against Defendants' actions.  LWV-US

activities include helping assure voters that their vote will count and that elections will be safe,

secure, and trustworthy.  Following the 2020 U.S. Presidential Election, LWV-US noticed an

increase in mis- and disinformation to the public, causing the LWV-US to carve out programming

and staff dedicated to tracking and supporting LWV-US chapters to inform voters of changing laws

and counter mis- and disinformation with accurate information.

49.    Internally, LWV-US maintains a threat matrix of various election scenarios that it

works with state leagues to assess and respond to if such a scenario occurs.  Before the New

Hampshire Primary, the LWV-US rated disruptive vote-suppressing robocalls relatively low on the

threat scale and allocated resources accordingly.

---

[32] *See* Alex Seitz-Wald, *supra* note 6 ("Even individuals acting alone can quickly and easily use A.I. for misleading and disruptive purposes").

[33] *See* Marcia Kramer, *supra* note 15 ("I got sick of it. . . . I've got calls or texts or emails or things from different consultants, corporations, PACs, Super PAC. The only group that hasn't called me about doing something nasty is labor unions.").

[34] *Id.*

[35] *See* Alex Seitz-Wald, *supra* note 6.

50.     As a result of the New Hampshire Robocalls, LWV-US has raised its assessment of the threat level of similar robocalls in other states and for the General Election, to the second-highest ranking.  Accordingly, LWV-US has expended resources providing additional guidance and training to staff tracking robocalls from its members or via media coverage, and in working directly with staff and any impacted state to provide education to voters who may be contacted via robocall and negatively impacted, including those who become confused about their right to vote and who may need additional information to cast their ballot.

51.     In addition, LWV-US will incur monetary costs to prepare for, and respond to, these calls.  LWV-US will continue to prioritize voter education, and the upcoming elections, to encourage higher voter turnout and participation. With Defendants' recent voter intimidation efforts, LWV-US is concerned that voters will be discouraged from voting and that the damage created by the Defendants' efforts will be long-lasting and detrimental to the LWV-US's mission to encourage registration and voting.

52.     For example, because of the New Hampshire Robocalls, LWV-US has implemented changes to its VOTE411.org website.  The website is intended to provide election-related information to voters. In the aftermath of the New Hampshire Robocalls, LWV-US created a new VOTE411.org alert to inform voters of deceptive, threatening, or intimidating robocalls.  LWV-US had to divert staff resources to creating the new alert, and will have to dedicate staff time to updating the website and translating alerts into Spanish to update voters about deceptive, threatening, or intimidating robocall campaigns.

53.     The New Hampshire Robocalls similarly materially damages LWV-NH's mission by forcing it to divert scarce resources away from its core functions and toward activities that combat Defendants' attempts to misinform voters and suppress the vote.  LWV-NH must now quell

current and potential voters' concerns about their right to vote in the General Election.  LWV-NH must perform extra and different work to reassure voters that votes will be counted fairly, and that voters do not lose their right to vote in the General Election if they cast a vote in the New Hampshire Primary.

54.    By way of example, on January 22 and 23, 2023, the President of the LWV-NH, Elizabeth Tentarelli, devoted more hours to monitoring the LWV-NH office phone in case any voters called to inquire whether they could participate in both the New Hampshire Primary and the General Election.

55.    Further, LWV-NH must now prepare specifically for similar efforts to dissuade or pressure people not to vote in the General Election.  Typically, LWV-NH volunteers schedule time distributing voter registration information at public events.  But these voter-suppression calls affect voters who are already registered to vote, not potential new registrants.  LWV-NH must expend additional volunteer labor hours to respond to future such voter-suppression calls.  Furthermore, this additional volunteer time will be unusually challenging because of its unpredictable nature. LWV-NH's voter registration efforts are generally planned and predictable; rapid-response to robocall voter suppression will severely tax or drain LWV-NH's limited volunteer-time resources.

56.    In addition, LWV-NH will incur monetary costs to prepare for, and respond to, these new false and malicious tactics.  This includes changing LWV-NH's standard printed information about voter registration to include warnings about fake phone calls.  To incorporate this new cautionary language, LWV-NH will likely have to expand its printed materials to two pages.  This will double the cost of making copies, causing LWV-NH to incur several hundred dollars in new printing costs that LWV-NH would otherwise not incur.

