# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

**LEAGUE OF WOMEN VOTERS OF NEW HAMPSHIRE,** *et al.*,

Plaintiffs,

v.

**STEVE KRAMER,** *et al.*,

Defendants.

Civil Action No. 1:24-cv-73-SM-TSM

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF AMENDED MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...........................................................................................................1

STATEMENT OF FACTS ...........................................................................................2

    I.      The NH Robocalls...........................................................................................2

    II.     The Orchestrators of the NH Robocalls.................................................3

    III.    The Creation of the Deepfake Audio of President Biden ......................7

    IV.   The Transmission and Authentication of the NH Robocalls..................8

    V.     The Revelation of the NH Robocalls .................................................10

    VI.   The League of Women Voters' Mitigation Efforts ................................12

LEGAL STANDARD ................................................................................................13

ARGUMENT ..............................................................................................................14

    I.      PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS .........................14

         A.     Plaintiffs Are Likely to Show That Defendants Violated Section 11(b) of the  VRA .................................................................................14

         B.     Plaintiffs Are Likely to Show That Defendants Violated the TCPA..........19

         C.     Plaintiffs' State Law Claims Are Likely to Succeed on the Merits ...........21

             1.     Plaintiffs are likely to show that Defendants violated RSA 664:14-b .........................................................................................21

             2.     Plaintiffs are likely to show that Defendants violated RSA 664:14-a .........................................................................................22

    II.     PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT PRELIMINARY RELIEF ...................................................................................23

    III.   THE BALANCE OF THE EQUITIES WEIGH IN PLAINTIFFS' FAVOR.........25

    IV.   A PRELIMINARY INJUNCTION IS IN THE INTEREST OF THE PUBLIC ......................................................................................................26

CONCLUSION..........................................................................................................29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allen v. State Bd. of Elections*,
    393 U.S. 544 (1969)............................................................................14

*Ariz. Democratic Party v. Ariz. Republican Party*,
    No. 16 Civ. 03752, 2016 WL 8669978 (D. Ariz. Nov. 4, 2016) ................................14, 23, 24

*Arlene Ocasio v. Comision Estatal de Elecciones*,
    486 F. Supp. 3d 478 (D.P.R. 2020)....................................................23

*Borinquen Biscuit Corp. v. M.V. Trading Corp.*,
    443 F.3d 112 (1st Cir. 2006)............................................................25

*Burson v. Freeman*,
    504 U.S. 191 (1992)..........................................................................25

*Colon-Marrero v. Conty-Perez*,
    703 F.3d 134 (1st Cir. 2012)............................................................23

*Corp. Techs., Inc. v. Harnett*,
    731 F.3d 6 (1st Cir. 2013)................................................................13

*Daschle v. Thune*,
    No. 4:04-cv-4177 (D.S.D. Nov. 2, 2004)..................................15, 16, 19

*Fish v. Kobach*,
    840 F.3d 710 (10th Cir. 2016) ........................................................24

*Jackson v. Riddell*,
    476 F. Supp. 849 (N.D. Miss. 1979)................................................15

*Jones v. Montachusetts Reg'l Transit Auth.*,
    No. 22-1569, 2023 WL 9233970 (1st Cir. Nov. 30, 2023)....................21

*League of United Latin Am. Citizens - Richmond Region Council 4614 v. Pub.
Interest Legal Found.*,
    No. 18 Civ. 423, 2018 WL 3848404 (E.D. Va. Aug. 13, 2018) ............15

*League of Women Voters of N.C. v. North Carolina*,
    769 F.3d 224 (4th Cir. 2014) ..........................................................23

*Mich. Welfare Rights Org. v. Trump*,
    600 F. Supp. 3d 85 (D.D.C. 2022)..................................................14

*Murray v. Grocery Delivery E-Servs. USA Inc.*,
55 F.4th 340 (1st Cir. 2022)........................................................................21

*Nat'l Coal. on Black Civic Participation v. Wohl* (*Wohl I*),
498 F. Supp. 3d 457 (S.D.N.Y. 2020).............................................. *passim*

*Nat'l Coal. on Black Civic Participation v. Wohl* (*Wohl II*),
661 F. Supp. 3d 78 (S.D.N.Y. 2023).......................................14, 16, 17

*O'Brien v. N.H. Democratic Party*,
166 N.H. 138 (2014)..................................................................................22

*Reynolds v. Sims*,
377 U.S. 533 (1964)......................................................................................1

*Rhodes v. Siver*,
No. 19-12550, 2021 WL 912393 (E.D. Mich. Mar. 10, 2021)..............14

*Smith v. Meese*,
821 F.2d 1484 (11th Cir. 1987) ..............................................................19

*TikTok Inc. v. Trump*,
490 F. Supp. 3d 73 (D.D.C. 2020) ..........................................................26

*United States v. Nguyen*,
673 F.3d 1259 (9th Cir. 2012) .................................................................15

*Wesberry v. Sanders*,
376 U.S. 1 (1964).......................................................................................26

*Williams v. Rhodes*,
393 U.S. 23 (1968).....................................................................................25

*Williams v. Salerno*,
792 F.2d 323 (2d Cir. 1986).....................................................................23

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008).......................................................................................13

**Statutes**

47 U.S.C. § 227(b) ........................................................................................19

52 U.S.C. § 10307(b) ........................................................................14, 24, 25

RSA 664:14-a...........................................................................................22, 24, 26

RSA 664:14-a(II) ...........................................................................................22

RSA 664:14-a(IV)(b) ....................................................................................................22

RSA 664:14-b ..................................................................................................21, 24, 26

RSA 664:14-b(I) ...........................................................................................................21

RSA 664:14-b(II)(b) ...............................................................................................21, 22

**Other Authorities**

47 C.F.R. § 64.1200(a)(3)(ii) .....................................................................................20

47 C.F.R. § 64.1200(b) ...............................................................................................20

47 C.F.R. § 64.1200(d) ...............................................................................................20

155 Cong. Rec. S170-02 (2009) .................................................................................18

156 Cong. Rec. H2522 (2010) ....................................................................................18

*In re Advanced Methods to Target and Eliminate Unlawful Robocalls*,
    CG Docket No. 17-59 (Nov. 17, 2017)................................................................17, 18

Call Authentication Trust Anchor, WC Docket No. 17-97, Second Report and
    Order, 36 FCC Rcd 1859, 1862-3 (2020) ..............................................................6

House Committee on Election Law, Public Hearing on HB 332 (N.H. Feb. 4,
    2003) (Statement of Rep. Paul Spiess, Prime Sponsor of HB 332).......................23

*Implementing Section 13(d) of the Pallone-Thune Robocall Abuse Criminal
    Enforcement and Deterrence
    Act (TRACED Act)*, EB Docket No. 20-22, Report and Order, DA 23-719,
    2023 WL 5358422 (Aug. 18, 2023)........................................................................6

*In re Implications of Artificial Intelligence Technologies on Protecting
    Consumers from Unwanted Robocalls and Robotexts*,
    CG Docket No. 23-362, Declaratory Ruling, FCC 24-17, 2024 WL 519167
    (Feb. 8, 2024)........................................................................................................17

Letter from Tracy Nayer, Special Deputy Attorney General, Consumer Protection
    Division, N.C. Dep't of Justice, to Talal Khalid, CEO, Telcast Network LLC
    (Nov. 3, 2023) ........................................................................................................6

Report and Order and Further Notice of Proposed Rulemaking, 35 FCC Rcd 3241
    (2020)....................................................................................................................10

Voting Rights, Part 1: Hearings on S. 1564 Before the S. Comm. on the Judiciary,
    89th Cong. 16 (1965) ............................................................................................14

# INTRODUCTION

"[S]ince the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized." *Reynolds v. Sims*, 377 U.S. 533, 562 (1964). Defendants Steve Kramer, Voice Broadcasting Corporation ("Voice Broadcasting"), Life Corporation ("Life Corp"), and Lingo Telecom, LLC ("Lingo") (collectively, "Defendants") orchestrated an assault on New Hampshire citizens' right to vote by creating, authenticating, and disseminating unlawful, intimidating, threatening, and coercive robocalls in advance of the January 2024 New Hampshire Presidential Primary (the "New Hampshire Primary").

