**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE**

LEAGUE OF WOMEN VOTERS OF NEW
HAMPSHIRE, *et al.*,

            Plaintiffs,

            v.

STEVE KRAMER, *et al.*,

            Defendants.

Civil Action No. 1:24-cv-00073-SM-TSM

**LINGO TELECOM LLC'S MEMORANDUM IN OPPOSITION TO
PLAINTIFFS' AMENDED MOTION FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

                                                                                                                              **Page**

INTRODUCTION AND BACKGROUND ........................................................................... 1

STANDARD OF REVIEW .............................................................................................. 3

ARGUMENT ............................................................................................................... 4

I.   PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS ................................................. 4

A.   Plaintiffs Are Unlikely To Succeed In Invoking This Court's Jurisdiction Over Their
     Requests For Prospective Relief Against Lingo .................................................................. 4

     1.   Plaintiffs Have Not Shown An Imminent Future Injury Traceable To Lingo ............ 4

     2.   Plaintiffs Have Not Shown That A Prospective Remedy Against Lingo Would
          Redress Their Injuries ................................................................................................. 8

B.   Plaintiffs Are Unlikely To Succeed On The Merits Against Lingo ................................. 11

     1.   Plaintiffs' Election-Law Claims Are Unlikely To Succeed Against Lingo .............. 11

          a.   Plaintiffs Are Unlikely To Show That Lingo Intimidated, Threatened, Or
               Coerced Anyone In Violation Of The VRA ........................................................ 11

          b.   Plaintiffs Are Unlikely To Show That The Calls Were Intimidating Threatening,
               Or Coercive ........................................................................................................ 13

          c.   Plaintiffs Are Unlikely To Show Lingo Knowingly Misrepresented Or Delivered
               Robocalls In Violation Of State Law .................................................................. 14

          d.   Plaintiffs Are Unlikely To Show That Lingo Proximately Caused Any Injury
               From The Alleged Election-Law Violations ........................................................ 16

          e.   Plaintiffs Are Unlikely To Succeed On Their Election-Law Claims Because
               They Lack Valid Causes Of Action For Them .................................................... 17

          f.   Plaintiffs Are Unlikely To Overcome Lingo's Statutory Immunity Against Their
               Election-Law Claims .......................................................................................... 20

     2.   Plaintiffs' TCPA Claim Is Unlikely To Succeed Against Lingo .............................. 22

II.  PLAINTIFFS HAVE NOT SHOWN THAT THEY WILL SUFFER IRREPARABLE HARM
     ATTRIBUTABLE TO LINGO ABSENT A PRELIMINARY INJUNCTION .................................... 24

III. THE EQUITIES AND THE PUBLIC INTEREST STRONGLY DISFAVOR A PRELIMINARY
     INJUNCTION AGAINST LINGO .......................................................................................... 27

IV.  PLAINTIFFS' REQUESTED PRELIMINARY INJUNCTION IS VAGUE AND OVERBROAD ......... 29

CONCLUSION ............................................................................................................. 30

# TABLE OF AUTHORITIES

<b>Page(s)</b>

CASES

*Adzhikosyan v. Callfire, Inc.*,
2019 WL 7856759 (C.D. Cal. Nov. 20, 2019) ........................................................22

*Alexander v. Sandoval*,
532 U.S. 275 (2001) ................................................................................................18

*Allco Renewable Energy Ltd. v. Mass. Elec. Co.*,
875 F.3d 64 (1st Cir. 2017) ...............................................................................17, 18

*Andrews v. D'Souza*,
2023 WL 6456517 (N.D. Ga. Sept. 30, 2023) ...................................................17, 18

*Auguston v. Nat'l Admin. Serv. Co.*,
2023 WL 1810397 (E.D. Tex. Jan. 11, 2023) .........................................................24

*Bonano v. E. Caribbean Airline Corp.*,
365 F.3d 81 (1st Cir. 2004) ...............................................................................17, 18

*Braintree Labs., Inc. v. Citigroup Glob. Mkts. Inc.*,
622 F.3d 36 (1st Cir. 2010) .....................................................................................27

*Buntin v. City of Bos.*,
857 F.3d 69 (1st Cir. 2017) .....................................................................................17

*CBS Corp. v. FCC*,
663 F.3d 122 (3d Cir. 2011) .....................................................................................8

*Charlesbank Equity Fund II v. Blinds To Go, Inc.*,
370 F.3d 151 (1st Cir. 2004) .................................................................................3, 27

*City of Los Angeles v. Lyons*,
461 U.S. 95 (1983) ...............................................................................................4, 26

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) .............................................................................................6, 8

*Coffey v. N.H. Jud. Ret. Plan*,
957 F.3d 45 (1st Cir. 2020) .....................................................................................15

*Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*,
589 U.S. 327 (2020) ................................................................................................13

iii

*Cunningham v. Montes*,
    378 F. Supp. 3d 741 (W.D. Wis. 2019) ...............................................................23

*Dantzler, Inc. v. Empresas Berrios Inventory & Operations, Inc.*,
    958 F.3d 38 (1st Cir. 2020)..................................................................................5

*Do No Harm v. Pfizer Inc.*,
    96 F.4th 106 (2d Cir. 2024) ...............................................................................10

*In re Evenflo Co., Mktg., Sales Pracs. & Prod. Liab. Litig.*,
    54 F.4th 28 (1st Cir. 2022).................................................................................6

*FDA v. All. for Hippocratic Med.*,
    144 S. Ct. 1540 (2024).....................................................................................5, 6

*Ferrari v. Vitamin Shoppe Indus. LLC*,
    70 F.4th 64 (1st Cir. 2023).................................................................................13

*Francisco Sanchez v. Esso Stand. Oil Co.*,
    572 F.3d 1 (1st Cir. 2009)..................................................................................30

*Gonzalez-Droz v. Gonzalez-Colon*,
    573 F.3d 75 (1st Cir. 2009).............................................................................24, 25

*Gray v. Cummings*,
    917 F.3d 1 (1st Cir. 2019)....................................................................................4

*Haaland v. Brackeen*,
    599 U.S. 255 (2023)........................................................................................9, 10

*Herrick v. Grindr, LLC*,
    306 F. Supp. 3d 579 (S.D.N.Y. 2018)..................................................................23

*Iverson v. City of Bos.*,
    452 F.3d 94 (1st Cir. 2006)................................................................................17

*Jane Doe No. 1 v. Backpage.com, LLC*,
    817 F.3d 12 (1st Cir. 2016)................................................................................22

*Kauffman v. CallFire, Inc.*,
    141 F. Supp. 3d 1044 (S.D. Cal. 2015)...............................................................22

*League of United Latin Am. Citizens - Richmond Region Council 4614 v. Pub. Int.*
    *Legal Found.*, 2018 WL 3848404 (E.D. Va. Aug. 13, 2018) .................................18

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    572 U.S. 118 (2014)...........................................................................................16

*Lujan v. Defs. of Wildlife*,
 504 U.S. 555 (1992)........................................................................................4, 8

*McBreairty v. Miller*,
 93 F.4th 513 (1st Cir. 2024)............................................................................4, 8

*Meeks v. Buffalo Wild Wings, Inc.*,
 2018 WL 1524067 (N.D. Cal. Mar. 28, 2018)..................................................22

*Monsarrat v. Newman*,
 28 F.4th 314 (1st Cir. 2022)........................................................................21, 22

*Mont. Med. Ass'n v. Knudsen*,
 591 F. Supp. 3d 905 (D. Mont. 2022)................................................................28

*Murthy v. Missouri*,
 2024 WL 3165801 (U.S. June 26, 2024)..............................................2, 4, 8, 10

*O'Brien v. N.H. Democratic Party*,
 166 N.H. 138 (2014)...........................................................................18, 19, 20

*O'Brien v. W. Union Tel. Co.*,
 113 F.2d 539 (1st Cir. 1940)..............................................................................13

*Ocean State Tactical, LLC v. Rhode Island*,
 95 F.4th 38 (1st Cir. 2024).................................................................................3

*Open Top Sightseeing USA v. Mr. Sightseeing, LLC*,
 48 F. Supp. 3d 87 (D.D.C. 2014).......................................................................27

*Roe v. Healey*,
 78 F.4th 11 (1st Cir. 2023).....................................................................4, 5, 7, 8

*Rudisill v. McDonough*,
 144 S. Ct. 945 (2024).........................................................................................13

*Schilling v. Washburne*,
 592 F. Supp. 3d 492 (W.D. Va. 2022) ........................................................17, 18

*SMA Life Assur. Co. v. Sanchez-Pica*,
 960 F.2d 274 (1st Cir. 1992)..............................................................................27

*Smith v. Securus Techs., Inc.*,
 120 F. Supp. 3d 976 (D. Minn. 2015)................................................................22

*Sosa v. Mass. Dep't of Corr.*,
 80 F.4th 15 (1st Cir. 2023)...................................................................................3

*State v. Etienne,*
    163 N.H. 57 (2011) ........................................................................15

*Sverdlov v. Eydinov,*
    555 F. Supp. 3d 1 (D. Mass. 2021) .................................................8

*United Nurses & Allied Pros. v. NLRB,*
    975 F.3d 34 (1st Cir. 2020)...........................................................19

*United States v. Cruz-Ramos,*
    987 F.3d 27 (1st Cir. 2021)...........................................................23

*United States v. Stratics Networks Inc.,*
    2024 WL 966380 (S.D. Cal. Mar. 6, 2024) ..................................21