57.     LWV-NH must now also budget for unforeseen, additional paid promotion (several hundred dollars or more) of Facebook posts to reach more New Hampshire voters as quickly as possible, and purchase space for last-minute newspaper informational advertisements to reach voters who may receive these calls but do not use social media.

58.     At this point in the election cycle, LWV-NH's priority is voter education on current state legislative issues and local (town meeting) elections, and to encourage high voter participation.  However, LWV-NH is concerned that Defendants' misappropriation of the voice of the President of the United States via artificial intelligence and the identity of a local Democratic Party leader via caller ID spoofing will cause voters to distrust or second guess authoritative sources of information about elections.  The LWV-NH fears that this distrust will cause long-lasting damage to its mission to encourage registration and voting.

**<u>Defendants Must Be Enjoined from Causing Irreparable Harm</u>**

59.     There is every reason to believe that Defendants—individuals and corporations with track records of dishonesty and disregard for the law—will continue to transmit deceptive and coercive AI-generated robocalls, unless enjoined by this Court.  As previously described, Kramer has recently been accused of deceiving clients and misappropriating public funds.  Public scrutiny of Kramer's misconduct—and a related lawsuit—has not deterred him from continuing to engage in dishonest and deceptive tactics in his work as a political consultant.  Regulatory scrutiny of Lingo and Life Corp have similarly failed to deter these companies from facilitating unlawful robocalls.

60.     If Defendants are not permanently enjoined from deploying AI-generated robocalls, there is a strong likelihood that it will happen again.  Kramer has already deployed the technology in two states and determined the deepfakes were highly effective.  Kramer also claims

to have received calls from multiple potential clients asking him to engage in similar tactics and has bragged that his $500 out-of-pocket expenditure had a $5 million impact.  Furthermore, Kramer took steps to conceal his involvement by hiring a transient individual, Paul Carpenter, to generate the robocalls, paying for the calls through his father's Venmo account, and asking Carpenter to delete their correspondence after the scheme was revealed.  Had Carpenter not come forward, it is unclear if Kramer's involvement would have ever become publicly known.

61.     Defendants' intimidating, threatening, and coercive tactics must be enjoined immediately to prevent irreparable harm to voters, including Plaintiffs.  Kramer intentionally and wrongfully chose and used an AI-generated voice of the President of the United States to misuse the authority, credibility, and influence of the President to change the voting practice of Democratic voters.  Intimidating, threatening, or coercing voters not to vote is an irreparable harm; once the desired outcome happens—stopping the voter from voting—the harm has occurred.  If voters are intimidated, threatened, or coerced, or otherwise prevented from voting in any of the remaining Democratic or Republican primaries, or the upcoming General Election, because of the Defendants' actions, there will be no way to undo or remedy this damage.  If Plaintiffs, or other potential voters, do not vote in these or other elections as a result of the Defendants' actions, their vote in that election is permanently lost.

62.     Critically, the Defendants were able to reach thousands of voters in the course of just a few hours on a single day.  The damage was done quickly, and within just two days of the New Hampshire Primary.  The nature of robocalls enables Defendants to intimidate, threaten, coerce, or attempt to intimidate, threaten, or coerce thousands of individuals within a short period of time, using a single recording.  The damage can be fast, widespread, and—particularly if repeated on the eve of an election—irreparable.  While the Plaintiffs in this matter are frequent

voters and closely follow local elections, the impact on voters who are not as informed and are consequently misled could be devastating.

63.     Defendants' misconduct must be declared unlawful for the sake of protecting the long-term health of American democracy.  The Defendants disseminated a convincing audio recording ostensibly of the President of the United States and leader of the Democratic Party to thousands of potential or likely Democratic voters who trust him, falsely and coercively stating that by participating in the New Hampshire Primary they would be lose their vote in the General Election.  To add to the ruse, the Defendants spoofed the call to deceive voters into believing the call came from another trusted source, a former leader of the local Democratic Party who was known to be spearheading efforts to help President Biden win a write-in campaign.  The Defendants' pernicious combination of deepfake audio and spoofed caller ID can inflict untold damage on Americans' ability to cast their vote free of impairment.  Moreover, if Defendants are not enjoined and punished, their conduct is likely to be adopted by others, thereby inflicting further harm to other voters.

## CLAIMS FOR RELIEF

### COUNT ONE

**Intimidating, Threatening, or Coercing Voters or Attempting to Intimidate, Threaten, or Coerce Voters in Violation of Section 11(b) of the Voting Rights Act of 1965**

64.     Plaintiffs reallege and incorporate by reference as if fully set forth herein each of the preceding paragraphs and allegations.