Two days before the New Hampshire Primary, Defendants delivered thousands of robocalls (the "NH Robocalls") to potential or likely Democratic voters urging them not to exercise their right to vote. Using AI technology and caller ID spoofing, Defendants misappropriated the identities of two authoritative figures on voting—President Joe Biden and the former Chair of the State Democratic Party, Kathleen Sullivan—in an effort to suppress or divert the patterns of New Hampshire voters. The NH Robocalls—delivered via a "deepfake"[1] voice of President Biden on a call spoofed to appear that it was made from Sullivan's household—suggested that participating in the New Hampshire Primary would jeopardize voters' ability to participate in the November 2024 General Election (the "General Election") and contribute to a victory for President Biden's presumptive opponent, former President Donald Trump. Defendants' delivery of unlawful, intimidating, threatening, and coercive robocalls to New Hampshire voters violates Section 11(b)

---

[1] "Deepfake" is defined as "an image or recording that has been convincingly altered and manipulated to misrepresent someone as doing or saying something that was not actually done or said." *Deepfake*, Merriam-Webster (last visited June 5, 2024), https://www.merriam-webster.com/dictionary/deepfake.

of the Voting Rights Act ("VRA"), the Telephone Consumer Protection Act ("TCPA"), and the New Hampshire Election Code.

Once a voter is dissuaded from voting in an election due to unlawful means, that right cannot be recovered. The Defendants' robocalls created serious consequences for New Hampshire voters and the state's presidential primary election, and can be easily and swiftly repeated before other upcoming U.S. local, state, and federal elections. Defendants have already demonstrated that they are willing and able to perpetrate or facilitate a mass voter suppression scheme less than 48 hours before an election, quickly and at minimal costs. Given the significant harm posed to voters prior to upcoming elections, Plaintiffs seek a preliminary injunction to enjoin Defendants from delivering similarly misrepresented, spoofed, or deepfaked robocalls to voters nationwide.

## STATEMENT OF FACTS

### I.     The NH Robocalls

On January 21, 2024, two days before the New Hampshire Primary, thousands of potential voters received robocalls that included the following prerecorded and deepfake message—all but the last sentence of which was spoken in a voice artificially created to sound like President Biden:

> This coming Tuesday is the New Hampshire Presidential Preference Primary. Republicans have been trying to push nonpartisan and Democratic voters to participate in their primary. What a bunch of malarkey. We know the value of voting Democratic when our votes count. It's important that you save your vote for the November election. We'll need your help in electing Democrats up and down the ticket. Voting this Tuesday only enables the Republicans in their quest to elect Donald Trump again. Your vote makes a difference in November, not this Tuesday. If you would like to be removed from future calls, please press two now. Call [spoofed telephone number] to be removed from future calls.

*See* Declaration of Joseph T. DiPiero ("DiPiero Decl."), Ex. A (Kramer NAL), ¶ 5.[2]

---

[2] Unless otherwise indicated, all exhibit references are to the DiPiero Decl.

The Caller ID information, which matched the spoofed number referenced in the NH Robocalls, indicated that the calls came from the personal cell phone number of Kathleen Sullivan, a former New Hampshire Democratic Party Chair, the name of her spouse (whose name is on her and her spouse's joint cell phone account), or both. *See* Declaration of Kathleen Sullivan ("Sullivan Decl."), ¶ 7. At the time, Sullivan was the treasurer of Granite for America, an independent Super PAC that was leading a public effort to ask Democrats to write in President Biden's name in the New Hampshire Primary. *Id.* ¶ 5. Sullivan received multiple phone calls from friends, family, and strangers who were confused or upset that they had received the NH Robocalls, apparently from Sullivan or her husband. *Id.* ¶¶ 9-13. At least one of the callers sought to opt out of future calls per the directions in the robocall. *Id.* ¶ 11.

Plaintiffs Fieseher, Marashio, and Gingrich (collectively, the "Individual Plaintiffs") each received a robocall and immediately recognized the voice on the call as President Biden's. *See* Declaration of James Fieseher ("Fieseher Decl."), ¶ 5; Declaration of Nancy Marashio ("Marashio Decl."), ¶ 6; Declaration of Patricia Gingrich ("Gingrich Decl."), ¶¶ 6-7. The Individual Plaintiffs realized the call was illegitimate only when the forged voice of the President told them to not vote and that participating in the New Hampshire Primary would be a waste of their vote. *See* Fieseher Decl. ¶¶ 5-6; Marashio Decl. ¶¶ 6-7; Gingrich Decl. ¶ 8. The Individual Plaintiffs are experienced voters and/or politically active in their communities and understood that President Biden would not attempt to suppress their vote; however, they feared that less-experienced voters would not have been able to discern its inauthenticity, and that it could have led to the suppression of these voters. *See* Fieseher Decl. ¶¶ 6, 8-9; Marashio Decl. ¶ 10-11; Gingrich Decl. ¶¶ 10-11.

## II.     The Orchestrators of the NH Robocalls

Steve Kramer is a longtime political consultant who claims to have worked on campaigns in 38 different states. *See* Ex. B (Kramer Dep. Excerpts), at 26. Kramer is the founder of Get Out

3

the Vote—a political consulting firm that provides a variety of services to political campaigns, including automated calls, "blast" texting, live calls, and door-to-door campaigns. *Id.* at 14, 26. He claims to operate one of the "largest automated call vendors in the country," and has the ability to transmit "15.4 million calls in a day." *Id.* at 24. He also claims to operate three call centers in the United States, including one in Arlington, Texas, where Defendants Voice Broadcasting and Life Corp are located. *Id.* at 25. Kramer reportedly has between 18 and 50 employees working for him at any one time. *Id.* at 50.

Kramer has been accused of malfeasance, misconduct, and fraud in connection with his political consulting work. In April 2019, Kramer was the subject of a complaint filed with the New York City Campaign Finance Board, alleging Kramer and his associates perpetrated a "massive fraud" on a local campaign. *See* Ex. C (Politico Article). A subsequent media investigation of the allegations concluded that Kramer and his associates concealed the identities of the recipients of campaign funds, altered invoices to inflate the costs of services provided, falsified canvassing records to misrepresent the extent of the services provided, and failed to properly disclose the nature of certain services provided to the campaign, including the organization of robocalls. *Id.* Two years later, in April 2021, Kramer was sued and accused of malfeasance by a former client who paid Kramer $80,000 to gather signatures to secure her appearance on the New York mayoral ballot. *See* Ex. D (NY Complaint). Per the court's findings, nearly 90% of the signatures that Kramer submitted were later ruled invalid, and Kramer was able to produce timecards for only a fraction of the petitioners and person-hours worked that he promised under the contract. *See* Ex. E (NY Decision & Order).

Since 2010, Kramer has partnered with Voice Broadcasting to deliver millions of election-related calls to voters. *See* ECF No. 59-2, Declaration of Jeff Fournier ("Fournier Decl."), ¶ 15.

Voice Broadcasting is a Texas-based company that leases equipment and software to clients who wish to conduct election-related and other calling campaigns. *Id.* ¶ 8. Voice Broadcasting has provided Kramer automated dialing equipment, bandwidth, and technical support for the purpose of initiating phone calls. *Id.* ¶ 10. Voice Broadcasting does not employ a legal team, and purports to rely on its clients to ensure that the millions of election-related calls that Voice Broadcasting delivers comply with applicable state and federal law. *Id.* ¶¶ 14, 21-26. Voice Broadcasting does not have protocols to detect, or prevent the company from delivering, robocalls that unlawfully use AI-generated or deepfake technology. *Id.*

Voice Broadcasting purchases communications services from its affiliate Life Corp to enable calling capabilites on the Voice Broadcasting platform. *Id.* at 8. Life Corp has previously been cited by the Federal Communications Commission ("FCC") for failing to comply with federal laws and regulations governing the dissemination of robocalls, including delivering unsolicited calls to residential phone lines, and failing to disclose required information in its prerecorded messages and telephone solicitations. *See* Ex. F (FCC Citation).

Voice Broadcasting and Life Corp "share common ownership and control," *see* Ex. A at ¶ 7, being part of a constellation of companies owned, controlled, or operated by Walter Monk, *see* Ex. G (CyberScoop Article). Monk's companies provide robocalling, political advertising, polling, fundraising and text messaging services. *Id.* In November 2021, Monk claimed that his firm sent "millions of text messages and phone calls for both the Trump and Biden campaigns," and that it had sent messages and phone calls on "thousands of smaller races throughout the U.S." *See* Ex. H (Fort Worth Inc. Article). In that interview, Monk stated that his firm generated $14.6 million

in sales in 2020, and that it had updated its facility in Arlington, Texas to have more than 500 servers running in that location. *Id.*

Life Corp has used Lingo, or its predecessor Matrix Telecom, LLC, to originate call traffic since at least July 2, 2021. *See* Ex. I (Lingo NAL), ¶ 15. Lingo is a voice service provider, registered with the FCC to provide telecommunications services in all 50 states.[3] As a voice service provider, Lingo is required to fully implement a STIR/SHAKEN authentication framework,[4] and to use know-your-client ("KYC") protocols, to verify that the party transmitting a call has the authority to use the Caller ID information they designate. *Id.* ¶¶ 1-2.