*United States v. Texas,*
    599 U.S. 670 (2023) ......................................................................10

*Universal Commc'n Sys., Inc. v. Lycos, Inc.,*
    478 F.3d 413 (1st Cir. 2007)....................................................21, 22

*Walsh v. TelTech Sys., Inc.,*
    821 F.3d 155 (1st Cir. 2016).........................................10, 16, 17, 30

*Webb v. Injured Workers Pharmacy, LLC,*
    72 F.4th 365 (1st Cir. 2023)............................................................6

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) ....................................................................24, 29

*Zoom Video Commc'ns Inc. Privacy Litig.,*
    525 F. Supp. 3d 1017 (N.D. Cal. 2021) ........................................21

**STATUTES**

18 U.S.C. § 2511 ....................................................................................9, 13

47 U.S.C. §§ 201–02 ..................................................................................9

47 U.S.C. § 227 ....................................................................................22, 24

47 U.S.C. § 227b..........................................................................................24

47 U.S.C. § 230....................................................................13, 20, 21, 22

52 U.S.C. § 10302......................................................................................18

52 U.S.C. § 10307......................................................................................18

52 U.S.C. § 10307(c) ...................................................................................................13

52 U.S.C. § 10308..........................................................................................................18

RSA 664:14-a..........................................................................................15, 16, 18, 19, 22

RSA 664:14-b .......................................................................................14, 15, 16, 18, 19, 22

**RULES & REGULATIONS**

Fed. R. Civ. P. 65 .........................................................................................................30

Local Rule 65.1 .............................................................................................................30

47 C.F.R. § 64.6301 ......................................................................................................23

**OTHER AUTHORITIES**

*Advanced Methods to Target & Eliminate Unlawful Robocalls*,
    Seventh Report and Order, 38 FCC Rcd 5404 (2023) .......................................9, 10

Black's Law Dictionary (Rev. 4th ed. 1968) .................................................................12

*Call Authentication Trust Anchor*, Report and Order and Further Notice of
    Proposed Rulemaking, 35 FCC Rcd 3241 (2020) ......................................12, 14, 15

FCC, *Combating Spoofed Robocalls with Caller ID Authentication* ............................21

*IP-Enabled Servs.*, Report and Order,
    24 FCC Rcd 6039 (2009)....................................................................................21

Lingo Management, LLC, Robocalling Mitigation Plan v4.2024 ................................10

Lingo Telecom, LLC, Tariff FCC No. 1 (Aug. 2, 2022) ......................................7, 15, 17

N.H. Secretary of State, 2024-2025 Political Calendar ...............................................25

FEC, 2024 Presidential Primary Dates and 2024 Congressional Primary Dates..........25

Restatement (Second) of Torts (Am. L. Inst. 1977) .....................................................16

*Rules & Reguls. Implementing the Tel. Consumer Prot. Act of 1991*,
    Declaratory Ruling and Order, 30 FCC Rcd 7961 (2015)....................................22

*Vonage Holdings Corp.*, Memorandum Opinion and Order,
    19 FCC Rcd 22404 (2004).................................................................................21

**INTRODUCTION AND BACKGROUND**

Plaintiffs ask this Court to enter an extraordinary and entirely unwarranted preliminary injunction. They would have this Court enjoin Lingo Telecom, LLC ("Lingo")—a telephone company that cannot lawfully review the contents of calls transiting its network—from "distributing" certain "AI-generated robocalls" and "spoofed" calls, as well as any "telephone calls, text messages, or other mass communications that do not comply with all applicable state and federal laws or that are made for an unlawful purpose." ECF No. 71-31 at 1–2. Lingo was an innocent bystander in a scheme carried out by others that victimized Lingo as well. Accordingly, Plaintiffs do not and cannot come close to justifying their requested relief.

More than five months ago, Steve Kramer allegedly placed robocalls (the "New Hampshire Robocalls") conveying incorrect information related to the New Hampshire presidential primary, using an artificial intelligence ("AI") voice to mimic President Biden. Those calls were "commissioned" by Kramer and "initiated" by Voice Broadcasting "using service and equipment provided by" Life Corporation ("Life Corp"). ECF No. 71-1 ("Am. Mot.") at 7, 9. Life Corp, in turn, routed "a portion" of those calls to Lingo. *Id.* at 9.

Plaintiffs devote nearly their entire motion to Kramer's misdeeds, Kramer's motivations, and the likelihood that Kramer will act again. But Lingo is not Kramer, and Plaintiffs do not provide a shred of evidence suggesting that Lingo knowingly supported Kramer's scheme. Thus, whatever case Plaintiffs may have against the other Defendants, they are not entitled to an extraordinary grant of preliminary relief against Lingo.

Plaintiffs' request for a preliminary injunction fails at the threshold because they do not and cannot establish Article III standing to seek prospective relief against Lingo. As the Supreme Court explained this week, plaintiffs must "make a 'clear showing'" that they face "'a

real and immediate threat of repeated injury'" traceable to "*each defendant*" they seek to enjoin. *Murthy v. Missouri*, 2024 WL 3165801, at *8–9 (U.S. June 26, 2024) (emphasis added, citations omitted). Plaintiffs have not and cannot. Once Lingo learned of the New Hampshire Robocalls, it immediately terminated Life Corp as a customer. And although dozens of states have held presidential primaries—and New Hampshire has held local elections—in recent months, Plaintiffs offer *no evidence* that Kramer has repeated his misconduct, much less that he had done so by routing robocalls through Lingo's network or that Lingo's current protocols would not rate them as likely inauthentic. Thus, the notion that Plaintiffs face future injury from Lingo is based purely on unfounded speculation. And even if Plaintiffs could show a real threat of future injury by Lingo, their requested injunction would do nothing to redress it. Lingo is *legally prohibited* from reviewing the contents of its customers' calls, so an injunction preventing it from distributing calls based on their content or its customers' purposes would have no effect. This Court should deny Plaintiffs' motion on this basis alone.

But even if Plaintiffs had standing, they have not plausibly alleged—much less shown a likelihood of success on—any claims against Lingo, as Lingo has already explained in its motion to dismiss the amended complaint. *See* ECF No. 79-1 ("Second MTD").

Plaintiffs fail on the other preliminary-injunction factors too. For example, Plaintiffs have not shown that they are likely to be irreparably harmed absent a preliminary injunction *against Lingo*. The Individual Plaintiffs rest their argument *exclusively* on the denial of the right to vote. *See* Am. Mot. 23–24. But each Individual Plaintiff exercised his or her right to vote in the New Hampshire primary. There is no evidence that they will receive a future robocall attributable in any way to Lingo, let alone that it would dissuade them from voting in the future. And although the Organizational Plaintiffs insist that they have "divert[ed] resources" to guard

against similar efforts to spread election misinformation, *id.* at 25, they do not suggest they would do anything differently if this Court were to enjoin Lingo.  Moreover, Plaintiffs' own delay—waiting three months to file their original preliminary injunction motion and then another six weeks to file an amended motion—undermines any showing of irreparable harm.

By contrast, Plaintiffs' requested injunction would irreparably harm Lingo and its customers by compelling Lingo to intercept and censor calls based on their content and the callers' motives—all of which Congress and the Federal Communications Commission ("FCC") have prohibited by law and regulation to protect the public's interests in privacy and widespread access to phone service.  Plaintiffs are not entitled to override a century of legislative judgments through injunctive relief, particularly on such a speculative theory of potential future harm.

Accordingly, the Court should deny Plaintiffs' amended motion and dismiss the injunctive relief claim against Lingo for lack of standing.

## STANDARD OF REVIEW

A "preliminary injunction is an extraordinary remedy never awarded as of right." *Sosa v. Mass. Dep't of Corr.*, 80 F.4th 15, 25 (1st Cir. 2023) (quotations omitted).  To obtain this extraordinary relief, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Ocean State Tactical, LLC v. Rhode Island*, 95 F.4th 38, 42 (1st Cir. 2024) (quotations omitted).  The plaintiff bears the burden of demonstrating irreparable harm with "something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store." *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004).

## ARGUMENT

## I.   PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS.

Plaintiffs are unlikely to succeed because they cannot show that this Court has Article III jurisdiction over their claims for injunctive relief against Lingo.  Even if Plaintiffs could clear that fundamental hurdle, their claims against Lingo are legally flawed and factually unsupported.

### A.   Plaintiffs Are Unlikely To Succeed In Invoking This Court's Jurisdiction Over Their Requests For Prospective Relief Against Lingo.

In all cases, a plaintiff must establish Article III "standing to obtain the relief sought." *McBreairty v. Miller*, 93 F.4th 513, 518 (1st Cir. 2024).  "For there to be standing, the plaintiff must have suffered an injury in fact, that is fairly traceable to the challenged conduct, and that may be redressed by the requested relief."  *Id.*  "At the preliminary injunction stage," Plaintiffs "must make a 'clear showing' that [they are] 'likely' to establish each element of standing."  *Murthy*, 2014 WL 3165801, at *8 (citation omitted).  Because "'standing is not dispensed in gross,'" Plaintiffs must make that showing "'for *each claim* that they press' against *each defendant*, 'and for *each form of relief* that they seek.'"  *Id.* at *9 (emphases added; citation omitted).  And because Plaintiffs "request forward-looking relief, they must face 'a real and immediate threat of repeated injury'" *traceable to Lingo*.  *Id.* at *8 (citation omitted).  Plaintiffs do not and cannot do so.