65.     Section 11(b) of the Voting Rights Act, 52 U.S.C. § 10307(b), provides:

> No person, whether acting under color of law or otherwise, shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote, or intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for urging or aiding any person to vote or attempt to vote, or intimidate, threaten, or coerce any person for exercising any powers or duties under [other provisions of this law].

66.     Kramer orchestrated a deceptive and coercive robocall campaign threatening Democratic voters that if they participated in the New Hampshire Primary, they would lose their ability to participate in the General Election.

67.     Kramer's actions were undertaken with the purpose of intimidating, threatening, or coercing lawfully registered voters, so that they would be fearful or reluctant to exercise their right to vote in the 2024 New Hampshire Primary.

68.     Kramer targeted likely or potential Democratic voters with the robocall campaign in an effort to intimidate, threaten, or coerce Democratic voters into not voting in the New Hampshire Primary and thereby suppress their votes.

69.     Life Corp and Lingo were aware or should have been aware of the false information reflected in the call but nevertheless failed to prevent the message's broadcast.  Instead, Life Corp and Lingo sent the deceptive and coercive robocalls to thousands of phone numbers in New Hampshire.  Lingo also provided false attestations for the calls, disguising the identity of the caller and thereby adding to the deception.

70.     Defendants' conduct violates Section 11(b) of the Voting Rights Act.

71.     Unless and until enjoined by the Court, Defendants are likely to continue to intimidate, threaten, and/or coerce, or attempt to intimidate, threaten, and/or coerce, lawfully registered voters, including the individual Plaintiffs, members of LWV-NH and of LWV-US, and other voters across the United States whom LWV-NH and LWV-US seek to protect in their right to vote, in violation of Section 11(b) of the Voting Rights Act.

## COUNT TWO

**Disseminating Unlawful Artificial or Prerecorded-Voice Telephone Calls in Violation of Section 272 of the Telephone Consumer Protection Act**

72.     Plaintiffs reallege and incorporate by reference as if fully set forth herein each of the preceding paragraphs and allegations.

73.     Defendants orchestrated a scheme to send artificial or prerecorded-voice telephone calls to Plaintiffs Marashio, Fieseher, and Gingrich.

74.     Defendants spoofed the artificial or prerecorded-voice telephone calls to falsely reflect that the calls were coming from a phone number unaffiliated with the Defendants.

75.     Defendants informed Plaintiffs Marashio, Fieseher, and Gingrich that they could opt out of future calls by calling a phone number unaffiliated with the Defendants.

76.     Defendants' actions violated the Telephone Consumer Protection Act ("TCPA"), and federal regulations promulgated thereto, in multiple respects.

77.     The TCPA prohibits any person or entity from initiating any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party, unless the call is initiated for emergency purposes, or some other exemption applies.  47 U.S.C. § 227(b)(1)(B).

78.     Plaintiffs did not consent to receiving artificial or prerecorded-voice telephone calls from the Defendants.

79.     Defendants did not initiate the artificial or prerecorded-voice telephone calls for "emergency purposes."

80.     Defendants' artificial or prerecorded-voice telephone calls do not qualify for any other exemptions, including the exemption for certain non-commercial telephone calls set forth in 47 C.F.R. § 64.1200(a)(3)(ii) (described below).

81.     Federal regulations exempt certain artificial or prerecorded-voice telephone calls to residential telephone lines if: (a) the call is not made for a commercial purpose; (b) the caller makes no more than three calls within any consecutive 30-day period to the residential line; and (c) the caller honors the called party's request to opt out of future calls as required by 47 C.F.R. § 64.1200(b) and (d).   47 C.F.R. § 64.1200(a)(3)(ii).   The Defendants did not meet the basic requirements to qualify for the exemption, nor should the exemption be construed to exempt calls made for an unlawful purpose.

82.     Federal regulations require all artificial or prerecorded-voice telephone messages to clearly state, at the beginning of the message, the identity of the business, individual, or other entity that is responsible for initiating the call.  47 C.F.R. § 64.1200(b)(1).

83.     Federal regulations require all artificial or prerecorded-voice telephone messages to clearly state, at the beginning or the end of the message, the telephone number of the business, individual, or entity responsible for initiating the call.  47 C.F.R. § 64.1200(b)(2).