Lingo has been the subject of investigations, cease-desist-orders, and a civil penalty for facilitating and profiting from unlawful robocall call activity.

- In August 2022, the Anti-Robocall Multistate Litigation Task Force (the "Multistate Task Force")[5] issued a Civil Investigative Demand ("CID") to Lingo to identify, investigate, and mitigate unlawful robocall traffic transmitting from its network. *See* Ex. J (Multistate Task Force Letter). The CID was sent after Lingo received 517 traceback notices from USTelecom's Industry Traceback Group ("ITG"),[6] which cited "recurrent high-volume illegal and/or suspicious robocalling campaigns concerning SSA government imposters, financial impersonations, utilities disconnects, suspicious Amazon charges, student loans, and others," with Lingo "serving in various roles in the call path." *Id.* at 2.

- In August 2022, the Federal Trade Commission ("FTC") issued Matrix Telecom, LLC (Lingo's prior corporate name) a Cease-and-Desist Demand directing Matrix to cease and desist from routing and transmitting illegal robocall traffic. *See* Ex. K

---

[3] *See* Lingo Telecom, LLC, FCC Form 499A, 802572 (Apr. 1, 2024), https://apps.fcc.gov/cgb/form499/499detail.cfm?FilerNum=802572.

[4] The STIR/SHAKEN framework is a set of technical standards and protocols that enable providers to authenticate and verify caller ID information. *See* Call Authentication Trust Anchor, WC Docket No. 17-97, Second Report and Order, 36 FCC Rcd 1859, 1862-3, para. 7 (2020) (Second Call Authentication Order).

[5] The Anti-Robocall Multistate Litigation Task Force is a 51-member collective of State Attorneys General, which is focused on actively investigating and pursuing enforcement actions against various entities in the robocall ecosystem that are identified as being responsible for significant volumes of illegal and fraudulent robocall traffic routed into and across the country. *See* Letter from Tracy Nayer, Special Deputy Attorney General, Consumer Protection Division, N.C. Dep't of Justice, to Talal Khalid, CEO, Telcast Network LLC, at 1 n.1 (Nov. 3, 2023), https://ncdoj.gov/wp-content/uploads/2023/11/State-AG-Task-Force-NOTICE-Letter-to-TELCAST.pdf.

[6] The ITG is the registered industry consortium selected pursuant to the TRACED Act to conduct tracebacks. *See Implementing Section 13(d) of the Pallone-Thune Robocall Abuse Criminal Enforcement and Deterrence Act (TRACED Act),* EB Docket No. 20-22, Report and Order, DA 23-719, 2023 WL 5358422, at *1, ¶ 1 (Aug. 18, 2023).

(FTC Letter). The demand was prompted by an ITG investigation, which determined that Matrix was "apparently routing and transmitting illegal robocall traffic knowingly." *Id.* at 2. Specifically, Matrix was involved, directly or indirectly, in routing or transmitting illegal robocall traffic calls for numerous imposter campaigns, including callers impersonating Customs and Border Protection and law enforcement. *Id.* at 1.

- In February 2023, Lingo agreed to pay a $20,000 civil penalty to the Social Security Administration's Office of the Inspector General ("SSA OIG") following an investigation into violations of Section 1140 of the Social Security Act. *See* Ex. L (Summary of SSA OIG Enforcement Actions), at 60. Section 1140 prohibits people, companies, and other organizations from misleading consumers by giving a false impression of association with, or authorization or endorsement by, the SSA, through any type of communication, such as telephone solicitations. *Id.* at 57. The SSA OIG was investigating companies "who profit[] by accepting scam calls into the U.S. telecommunications system and passing them on to unsuspecting consumers." *Id.*

- In November 2023, the Multistate Task Force demanded that Lingo take steps to protect its network after observing that Lingo continued to transmit suspected illegal traffic. *See* Ex. J. The demand cited another 173 traceback notices, the majority of which were received after the Multistate Task Force issued its August 2022 CID. *Id.* at 2. The notice also identified 439 suspicious calls transmitted by Lingo, approximately 34% of which were marked with an A-Level STIR/SHAKEN attestation, which "indicat[ed] that Lingo both knows the identities of the calling parties that originated these suspicious calls and knows that those callers have legitimately acquired volumes of numbering resources that are being used to make these calls." *Id.* at 3. The Multistate Task Force expressed concern that Lingo's upstream call sources were "failing to affix an A- or B-attested signature of their own," and that Lingo's "acceptance of these calls despite that failure is evidence of Lingo's culpability." *Id.* at 3.

## III. The Creation of the Deepfake Audio of President Biden

Steve Kramer commissioned Paul Carpenter, a transient individual with experience in AI technology, to create the deepfake audio recording of President Biden that was delivered to thousands of New Hampshire voters by Defendants. *See* Declaration of Paul Carpenter ("Carpenter Decl."), ¶¶ 1, 9-11. Kramer's interest in AI technology was sparked after Carpenter, at a party, showed Kramer a deepfake recording of Senator Lindsey Graham. *Id.* ¶ 4.

In September 2023, Kramer sent Carpenter a script for an AI-generated recording of Senator Graham. *Id.* ¶ 5. Kramer suggested that he would be using the audio sample of Senator

Graham in connection with "recruiting business." Carpenter Decl., Ex. B (Kramer and Carpenter Texts). Kramer paid Carpenter $100 for the recording, *id.* ¶¶ 5-6, which Kramer later tested on 300 South Carolina likely Republican voters, *see* DiPiero Decl., Ex. M (NBC News Article). Kramer later bragged that the deepfake robocalls achieved a response rate four times higher than robocalls using a generic automated voice. *Id.*

Kramer subsequently approached Carpenter about creating a deepfake robocall of President Biden. *See* Ex. A at ¶ 9. On January 20, 2024, Kramer provided Carpenter a script for the deepfake recording. *Id.* The script, which Kramer claims to have written himself, did not include the final sentence including the opt out phone number of Sullivan, but the text of the call that was delivered to New Hampshire voters was otherwise the same. *Id.* Kramer has stated he deliberately included the word "malarkey" in the call, which in Kramer's words is President Biden's "signature catchphrase" and "gets people's attention." *Id.*

Carpenter used publicly available software developed by ElevenLabs to generate the AI-generated recording of President Biden's voice. *See* Carpenter Decl. ¶ 9. The recording cost Carpenter only $1. *Id.* On January 20, 2024, Steve Kramer's father Bruce Kramer sent Carpenter $150 via his Venmo account. *Id.* ¶ 11.

## IV. The Transmission and Authentication of the NH Robocalls

On January 19, 2024, Kramer solicited Voice Broadcasting to procure "a Sunday night robo[call], probably 25k [calls] range." *See* Ex. A at ¶ 11. On January 20, 2024, Kramer emailed Voice Broadcasting a file titled "New Hampshire DEM FEB 2020 Presidential voters," specifying that the folder contained a list of names and numbers for the "robo-call tomorrow." *Id.* Kramer's instructions to Voice Broadcasting were as follows: "Call[s] should go out at 6:15 p.m. EST Sunday. Run to answer machines and live pickup . . . we should be able to finish by 8:45 p.m."

*Id.* About a half-hour later, Kramer sent another email to Voice Broadcasting with the AI-generated audio of President Biden created by Carpenter. *Id.*

On January 21, 2024, Kramer instructed Voice Broadcasting to use a personal cell phone number belonging to Kathy Sullivan as the phone number that would appear on the Caller ID display. *Id.* Kramer selected the phone number in part because New Hampshire voters would be more likely to pick up a call from a number with the same area code. *Id.* ¶ 21. Kramer also wanted to use the phone number of someone associated with the Biden write-in campaign. *Id.* Kramer located Sullivan's phone number by searching FEC filings for Granite for America. *Id.*

On January 21, 2024, Voice Broadcasting sought Kramer's permission to add a sentence to the end of the deepfake recording of President Biden that instructed potential voters to call the cell phone number associated with Kathy Sullivan to opt out of future calls. *Id.* ¶ 11. After Kramer agreed, Voice Broadcasting modified the audio file and sent the recording, including the opt-out language, back to Kramer. *Id.* ¶¶ 5 n.10, 11. Shortly thereafter, Voice Broadcasting, using service and equipment provided by Life Corp, initiated thousands of robocalls, including Sullivan's spoofed Caller ID information, to New Hampshire voters. *Id.* ¶ 7. Neither Voice Broadcasting nor Life Corp had authorization to use Sullivan's cell phone number on the Caller ID display. *Id.* ¶ 6.