### 1.   Plaintiffs Have Not Shown An Imminent Future Injury Traceable To Lingo.

Plaintiffs lack standing to pursue prospective relief against Lingo because they have not and cannot show any non-speculative risk of *future* injury to the Individual Plaintiffs or Organizational Plaintiffs that would be fairly attributable *to Lingo*.  "Past exposure to illegal conduct does not show a present case or controversy regarding injunctive relief."  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 564 (1992) (quotations omitted); *see also City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983); *Roe v. Healey*, 78 F.4th 11, 21 (1st Cir. 2023); *Gray v. Cummings*, 917

F.3d 1, 19 (1st Cir. 2019).

The Individual Plaintiffs do not suggest that they face any risk of future injury *at all*. Each asserts that he or she previously received one of the New Hampshire Robocalls, was not misled, and voted. *See* Declaration of James Fieseher, ECF No. 71-18 ("Fieseher Decl.") ¶ 8; Declaration of Patricia Gingrich, ECF No. 71-19 ("Gingrich Decl.") ¶ 8; Declaration of Nancy Marashio, ECF No. 71-20 ("Marashio Decl.") ¶¶ 7, 10. None suggests that he or she is likely to receive an illegal robocall in the future or that an illegal robocall could possibly dissuade him or her from voting in an election. In any event, such "[c]onclusory assertions" would not "suffice" to show standing, *Dantzler, Inc. v. Empresas Berrios Inventory & Operations, Inc.*, 958 F.3d 38, 47 (1st Cir. 2020), because "merely invoking the possibility of these events [would] not [be] enough," *Roe*, 78 F.4th at 21.

For their part, the Organizational Plaintiffs assert that the New Hampshire Robocalls led them to divert resources away from other tasks and incur additional printing expenses. Am. Mot. 12–13; Declaration of Elizabeth Tentarelli, ECF No. 71-29 ("Tentarelli Decl.") ¶¶ 10–13; Declaration of Celina Stewart, ECF No. 71-30 ("Stewart Decl.") ¶¶ 10–14. But Plaintiffs' evidence demonstrates that these efforts to combat "disinformation" have been ongoing "[s]ince 2020," Stewart Decl. ¶ 7, and that these voter-engagement organizations have always engaged in "rapid-response" activities that consume resources as part of their shared mission, Tentarelli Decl. ¶ 8 (discussing "rumor" in "mid-October 2023" that "required several hours of volunteer time that was not otherwise planned for"). An organization "cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action," unless such action "direct affect[s]" its "core *business* activities." *FDA v. All. for Hippocratic Med.*, 144 S. Ct. 1540, 2024 WL 2964140, at *13 (2024) (emphasis added). Plaintiffs do not show any direct effect

on their core business activities, instead representing that they are engaged in their usual advocacy. Allegations that voter-engagement organizations "diverted" resources to efforts to promote voting fail to show standing on that basis along. They also independently fail to show standing because their assertions of *past* resource expenditure will not suffice for *prospective* relief. *See In re Evenflo Co., Mktg., Sales Pracs. & Prod. Liab. Litig.*, 54 F.4th 28, 41 (1st Cir. 2022) ("Standing for injunctive relief depends on whether [the plaintiff is] likely to suffer future injury." (quotations omitted)). And, as with the Individual Plaintiffs, any claim of future injury is based on unfounded speculation. *See*, *e.g.*, *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 417 (2013) (no standing where the costs an organization incurred "are simply the product of their fear of surveillance").

Even if Plaintiffs could make a clear showing that they are likely to suffer future injury from illegal robocalls in general, they do not and cannot show any real and immediate risk of future injury fairly traceable *to Lingo*. Lingo allegedly played an unwitting and passive part in the New Hampshire Robocalls. It did not create or initiate them. At most, it purportedly gave them incorrect attestations under the STIR/SHAKEN framework for caller ID authentication—which, Plaintiffs say, "increas[ed] the likelihood that the [New Hampshire] Robocalls would reach their intended target." Am. Mot. 19. But Plaintiffs have not shown that Lingo is more likely to carry illegal robocalls than other telephone companies going forward. Instead, Lingo "faces much the same risk of future [illegal traffic] as virtually every" provider. *Webb v. Injured Workers Pharmacy, LLC*, 72 F.4th 365, 378 (1st Cir. 2023). And Plaintiffs do not suggest that Lingo would in the future provide improper attestations that would result in an illegal robocall reaching its target. In short, "nothing in the record" supports Plaintiffs' "speculation" about any future risk from Lingo. *All. for Hippocratic Med.*, 2024 WL 2964140, at *11.

In fact, the record shows the opposite. Lingo's policies prohibit its customers from

carrying spoofed traffic, Lingo Telecom, LLC, Tariff FCC No. 1, § 2.3.3(A) (Aug. 2, 2022) ("*Lingo FCC Tariff*"), https://tinyurl.com/5n6px997, and from using Lingo's services "for any unlawful purposes," *id.* § 2.2.  Plaintiffs allege, at bottom, that Life Corp breached these terms and placed illegal calls from a phone number it lacked the right to use.  Am. Compl. ¶ 54; Am. Mot. 9.  Lingo took swift action to rectify that breach.  After Lingo received "notice" of the New Hampshire Robocalls, it quickly "suspen[ded]" Life Corp from using Lingo's services, and terminated life Corp as a customer on February 7, 2024.  *See* ECF No. 58-2.

Plaintiffs allege that there is "substantial risk that *Defendants* will continue to transmit intimidating, threatening, coercive, or otherwise unlawful AI-generated robocalls."  ECF No. 65 ¶ 83 ("Am. Compl.") (emphasis added).  But they offer no evidence suggesting that *Lingo* would do so in the future.  Plaintiffs allege that Lingo previously "faciliat[ed]" unlawful robocalls, *id.* ¶ 87, but past illegal conduct does not establish standing for prospective relief, *see Roe*, 78 F.4th at 21.  And even if it did, Plaintiffs identify no such illegal conduct; they reference only "investigations," a settlement agreement, and notices of "*suspected* illegal traffic," *id.* ¶¶ 41–45 (emphasis added); *see also id.* ¶ 87 (referencing "accus[ations]" and "warn[ings]").  Plaintiffs' motion similarly relies on *allegations* arising in regulatory contexts to argue that Lingo has engaged in *past* misconduct.  *See* Am. Mot. 6–7, 11 (citing ECF Nos. 71-11) (notice of *apparent* liability from the FCC), 71-12 (notice that Lingo "apparently" transmitted "apparently illegal robocalls"), 71-13 (alleging that Lingo was "apparently routing and transmitting illegal robocall traffic"), 71-14 at 8 (FTC chart stating that Lingo "enter[ed] into a Settlement Agreement" with the Social Security Administration)).  Lingo takes its regulatory obligations seriously and contests allegations of noncompliance when legally or factually unsupported.  Until proven, these allegations are just that:  "allegations—not facts." *Sverdlov*

*v. Eydinov*, 555 F. Supp. 3d 1, 3 (D. Mass. 2021) (dismissing claim that relied on "an unverified complaint in another case"); *see also CBS Corp. v. FCC*, 663 F.3d 122, 130 (3d Cir. 2011) ("[a] notice of apparent liability" is "non-final" and "therefore reflects only 'tentative conclusions,'" not "official policy").

Thus, it is "speculative" at best—and realistically, completely unfounded—that Plaintiffs' alleged injuries will "imminently" recur in a manner traceable to Lingo. *Clapper*, 568 U.S. at 411. Because Life Corp is no longer a Lingo customer, any future injury would have to come from "the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560 (quotations omitted). That third party would have to violate the law and its contracts with Lingo by placing illegal robocalls that cause a voting-related injury. And that injury would have to be suffered by *Plaintiffs* in a manner cognizable under Article III. "Such a sequence is too attenuated to support a claim that future injury is certainly impending, or that there is a substantial risk it will occur." *Roe*, 78 F.4th at 21.

     2.    <u>Plaintiffs Have Not Shown That A Prospective Remedy Against Lingo Would Redress Their Injuries.</u>

Plaintiffs lack standing for another reason: Even if they had shown that Lingo threatens a non-speculative future injury, that injury cannot likely "be redressed by the requested relief." *McBreairty*, 93 F.4th at 518; *see Murthy*, 2024 WL 3165801, at *16. Plaintiffs ask the Court to preliminarily enjoin Lingo from "producing, generating, or distributing AI-generated robocalls," "distributing spoofed telephone calls, text messages, or any other form of spoofed communication," and "distributing telephone calls, text messages, or other mass communications that do not comply with all applicable state and federal laws or that are made for an unlawful purpose." ECF No. 71-31 at 1–2; *see* Am. Compl. Prayer for Relief (b)–(f).

Such relief "would not remedy the alleged injury," *Haaland v. Brackeen*, 599 U.S. 255, 292–93 (2023), because Lingo does not "produc[e]" or "generat[e]" robocalls and cannot, without violating countless laws protecting consumer privacy and imposing common-carrier requirements, cease "distributing" calls that may contain unlawful content or reflect an "unlawful purpose."  Putting Lingo to this Hobson's choice would do nothing to remedy the intractable problem of illegal robocalls.