84.     Federal regulations require all artificial or prerecorded-voice telephone messages relying on the exemption set forth in 47 C.F.R. § 64.1200(a)(3)(ii) to provide an automated, interactive voice- and/or key press-activated opt-out mechanism for the called person to make a do-not-call request, including brief explanatory instructions on how to use such mechanism, within two seconds of providing the identification information required by 47 C.F.R. § 64.1200(b)(1).  47 C.F.R. § 64.1200(b)(3).

85.     Federal regulations require anyone who initiates an artificial or prerecorded-voice telephone call relying on the exemption set forth in 47 C.F.R. § 64.1200(a)(3)(ii) to maintain a list of consumers who have requested not to receive such calls made by or on behalf of that person or entity.  47 C.F.R. § 64.1200(d).

86.     Defendants did not state at the beginning of the call the identity of the business, individual, or entity responsible for initiating the call, in contravention of 47 C.F.R. § 64.1200(b)(1). To the contrary, they actively misrepresented this information by simulating President Biden's voice and providing a false phone number.

87.     Defendants failed to provide the telephone number of the business, individual, or entity responsible for initiating the call, in contravention of 47 C.F.R. § 64.1200(b)(2). To the contrary, they actively misrepresented this information by providing a false phone number.

88.     Defendants failed to provide a legitimate automated, interactive voice- and/or key press-activated opt-out mechanism, in contravention of 47 C.F.R. § 64.1200(b)(3). To the contrary, they provided call recipients a false and misleading opt-out mechanism, thwarting called parties' ability to prevent future calls.

89.     Defendants failed to maintain a list of individuals who no longer wished to receive calls from Defendants, in contravention of 47 C.F.R. § 64.1200(d).

90.     Defendants violated 47 C.F.R. § 64.1200(b) and (d), and have not met the basic requirements to qualify for an exemption pursuant to 47 C.F.R. § 64.1200(a)(3)(ii).

91.     Each call initiated by the Defendants in violation of the TCPA constitutes a separate violation.

92.     The Defendants' violations of the TCPA were knowing and willful.

## **COUNT THREE**

### **Delivering or Knowingly Causing to be Delivered a Prerecorded Political Message Without Required Disclosure in Violation of RSA 664:14-a**

93.     Plaintiffs reallege and incorporate by reference as if fully set forth herein each of the preceding paragraphs and allegations.

94.     New Hampshire law requires all prerecorded political messages to contain or by live operator provide, within the first 30 seconds of the message, the following information: the name of the candidate or of any organization or organizations the person is calling on behalf of, the name of the person or organizations paying for the delivery of the message, and the name of the fiscal agent, if applicable. RSA 664:14-a(II).

95.     Defendants did not state within the first 30 seconds of the message either the name of the candidate or of any organization the call was made on behalf of or the name of the person or organization that paid for the delivery of the message, in violation of RSA 664:14-a(II).  To the contrary, they actively misrepresented this information.

96.     Defendants did not state within the first 30 seconds of the message either the name of the candidate or of any organization the call was made on behalf of, or the name of the person or organization that paid for the delivery of the message, in violation of RSA 664:14-a(II).  To the contrary, they actively misrepresented this information.

97.     Each call initiated by the Defendants in violation of RSA 664:14-a(II) constitutes a separate violation.

98.     The Defendants' violations of RSA 664:14-a(II) were knowing and willful.

## COUNT FOUR

**Knowingly Misrepresenting the Origin of a Telephone Call Advocating for the Success or Defeat of a Person or Containing Information About a Candidate or Party in Violation of RSA 664:14-b.**

99.     Plaintiffs reallege and incorporate by reference as if fully set forth herein each of the preceding paragraphs and allegations.

100.     New Hampshire law prohibits any person from knowingly misrepresenting the origin of a phone call which expressly or implicitly advocates the success or defeat of any party,

measure, or person at any election, or contains any information about any candidate or party. RSA 664:14-b(I).

101.     Defendants caused the displayed caller identification information to indicate that the call originated from a source other than Defendants or the political campaign that employed Kramer. At least some calls displayed caller identification that indicated that the call originated from Kathy Sullivan, a former New Hampshire Democratic Party chair, and thereby knowingly misrepresented the origin of the phone call in violation of RSA 664:14-b(I).

102.     Defendants used AI to deepfake a recording that impersonated President Biden's voice, so that the call seemed to be from the President of the United States, and de facto leader of the Democratic Party, and thereby knowingly misrepresented the origin of the phone call in violation of RSA 664:14-b(I).