On January 21, 2024, Life Corp routed a portion of the calls to its contractual partner, Lingo. *See* Ex. I at ¶¶ 3, 15. Lingo served as the originating provider—i.e., the first provider in the call path—for 13,235 calls from Life Corp. *Id.* ¶¶ 7, 14 n.59. Lingo has admitted that it marked all 13,235 calls with an "A" level attestation, the highest level of attestation permitted under the STIR/SHAKEN rules. *Id.* An "A" attestation or "Full Attestation" means that the signing provider: (1) "is responsible for the origination of the call onto the IP-based service provider voice network;" (2) "has a direct authenticated relationship with the customer and can identify the

customer;" and (3) "has established a verified association with the telephone number used for the call." *Id.* ¶ 6 (citing 20-67, Report and Order and Further Notice of Proposed Rulemaking, 35 FCC Rcd 3241 (2020)). By providing full attestation, Lingo falsely authenticated that Life Corp had the legal authorization to use Kathy Sullivan's personal cell phone number. *Id.* ¶ 2. Lingo did not take any steps to verify Life Corp's right to use Ms. Sullivan's number before providing the A-level attestation. *Id.* ¶¶ 16, 22-23.

## V. The Revelation of the NH Robocalls

On January 22, 2024, following significant media coverage of the NH Robocalls, Kramer sent Carpenter a link to a related article and a text message reading, "Shhhhhhhh." *See* Carpenter Decl. ¶ 14, Ex. D (Kramer and Carpenter Texts). Kramer later directed Carpenter to delete his communications related to the creation of the NH Robocalls. *Id.* Kramer also assured Carpenter that the calls could not be traced back to Kramer because he had "spoofed" the call. *Id.* ¶ 16. Kramer remained silent about his involvement in the NH Robocalls for weeks, only coming forward after Carpenter publicly revealed their involvement. *See* Ex. M.

On February 25, 2024, Kramer issued a press release through a public relations consultant, admitting his involvement. *See* Carpenter Decl., Ex. F (Kramer Press Release). The statement read in relevant part:

> The evening of Sunday, January 20th, 2 days before the New Hampshire primary, I sent out an automated call to 5,000 most likely to vote Democrats. Using easy to use online technology, an automated version of President Joe Biden voice was created. [. . .]
>
> With a mere $500 investment, anyone could replicate my intentional call. A voter list can be purchased quickly and easily through any political vendor. New Hampshire lists are slightly tougher, as each county runs its own show. [. . .]
>
> Campaigns have contacted me since the November election to gauge my interest/ability in creating similar use of A.I. in campaigns against each other. PACs, SuperPACs, corporations were all poised to unleash this technology to the

American electorate. Even individuals acting alone can quickly and easily use A.I. for misleading and disruptive purposes. Self-policing won't work.

*Id.* Kramer has since claimed he planned the robocalls from the start as an act of civil disobedience to call attention to the dangers of AI in politics, comparing himself to American Revolutionary heroes Paul Revere and Thomas Paine. *See* Ex. M.

On May 23, 2024, the New Hampshire Department of Justice announced that Kramer had been indicted on 13 charges of felony voter suppression and 13 charges of misdemeanor impersonation of a candidate. *See* Ex. N (NH DOJ Press Release). Kramer was charged in four counties based on the residence of 13 individuals who received the robocalls. *Id.*

On May 23, 2024, the FCC voted to adopt a Notice of Apparent Liability against Steve Kramer. *See generally* Ex. A. The FCC proposed a $6,000,000 fine for Kramer for "knowingly caus[ing] thousands of illegal prerecorded voice robocalls to be transmitted using misleading and inaccurate caller ID information with the intent to defraud and cause harm in apparent violation of the Truth in Caller ID Act." *Id.* ¶¶ 1-2.

On May 23, 2024, the FCC also voted to adopt a Notice of Apparent Liability against Lingo. *See generally* Ex. I. The FCC proposed a $2,000,000 fine for Lingo for failing to utilize reasonable KYC protocols and applying incorrect STIR/SHAKEN attestations to the spoofed NH Robocalls. *Id.* ¶ 1. In the course of its investigation, the FCC found that Lingo "willfully and repeatedly" violated FCC rules, which require voice service providers to fully implement STIR/SHAKEN authentication framework. *Id.* ¶ 16. The FCC also found that Lingo's KYC practices were "glaringly deficient." *Id.* ¶ 23. In reaching these conclusions, the FCC stated that Lingo "abdicated its verification responsibility by punting the duty to its customer with absolutely no credible basis to believe its customer was taking any steps to make the necessary verification." *Id.* ¶ 21. The FCC also found that Lingo did not have "any practices" to verify, or periodically

assess, the reliability of attestations provided by customers.  *Id.*  The FCC further stated that Lingo provided "conflicting information" to investigators as to why it provided the highest level of authentication to the NH Robocalls.  *Id.* ¶ 15.

## VI.  The League of Women Voters' Mitigation Efforts

The League of Women Voters of the United States ("LWV-US") and the League of Women Voters of New Hampshire ("LWV-NH"), collectively (the "League"), share a mission to encourage informed and active participation in the government, increase understanding of major public policy issues, and influence public policy through education and advocacy.  *See* Declaration of Elizabeth Tentarelli ("Tentarelli Decl."), ¶¶ 2-3; Declaration of Celina Stewart ("Stewart Decl."), ¶¶ 2-3.  A critical component of their shared nonpartisan mission is to encourage citizens to register to vote, participate in elections, and engage with the civic process.  *See* Tentarelli Decl. ¶¶ 2-3, 5; Stewart Decl. ¶¶ 2-3, 5.  Consistent with this nonpartisan mission, LWV-NH serves all individuals who vote or wish to vote in New Hampshire, regardless of political party affiliation.  Tentarelli Decl. ¶ 3; Stewart Decl. ¶ 3.

In response to the NH Robocalls, the League has had to dedicate time, money, and resources to address the harm caused by Defendants' actions, and to prepare to defend New Hampshire voters against similar calls in the future.  As a direct response to the NH Robocalls, LWV-US has implemented changes to its VOTE411.org website, which provides election-related information to voters.  *See* Stewart Decl. ¶ 12.  LWV-US created a new alert VOTE411 alert to inform voters of deceptive, threatening, or intimidating robocalls.  *Id.*  LWV-US diverted staff resources to create the new alert, and will dedicate staff time to updating the website and translating alerts into Spanish to alert voters about similar harmful robocall campaigns.  *Id*.

LWV-US has also made changes to its internal threat matrix, which it uses to track and respond to various election threat scenarios in coordination with local state leagues.  *See* Stewart

Decl. ¶ 9. Before the New Hampshire Primary, LWV-US rated disruptive robocalls relatively low on the threat scale and allocated resources accordingly. *Id.* In response to the NH Robocalls, LWV-US raised its assessment of the threat level of inauthentic robocalls to its second-highest ranking. *Id.* ¶ 10. LWV-US has expended, and continues to expend, resources providing additional guidance and training to staff to track inauthentic or deepfake robocalls. *Id.*

LWV-NH is planning additional efforts to address the NH Robocalls. *See* Tentarelli Decl. ¶¶ 11-13. This includes changing LWV-NH's standard printed information about voter registration to include warnings about inauthentic robocalls. *Id.* ¶ 13. To incorporate this new cautionary language, LWV-NH anticipates that it will have to incur several hundred dollars in additional printing costs that it would not have otherwise incurred. *Id.* ¶ 13. LWV-NH also expects to dedicate more volunteer hours to rapidly respond to robocall voter suppression schemes, which will severely tax LWV-NH's limited volunteer-time resources. *Id.* ¶ 12.

## LEGAL STANDARD

Plaintiffs seeking a preliminary injunction "must establish that [they are] likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). In the First Circuit, "the four factors are not entitled to equal weight in the decisional calculus; rather, likelihood of success is the main bearing wall of the four-factor framework." *Corp. Techs., Inc. v. Harnett*, 731 F.3d 6, 9-10 (1st Cir. 2013) (internal citations and quotations omitted).