The FCC, law enforcement, and the communications industry have invested years and countless resources to "combat" illegal robocalls using "an incremental, multi-pronged approach."  *Advanced Methods to Target & Eliminate Unlawful Robocalls*, Seventh Report and Order, 38 FCC Rcd 5404, 5406–07 ¶¶ 6–7 (2023) ("*Seventh Robocall Report*").  The reason for this approach is that robocalls are a "complex problem" with "no 'silver bullet' fix."  *Id.* at 5405 ¶ 1.  There are large volumes of both illegal robocall traffic *and* "wanted, or even essential" robocall traffic.  *Id.* at 5423 ¶ 55.  Moreover, Congress has prohibited voice providers from taking more invasive steps to combat the problem by enacting statutes that protect consumer privacy and access to voice service.  Under the Wiretap Act, providers cannot listen in on or interfere with (*i.e.*, "intercept") the content of customers' calls absent exceptional circumstances.  *See* 18 U.S.C. § 2511(1)(a).  And under the Communications Act, voice providers have a "duty" to provide service on a non-discriminatory basis to consumers and to interconnect with other providers.  *See* 47 U.S.C. §§ 201–02.  So the trick is stopping illegal robocalls without knowing the content of calls *ex ante* and without impeding legitimate robocalls, such as "emergency notifications" or "appointment reminders."  *Seventh Robocall Report*, 38 FCC Rcd at 5423 ¶ 55.

Plaintiffs' request for prospective relief flies in the face of this reality by asking the Court

to order Lingo not to carry calls with illegal content and to discern whether the "purpose" of its customers' speech is "unlawful." ECF No. 71-31 at 1–2. That would itself be unlawful under the Wiretap Act. Nor can the harm of robocalls be addressed so easily. Lingo can—and does—take steps to mitigate illegal traffic. *See*, *e.g.*, Lingo Management, LLC, Robocalling Mitigation Plan v4.2024, https://tinyurl.com/35jzntwp. But neither Lingo nor any other provider can wave a wand to prohibit every person from picking up the phone and saying (or thinking) something unlawful. Likewise, Lingo cannot prohibit all spoofed calls because spoofing is often legal and has "legitimate importance for . . . consumers who wish to provide a temporary call-back number." *Walsh v. TelTech Sys., Inc.*, 821 F.3d 155, 163 (1st Cir. 2016) (quotations omitted).

Illegal robocalls are a real and complex problem that can result in injury. But that "asserted injury" is not "redressable in federal court" by an injunction against a single telephone company. *Murthy*, 2024 WL 3165801, at *14 (no standing where plaintiffs failed to trace harm to each defendant named in requested preliminary injunction); *United States v. Texas*, 599 U.S. 670, 676 (2023) (no standing where injunction could not alter executive enforcement policies); *Brackeen*, 599 U.S. at 292 (no standing where injunction would not prevent asserted harms). No order from this Court can provide the "'silver bullet' fix" that Plaintiffs seek for the broader challenge of combating illegal robocalls. *Seventh Robocall Report*, 38 FCC Rcd at 5405 ¶ 1.

The Court should dismiss Plaintiffs' claim for injunctive relief against Lingo for lack of standing. *See Do No Harm v. Pfizer Inc.,* 96 F.4th 106, 121 (2d Cir. 2024). At minimum, the Court should deny Plaintiffs' motion for a preliminary injunction against Lingo on that basis.

**B.      Plaintiffs Are Unlikely To Succeed On The Merits Against Lingo.**

1.      Plaintiffs' Election-Law Claims Are Unlikely To Succeed Against Lingo.

a.      *Plaintiffs Are Unlikely To Show That Lingo Intimidated, Threatened, Or Coerced Anyone In Violation Of The VRA.*

Section 11(b) of the Voting Rights Act ("VRA") provides that no person "shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person" to stop them from voting.   52 U.S.C. § 10307(b).   Plaintiffs argue the New Hampshire Robocalls "intimidated" voters by "threat[ening] . . . the loss of the right to vote in the General Election." Am. Mot. 16.   The deepfake of President Biden's voice, Plaintiffs say, inflicted this harm by telling voters to "save your vote for the November election" because "[v]oting this Tuesday only enables the Republicans in their quest to elect Donald Trump again." *Id.* at 2, 17.   They claim that the calls had a "veil of legitimacy" because of the deepfake and because the calls spoofed the phone number of a local Democratic Party figure. *Id.* at 18.

Lingo fully respects the right to vote, and it did *none* of these things.   Steve Kramer "commissioned" the "deepfake" message, provided the script, and "solicited" Voice Broadcasting to procure a batch of robocalls.   Am. Mot. 7–8.   Voice Broadcasting "initiated" the calls, and Life Corp "routed" the calls through various telecommunications providers. *Id.* at 9.   Lingo was merely one of the voice providers through which the calls were carried.   It did not create the calls, initiate them, or review their content.   Plaintiffs fail to show that *Lingo* can be held liable for Kramer and Life Corp's calls.

Plaintiffs barely mention Lingo in their VRA merits arguments.   They allege only that Lingo incorrectly gave a portion of the New Hampshire Robocalls "A-level" attestations under the STIR/SHAKEN framework and thus "falsely authenticated that Life Corp had the legal authorization to use Kathy Sullivan's personal cell phone number."   Am. Mot. 9–10; *see id.* at

11

22.  But Plaintiffs do not argue that Lingo "spoofed" the calls—it did not—and merely seeing incorrect caller ID information (or, as against Lingo, having a higher likelihood of seeing incorrect caller ID information) does not "intimidate" voters.  Spoofing and the STIR/SHAKEN framework have nothing to do with the *content* of calls.  Rather, "STIR/SHAKEN" is a technical standard designed to combat spoofing by requiring that providers "attes[t]" to other providers their level of confidence that calls are coming from the number that appears on the caller ID. *Call Authentication Trust Anchor*, Report and Order and Further Notice of Proposed Rulemaking, 35 FCC Rcd 3241, 3245 ¶ 8 (2020); *see also* Second MTD 5–6.  Any technical violation of that framework is thus irrelevant to Section 11(b), which is concerned *exclusively* with whether the content of communications intimidated voters.  Plaintiffs do not argue that Lingo was aware (or could have been aware) of the information in the calls.  And for good reason—Lingo is *prohibited* under the Wiretap Act from reviewing the contents of its customers' calls.  *See supra*, at 9; *see also* Second MTD 6–9.

Plaintiffs appear to assert that Lingo is liable for Life Corp's calls because Life Corp "routed a portion of the calls to its contractual partner, Lingo."  Am. Mot. 9.  This assertion does not somehow bring Lingo's provision of voice service within the ambit of VRA Section 11(b).  The "ordinary usage" of the statutory terms "intimidate, threaten, or coerce" does support the understanding that one person threatening another over the telephone means that the *phone company* threatened the recipient.  When Congress enacted the VRA (and no less today), these terms contemplated first-party action—intimidation meant "[u]nlawful coercion" and "putting in fear;" threat meant "[a] declaration of intention or determination to inflict punishment, loss, or pain . . . or to injure another;" and coercion meant "[c]ompulsion" and "[to] compel[ ] by force."  Black's Law Dictionary (Rev. 4th ed. 1968); *see also* Second MTD 7.  That

understanding is reinforced by "the backdrop of the common law" that informed Congress in drafting the VRA, *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 335 (2020), because third-party intermediaries were not liable for their customers' messages absent actual knowledge of unlawful content, *see*, *e.g.*, *O'Brien v. W. Union Tel. Co.*, 113 F.2d 539, 541–43 (1st Cir. 1940); *see also* Second MTD 7–8. Congress and the courts have adhered to this understanding ever since by enacting and applying statutes that prohibit intermediaries from intercepting content and immunize certain providers for content created by others. *See*, *e.g.*, 18 U.S.C. § 2511(1)(a); 47 U.S.C. § 230; *see also* Second MTD 8–9 & nn.2–3.

Plaintiffs are thus unlikely to succeed in showing that Lingo violated the VRA.

> b. *Plaintiffs Are Unlikely To Show That The Calls Were Intimidating Threatening, Or Coercive.*

Even if the content of the New Hampshire Robocalls could be imputed to Lingo, that content did not intimidate, threaten, or coerce voters in violation of the VRA. Plaintiffs say, at most, that the calls attempted to *deceive* voters. *See* Am. Mot. 3 (arguing that the calls deceived voters), 16 ("manipulation and suggestion"). But Section 11(b) says nothing about deception. By contrast, the next subsection penalizes "giv[ing] false information," 52 U.S.C. § 10307(c), and the statute elsewhere prohibits military officers from "interfer[ing]" "in any manner" with voting, *id.* § 101012. "Congress kn[ew] how to add" a prohibition on deception yet "excluded one" in Section 11(b), *Ferrari v. Vitamin Shoppe Indus. LLC*, 70 F.4th 64, 73 (1st Cir. 2023), and those "differences in language" "convey differences in meaning" with respect to Section 11(b)'s coverage, *Rudisill v. McDonough*, 144 S. Ct. 945, 955 (2024) (quotations omitted).

Plaintiffs' "fear[ ] that less-experienced voters would not have been able to discern [the calls'] inauthenticity, and that could have led to the suppression of these voters," does not even

meet their own standard for Section 11(b) liability:  That "a reasonable recipient, familiar with the context of the communication, would view [it] as a threat of injury to deter individuals from exercising their right to vote."  Am. Mot. 3, 16 (quoting *Nat'l Coal. on Black Civic Participation v. Wohl*, 661 F. Supp. 3d 78, 113 (S.D.N.Y. 2023)).  The New Hampshire Robocalls allegedly stated that "Republicans have been trying to push nonpartisan and Democratic voters to participate in their primary," that "[i]t's important that you save your vote for the November election," and that "[v]oting this Tuesday only enables the Republicans in their quest to elect Donald Trump again."  *Id.* at 2.  Plaintiffs have not shown a likelihood that a reasonable person familiar with political calls would understand this message as a "threat" of "the loss of the right to vote in the General Election" if the voter participated in the primary.  *Id.* at 16.