103.     Each call initiated by the Defendants in violation of RSA 664:14-b(I) constitutes a separate violation.

104.     The Defendants' violations of RSA 664:14-b(I) were knowing and willful.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs respectfully request judgment be entered in their favor and against Defendants as follows:

a)     Declaring that Defendants' actions as described above violate Section 11(b) of the Voting Rights Act, 52 U.S.C. § 10307(b), the Telephone Consumer Protection Act, 47 U.S.C. § 227(b), and New Hampshire Election Laws, RSA 664:14-a and 664:14-b.

b)     Entering a permanent, nationwide injunction enjoining Steve Kramer, Lingo Telecom LLC, and Life Corp from producing, generating, or distributing AI-generated robocalls impersonating any person, without that person's express, prior written consent;

c)      Entering a permanent, nationwide injunction enjoining Steve Kramer, Lingo Telecom LLC, and Life Corp from distributing spoofed telephone calls, spoofed text messages, or any other form of spoofed communications;

d)      Entering a permanent, nationwide injunction enjoining Steve Kramer, Lingo Telecom LLC, and Life Corp from distributing telephone calls, text messages, or other mass communications that do not fully comply with all applicable state and federal law or that are made for an unlawful purpose;

e)      Entering a permanent injunction requiring Lingo Telecom LLC and Life Corp to establish policies and procedures to prevent unlawful, intimidating, threating, or coercive robocalls directed to voters;

f)      Awarding monetary damages in the amount of $500 for each violation of 47 U.S.C. § 227(b)(1)(B) of the TCPA, as authorized by 47 U.S.C. § 227(b)(3), which damages Plaintiffs request be trebled by the Court because Defendants' violations of the TCPA were knowing and willful;

g)      Awarding monetary damages in the amount of $1,000 for each violation of RSA 664:14-a, as authorized by 664:14-a(IV)(b), which damages Plaintiffs request be trebled by the Court because Defendants' violations of the New Hampshire Election Laws were knowing and willful;

h)      Awarding monetary damages in the amount of $1,000 for each violation of RSA 664:14-a, as authorized by 664:14-b(II)(b), which damages Plaintiffs request be trebled by the Court because Defendants' violations of the New Hampshire Election Laws were knowing and willful;

i)      Awarding punitive damages in an amount to be determined at trial;

j)    Awarding reasonable attorneys' fees and costs; and

k)    Awarding such other and further relief that the Court deems reasonable and just.

Dated: March 14, 2024                    Respectfully submitted,

PRETI FLAHERTY, PLLP

By: */s/William C. Saturley*
    William C. Saturley (NH Bar #2256)
    Nathan R. Fennessy (NH Bar #264672)
    Nicholas A. Dube (NH Bar #276464)

    PRETI FLAHERTY, PLLP
    57 N. Main Street
    PO Box 1318
    Concord, NH 03302-1318
    (603) 410-1500
    wsaturley@preti.com
    nfennessy@preti.com
    ndube@preti.com

    Mark R. Herring* (DC Bar #90013124)
    Matthew R. Nicely* (DC Bar #430564)
    Caroline L. Wolverton* (DC Bar #496433)
    Amanda S. McGinn* (DC Bar #1049085)
    Joseph T. DiPiero* (DC Bar #1618536)
    Maria Julia Hershey* (DC Bar # 90020162)
    Sara M. Hanna* (DC Bar #90017864)

    AKIN GUMP STRAUSS HAUER & FELD
    Robert S. Strauss Tower
    2001 K Street, N.W.
    Washington, DC 20006-1037
    (202) 887-4000
    mherring@akingump.com
    mnicely@akingump.com
    cwolverton@akingump.com
    amcginn@akingump.com
    jdipiero@akingump.com
    mhershey@akingump.com
    shanna@akingump.com

Courtney Hostetler* (MA Bar #683307)
John Bonifaz* (MA Bar #562478)
Ben Clements* (MA Bar #555802)
Ronald Fein* (MA Bar #657930)
Amira Mattar* (NY Bar #5774450)

FREE SPEECH FOR PEOPLE
1320 Centre St. #405
Newton, MA 02459
(617) 244-0234
chostetler@freespeechforpeople.org
jbonifaz@freespeechforpeople.org
bclements@freespeechforpeople.org
rfein@freespeechforpeople.org
amira@freespeechforpeople.org

*Counsel for Plaintiffs*

*Application Pro Hac Vice Forthcoming