<u>**ARGUMENT**</u>

I. **PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS**

    A. **Plaintiffs Are Likely to Show That Defendants Violated Section 11(b) of the VRA**

Plaintiffs are likely to show that Defendants' robocall campaign violates Section 11(b) of the VRA. Section 11(b) of the VRA provides in relevant part: "No person, whether acting under color of law or otherwise, shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote[.]" 52 U.S.C. § 10307(b).[7] To succeed on a claim under Section 11(b), "a plaintiff must show that the defendant has intimidated, threatened, or coerced someone for voting or attempting to vote, or has attempted such intimidation, threat, or coercion." *Nat'l Coal. on Black Civic Participation v. Wohl* (*Wohl I*), 498 F. Supp. 3d 457, 477 (S.D.N.Y. 2020).[8] *Wohl I* described the meanings of these terms:

> The words "intimidate," "threaten," and "coerce," have familiar and somewhat overlapping definitions. To "intimidate" means to "make timid or fearful," or to "inspire or affect with fear," especially "to compel to action or inaction (as by threats)." To "threaten" means to "utter threats against" or "promise punishment, reprisal, or other distress." And to "coerce" means to "restrain, control, or dominate, nullifying individual will or desire (as by force, power, violence, or intimidation)."

*Id.* (citations omitted).

---

[7] Section 11(b) of the VRA "undoubtedly applies to private conduct, and private individuals are subject to its prohibitions." *Nat'l Coal. on Black Civic Participation v. Wohl*, 498 F. Supp. 3d 457, 476 (S.D.N.Y. 2020); *see also Rhodes v. Siver*, No. 19-12550, 2021 WL 912393 (E.D. Mich. Mar. 10, 2021); *Mich. Welfare Rights Org. v. Trump*, 600 F. Supp. 3d 85, 104 (D.D.C. 2022) ("The Court concludes that precedent and direction from the Court of Appeals for the District of Columbia Circuit and the Supreme Court support a finding of a private right of action."); *Ariz. Democratic Party v. Ariz. Republican Party*, No. 16 Civ. 03752, 2016 WL 8669978, at *11 (D. Ariz. Nov. 4, 2016).

[8] Section 11(b) does not contain an intent requirement. *Nat'l Coal. on Black Civic Participation v. Wohl* (*Wohl II*), 661 F. Supp. 3d 78, 116 (S.D.N.Y. 2023). In fact, Congress deliberately omitted any intent requirement and prohibited voter intimidation regardless of an actor's motives. *See* Voting Rights, Part 1: Hearings on S. 1564 Before the S. Comm. on the Judiciary, 89th Cong. 16 (1965) (Attorney General Nicholas Katzenbach, a drafter of § 11(b), testifying before the Senate Judiciary Committee that, "Under [the VRA] no subjective 'purpose' need be shown . . . in order to prove intimidation under the proposed bill. Rather, defendants would be deemed to intend the natural consequences of their acts.").

Courts have made clear that the Voting Rights Act in general, and Section 11(b) in particular, should be read expansively. Its application is not limited to any particular act. *E.g., Allen v. State Bd. of Elections*, 393 U.S. 544, 565-67 (1969) (noting that Congress intended "to give the [Voting Rights] Act the broadest possible scope"), *abrogated on other grounds by Ziglar v. Abbasi*, 582 U.S. 120 (2017); *Wohl I*, 498 F. Supp. 3d at 476 ("Section 11(b)'s reach is extensive, in accordance with the VRA's ambitious aims of encouraging true enforcement of the Fifteenth Amendment's promise of unencumbered access to the vote . . ."); *Jackson v. Riddell*, 476 F. Supp. 849, 859 (N.D. Miss. 1979) (explaining that even where a court finds "no case precisely on point," Section 11(b) should "be given an expansive meaning"). Indeed, courts have regularly found that any actual or attempted action to instill fear in connection with one's exercise of his or her right to vote violates the VRA. *See, e.g., Wohl I*, 498 F. Supp. 3d at 482 (robocalls stating that personal information would be disclosed to creditors, the CDC, and law enforcement violated VRA); *League of United Latin Am. Citizens - Richmond Region Council 4614 v. Pub. Interest Legal Found.*, No. 18 Civ. 423, 2018 WL 3848404, at *4 (E.D. Va. Aug. 13, 2018) (reports published by defendants that falsely accused Virginia voters of committing felony voting fraud by registering to vote and/or voting violated VRA); Decision and Order at 2, *Daschle v. Thune*, No. 4:04-cv-4177 (D.S.D. Nov. 2, 2004) (following Native Americans at polling sites, writing down their license plate numbers, and engaging in loud conversations about Native Americans being prosecuted for voting illegally intimidated prospective Native American voters and merited temporary restraining order); *United States v. Nguyen*, 673 F.3d 1259, 1265 (9th Cir. 2012) (letters mailed to voters warning that if they voted in the upcoming election, their personal information would be collected by the government and shared with organizations who were "against immigration" violated California statute analogous to VRA).

Here, the voter intimidation threat was the loss of the right to vote in the General Election. Courts have recognized that voter intimidation encompasses not only "forcefully coercive" conduct, but also subtler forms of intimidation such as "manipulation and suggestion." *Nguyen*, 673 F.3d at 1265; *see also Wohl I*, 498 F. Supp. 3d at 481 ("[U]nlawful voter intimidation also includes subtler forms of intimidation that do not threaten bodily harm."); *Daschle*, No. 4:04-cv-4177, at 1 (following Native American voters to their cars and writing down their license plates intimidated prospective Native American voters and created risk of irreparable harm by "improperly dissuad[ing] [them] from voting"). And in the specific context of voting rights and robocalls, at least one court has concluded that "messages that a reasonable recipient, familiar with the context of the communication, would view as a threat of injury to deter individuals from exercising their right to vote" violate the VRA. *Wohl II*, 661 F. Supp. 3d at 113. The threat of injury need not be violent or physical, and may include communications inspiring fear of other types of harm, such as legal consequences or economic harm. *Id.*

The *Wohl* case is particularly instructive. In *Wohl*, thousands of voters in the United States received robocalls falsely claiming that voting by mail would result in voters' personal information becoming part of a public database available to police departments and credit card companies to execute old warrants and collect outstanding debt. *Wohl I*, 498 F. Supp. 3d at 465. The robocall came from a woman who identified herself as "Tamika Taylor"—a name that has been used incorrectly by media outlets to refer to the mother of Breonna Taylor, Tamika Palmer, a well-known civil rights activist—and stated it was from "Project 1599, the civil rights organization founded by Jack Burkman and Jacob Wohl." *Id.* The *Wohl* court concluded that the robocalls violated Section 11(b) of the VRA, explaining that the use of this name in the script of the call, in addition to framing Project 1599 as a civil rights organization, "dressed the call with a veil of

legitimacy to mislead its listeners into believing the statements made in the call were true." *Wohl II*, 661 F. Supp. 3d at 123.   The *Wohl* court also emphasized, in a previous ruling granting the plaintiffs a temporary restraining order, that the defendants had specifically targeted areas with large populations of Black voters, with whom the defendants' false statements were intended to resonate most.   *Wohl I*, 498 F. Supp. 3d at 466.

Similarly, here, Defendants delivered thousands of robocalls telling voters to "save [their] vote for the November election" instead of voting in the New Hampshire Primary, warning them that "[v]oting this Tuesday only enables the Republicans in their quest to elect" the opposing party candidate.   *See* Ex. A at ¶ 5.   This language falsely told voters that exercising their right to vote in the New Hampshire Primary would carry serious adverse consequences: they would be unable to vote in the General Election.   *Id.* ¶ 26.

As in *Wohl*, Defendants in this case shrouded the NH Robocalls in a "veil of legitimacy" designed to "mislead its listeners into believing the statements made in the call were true." *Wohl II*, 661 F. Supp. 3d at 123.   This was accomplished in part by using voice-cloned audio of President Biden to convey the message.   As the FCC has stated, voice-cloning technology can "uniquely harm consumers" because of its capacity to "convince a called party that a trusted person . . . wants or needs them to take some action that they would not otherwise take."   *In re Implications of Artificial Intelligence Technologies on Protecting Consumers from Unwanted Robocalls and Robotexts,* CG Docket No. 23-362, Declaratory Ruling, FCC 24-17, 2024 WL 519167, at *2 (Feb. 8, 2024).   That is precisely why President Biden's voice was chosen, as there were "potentially thousands" of New Hampshire voters who "would care what the president of the United States has to say."   *See* Ex. A at ¶ 29.