Plaintiffs' own evidence confirms as much.  Each of the Individual Plaintiffs "knew" that the calls were not authentic and "knew" that he or she could vote in both the primary and general election.   Gingrich Decl. ¶ 8; *see also* Fieseher Decl. ¶ 8; Marashio Decl.¶¶ 7, 10.  Plaintiffs have pointed to no evidence that anyone understood the message differently.

>   c.   *Plaintiffs Are Unlikely To Show Lingo Knowingly Misrepresented Or Delivered Robocalls In Violation Of State Law.*

Plaintiffs' claims fare no better under state election law.  *See* Second MTD 11–12.  To succeed on a claim under NH RSA 664:14-b, I, Plaintiffs must prove that Lingo "knowingly misrepresent[ed] the origin of a telephone call."   Plaintiffs argue that "Defendants" (collectively) spoofed caller ID information and used a deepfake to impersonate President Joe Biden.  Am. Mot. 21–22.  But Lingo had nothing to do with either alleged misrepresentation.  Spoofing occurs where "*the caller* falsifies caller ID information that appears on a recipient's phone," *Call Authentication Trust Anchor*, 35 FCC Rcd at 3242 ¶ 1 (emphasis added), and Lingo

was not the caller.  To the contrary, Plaintiffs admit that "*Kramer* instructed Voice Broadcasting to use" the wrong phone number "that would appear on the Caller ID display."  Am. Mot. 9 (emphasis added).  And they do not suggest that Lingo knew about the spoofing.  They in fact say the opposite:  That Lingo gave the calls "'A' level [STIR/SHAKEN] attestation[s]," indicating Lingo believed that "Life Corp had the legal authorization" to use the number displayed on the Caller ID.  *Id.* at 9–10; *accord Lingo FCC Tariff* § 2.3.3(A) (prohibiting customers from spoofing).  Likewise, Plaintiffs allege that *Kramer* commissioned the deepfake, Am. Mot. 7, and do not allege that Lingo knew it existed, much less shaped its content.  Thus, Plaintiffs are unlikely to succeed in showing that Lingo violated NH RSA 664:14-b, I.

The same is true for Plaintiffs' claim under NH RSA 664:14-a, II.  For that claim, Plaintiffs must prove that Lingo "deliver[ed] or knowingly cause[d] to be delivered a prerecorded political message" that did not disclose the entities responsible for the call.  But again, Plaintiffs do not argue that Lingo had any role in shaping the content of the prerecorded message in the New Hampshire Robocalls.  Lingo would not have been able to screen for—or add—any of the disclosures that Plaintiffs allege are missing.  Thus, Plaintiffs are unlikely to succeed that Lingo violated NH RSA 664:14-a, II.

Lingo's role as a voice service provider means that Plaintiffs cannot hold Lingo liable under these statutes for the contents of calls placed by its customers.  New Hampshire courts construe statutory "language according to its plain and ordinary meaning," *Coffey v. N.H. Jud. Ret. Plan*, 957 F.3d 45, 49 (1st Cir. 2020) (quotation omitted), avoid "absurd results," *id.* at 52, and presume consistency with "the common law unless the statute clearly expresses" a contrary "intent," *State v. Etienne*, 163 N.H. 57, 74 (2011) (quotations omitted).  The same limitations on intermediary liability that apply under federal law, therefore, apply under the analogous New

Hampshire statutes. Nobody would say that a telephone company "knowingly misrepresents" information when one of its customers makes a misrepresentation in a phone call. *See supra*, at 12. Similarly, the "word 'delivers,' as used [at common law]," does not encompass "one who merely makes available to another equipment or facilities that he may use himself for general communication purposes," including "a telephone company." Restatement (Second) of Torts § 581 (Am. L. Inst. 1977). Interpreting the statutes in accord with this plain meaning also avoids an absurd outcome: imposing liability on telephone companies for the contents of messages that they are unable to review, monitor, or edit. Thus, Plaintiffs cannot use the actions of Kramer or the other Defendants to show a likelihood that *Lingo* "knowingly misrepresent[ed]" information, NH RSA 664:14-b, I, or "deliver[ed]" calls, NH RSA 664:14-a, II.

> d.     *Plaintiffs Are Unlikely To Show That Lingo Proximately Caused Any Injury From The Alleged Election-Law Violations.*

Plaintiffs' VRA and state-law claims also fail for the independent reason that they are unlikely to show that Lingo proximately caused any election-law-related injury. *See* Second MTD 13–14. Courts "generally presume that a statutory cause of action is limited to plaintiffs whose injuries are proximately caused by violations of the statute." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 132 (2014). The "proximate-cause requirement generally bars suits for alleged harm that is 'too remote' from the defendant's unlawful conduct." *Id.* at 133. Plaintiffs are unlikely to show that Lingo proximately caused them harm.

The First Circuit's decision in *Walsh* is instructive. That case concerned "a prepaid minutes-based calling service—named SpoofCard—that allow[ed] customers to disguise the phone number from which they place calls" and to "alter their voices." 821 F.3d at 157–58. A third party "used that service to disguise her identity" and to deliver harmful messages to the

plaintiff.  *Id.*  The plaintiff sued the provider of SpoofCard for violating a "broad . . . consumer protection statute."  *Id.* at 160.  The First Circuit held that the plaintiff had "not met her burden of establishing proximate causation" because the third-party customer's "actions were" not "reasonably foreseeable to" the provider where there were "illegitimate and legitimate uses of the SpoofCard service."  *Id.* at 163–64.  Just like the provider of SpoofCard, Lingo's offering of a legitimate service is "too remote" to create liability for any misdeeds of its customers.  *Id.*[1]

                e.       *Plaintiffs Are Unlikely To Succeed On Their Election-Law Claims Because They Lack Valid Causes Of Action For Them.*

                (1)     Voting Rights Act Claim

Plaintiffs are unlikely to prevail on their VRA claim against Lingo for another, more fundamental reason:  There is "no private right of action under Section 11(b) of the VRA."  *Andrews v. D'Souza*, 2023 WL 6456517, at *11 (N.D. Ga. Sept. 30, 2023); *Schilling v. Washburne*, 592 F. Supp. 3d 492, 497–99 (W.D. Va. 2022); *see also* Second MTD 14–16.

The "power to create a private right of action . . . lies exclusively with Congress."  *Iverson v. City of Bos.*, 452 F.3d 94, 100 (1st Cir. 2006); *see also Buntin v. City of Bos.*, 857 F.3d 69, 74 (1st Cir. 2017).  If Congress "has not explicitly provided for private enforcement," then a private right of action "must be implied."  *Bonano v. E. Caribbean Airline Corp.*, 365 F.3d 81, 83–84 (1st Cir. 2004).  Such implied rights of action "must be 'unambiguously conferred.'"  *Allco Renewable Energy Ltd. v. Mass. Elec. Co.*, 875 F.3d 64, 69 (1st Cir. 2017).  And "the existence of other express enforcement provisions" may "preclude[ ] . . . a private right of action."  *Id.* at 70.

---

[1] The risk of wrongdoing from the SpoofCard service was, if anything, *more* foreseeable than the risk of wrongdoing from Lingo's voice service.  SpoofCard published "promotional material" expressly highlighting "illegitimate" uses of the service.  *Walsh*, 821 F.3d at 163–64.  Here there is *no* allegation that Lingo promoted any "illegitimate" use of its service.  To the contrary, it prohibits such unlawful uses.  *See* Lingo FCC Tariff § 2.2.1.

This Court can "begin with the obvious:  Congress . . . has not explicitly provided for private enforcement of" Section 11(b).  *Bonano*, 365 F.3d at 83–84.  Section 11 says nothing about private enforcement.  *See* 52 U.S.C. § 10307.  The VRA instead contemplates private suits by "an aggrieved person" only to "enforce the voting guarantees of the fourteenth or fifteenth amendment."  *Id.* § 10302(a)–(c).  Because "Section 11(b) stems from the Elections Clause rather than the 14th or 15th Amendments," it does not fall within this "statutory language."  *Andrews*, 2023 WL 6456517, at *11; *accord League of United Latin Am. Citizens - Richmond Region Council 4614 v. Pub. Int. Legal Found.*, 2018 WL 3848404, at *3 (E.D. Va. Aug. 13, 2018).  Thus, any private right of action "must be implied."  *Bonano*, 365 F.3d at 84.

The VRA's "other express enforcement provisions" strongly "cut against finding an implied private cause of action."  *Allco*, 875 F.3d at 70; *see also Alexander v. Sandoval*, 532 U.S. 275, 290 (2001).  The statute gives the Attorney General the right to enjoin violations of Section 11, *see* 52 U.S.C. § 10308(d), and to seek penalties for violations of other provisions, *id.* § 10308(a)–(c).  And, as explained, the VRA authorizes private actions to enforce provisions other than Section 11(b).  Because the VRA "expressly provide[s] for an intricate enforcement framework, involving both [the Government] and private litigants," any "assertion that the [statute] gives" Plaintiffs an unenumerated "private right" is "unavailing."  *Allco*, 875 F.3d at 73–74; *accord Andrews*, 2023 WL 6456517, at *11; *Schilling*, 592 F. Supp. 3d at 497–99.