The veil of legitimacy was further bolstered by the unlawful misappropriation of Kathy Sullivan's personal phone number, both through its inclusion as an opt-out number for voters, and its appearance on voters' Caller ID information. As the FCC has previously acknowledged, the legitimacy conferred by Caller ID spoofing is "often the key to making robocall scams work." *In re Advanced Methods to Target and Eliminate Unlawful Robocalls*, CG Docket No. 17-59, ¶ 3 (Nov. 17, 2017). That is because call recipients presume Caller ID is "ironclad," 156 Cong. Rec. H2522, H2524 (2010) (remarks of Rep. Engel), and rely on that information to decide "whether to answer a phone call and trust the person on the other end of the line," 155 Cong. Rec. S170-02, S173 (2009) (remarks of Sen. Nelson). That is precisely why Kathy Sullivan's phone number was spoofed, as "New Hampshire Primary Election voters would pay attention to a call from [a] well-known figure" like Kathy Sullivan. *See* Ex. A at ¶ 29.

As in *Wohl*, the intimidating, threatening, and coercive impact of the NH Robocalls was further amplified by targeting individuals uniquely susceptible to their message. Specifically, the Defendants delivered the calls to Democratic-leaning voters, *see* Ex. A at ¶ 11, a population with whom the core message of the NH Robocalls—*i.e.,* that voting in the New Hampshire Primary would cause them to lose their ability to vote against President Donald Trump in the General Election—would resonate most. *See* Carpenter Decl., Ex. F; *Wohl I*, 498 F. Supp. 3d at 466. Defendants' robocalls were thus "messages that a reasonable recipient familiar with the context of the message would interpret as a threat of injury tending to deter [them] from exercising their voting rights." *Wohl I*, 498 F. Supp. 3d at 477.

Critical here, all four Defendants played a key role in amplifying the threatening, intimidating, and coercive impact of the NH Robocalls. Kramer created the deepfake audio recording of President Biden and identified the targets of the message. Voice Broadcasting revised

the audio to include Kathy Sullivan's personal cell phone number and provided Kramer the tools to spoof the Caller ID information. Life Corp misappropriated Sullivan's personal cell phone number and transmitted it to Lingo. And Lingo falsely authenticated Life Corp's misappropriation of Sullivan's personal cell phone number, increasing the likelihood that the NH Robocalls would reach their intended target.

The Defendants' collective actions "not only harmed potential voters but also interfered with the Primary Election and potentially could have interfered with the November 2024 General Election." *See* Ex. A at ¶ 27. The loss of a vote is a significant and severe injury. *See Smith v. Meese*, 821 F.2d 1484, 1494 (11th Cir. 1987) ("If individuals fail to vote because of intimidation . . . whether or not specifically targeted at the individuals, the individuals have been injured, especially in light of the importance of the vote in our political system."). The threat of the loss of the vote violates the VRA. *Wohl I*, 498 F. Supp. 3d at 476; *see also Daschle*, No. 4:04-cv-4177, at 1-2 ("[T]here clearly is the threat of irreparable harm to the Movant in that if Native Americans are improperly dissuaded from voting . . . even if identified, they can't vote later.").

### B. Plaintiffs Are Likely to Show That Defendants Violated the TCPA

The TCPA prohibits any person or entity from initiating any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party, unless the call is initiated for emergency purposes, or some other exemption applies. 47 U.S.C. § 227(b)(1)(B). Here, Defendants orchestrated a scheme to send artificial and prerecorded-voice telephone calls to the Individual Plaintiffs, who did not consent to receiving calls, and Defendants did not initiate the artificial or prerecorded-voice telephone calls for "emergency purposes." *See id*. No statutory exemption applies. *See, e.g., id*. §§ (b)(2)(B)(i) (exempting certain calls not made for a commercial purpose); (b)(2)(B)(ii) (exempting certain commercial calls).

For example, the exemption for calls not made for a commercial purpose plainly does not apply. The TCPA authorizes the FCC, subject to such conditions as the Commission may prescribe, to exempt calls that that are not made for a commercial purpose. *See id.* § (b)(2)(B)(i). Acting pursuant to that authority, the FCC exempted certain artificial or prerecorded-voice telephone calls to residential telephone lines if: (a) the call is not made for a commercial purpose; (b) the caller makes no more than three calls within any consecutive 30-day period to the residential line; and (c) the caller honors the called party's request to opt out of future calls as required by 47 C.F.R. § 64.1200(b) and (d). *See* 47 C.F.R. § 64.1200(a)(3)(ii).

Defendants did not follow the requirements prescribed by the FCC. Specifically, 47 C.F.R. § 64.1200(b) requires that "[a]ll artificial or prerecorded voice telephone messages shall: (1) [a]t the beginning of the message, state clearly the identity of the business, individual, or other entity that is responsible for initiating the call." *Id.* § (b)(1). Defendants' robocall did not identify any individual or entity responsible for the call at any point in the message, let alone at the beginning. Additionally, during or after the message, a telephone number of the entity or individual responsible for the message must be provided. *Id.* § (b)(2). The NH Robocalls did not do so. Instead, the robocalls provided the cell phone number of a person who was unaffiliated with the calls, who was neither asked nor gave permission for her number to be used, and who had no knowledge prior to the calls being made that her number (or her spouse's name) was being associated with the calls. *See* Sullivan Decl. ¶¶ 7, 12, 19.

Furthermore, no robocalls falling under an exemption may be placed unless the individual or entity responsible for the call has instituted procedures for maintaining a list of persons who request not to receive such calls made by or on behalf of that person or entity. 47 C.F.R. § 64.1200(d). The TCPA includes minimum procedural standards such as maintaining a do-not

call list; having a written policy, available upon demand, for maintaining a do-not-call list; and mandating that personnel engaged in making prerecorded-voice telephone calls be informed and trained in the existence and use of a do-not-call list. *Id.* Defendants could not have instituted a do-not-call list affiliated with the NH Robocalls because upset callers—based on misinformation provided by Defendants—directed their opt-out requests to Sullivan who had no prior knowledge of the calls nor any power to opt anyone out of receiving those calls in the future. *See* Sullivan Decl. ¶¶ 11, 19.

As the NH Robocalls are not exempt from the TCPA, Defendants' actions violated the TCPA. *See, e.g.*, *Jones v. Montachusetts Reg'l Transit Auth.*, No. 22-1569, 2023 WL 9233970, at *3 (1st Cir. Nov. 30, 2023) (finding that the defendant company violated the TCPA after initiating calls to the plaintiff's phone using an artificial prerecorded voice without the plaintiff's prior express consent); *Murray v. Grocery Delivery E-Servs. USA Inc.*, 55 F.4th 340, 343 (1st Cir. 2022) (litigating a class action lawsuit under the TCPA after consumers received automated calls on their cell phones and landlines from the defendant company).

**C.      Plaintiffs' State Law Claims Are Likely to Succeed on the Merits**

**1.    Plaintiffs are likely to show that Defendants violated RSA 664:14-b**

New Hampshire law prohibits any person from "knowingly misrepresent[ing] the origin of a telephone call which expressly or implicitly advocates the success or defeat of any party, measure, or person at any election, or contains any information about any candidate or party." RSA 664:14-b(I). "Such knowing misrepresentation shall include, *but shall not be limited to*," spoofing the person originating the call. *Id.* (emphasis added). Injunctive relief is available to private plaintiffs under this statute. RSA 664:14-b(II)(b).

As a threshold matter, the NH Robocalls implicitly advocated for the defeat of a political party in the upcoming election. *See* Ex. A at ¶ 5. In so doing, Defendants "knowingly

misrepresent[ed] the origin of a phone call" in multiple ways: spoofing, listing Kathy Sullivan's personal cell phone number as the opt-out number, and conveying the message using a deepfake audio recording of President Biden without his or his campaign's consent. All four Defendants played a critical role in misrepresenting the origin of the NH Robocalls. Kramer created the deepfake audio recording of President Biden. Voice Broadcasting provided Kramer the tools to spoof the Caller ID information and revised the audio to include Sullivan's phone number. Life Corp misappropriated Sullivan's phone number and transmitted it to Lingo. And Lingo falsely authenticated Life Corp's misappropriation of Sullivan's personal cell phone number.