(2)   State-Law Claims

Plaintiffs are also unlikely to succeed on their claims under NH RSA 664:14-a, II and NH RSA 664:14-b, I because they were not "injured," as required to bring a private action.  *See* NH RSA 664:14-a, IV(b); NH RSA 664:14-b, II(b); *see also* Second MTD 16–18.

The Supreme Court of New Hampshire's decision in *O'Brien v. New Hampshire*

18

*Democratic Part*y, 166 N.H. 138 (2014), is instructive.[2]  There, a plaintiff alleged a violation of

NH RSA 664:14-a, II against a defendant that placed political robocalls without "the required

disclosures."  *Id.* at 140–41.  Because the statute allows suit only by a "person injured by

another's violation," the court explained that the plaintiff had to show "(1) a violation of the

statute; (2) an injury; and (3) that the violation of the statute caused the injury." *Id.* at 143.  The

court found that a call-recipient voter would not be able to establish the third prong of this

showing where she submitted an affidavit stating that she was "confused about the legitimacy

of the message," which "did not make sense to" her.  *Id.* at 145 (quotations omitted).  The court

explained that the voter could not establish that her injury was "caused by" the statutory

violation because her "confusion flowed from the political content of the message, rather than

from the alleged absence of the required disclosure." *Id.*

Like the voter in *O'Brien*, Plaintiffs here have failed to allege an injury stemming from

a violation of NH RSA 664:14-a, II or NH RSA 664:14-b, I.  To begin, Plaintiffs do not claim

to have suffered any "legal injury against which the law was designed to protect." *O'Brien*, 166

N.H. at 142 (quotations omitted).  The statutes at issue here are designed to protect against voter

confusion.  *See id.* at 145 (assessing voter confusion to analyze statutory standing).[3]  But all of

---

[2] Plaintiffs attempt to downplay the New Hampshire Supreme Court's analysis as dicta.  *See* Am. Mot. 22.  But federal courts are "bound by" the "considered dicta" of a controlling jurisdiction. *United Nurses & Allied Pros. v. NLRB*, 975 F.3d 34, 40 (1st Cir. 2020) (quotations omitted).

[3] Plaintiffs claim that the "injury" is (i) the interference with their right to privacy and the quiet enjoyment of their home, and (ii) not knowing who made the call or paid for the message.  Am. Mot. 22–23.  Both theories "improperly conflate a statutory violation with an injury." *O'Brien*, 166 N.H. at 145.  The misrepresentation and lack of disclosures are the violation; the resulting confusion is the injury.  By conflating these concepts, Plaintiffs' theories of injury do not work under the statutes.  First, if the injury stemmed from merely receiving the call, then it would not be "caused by" the misrepresentation or omitting the required disclosures.  *Contra* NH RSA 664:14-a, IV(b); NH RSA 664:14-b, II(b).  Second, the injury cannot be merely not knowing who made or paid for the call (or merely receiving a misrepresentation) because then every violation

the Individual Plaintiffs knew "the call was illegitimate."  Am. Mot. 3.  The Organizational Plaintiffs also make no allegation that they were confused.  Because Plaintiffs were not confused, they were not "injured" for purposes of either state statute.

And even if Plaintiffs alleged a cognizable statutory injury, they fail to establish that it comes "from the alleged" violations.  *O'Brien*, 166 N.H. at 145.  The crux of Plaintiffs' case is that the New Hampshire Robocalls deceived voters by telling them "that exercising their right to vote in the New Hampshire Primary" would render them "unable to vote in the General Election."  Am. Mot. 17.  Thus, any injury necessarily "flowed from the political content of the message, rather than from the alleged absence of the disclosure."  *O'Brien*, 166 N.H. at 145.  Even if the message disclosed Kramer as "the fiscal agent" or displayed a different phone number, that "additional information would not have clarified" that voters could participate in the general election if they voted in the primary.  *Id.*  Thus, because Plaintiffs do "not allege an injury flowing from the alleged statutory violation," they lack statutory standing.  *Id.* at 146.

> *f.*     *Plaintiffs Are Unlikely To Overcome Lingo's Statutory Immunity Against Their Election-Law Claims.*

Plaintiffs' election-law claims are unlikely to succeed against Lingo for a final, independent reason:  They are barred by Section 230 of the Communications Decency Act.  *See* 47 U.S.C. § 230(c)(1); Second MTD 18–21.  Under Section 230, "a defendant is shielded from liability" where "(1) the defendant is a provider or user of an interactive computer service; (2) the claim is based on information provided by another information content provider; and (3) the claim would treat the defendant as the publisher or speaker of that information."

---

would necessarily satisfy the statutory injury requirement, and *O'Brien* rejected that "a violation of the statute is, in and of itself, sufficient to allow the plaintiff to recover."  166 N.H. at 143–45 (rejecting "construction" that "would render meaningless the word 'injured'").

*Monsarrat v. Newman*, 28 F.4th 314, 318 (1st Cir. 2022) (quotations and alterations omitted). "[I]mmunity under section 230 should be broadly construed." *Id.* (quotations omitted) (citing *Universal Commc'n Sys., Inc. v. Lycos, Inc.*, 478 F.3d 413, 419 (1st Cir. 2007), and *Jane Doe No. 1 v. Backpage.com, LLC*, 817 F.3d 12, 18 (1st Cir. 2016)).

Lingo satisfies all three elements. *First*, Lingo's voice over Internet Protocol ("VoIP") service is an "interactive computer service." 47 U.S.C. § 230(f)(2). Because the calls were given STIR/SHAKEN attestations, Am. Mot. 9–10, they were necessarily "carried over Internet Protocol (IP) networks." FCC, *Combating Spoofed Robocalls with Caller ID Authentication*, https://tinyurl.com/yc6kecav (last visited June 27, 2024) ("the STIR/SHAKEN framework is only operational on IP networks"). VoIP "is a service that falls squarely within the phrase 'Internet and other interactive computer services' as defined in sections 230(f)(1) & 230(f)(2)." *Vonage Holdings Corp.*, Mem. Opinion and Order, 19 FCC Rcd 22404, 22425 ¶ 34 n.115 (2004); *see also IP-Enabled Servs.*, Report and Order, 24 FCC Rcd 6039, 6047–48 ¶ 15 (2009); *accord United States v. Stratics Networks Inc.*, 2024 WL 966380, at *1, *12 (S.D. Cal. Mar. 6, 2024); *Zoom Video Commc'ns Inc. Privacy Litig.*, 525 F. Supp. 3d 1017, 1029 (N.D. Cal. 2021).

*Second*, Plaintiffs' VRA and state-law claims are "based on information provided by another information content provider." *Monsarrat*, 28 F.4th at 318 (quotations omitted). Kramer satisfies the "broad definition" of information content provider, *Lycos*, 478 F.3d at 419, because he "commissioned" the "New Hampshire Robocalls," Am. Mot. 7–8. Life Corp, at Kramer's direction, delivered the resulting content using "Lingo['s] serv[ices]." *Id.* at 9. Plaintiffs do not suggest that Lingo had any role in creating or developing the New Hampshire Robocalls. Thus, "Plaintiff[s] seek[ ] to hold [Lingo] liable for content generated by third party users." *Stratics*, 2024 WL 966380, at *14; *see also Monsarrat*, 28 F.4th at 319 ("'downstream

distribution'" of third-party content is not creation or development of such content).

*Third*, Plaintiffs' VRA and state-law claims would treat Lingo "as the publisher or speaker of" the robocalls.  *Monsarrat*, 28 F.4th at 318 (quotations omitted); *see also Backpage.com*, 817 F.3d at 19 (noting First Circuit's "capacious conception" of this prong of Section 230).  Plaintiffs' VRA claim alleges the calls' contents were intimidating; their NH RSA 664:14-a claim alleges the calls "did not contain" required information; and their NH RSA 664:14-b claim alleges that the calls "displayed" misleading "caller identification information" and "used" "President Biden's voice."  Am. Mot. 21–23.  Thus, "there would be no harm to [the Plaintiffs] but for the content of the" calls.  *Backpage.com*, 817 F.3d at 19–20.  Plainly then, "any liability against [Lingo] must be premised on imputing to it the" calls' content—"that is, on treating it as the publisher [or speaker] of that information."  *Lycos*, 478 F.3d at 422.

Thus, Plaintiffs are unlikely to succeed in overcoming Lingo's Section 230 immunity.

## 2.    <u>Plaintiffs' TCPA Claim Is Unlikely To Succeed Against Lingo.</u>

Plaintiffs are unlikely to succeed in their claim that Lingo violated the Telephone Consumer Protection Act ("TCPA") because they are unlikely to show that Lingo "initiated" the New Hampshire Robocalls within the meaning of 47 U.S.C. § 227(b)(1)(B).  *See* Second MTD 21–25.  Consistent with the plain meaning of that term, the FCC and the courts have long held that communications intermediaries generally do not "initiate" calls because they "do[ ] not control the recipients, timing, or content" of the calls.  *Rules & Reguls. Implementing the Tel. Consumer Prot. Act of 1991*, Declaratory Ruling and Order, 30 FCC Rcd 7961, 7982 ¶ 33 (2015); *see also Adzhikosyan v. Callfire, Inc.*, 2019 WL 7856759, at \*2–4 (C.D. Cal. Nov. 20, 2019); *Meeks v. Buffalo Wild Wings, Inc.*, 2018 WL 1524067, at \*3–5 (N.D. Cal. Mar. 28, 2018); *Kauffman v. CallFire, Inc.*, 141 F. Supp. 3d 1044, 1048–49 (S.D. Cal. 2015); *Smith v. Securus*

*Techs., Inc.*, 120 F. Supp. 3d 976, 981–83 (D. Minn. 2015).   Because Plaintiffs have not alleged—much less shown—that Lingo controlled the recipients, timing, or content of the calls, they are unlikely to succeed on their TCPA claim against Lingo.   To the contrary, Plaintiffs themselves admit that "*Voice Broadcasting*, using service and equipment provided by Life Corp, *initiated*" the New Hampshire Robocalls.  Am. Mot. 9 (emphases added).