### 2. Plaintiffs are likely to show that Defendants violated RSA 664:14-a

New Hampshire law requires all prerecorded political messages to contain, or by live operator provide within the first 30 seconds of the message: (i) the name of the candidate or of any organization or organizations on whose behalf the person is calling; and (ii) the name of the person or organizations paying for the delivery of the message and the name of the fiscal agent, if applicable. RSA 664:14-a(II). Injunctive relief is available to private plaintiffs under this statute. RSA 664:14-a(IV)(b). Defendants violated RSA 664:14-a because the robocall message did not disclose on whose behalf the call was made, or who paid for its delivery.

We are aware of only one decision interpreting the scope of RSA 664:14-a, and it is inapposite to the present case. *See O'Brien v. N.H. Democratic Party*, 166 N.H. 138 (2014). In *O'Brien*, the New Hampshire Supreme Court assessed whether a political candidate who was the subject of a prerecorded political message had standing to bring suit for failure to comply with RSA 664:14-a. *Id.* at 139. The Court dismissed the case for lack of standing because the candidate failed to assert that he "suffered a legal injury against which the law was designed to protect." *Id.* at 142 (citations omitted). The Court did not address whether a *voter* would have standing under the statute where they received such a robocall.

Indeed, in the present case, it is clear that the Individual Plaintiffs have suffered the type of injury from which the RSA 664:14-a was designed to protect. As reflected in the legislative history, RSA 664:14-a was enacted to address "offensive" pre-recorded telephone messages, which interfere with "rights to privacy and the [quiet] enjoyment of [the] home," and leave recipients "unable to determine who made the recording, who paid for the message, and which political candidate (if any) they were endorsing." *See* House Committee on Election Law, Public Hearing on HB 332 (N.H. Feb. 4, 2003) (Statement of Rep. Paul Spiess, Prime Sponsor of HB 332). Here, the Individual Plaintiffs' right to privacy and quiet enjoyment of the home were violated by Defendants' offensive robocalls, which left recipients unable to determine who made and paid for the message, and which lacked the required disclosures to inform the Individual Plaintiffs that the Defendants—not President Biden's campaign, Kathy Sullivan, Granite for America, or any other person affiliated with the Democratic Party—were responsible for the NH Robocalls.

## II.  PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT PRELIMINARY RELIEF

A plaintiff suffers "irreparable harm" where, as here, the harm is to the fundamental right to vote. *See Arlene Ocasio v. Comision Estatal de Elecciones*, 486 F. Supp. 3d 478, 484 (D.P.R. 2020); *see also Colon-Marrero v. Conty-Perez*, 703 F.3d 134, 145 (1st Cir. 2012) (Torruella, J., dissenting) (explaining that infringement on the right to vote constitutes irreparable harm per se). In fact, "[c]ourts routinely deem restrictions on fundamental voting rights irreparable injury." *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014); *see also Williams v. Salerno*, 792 F.2d 323, 326 (2d Cir. 1986) ("The registration applicants in this case would certainly suffer irreparable harm if their right to vote were impinged upon."). Given the fundamental nature of the right to vote, "if potential members of the electorate suffer intimidation, threatening conduct, or coercion such that their right to vote freely is abridged, or altogether

extinguished, Plaintiff[s] would be irreparably harmed." *Ariz. Democratic Party v. Ariz. Republican Party*, No. 16 Civ. 03752, 2016 WL 8669978, at *11 (D. Ariz. Nov. 4, 2016).

Here, the Individual Plaintiffs have already been harmed by being subjected to Defendants' attempted threats, intimidation, and coercion. The harm that Individual Plaintiffs have suffered and will suffer from these robocalls cannot be rectified by monetary relief after the fact. "Because there can be no 'do-over' or redress of a denial of the right to vote after an election, denial of that right weighs heavily in determining whether plaintiffs would be irreparably harmed absent an injunction." *Fish v. Kobach*, 840 F.3d 710, 752 (10th Cir. 2016). "Further, if some potential voters are improperly dissuaded from exercising their franchise, it is unlikely those voters can be identified, their votes cannot be recast, and no amount of traditional remedies such as money damages would suffice after the fact." *Ariz. Democratic Party*, 2016 WL 8669978, at *11.

Additionally, the Individual Plaintiffs were subjected to intimidating, threatening, and coercive calls about their rights. Pursuant to Section 11(b) of the VRA, the Defendants' attempt to dissuade the Individual Plaintiffs from voting—by falsely indicating that a vote in the primary election would cost them the right to vote in the general election—was a scheme to "intimidate, threaten, or coerce" the Individual Plaintiffs. 52 U.S.C. § 10307(b). The Defendants' delivery of artificially cloned and spoofed robocalls to the Individual Plaintiffs was also a direct violation of New Hampshire law, because an individual is prohibited from distributing prerecorded political messages without disclosing within 30 seconds the names of the candidates or organization on whose behalf the call is being made and who is paying for the message, RSA 664:14-a; and prohibited from knowingly misrepresenting the origin of a phone call which advocates the success or defeat of any party, measure, or person at any election, or contains any information about any candidate or party, RSA 664:14-b.

Further, the harm that the League has suffered, and will continue to suffer, by being forced to divert resources away from its mission to defend against Defendants' false and malicious tactics is clearly irreparable. *See* Tentarelli Decl. ¶ 12. This is similar to the harm alleged in *Wohl I*, which the court found to be irreparable because the plaintiff was forced to divert resources away from its work related to the Census and the Census had concluded at the time of the injunction. 498 F. Supp. 3d at 475. Here, too, the League cannot recover the time and resources they have already spent—and will continue to spend—to combat the harm caused by the Defendants.

In the months ahead, the League must budget for and allocate limited resources to guard against the substantial threat posed by the Defendants, particularly given the demonstrated speed and volume at which their voice-cloned and spoofed robocalls can be disseminated to intimidate voters on the eve of an election. Five months before the General Election, the League would typically be focusing on registering eligible voters so that everyone has the opportunity to participate in the democratic process. Instead, the League is now diverting its focus and resources to ensuring that Americans who have already registered to vote don't lose that right due to the Defendants' malicious actions.

## III.    THE BALANCE OF THE EQUITIES WEIGH IN PLAINTIFFS' FAVOR

To determine the balance of the equities, a court will contrast the hardship that will befall the nonmovant if the injunction issues against the hardship that will befall the movant if the injunction does not issue. *Borinquen Biscuit Corp. v. M.V. Trading Corp.*, 443 F.3d 112, 115 (1st Cir. 2006). Plaintiffs have an overwhelmingly strong interest in protecting the unimpaired right to vote, free of intimidation, threats, or coercion. The interest in "protecting voters from confusion and undue influence" is "compelling," *Burson v. Freeman*, 504 U.S. 191, 199 (1992) (plurality opinion), and indeed, "the right …, regardless of [] political persuasion, to cast [] votes effectively" is voters' "most precious" right. *Williams v. Rhodes*, 393 U.S. 23, 30-31 (1968). That

overwhelmingly strong interest in protecting the unimpaired right to vote, free of intimidation, is vindicated by the injunctive relief requested here. *See, e.g.*, 52 U.S.C. § 10307(b) (no person "shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote"); RSA 664:14-a (an individual may not distribute prerecorded political messages without disclosing who paid for the call and who the call is made on behalf of); RSA 664:14-b (an individual may not knowingly misrepresent the origin of a phone call which expressly or implicitly advocates the success or defeat of any party, measure, or person at any election, or contains any information about any candidate or party).

In contrast, Defendants will suffer no harm if injunctive relief is granted. Defendants have no legitimate interest in making future deepfake or unlawfully spoofed robocalls. Further, injunctive relief of this nature will not place a burden on Voice Broadcasting, Life Corp, or Lingo's business. Voice Broadcasting, Life Corp, and Lingo cannot continue to distribute unlawful deepfake robocalls, and courts have found that an injunction that merely ends an unlawful practice does not impart harm on a party. *See*, *e.g.*, *TikTok Inc. v. Trump*, 490 F. Supp. 3d 73, 84-85 (D.D.C. 2020) (concluding, in context of balance of equities inquiry, that defendant "cannot suffer harm from an injunction that merely ends an unlawful practice") (citations omitted).