Courts have allowed TCPA claims to proceed against intermediaries only when they were in on the misconduct.  *Compare Cunningham v. Montes*, 378 F. Supp. 3d 741, 749 (W.D. Wis. 2019) (not dismissing where telemarketing platform "set up and ran some of [its] clients' campaigns from start to finish"), *with Herrick v. Grindr, LLC*, 306 F. Supp. 3d 579, 589–90 (S.D.N.Y. 2018), *aff'd*, 765 F. App'x 586 (2d Cir. 2019) (dismissing where application did not "contribute" to offending content sent by user).   But Plaintiffs have offered nothing to suggest that Lingo even knew about the allegedly unlawful content in the New Hampshire Robocalls— much less willingly participated in the scheme.   Plaintiffs ignore the general rule that intermediaries do not "initiate" calls and say nothing specific about Lingo in their TCPA argument.  *See* Am. Mot. 19–21.  This Court need not "construct a party's arguments for him," *United States v. Cruz-Ramos*, 987 F.3d 27, 40 (1st Cir. 2021), and no argument that can be inferred shows that Plaintiffs are likely to succeed on their TCPA claim against Lingo.

Plaintiffs cannot rely on Lingo's allegedly incorrect STIR/SHAKEN attestations for the calls—an argument not mentioned in their briefing on the TCPA—because attestations do not transform Lingo into the call initiator.   Federal regulations *require* Lingo to "implement the STIR/SHAKEN authentication framework," 47 C.F.R. § 64.6301(a), and that framework does not distinguish legal calls from illegal ones for TCPA purposes, *see* Second MTD 25 n.8.  Also, Congress required the FCC to adopt STIR/SHAKEN regulations in the TRACED Act of 2019,

which did not extend a private right of action to such regulations.  *See* 47 U.S.C. § 227b; Second

MTD 24.  And even FCC "technical" and "procedural standards" promulgated under the TCPA

"do[ ] not give rise to a private cause of action."  *Auguston v. Nat'l Admin. Serv. Co.*, 2023 WL

1810397, at *7 n.1 (E.D. Tex. Jan. 11, 2023) (quotations omitted), *report and recommendation*

*adopted*, 2023 WL 1802389 (E.D. Tex. Feb. 7, 2023); *see* 47 U.S.C. § 227(d)(3).

## II.   PLAINTIFFS HAVE NOT SHOWN THAT THEY WILL SUFFER IRREPARABLE HARM ATTRIBUTABLE TO LINGO ABSENT A PRELIMINARY INJUNCTION.

Preliminary injunctions cannot issue unless the movant "demonstrate[s] that irreparable

injury is *likely* in the absence of an injunction" before a decision on the merits can be reached.

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (emphasis in original).  Plaintiffs

have not shown any likelihood of irreparable injury attributable to Lingo because they point

only to allegations of *past* harms and because their only theory of irreparable harm—voter

intimidation based on a deepfake of President Biden's voice—has no connection to their

allegations against Lingo, *i.e.*, providing inaccurate STIR/SHAKEN attestations.

*First*, Plaintiffs point only to "irreparable harm related to harm" they allegedly have

"already suffered, rather than to harm [they] would suffer if the preliminary injunction were not

granted."  *Gonzalez-Droz v. Gonzalez-Colon*, 573 F.3d 75, 80–81 (1st Cir. 2009).  They candidly

admit that the Individual Plaintiffs "have already been harmed."  Am. Mot. 24.  They say that

these voters were "subjected" (in the past) "to Defendants' attempted threats, intimidation, and

coercion" and that they received (in the past) illegal calls.  *Id.*  They do not assert that these

voters are currently being subjected to illegal calls or that they will receive illegal calls in the

future.  Plaintiffs attempt to bridge this gap with the conclusory statement that "Individual

Plaintiffs have suffered and will suffer from these robocalls," *id.*, but do not allege any robocalls

since the New Hampshire primary or that the Individual Plaintiffs—who were not intimidated to begin with—are suffering ongoing harm from calls received five months ago. Lacking any "future harm" or "ongoing detriment," Plaintiffs have not shown they will suffer irreparable harm absent an injunction. *Gonzalez-Dros*, 573 F.3d at 81.

Similarly, the Organizational Plaintiffs assert they have "suffered, and will continue to suffer, by being forced to divert resources away from [their] mission" in order "to combat the harm caused" (in the past) "by the Defendants." Am. Mot. 25. But Plaintiffs must show "irreparable harm *in the absence of an injunction*." *Gonzalez-Droz*, 573 F.3d at 79 (emphasis added). The resource-diversion harm asserted here will occur regardless of any injunction because the Organizational Plaintiffs supposedly took these actions in response to past harm (and, as noted, had already taken them before the New Hampshire Robocalls, *supra*, at 5). They have already "raised [their] assessment of the threat level of similar robocalls in other states and for the general election," Stewart Decl. ¶ 10, and do *not* assert that they would lower that assessment again if Lingo—alone among all telephone companies that could be used by bad actors to route illegal robocalls—is enjoined. Since a prospective injunction against Lingo would not un-spread the misinformation or prevent unlawful traffic from transiting any other network, the Organizational Plaintiffs cannot show "harm [they] would suffer *if the preliminary injunction were not granted*." 573 F.3d at 81 (emphasis added).[4]

---

[4] Despite seeking an injunction of "nationwide effect," ECF No. 71-31 at 2, Plaintiffs have not attempted to show that Lingo (or any other Defendant) has repeated the alleged misconduct in the many hotly contested presidential and congressional primaries that have occurred in other states since January 2024. *See* FCC, 2024 Presidential Primary Dates and 2024 Congressional Primary Dates, https://www.fec.gov/resources/cms-content/documents/2024pdates.pdf; *see also* Am. Mot. 6 (noting that Lingo is registered "to provide telecommunications services in all 50 states"). Nor have Plaintiffs alleged further misconduct in New Hampshire, which has held multiple local elections since the presidential primary. *See* N.H. Secretary of State, 2024-2025 Political

*Second*, Plaintiffs fail to show irreparable harm as against Lingo because of the fundamental mismatch between their allegations against Lingo—which are limited to providing inaccurate attestations, Am. Mot. 9–10—and their only theory of irreparable harm—voter intimidation, *id.* 23–25.  Even if accurate attestations might have reduced the odds Plaintiffs would have received spoofed calls, Plaintiffs do not assert spoofing as a standalone basis of irreparable harm.  Nor could they:  Plaintiffs are seeking damages under the TCPA, *see* Am. Compl. ¶ 103, Prayer for Relief (g), and cannot claim that spoofing is an irreparable harm while, at the same time, asserting they are entitled to a legal remedy for the same conduct, *see Lyons*, 461 U.S. at 111 (no irreparable harm where injury can be adjudicated in suit for damages).

In any event, Plaintiffs' own evidentiary submissions establish that the perceived threat from voter intimidation arose exclusively from the deepfake of President Biden's voice, not from spoofing.  The Individual Plaintiffs exclusively cite the deepfake as the source of their concerns about voter intimidation, *see* Gingrich Decl. ¶ 10 ("[I]f someone who received the call thought it was President Biden, the robocall might cause some voters not to vote."); Marashio Decl.¶ 10 ("I am concerned that a less experienced voter may not have known that the voice was a fake."); Fieseher Decl. ¶¶ 6, 9; as do the Organizational Plaintiffs, *see* Tentarelli Decl. ¶ 9 (voters "were receiving prerecorded telephone calls . . . purporting to come from President Joe Biden and realistically simulating his voice by computer"); Stewart Decl. ¶¶ 7, 10 (referencing content-based concerns, only).  None mentions the allegedly spoofed telephone number or asserts that the potential harm to voters was or could be worse because of spoofing.  And because Plaintiffs do not allege that Lingo had any role in creating—or knowledge of—the content of

---

Calendar, https://www.sos.nh.gov/elections/2024-2025-political-calendar.

the calls, including the deepfake, Plaintiffs are left with no argument for irreparable harm that applies to Lingo.

*Third*, Plaintiffs' own delay "detracts from [their] claim of irreparable harm." *Charlesbank*, 370 F.3d at 163.  The New Hampshire Robocalls occurred on January 21, 2024. Am. Mot. 2.  Yet Plaintiffs waited until March 14 to file this suit, *see* ECF No. 1, and until April 26 to move for a preliminary injunction, *see* ECF No. 47.  Then, instead of filing a reply and asking this Court to set the motion for argument, Plaintiffs filed their amended motion on June 7—nearly five months after the New Hampshire primary.  *See* ECF No. 71.[5]  That "delay in seeking relief in federal court after learning" of the alleged misconduct confirms the absence of any irreparable harm.  *SMA Life Assur. Co. v. Sanchez-Pica*, 960 F.2d 274, 278 (1st Cir. 1992); *see also Open Top Sightseeing USA v. Mr. Sightseeing, LLC*, 48 F. Supp. 3d 87, 90 (D.D.C. 2014).  Nor can the delay be justified by the fact that the general election is not until November, given the dozens of other elections that have occurred while Plaintiffs waited (none of which Plaintiffs claim involved harms traceable to Lingo).  *See supra*, at 25 n.4.