## IV.     A PRELIMINARY INJUNCTION IS IN THE INTEREST OF THE PUBLIC

"[O]ther rights, even the most basic, are illusory if the right to vote is undermined." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964). "By disseminating a robocall message laden with falsity and ill purpose . . . [t]he result cannot be described as anything but deliberate interference with voters' rights to cast their ballots in any legal manner they choose. And the intimidation of individual voters inflicts harm upon the broader public's interest in selecting elected officials through a free and fair process." *Wohl I*, 498 F. Supp. 3d at 488. The court in *Wohl I* recognized

that "if left unchecked, Defendants' conduct imperils this right, and with it, the very heart and constitutional foundation of this nation." *Id.*

There remains a substantial risk that Defendants—if left unchecked—will continue to transmit unlawful, intimidating, threatening, or coercive robocalls, as well as unlawfully spoofed communications. Defendants are financially incentivized to continue delivering such messages, have the willingness and capacity to do so, and have not been deterred from engaging in unlawful or negligent conduct by previous regulatory scrutiny, civil penalties, and lawsuits, or the fallout from the NH Robocalls.

Defendant Steve Kramer is a prolific disseminator of robocalls, having delivered millions to U.S. voters over the past decade. *See* Ex. B at 14. He was actively seeking ways to profit from AI-generated technology immediately prior to his creation of the NH Robocalls. *See* Carpenter Decl. ¶ 5. He has significant resources at his disposal, purportedly operating three U.S. call centers, and reportedly having anywhere from 18 to 50 employees at his disposal. *See* Ex. B at 26. Most critically, he has stated that AI-generated robocalls are cheap, easy to produce, and effective, and that there is a market for delivering these types of malicious robocalls to voters. *See* Carpenter Decl., Ex. F.

Although Kramer was recently indicted by the State of New Hampshire, public scrutiny and fallout from his misconduct has not deterred him from continuing to engage in dishonest and deceptive tactics in his work as a political consultant. Indeed, Kramer was actively defending himself against claims that he engaged in malfeasance in his work for a New York mayoral campaign when he conceived of and executed the distribution of the NH Robocalls.[9] Kramer tried

---

[9] *See, e.g.,* Defendant's Memorandum of Law in Opposition to Cross-Motion and in Further Support of Motion, *Sarah Tirschwell for Mayor, Inc. v. Kramer*, No. 154123/2021 (N.Y. Sup. Ct. Nov. 11, 2023), NYSCEF Doc. No. 99.

to conceal his involvement by hiring a transient individual, Paul Carpenter, to generate the robocalls, paying for the calls through his father's Venmo account, and asking Carpenter to delete their correspondence after the scheme was revealed. *See* Carpenter Decl. Since being outed, he has shown zero remorse for his conduct, concocting a farfetched explanation that he was seeking to warn Americans against the dangers of AI technology. *See* Ex. M. Far from serving as a Paul Revere-like figure, Kramer *is* the danger he was purporting to warn about. There is a compelling reason to believe he will seek to perpetrate and profit from a similar scheme in the future, while more effectively concealing his involvement, if left unchecked.

Defendants Voice Broadcasting and Life Corp have delivered millions of political robocalls to voters in recent years, for thousands of political campaigns, generating millions of dollars in revenue for their companies. *See* Ex. H. Despite the expanding scope of their operations, *id.*, and the "important role" that they purport to play in disseminating information to voters, *see* Fournier Decl. ¶ 27, Voice Broadcasting and Life Corp appear to take the position that they have no obligation to implement compliance measures to prevent their companies from delivering spoofed, illicitly voice-cloned, or otherwise unlawful robocalls to voters, *id.* ¶¶ 24-25 (arguing that imposing such an obligation would be "inefficient" and "redundant" because federal and state campaigns already have their own compliance teams). In their view, to do so would "impose significant, additional costs" and result in pushback from their customers. *Id.* ¶¶ 23, 25.

Put another way, Voice Broadcasting and Life Corp believe that implementing basic compliance protocols to prevent their systems from being abused by customers would cost them money. Furthermore, they have signaled that they have zero intention of correcting course despite the key role they played in delivering millions of unlawful robocalls to New Hampshire voters on the eve of an election. Voice Broadcasting and Life Corp's effort to wash their hands of

responsibility for this episode demonstrates that they pose a substantial and ongoing risk to voters as they continue to deliver millions of political robocalls to voters in ongoing local, state, and federal elections.

Defendant Lingo, for its part, has demonstrated that investigations, cease and desist orders, and a civil penalty will not deter the company from continuing to authenticate—and profit from—unlawful robocall activity. Despite an avalanche of regulatory scrutiny in the past three years, Lingo continues to violate FCC rules "willfully and repeatedly" by failing to fully implement the requisite STIR/SHAKEN framework, while simultaneously maintaining "glaringly deficient" KYC practices. *See* Ex. I at ¶¶ 16, 23. As a result of Lingo's actions—or inaction—Lingo has legitimized thousands of unlawful robocall campaigns, impersonating everyone from Amazon to Customs and Border Patrol to the President of the United States, creating a reliable avenue for bad actors to deliver all manner of schemes and scams to their intended targets. Absent court intervention, Lingo is likely to continue to provide false attestations for intimidating, threatening, coercive, or otherwise unlawful robocalls, preventing them from being blocked before they can reach and harm voters.

In view of the foregoing, the public interest clearly would be advanced by the preliminary injunction sought here. Defendants should not be permitted to engage in conduct that impedes and threatens the exercise of the most basic right in American democracy.

## **CONCLUSION**

This Court should grant Plaintiffs' application for a nationwide preliminary injunction to enjoin Defendants Kramer, Voice Broadcasting, Life Corp, and Lingo until further order of this Court from producing, generating, or distributing AI-generated robocalls impersonating any person, without that person's express, prior written consent; from distributing spoofed telephone calls, spoofed text messages, or any other form of spoofed communications without the express,

prior written consent of the individual or entity upon whose half the communication is being sent; and from distributing telephone calls, text messages, or other mass communications that do not comply with all applicable state and federal laws or that are made for an unlawful purpose.

Dated:  June 7, 2024                Respectfully submitted,

                                    */s/  Mark R. Herring*

William C. Saturley (NH Bar #2256)
Nathan R. Fennessy (NH Bar #264672)
Nicholas A. Dube (NH Bar #27464)

**PretiFlaherty**
57 N Main Street
New Hampshire 03301
(603)-410-1500
WSaturley@preti.com
Nfennessy@preti.com
Ndube@preti.com

*Counsel for Plaintiffs*

Courtney Hostetler (MA Bar #683307)
John Bonifaz (MA Bar #562478)
Ben Clements (MA Bar #555802)
Amira Mattar (NY Bar #5774450)

**Free Speech For People**
48 N. Pleasant St., Suite 304
Amherst, MA 01002
617-244-0234
chostetler@freespeechforpeople.org
jbonifaz@freespeechforpeople.org
bclements@freespeechforpeople.org
amira@freespeechforpeople.org

*Counsel for Plaintiffs*

Mark R. Herring (DC Bar #90013124)
Matthew R. Nicely (DC Bar #430564)
Caroline L. Wolverton (DC Bar #496433)
Amanda S. McGinn (DC Bar #1049085)
Joseph T. DiPiero (DC Bar #1618536)
Maria Julia Hershey (DC Bar #90020162)
Sara M. Hanna (DC Bar #90017864)

**Akin Gump Strauss Hauer & Feld LLP**
2001 K Street, N.W.
Washington, DC 20006-1037
(202)-887-4000
mherring@akingump.com
mnicely@akingump.com
cwolverton@akingump.com
amcginn@akingump.com
jdipiero@akingump.com
mhershey@akingump.com
shanna@akingump.com

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

The undersigned hereby certified that on June 7, 2024, the foregoing was electronically filed with the Court and served upon the following:

Boyd Garriott
Frank Scaduto
Michele E. Kenney
Thomas M. Johnson, Jr.
Wiley Rein LLP
2050 M Street NW
Washington, DC 20036
210-833-5573
*Counsel for Defendant Lingo Telecom, LLC*
***Via ECF System***

Steve Kramer
20 Cloverleaf Drive
New Fairfield, CT 06812
***Via US Mail***

Wayne E. George
Ezra D. Church
Terese M. Schireson
Morgan Lewis & Bockius LLP
One Federal St
Boston, MA 02110-4104
*Counsel for Defendants Life Corporation and Voice Broadcasting Corporation*
***Via ECF System***

A true and correct copy was also transmitted via electronic mail to Steve Kramer at gotvcalls@gmail.com.

Respectfully submitted,

*/s/ Mark R. Herring*
Mark R. Herring (DC Bar #90013124)