Because "irreparable harm" is an "essential prerequisite for equitable relief," denial is warranted on this ground alone.  *Braintree Labs., Inc. v. Citigroup Glob. Mkts. Inc.*, 622 F.3d 36, 41–43 (1st Cir. 2010) (quotations omitted).

## III.   THE EQUITIES AND THE PUBLIC INTEREST STRONGLY DISFAVOR A PRELIMINARY INJUNCTION AGAINST LINGO.

Plaintiffs fail to grapple with the sweeping consequences of their requested injunction

---

[5] Plaintiffs said they needed to amend their motion to address "new information" and to add "one additional party."  ECF No. 63 ¶ 9.  But Plaintiffs could have addressed any information in their reply and filed a separate motion to enjoin the new party.  Their decision to reset preliminary-injunction briefing for all Defendants—adding more than a month of delay—was a deliberate choice that belies any sense of urgency.

for Lingo, its customers, and the public.  Ordering Lingo to cease "distributing AI-generated robocalls," "spoofed" communications, and any communications "that do not fully comply with all applicable state and federal laws or that are made for an unlawful purpose," ECF No. 71-31 at 1–2, would force Lingo to monitor and censor calls in violation of federal law.  And in pursuit of the public interest in the "right to vote," Am. Mot. 26, the injunction would eviscerate the competing interests in privacy, free expression, and access to communications services.  The Court should deny the injunction against Lingo on equitable and public-interest grounds.

The balance of equities cuts strongly against granting an injunction against Lingo. Plaintiffs assert that Lingo "will suffer no harm if injunctive relief is granted" because "an injunction that merely ends an unlawful practice does not impart harm on a party."  Am. Mot. 26.  But the injunction would "end" one allegedly illegal practice by requiring another one—the monitoring and censorship of call content in violation of the Wiretap and Communications Acts, among other federal and state laws.  *See supra*, at 9.  Lingo would be forced either to violate federal law by complying with the injunction or to violate the injunction to comply with federal law.  That "Hobson's choice" is an irreparable harm *to Lingo*.  *Mont. Med. Ass'n v. Knudsen*, 591 F. Supp. 3d 905, 914–15 (D. Mont. 2022) (finding irreparable harm where regulated party was forced to comply either with state law or federal regulation and "a very real penalty [would] attach[ ] . . . regardless of how they proceed" (quotations omitted)).  Separately, while Plaintiffs give short shrift to the burdens that would be imposed by the proposed injunction, Am. Mot. 28–29, developing the capability to monitor call *content* would entail significant costs because the injunction would extend beyond existing legal requirements for phone companies.

Plaintiffs offer nothing on the other side of the ledger to justify an injunction against Lingo.  Lingo vehemently agrees that the right to vote is important.  But Lingo does not create

robocalls, place them, or review their contents.  It is a neutral conduit.  Plaintiffs' attempt to enjoin a telephone company will do nothing to protect the right to vote.

The public interest would not be served by entering an injunction that replaces Congress's judgment on the appropriate role of voice providers with Plaintiffs'.  Customers are legally entitled to, and expect, privacy in the contents of their telephone communications and that calls will be connected without service-provider scrutiny into their content and purpose. Plaintiffs fail to acknowledge the First Amendment implications of their requested injunction as well.  Phone communications are a critical avenue for free expression, and the proposed injunction would use an axe when a scalpel is required to draw the line between lawful and unlawful speech without chilling the exercise of protected rights by phone-service customers.

Because the final two factors heavily and unanimously counsel against an injunction, denial is warranted on this basis as well.  *See Winter*, 555 U.S. at 26–33 (vacating preliminary injunction on sole ground that equities and public interest disfavored injunctive relief).[6]

## IV.   PLAINTIFFS' REQUESTED PRELIMINARY INJUNCTION IS VAGUE AND OVERBROAD.

At minimum, the Court should not enter Plaintiffs' preliminary injunction as proposed. Plaintiffs ask this Court to preliminarily enjoin Lingo from (i) "distributing AI-generated robocalls impersonating any person, without that person's express, prior written consent," (ii) "distributing spoofed telephone calls, text messages, or any other form of spoofed communication,"  and  (iii) "distributing  telephone  calls,  text  messages,  or  other  mass

---

[6] In addition, it would be inequitable to enter an injunction against Lingo when Kramer *still* has not appeared in this case.  Kramer "commissioned" the New Hampshire Robocalls at the center of this case.  Am. Mot. 7.  Before enjoining Lingo in connection with the acts and statements of an unrelated third party, the Court should—at minimum—wait until that pivotal third party appears so Lingo has an opportunity to consider and respond to his representations and contentions.

communications that do not fully comply with all applicable state and federal laws or that are made for an unlawful purpose." ECF No. 71-31 at 1–2. That vague and overbroad language violates Local Rule 65.1 and Federal Rule of Civil Procedure 65(d)(1)(C) because it does not "describe in reasonable detail . . . the act or acts restrained or required." *See*, *e.g.*, *Francisco Sanchez v. Esso Stand. Oil Co.*, 572 F.3d 1, 15 (1st Cir. 2009) ("An order that fails to comply with the prerequisites of Rule 65(d) should be set aside on appeal.").

Neither Lingo nor any other voice provider can magically stop customers from making calls that include illegal content short of unprecedented and illegal monitoring and censorship. Plaintiffs do not define what it means to have an illegal "purpose" for making a call, or explain how Lingo could possibly discern its customers' purposes. The exact same conversation could be made for lawful or unlawful purposes—for example, a call asking for money could be criminal fraud or a grandson talking with indulgent grandparents, and Lingo would have no way of knowing the difference *ex ante*. The same flaw applies to Plaintiffs' proposed "express, written consent" language, as Lingo generally has no way of knowing whether one caller placing a robocall or spoofed call has obtained such consent from the recipient. Plaintiffs also cite no authority to enjoin Lingo from distributing *any* spoofed communication. Spoofing is generally legal and holds "legitimate importance" for many callers. *Walsh*, 821 F.3d at 163 (quotations omitted). At most, Plaintiffs could request an injunction to prevent *illegal* spoofing, but that would pose the same problem: Neither Lingo nor any other telephone company can tell *ex ante* and with certainty whether a spoofed call is made for an illegal purpose.

## CONCLUSION

Lingo respectfully requests that the Court dismiss Plaintiffs' claim for injunctive relief against Lingo for lack of standing and, at a minimum, deny the amended motion.

June 28, 2024

/s/ Michele E. Kenney
Michele E. Kenney (NH Bar No. 19333)
**PIERCE ATWOOD LLP**
One New Hampshire Avenue, Suite 350
Portsmouth, NH 03801
(603) 433-6300
mkenney@pierceatwood.com

Respectfully submitted,

/s/ Helgi C. Walker
Helgi C. Walker* (D.C. Bar # 454300)
Jacob T. Spencer* (D.C. Bar # 1023550)
**GIBSON, DUNN & CRUTCHER LLP**
1050 Connecticut Ave., N.W.
Washington, DC 20036
Tel: 202.955.8500
Fax: 202.467.0539
HWalker@gibsondunn.com

/s/ Thomas M. Johnson, Jr.
Thomas M. Johnson, Jr.* (D.C. Bar # 976185)
Frank Scaduto* (D.C. Bar # 1020550)
Boyd Garriott* (D.C. Bar # 1617468)
**WILEY REIN LLP**
2050 M Street NW
Washington, DC 20036
Tel: 202.719.7000
Fax: 202.719.7049
TMJohnson@wiley.law

*Counsel for Lingo Telecom, LLC*
*Admitted Pro Hac Vice*

31

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on June 28, 2024, the foregoing was electronically filed with the Court and served upon the following:

William C. Saturley
Nathan R. Fennessy
Nicholas A. Dube
Preti Flaherty, PLLP
57 N. Main Street
PO Box 1318
Concord, NH 03302-1318
Counsel for Plaintiffs
*Via ECF System*

Courtney Hostetler
John Bonifaz
Ben Clements
Amira Mattar
Free Speech For People
48 N. Pleasant St., Ste. 304
Amherst, MA 01002
Counsel for Plaintiffs
*Via ECF System*

Wayne E. George
Morgan Lewis & Bockius LLP
One Federal St
Boston, MA 02110-4104
Counsel for Defendant Life Corporation
*Via ECF System*

Mark R. Herring
Matthew R. Nicely
Caroline L. Wolverton
Amanda S. McGinn
Joseph T. DiPiero
Maria Julia Hershey
Sara M. Hanna
Akin Gump Strauss Hauer & Feld
Robert S. Strauss Tower
2001 K Street, N.W.
Washington, DC 20006-1037
Counsel for Plaintiffs
*Via ECF System*

Steve Kramer
2100 Napoleon Ave.,
New Orleans, LA 70115
*Via US Mail*

Ezra D. Church
Terese M. Schireson
Morgan Lewis & Bockius LLP
2222 Market Street
Philadelphia, PA 19103
Counsel for Defendant Life Corporation
*Via ECF System*

Benjamin T. King
Douglas Leonard & Garvey PC
14 South St, Ste 5
Concord, NH 03301
Counsel for Defendant Life Corporation
*Via ECF System*

*/s/ Helgi C. Walker*
Helgi C. Walker (D.C. Bar # 454300)