**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE**

**LEAGUE OF WOMEN VOTERS OF
NEW HAMPSHIRE,** *et al.***,**

          Plaintiffs,

    v.

**STEVE KRAMER,** *et al.***,**

          Defendants.

Civil Action No. 1:24-cv-73-SM-TSM

**PLAINTIFFS' CONSOLIDATED OPPOSITION TO DEFENDANTS' MOTIONS TO
DISMISS AMENDED COMPLAINT**

# TABLE OF CONTENTS

INTRODUCTION ...............................................................................................1

STANDARD OF REVIEW ...............................................................................1

ARGUMENT ......................................................................................................2

    I.      Plaintiffs Allege Sufficient Facts to Establish Article III Standing ........................2

          a.     Plaintiffs Have Plausibly Established an Injury-in-Fact. ............................2

          b.     Plaintiffs Have Shown the Alleged Injury Is Fairly Traceable to Life And Voice. ......................................................................................5

    II.     Plaintiffs Plausibly Allege Defendants Violated the VRA.....................................7

          a.     Plaintiffs Have Pled Sufficient Facts to Show that the NH Robocalls Were Threatening, Intimidating, or Coercive ............................7

          b.     Plaintiffs have pled sufficient facts that the Defendants were liable under the VRA. ..................................................................................9

    III.    Plaintiffs Plausibly Allege Violations of New Hampshire Election Law .............13

    IV.    Plaintiffs Plausibly Allege Violations of the TCPA .............................................16

          a.     The Court Must Consider the Totality of the Facts and Circumstances, As Well As Congressional Intent, in Assessing TCPA Liability ...............................................................................16

          b.     Plaintiffs Allegations Support Plausible Inference that Defendants Initiated the NH Robocalls...................................................19

          c.     Defendants Life Corp and Voice Broadcasting Do Not Qualify for an Exemption Under the TCPA................................................21

    V.     Defendant Lingo Does Not Qualify for Section 230 Immunity ............................24

          a.     Plaintiffs Have Not Alleged Lingo Provided Interactive Computer Services in Connection with NH Robocalls................................25

          b.     Lingo Is Not Entitled to Immunity Because of Its Key Role in Developing the NH Robocalls' Offensive Content....................................28

CONCLUSION...................................................................................................29

## TABLE OF AUTHORITIES

**Cases**

*Allen v. State Bd. of Elections*,
 393 U.S. 544 (1969), *abrogated on other grounds by Ziglar v. Abbasi*, 582 U.S. 120
 (2017) ................................................................................................................................ 8

*Am. Postal Workers Union v. Frank*,
 968 F.2d 1373 (1st Cir. 1992) ......................................................................................... 3

*Anderson v. N.Y. Tel. Co.*,
 320 N.E.2d 647 (N.Y. 1974) ........................................................................................... 12

*Arcam Pharm. Corp. v. Faria*,
 513 F.3d 1 (1st Cir. 2007) ............................................................................................... 15

*Ariz. Democratic Party v. Ariz. Republican Party*,
 No. 16 Civ. 03752-PHX-JJT, 2016 WL 8669978 (D. Ariz. Nov. 4, 2016) ......................... 10

*Ashcroft v. Iqbal*,
 556 U.S. 662 (2009) ..................................................................................................... 1, 2

*Ashworth v. Albers Med., Inc.*,
 410 F. Supp. 2d 471 (S.D. W. Va. 2005) ......................................................................... 12

*Ayyadurai v. Floor64, Inc.*,
 270 F. Supp. 3d 343 (D. Mass. 2017) ............................................................................. 29

*Bauman v. Saxe*,
 No. 2:14-cv-01125-RB-PAL, 2019 WL 591439 (D. Nev. Feb. 13, 2019) ......................... 18

*Bell Atl. Corp. v. Twombly*,
 550 U.S. 544 (2007) ......................................................................................................... 1

*Blackstone Realty LLC v. FDIC*,
 244 F.3d 193 (1st Cir. 2001) ........................................................................................... 25

*Boyle v. City of Portsmouth*,
 154 N.H. 390 (2006) ....................................................................................................... 13

*Butler v. Balolia*,
 736 F.3d 609 (1st Cir. 2013) ............................................................................................. 2

*Carignan v. N.H. Int'l Speedway*,
 151 N.H. 409 (2004) ....................................................................................................... 14

*Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*,
 589 U.S. 327 (2020) ....................................................................................................... 12

*Cunningham v. Montes*,
   378 F.Supp.3d 741 (W.D. Wis. 2019) .................................................................... 17, 18, 21

*Daschle v. Thune*,
   Case No. 04-4177, Temporary Restraining Order (TRO) .............................................. 8, 10

*Dept. of Com. v. New York*,
   588 U.S. 752 (2019) .................................................................................................. 6

*Dish Declaratory Ruling*,
   28 FCC Rcd. 6574 (2013) ......................................................................................... 16

*Donahue v. City of Boston*,
   304 F.3d 110 (1st Cir. 2002) ..................................................................................... 6

*Dryoff v. Ultimate Software Grp., Inc.*,
   934 F.3d 1093 (9th Cir. 2019) ................................................................................. 25

*Equal Means Equal v. Ferriero*,
   3 F.4th 24 (1st Cir. 2021) ........................................................................................ 5

*In re Est. of Norton*,
   135 N.H. 62 (1991)................................................................................................. 15

*F.D.A. v. All. for Hippocratic Med.*,
   602 U.S. 367 (2024) ................................................................................................ 4

*Ferrari v. Vitamin Shoppe Indus. LLC*,
   70 F.4th 64 (1st Cir. 2023) ...................................................................................... 9

*Foley v. Wells Fargo Bank, N.A.*,
   772 F.3d 63 (1st Cir. 2014) .................................................................................. 2, 11

*FTC v. Accusearch Inc.*,
   570 F.3d 1187 (10th Cir. 2009) ............................................................................... 29

*FTC v. Educare Ctr. Servs. Inc.*,
   No. 3:19-cv-00196-KC (W.D. Tex. Am. Compl. filed Dec. 3, 2019)................................ 27

*FTC v. LeadClick Media, Ltd. Liab. Co.*,
   838 F.3d 158 (2d Cir. 2016) .................................................................................... 25

*g., 2007*
   *CPNI Order*, 22 FCC Rcd. 6927 (2007)..................................................................... 27

*Gibbs v. SolarCity Corp.*,
   239 F. Supp. 3d 391 (D. Mass. 2017)......................................................................... 3

*Havens Realty Corp v. Coleman*,
   455 U.S. 363 (1982) ............................................................................................. 4, 5

*Hayward v. Bank of N.Y. Mellon as Tr. for Certificateholders, CWALT, Inc.*,
   688 F. Supp. 3d 22 (D.N.H. 2023) ................................................................................ 3

*Herrick v. Grindr, LLC*,
   306 F. Supp. 3d 579 (S.D.N.Y. 2018) ......................................................................... 12

*In the Matter of Implications of Artificial Intelligence Technologies on Protecting
   Consumers from Unwanted Robocalls and Robotexts*,
   CG Docket No. 23-362, Declaratory Ruling, FCC 24-17, 2024 WL 519167 (Feb. 8,
   2024)............................................................................................................................... 22

*Ives v. Manchester Subaru, Inc.*,
   126 N.H. 796 (1985)...................................................................................................... 14

*Jackson v. Riddel*,
   476 F. Supp. 849 (N.D. Miss. 1979) ............................................................................. 8

*Katz v. Pershing, LLC*,
   672 F.3d 64 (1st Cir. 2012) ............................................................................................ 5

*L.A. v. Lyons*,
   461 U.S. 95 (1983) ......................................................................................................... 3

*Laccinole v. Students for Life Action Inc.*,
   No. CV 21-252 WES, 2022 WL 3099211 (D.R.I. Aug. 4, 2022) ................................. 3

*League of United Latin Am. Citizens—Richmond Region Council 4614 v. Pub. Int. Legal
   Found.*,
   No. 1:18-cv-423, 2018 WL 3848404 (E.D. Va. Aug. 13, 2018) ................................ 10

*League of Women Voters of N.C. v. North Carolina*,
   769 F.3d 224 (4th Cir. 2014)..................................................................................... 3, 7

*Lexmark Intern., Inc. v. Static Control Components, Inc.*,
   572 U.S. 118 (2014) ................................................................................................. 6, 14

*Lord v. Lovett*,
   146 N.H. 232 (2001)...................................................................................................... 15

*Lowe v. Mills*,
   68 F.4th 706 (1st Cir. 2023) ........................................................................................... 2

*Lujan v. Defs. of WildLife*,
   504 U.S. 555 (1992) ....................................................................................................... 6

*Lunny v. Prodigy Servs. Co.*,
   723 N.E.2d 539 (N.Y. 1999) ....................................................................................... 12

*In re Matter of Lingo Telecom, LLC*,
   FCC 24-60 (May 28, 2024) ................................................................................... *passim*

*In re Matter of Steve Kramer*,
    FCC 24-59 (May 24, 2024) ................................................................................................. 6

*Mey v. All Access Telecom Inc.*,
    No. 5:19-CV-00237-JPB, 2021 WL 8892199 (N.D.W. Va. Apr. 23, 2021) ...................... 18

*Mich. Welfare Rights Org. v. Trump*,
    600 F. Supp. 3d 85 (D.D.C. 2022) .................................................................................. 10

*Nat'l Coal. on Black Civic Participation v. Wohl*,
    498 F. Supp. 3d 457 (S.D.N.Y. 2020) ................................................................ 4, 7, 8, 10

*Nat'l Coal. On Black Civic Participation v. Wohl*,
    661 F. Supp. 3d 78 (S.D.N.Y. 2023) ......................................................................*passim*

*Nat'l Coal. On Black Civic Participation v. Wohl*,
    No. 20 Civ. 8668 (VM), 2021 WL 4254802 (S.D.N.Y. Sept. 17, 2021) ........................... 10

*O'Brien v. N.H. Democratic Party*,
    166 N.H. 138 (2014) ................................................................................................ 14, 15

*O'Brien v. W. U. Tel. Co.*,
    113 F.2d 539 (1st Cir. 1940) ............................................................................... 12, 14, 15

*Reddy v. Foster*,
    845 F.3d 493 (1st Cir. 2017) .............................................................................................. 2

*Reynolds v. Sims*,
    377 U.S. 533 (1964) ........................................................................................................... 7

*Rhodes v. Siver*,
    No. 19-12550, 2021 WL 912393 (E.D. Mich. Mar. 10, 2021) ......................................... 10

*Rudisill v. McDonough*,
    144 S. Ct. 945 (2024) ........................................................................................................ 9

*In re Rules & Reguls. Implementing the Tel. Consumer Prot. Of 1991*,
    7 FCC Rcd. 8752 (1992) .................................................................................................. 21

*In the Matter of Rules and Reguls. Implementing the Tel. Consumer Prot. Act of 1991*,
    FCC 15-72, 30 FCC Rcd. 7961 (July 10, 2015) ............................................................... 16

*Spiegel v. EngageTel Inc.*,
    372 F.Supp. 3d 672 (N.D. Ill. 2019) ........................................................................... 18, 19

*Appeal of Town of Lincoln*,
    172 N.H. 244 (2019) ........................................................................................................ 15

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021) ........................................................................................................... 3

*United Nurses & Allied Pros v. NLRB*,
  975 F.3d 34 (1st Cir. 2020) ................................................................................... 15

*United States v. Stratics Networks Inc.*,
  No. 23-CV-0313-BAS-KSC, 2024 WL 966380 (S.D. Cal. Mar. 6, 2024).......................... 28

*United States v. Turner*,
  720 F.3d 411 (2d Cir. 2013) ..................................................................................... 9

*Universal Commun. Sys. v. Lycos, Inc.*,
  478 F.3d 413 (1st Cir. 2007) ..................................................................... 24, 28, 29

*Universal Service Contribution Methodology*,
  Report and Order, 21 FCC Rcd 7518 (2006) ............................................................ 27, 28

*Vonage Holdings Corp.*,
  Memorandum Opinion and Order, 19 FCC Rcd. 22404 ............................................ 27

*Walsh v. TelTech Sys., Inc.*,
  821 F.3d 155 (1st Cir. 2016) ................................................................................... 14

*Webb v. Injured Workers Pharmacy, LLC*,
  72 F.4th 365 (1st Cir. 2023) ...................................................................................... 3

*Williams v. Salerno*,
  792 F.2d 323 (2d Cir. 1986) ....................................................................................... 3

*Yick Wo v. Hopkins*,
  118 U.S. 356 (1886) .................................................................................................. 7

**Statutes**

18 U.S.C. § 2511 ........................................................................................................ 12

47 U.S.C. 214(a) ......................................................................................................... 26

47 U.S.C. § 153(51) ................................................................................................... 26

47 U.S.C. § 227 .................................................................................... 16, 24, 25, 27, 28

52 U.S.C. § 10307(b) ................................................................................................. 10

Pub. Law. No. 104-104, tit. I, §§ 102-104, 251-261 (1996) ...................................... 26

N.H. Rev. Stat. § RSA 664:14 .................................................................................. 15

**Other Authorities**

Ali Swenson and Will Weissert, *New Hampshire investigating fake Biden robocall meant
    to discourage voters ahead of primary,* ASSOCIATED PRESS (Jan. 24, 2024)
    https://apnews.com/article/new-hampshire-primary-biden-ai-
    deepfakerobocall-f3469ceb6dd613079092287994663db5 ....................................................... 22

FCC, *Combating Spoofed Robocalls with Caller ID Identification,*
    https://www.fcc.gov/call-authentication ............................................................................... 24

FCC, *International Section 214*, https://www.fcc.gov/general/international-section-214 ......................... 26

FCC, *Rules for Political Campaign Calls and Texts*, https://www.fcc.gov/rules-political-
    campaign-calls-and-texts ..................................................................................................... 21

Federal Rule of Civil Procedure 12(b)(6) ............................................................................... 1, 2, 17

Hearing on HB 332, at 56 (N.H. Feb. 4, 2003) ............................................................................ 15

NPR (April 30, 2023), https://www.npr.org/2023/04/30/1172276538/world-wide-web-
    internet-anniversary ............................................................................................................. 26

Statement of Rep. Paul Spiess, Prime Sponsor of HB 332 ........................................................... 15

NOW COME Plaintiffs League of Women Voters of New Hampshire and League of Women Voters of the United States (collectively, the "League"), and Nancy Marashio, James Fieseher, and Patricia Gingrich (collectively, the "Individual Plaintiffs"), by and through counsel, and respectfully submit this Consolidated Memorandum of Law in Opposition to Defendants' Motions to Dismiss, filed by Life Corporation ("Life"), Voice Broadcasting ("Voice"), and Lingo Telecomm, LLC ("Lingo") (collectively, the "Defendants"), stating as follows:

## INTRODUCTION

Defendants seek to avoid culpability for their involvement in generating and distributing thousands of unlawful, threatening, intimidating, and coercive robocalls delivered to New Hampshire voters on the eve of the January 2024 New Hampshire Presidential Primary (the "New Hampshire Primary"). As plausibly alleged in the Plaintiffs' Amended Complaint, and detailed further herein, each of the Defendants played an integral role in ensuring that AI-generated or "deepfake" robocalls impersonating the President of the United States, and warning voters not to participate in the New Hampshire Primary, reached their intended target (the "NH Robocalls"). Furthermore, each of the Defendants contributed to the misattribution—or "spoofing"—of the NH Robocalls to the former Chairwoman of the New Hampshire Democratic Party, misleading voters as to the source of the NH Robocalls, and intensifying the legitimacy of the threatening, intimidating, and coercive message conveyed therein. As a result of their individual and collective actions, Defendants have violated the Voting Rights Act ("VRA"), New Hampshire Election Laws, and Telecommunications Consumer Protection Act ("TCPA").

## STANDARD OF REVIEW

To survive a Federal Rule of Civil Procedure 12(b)(6) motion to dismiss, a plaintiff need only make factual allegations sufficient to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S.

1

544, 570 (2007)).  Pursuant to Rule 12(b)(6), the Court must accept the factual allegations in the complaint as true, construe reasonable inferences in the plaintiff's favor, and "determine whether the factual allegations in the plaintiff's complaint set forth a plausible claim upon which relief may be granted."  *Foley v. Wells Fargo Bank, N.A.*, 772 F.3d 63, 71 (1st Cir. 2014) (internal quotation marks omitted).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft*, 556 U.S. at 678.  Analyzing plausibility is "a context-specific task" in which the court relies on its "judicial experience and common sense."  *Id.* at 679.  The Court may consider the facts alleged in the complaint, exhibits attached to the complaint, and other materials that are fairly incorporated in the complaint or are subject to judicial notice such as matters of public record.  *Lowe v. Mills*, 68 F.4th 706, 713-14 (1st Cir. 2023); *see also Butler v. Balolia*, 736 F.3d 609, 611 (1st Cir. 2013).

## ARGUMENT

### I.   PLAINTIFFS ALLEGE SUFFICIENT FACTS TO ESTABLISH ARTICLE III STANDING

Defendants Life and Voice contend that Plaintiffs do not have standing to assert their claims.  Specifically, Life and Voice argue Plaintiffs have not sufficiently alleged an injury-in-fact, or plausibly alleged that the actions of Life and Voice caused their injuries.  *See* Def. Life Corp. and Voice Broad. Mem. of Law in Support of Mot. to Dismiss, at 4-6, ECF No. 76-1 ("Life/Voice Mem.").  They are incorrect.

   *a.   Plaintiffs Have Plausibly Established an Injury-in-Fact.*

"To satisfy [] [standing], the injury [in fact] 'must be concrete and particularized and actual or imminent, not conjectural or hypothetical.'"  *Reddy v. Foster*, 845 F.3d 493, 500 (1st Cir. 2017)

(citations omitted).  At the motion to dismiss stage, standing must be plausible, and the court must "accept the factual allegations in the complaint as true [and] construe reasonable inferences in the plaintiff's favor."  *Hayward v. Bank of N.Y. Mellon as Tr. for Certificateholders, CWALT, Inc.*, 688 F. Supp. 3d 22, 24 (D.N.H. 2023); *see also Webb v. Injured Workers Pharmacy, LLC*, 72 F.4th 365, 371 (1st Cir. 2023).  Thus, to establish standing for a claim for damages, Plaintiffs must plausibly allege they have suffered a past concrete harm, *see TransUnion LLC v. Ramirez,* 594 U.S. 413, 426 (2021), and for equitable relief, plaintiffs must plausibly plead a likelihood that they will be wronged again in a similar way.  *See Am. Postal Workers Union v. Frank*, 968 F.2d 1373, 1376 (1st Cir. 1992) (quoting *L.A. v. Lyons*, 461 U.S. 95, 111 (1983)).  Plaintiffs have met this burden.

The Individual Plaintiffs were harmed by receiving threatening, intimidating, and coercive robocalls—an injury plainly particular and actual enough to confer standing.  *See Gibbs v. SolarCity Corp.*, 239 F. Supp. 3d 391, 395 (D. Mass. 2017) (finding that unwanted telemarketing calls comprise a concrete injury, following many other courts); *Laccinole v. Students for Life Action Inc.*, No. CV 21-252 WES, 2022 WL 3099211, at *3 (D.R.I. Aug. 4, 2022) ("unwanted, solicitous text messages" sufficient to establish injury for standing purposes) (collecting cases).  That is particularly true where, as here, the unwanted robocall interfered with the exercise of people's right to vote in the New Hampshire Primary.  *See League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014); *see also Williams v. Salerno*, 792 F.2d 323, 326 (2d Cir. 1986) ("The registration applicants in this case would certainly suffer irreparable harm if their right to vote were impinged upon.").  And Plaintiffs have further alleged that they will be similarly wronged again by Defendants.  Plaintiffs have alleged that Defendants Life and Voice distribute tens of millions of robocalls, generating millions in profit for the companies, *see* First Am. Compl. ¶¶ 29, ECF No. 65 (the "Amended Complaint"), that they offer clients the ability to

spoof Caller ID information, *id.* ¶ 33, and that they do not employ any controls to prevent spoofing or ensure clients aren't misusing their services, *id.* ¶ 86.

Recent Supreme Court precedent establishes that the League also has organizational standing.  An organization is injured particularly, the Supreme Court explained, when the defendant's action "directly affected and interfered with [the organization's] core business activities." *F.D.A. v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024).  Other courts have found that needing to respond to a harmful robocall frustrating an organization's core business activity is sufficient grounds for organizational standing.  *Nat'l Coal. on Black Civic Participation v. Wohl*, 498 F. Supp. 3d 457, 471 (S.D.N.Y. 2020) ("*Wohl I*") (explaining that the organization's goal of promoting civic participation especially encouraging Census participation among the Black community was frustrated as the co-chair had to stop Census work to respond to robocalls); *see also Victim Rights Law Ctr. v. Cardona*, 552 F. Supp. 3d 104, 126 (D. Mass. 2021) ("*Victim Rights*") (finding that an organization to help victims in the Title IX process had organizational standing, seeking injunction, to challenge a regulatory action by the U.S. Department of Education which caused unwillingness from victims to continue with their complaints, frustrating the purpose of the organization).

The League's core business is to encourage informed and active participation in the government, which they facilitate by encouraging citizens to register to vote and participate in elections.  *See* Am. Compl. ¶ 11.  Just like in *Wohl I* and *Victim Rights*, the illegal robocalls directly interfered with League's ability to continue this core business as it has been forced to divert human and other resources that would have gone into voter registration.  *Id.* ¶¶ 4, 72-78.  The League has been harmed already, and without an injunction, the League will be forced to continue these costly diversions to combat future illegal robocall campaigns.  *Id.* ¶¶ 79-82; *see also Havens Realty Corp*

*v. Coleman*, 455 U.S. 363, 378-79 (1982) ("*Havens*") (finding it was improper to dismiss for lack of organizational standing for injunctive relief where organization had to divert its resources from providing counseling and referral services to combatting allegedly discriminatory steering practices); *Victim Rights*, 552 F. Supp. 3d at 115 (finding organizational standing for injunctive relief and merits review based on frustrated purpose).

Defendants' reliance on *Equal Means Equal v. Ferriero*, 3 F.4th 24 (1st Cir. 2021), fails. There, the First Circuit rejected organizational standing for "lobbying activities" or "pure-issue advocacy" as the purported costs incurred were from resources used to file the lawsuit and generate materials to educate government officials about the issue in the case. *Equal Means Equal*, 3 F.4th at 30. The First Circuit also clarified that the plaintiff organization's description of the injury did not match the organizational standing argument from *Havens*. *Id.* (citing *Havens*, 3 F.4th at 379) (noting that the organization at issue in *Havens* provided services such as counseling and referral which had been impaired). Unlike *Equal Means Equal*, in this case the organizational plaintiffs' actual services were impaired, more like the organization in *Havens*, because the League had to expend resources outside of their core purpose. Furthermore, unlike *Ferriero*, the League was not lobbying the government or advocating on an issue—it was attempting to ensure proper voter information and registration. Because those are core business activities, *Ferriero*'s holding is inapposite.

       *b.*  *Plaintiffs Have Shown the Alleged Injury Is Fairly Traceable to Life And Voice.*

Life and Voice also contend—in one sentence with no analysis or case law—that Plaintiffs have not alleged facts to demonstrate the injury was caused by them. *See* Life/Voice Mem. at 5. Causation "requires the plaintiff to show a sufficiently direct causal connection between the challenged action and the identified harm," *Katz v. Pershing, LLC*, 672 F.3d 64, 71 (1st Cir. 2012)

(citing *Lujan v. Defs. of WildLife*, 504 U.S. 555, 560-561 (1992)), which cannot be "overly attenuated." *Donahue v. City of Boston*, 304 F.3d 110, 115 (1st Cir. 2002). The Supreme Court has held that Article III requires only de facto causality, not proximate cause. *Dept. of Com. v. New York*, 588 U.S. 752, 768 (2019) (citation omitted). Thus, Plaintiffs need only allege that their injuries are "fairly traceable to the defendant's conduct." *Lexmark Intern., Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 134 n. 6 (2014). Causation has been found where the plaintiff's theory of standing relies on "the predictable effect of" a defendant's action "on the decisions of third parties." *Dept of Com.*, 588 U.S. at 768.

Plaintiffs have plausibly alleged that the unlawful robocalls are fairly traceable to Life's and Voice's actions. As alleged in the Amended Complaint (described *infra* in Section IV(b)), and documented extensively in the Notices of Apparent Liability issued to Steve Kramer and Lingo, Life and Voice were directly involved at key steps in the process of the creation and dissemination of the NH Robocalls. *See* Am. Compl. ¶ 71 (citing *In re Matter of Steve Kramer*, FCC 24-59 (May 24, 2024) (the "Kramer NAL"); *In re Matter of Lingo Telecom, LLC*, FCC 24-60 (May 28, 2024) (the "Lingo NAL")). For example, Voice added a sentence to the end of the deepfake audio recording instructing voters to call the spoofed number to opt out of future calls. *Id.* ¶ 52. Life conveyed that it had the legal authorization to utilize Kathy Sullivan's spoofed telephone number and provided equipment to help disseminate the calls. *Id.* ¶¶ 30, 53. Moreover, by deliberately failing to maintain a legal and compliance team, despite facilitating millions of political robocalls annually, Defendants missed the opportunity to stop the NH Robocalls when they were carried out. *Id.* ¶ 86. Plaintiffs have therefore alleged that Defendants are causally responsible for the NH Robocalls.

## II.     PLAINTIFFS PLAUSIBLY ALLEGE DEFENDANTS VIOLATED THE VRA

### a.   Plaintiffs Have Pled Sufficient Facts to Show that the NH Robocalls Were Threatening, Intimidating, or Coercive

Defendants argue that threatening to strip voters of their right to vote in a future election is not threatening, intimidating, or coercive. *See* Mem. in Supp. of Def. Lingo Telecom, LLC's Mot. to Dismiss the Am. Compl. at 10-11, ECF No. 79-1 ("Lingo Mem."); Life/Voice Mem. at 7. This argument is baseless. A person's right to vote is and must be sacrosanct, a cornerstone of our democracy and of our individual rights. "[T]he right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights." *Reynolds v. Sims*, 377 U.S. 533, 562 (1964); *see also Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886); *Wohl I*, 498 F. Supp. 3d at 464 ("The right to vote embodies the very essence of democracy.").

Courts "routinely deem restrictions on fundamental voting rights irreparable injury," *League of Women Voters of N.C.*, 769 F.3d at 247, and for good reason. Each election—whether primary or general, local or national—is important and necessary for the functioning of our democracy and must be protected. It is threatening, intimidating, and coercive to call thousands of voters to tell them that voting in one election will strip them of their right to vote in another.

In November 2024, New Hampshire voters will elect not just the U.S. president, but their U.S. Representatives, Governor, and key state and local officials. The NH Robocalls warned these voters that to vote in this critically important election, they would have to "save" their vote. The implication was clear: voting in the primary would cost them their right to vote in the General Election. The political threat—the loss of the right to vote in an important election—is at least as serious as the consequences threatened in the robocalls at issue in *Nat'l Coal. On Black Civic Participation v. Wohl*, 661 F. Supp. 3d 78, 113 (S.D.N.Y. 2023) ("*Wohl III*") (communications that "inspire[d] fear of legal consequences, economic harm, dissemination of personal information,

and surveillance" may qualify as unlawful threats or intimidation); *see also Daschle v. Thune,* Case No. 04-4177, Temporary Restraining Order (TRO), D.S.D. Nov. 2, 2004 (finding a violation of Section 11(b) where defendants followed Native American voters from polling places, and copied or recorded voters' license plate numbers).  And, as in *Wohl III*, the threat at issue here violates the VRA.  To hold otherwise would fundamentally be at odds with the purpose and scope of the VRA, which courts have consistently made clear must be interpreted expansively.  *See, e.g.*, *Allen v. State Bd. of Elections,* 393 U.S. 544, 565-67 (1969) (noting that Congress intended "to give the [Voting Rights] Act the broadest possible scope"), *abrogated on other grounds by Ziglar v. Abbasi*, 582 U.S. 120 (2017); *Wohl I*, 498 F. Supp. 3d at 476 ("Section 11(b)'s reach is extensive, in accordance with the VRA's ambitious aims of encouraging true enforcement of the Fifteenth Amendment's promise of unencumbered access to the vote . . ."); *Jackson v. Riddel*, 476 F. Supp. 849, 859 (N.D. Miss. 1979) (explaining that even where a court finds "no case precisely in point," Section 11(b) should "be given an expansive meaning").

Furthermore, contrary to the Life and Voice's assertions, Life/Voice Mem. at 7, the NH Robocalls included a number of elements that would be persuasive to a reasonable person.  *See Wohl III*, 661 F. Supp. at 123 (noting that the call "markedly lacked any outlandish details or other cues that may indicate to an ordinary listener that it should not be taken seriously").  As alleged in the Amended Complaint, the robocalls deepfaked President Biden's voice, used language associated with President Biden, emphasized the importance of the 2024 General Election, and identified the sender as Kathy Sullivan, a respected figure in New Hampshire's Democratic Party and leader of an effort to support President Biden's write-in campaign.  Am. Compl. ¶¶ 44, 53-55.  The Individual Plaintiffs immediately recognized President Biden's voice, explained they became

suspicious due to their above-average knowledge of elections, and expressed concern that other voters would be deceived and therefore intimidated from voting. *See* Am. Compl. ¶¶ 59-61.

Lingo argues that mere deception alone cannot be a threat of injury and therefore, it is not coercive, threatening or intimidating. *See* Lingo Mem. at 10. However, deception can be a tool to coerce, threaten and intimidate. *See Wohl III*, 661 F. Supp. 3d at 121 ("Defendants' false utterances in the Robocall were made in order to intimidate or threaten voters who were exercising their right to vote."); *see id.* at 92, 119-21 (repeatedly identifying the illegal robocalls as misleading and false). As described above, the Amended Complaint clearly alleges how the deception here—the use of an AI-generated voice of President Biden and the misappropriation of Kathy Sullivan's personal cell phone number—were integral to the scheme to intimidate, threaten, and coerce voters into relinquishing their right to participate in the New Hampshire Primary out of fear of future disenfranchisement. *See* Am. Compl. 65 ¶ 88. The fact that the Defendants deceived voters about the consequence of voting in the presidential primary does not make the untruthful statement any less intimidating or threatening. *Wohl III*, 661 F. Supp. 3d at 118 (true threats may be proscribed "even where the speaker has no intention of carrying them out" (quoting *United States v. Turner*, 720 F.3d 411, 420 (2d Cir. 2013)).[1] Thus, the factual allegations in Plaintiffs' Amended Complaint are sufficient to sustain their claim that the NH Robocalls violated Section 11(b) of the VRA.

  *b. Plaintiffs have pled sufficient facts that the Defendants were liable under the VRA.*

Defendants attempt to shift blame to Defendant Kramer and minimize their role in the robocall scheme to evade liability under the VRA. *See* Life/Voice Mem. at 7-8, Lingo Mem. at 5-

---

[1] Defendant Lingo relies on inapposite cases to argue otherwise. *Ferrari v. Vitamin Shoppe Indus. LLC*, 70 F.4th 64, 73 (1st Cir. 2023). *Ferrari* is a case about whether the Federal Food, Drug, and Cosmetics Act has an efficacy requirement for health supplements. It has nothing to do with the VRA nor about the role that deception may play in a threat. In *Rudisill v. McDonough*, 144 S. Ct. 945, 955 (2024), the Court rejected a narrow, unsupportable interpretation of the word "coordination" in a law related to a veteran's benefits.

10.  In particular, they claim that they did not know the contents of the call, and thus cannot be held liable.[2]  Their arguments are unfounded.

First, Defendants attempt to read an intent requirement into Section 11(b), which does not exist.  *See* 52 U.S.C. § 10307(b); *Wohl III*, 661 F. Supp. at 116 ("That no intent need be shown is evident not only in the statutory text but also in the VRA's legislative history."); *League of United Latin Am. Citizens—Richmond Region Council 4614 v. Pub. Int. Legal Found.*, No. 1:18-cv-423, 2018 WL 3848404 at *4 (E.D. Va. Aug. 13, 2018); *Daschle*, Case No. 04-4177, TRO ("Whether the intimidation was intended or simply the result of excessive zeal is not the issue . . . .").  Life and Voice's reliance on *Nat'l Coal. On Black Civic Participation v. Wohl*, No. 20 Civ. 8668 (VM), 2021 WL 4254802, at *5 (S.D.N.Y. Sept. 17, 2021) ("*Wohl II*"), to suggest otherwise is misplaced.  There, the court recognized in dicta that the defendant had knowledge of the scheme, but the court did not rely on this knowledge in its holding that the defendants violated Section 11(b).  *Wohl II*, 2021 WL 4254802 at *5 (recognizing that there is "reasonable inference" that defendants "knew of the content or purpose of the robocalls.").  Defendants fail to cite to any binding precedent to establish that knowledge of the contents of the message is required.

Second, Plaintiffs have pled sufficient facts to show that Life, Voice, and Lingo played critical roles in the robocall scheme and should be held liable under the VRA.  As an initial mater, Plaintiffs allege that Voice sought Kramer's permission to add an opt-out sentence at the end of the recording that instructed potential voters to call the cell phone number associated with Kathy

---

[2] Lingo also contends that Plaintiffs cannot sustain their claims under the VRA because there is no private right of action under Section 11(b).  But this position is contrary to the majority of cases, which have concluded that Section 11(b) of the VRA "undoubtedly applies to private conduct, and private individuals are subject to its prohibitions."  *Wohl I*, 498 F. Supp. 3d at 476; *see also Rhodes v. Siver*, No. 19-12550, 2021 WL 912393 (E.D. Mich. Mar. 10, 2021); *Mich. Welfare Rights Org. v. Trump*, 600 F. Supp. 3d 85, 104 (D.D.C. 2022) ("The Court concludes that precedent and direction from the Court of Appeals for the District of Columbia Circuit and the Supreme Court support a finding of a private right of action."); *Ariz. Democratic Party v. Ariz. Republican Party*, No. 16 Civ. 03752-PHX-JJT, 2016 WL 8669978, at *11 (D. Ariz. Nov. 4, 2016).

Sullivan to opt out of future calls, which suggests that Voice reviewed and had knowledge of the content of the call.  *See* Am. Compl. ¶ 52; *see also Foley*, 772 F.3d at 71 (the court must draw all reasonable inferences in plaintiffs' favor at the motion to dismiss stage).  This directly contradicts its statement that it "had no knowledge of [the call's] content."  Life/Voice Mem., at 8.  Further, Plaintiffs allege that Voice and Life (an alter ego of Voice) allowed Kramer to affix Kathy Sullivan's phone number to all the robocalls without verification and facilitated the distribution of over ten thousand robocalls to unsuspecting potential voters.  Am. Compl.  ¶¶ 51–53.  Life and Voice were thus active and knowing participants in this scheme to influence voting behavior through intimidation, threats, and coercion.

And, contrary to what it would lead the Court to believe, Lingo was not an innocent bystander in the scheme to disseminate the deepfake robocalls.  *See* Lingo Mem. at 5-10.  Plaintiffs allege that Lingo applied A-level STIR/SHAKEN attestations of the purported originating phone number—which in fact spoofed a respected Democratic Party operative's number—to over ten thousand robocalls based solely on the word of Life (based on a blanket check-the-box form from July of 2021) and did nothing to verify that Life was authorized to use the phone number in violation of "reasonable KYC protocols."   Lingo NAL 71-11, ¶¶ 1, 15; Am. Compl. ¶ 98.  Lingo thus played a key role in the scheme and "dressed the call with a veil of legitimacy to mislead its listeners into believing the statements made in the call were true."  *Wohl III*, 661 F. Supp. 3d at 123.[3]

---

[3] Indeed, the history of enforcement actions against Lingo only further evidences Lingo's culpability in the robocall scheme.  For example, the Federal Trade Commission ("FTC") issued a Cease-and-Desist Demand directing Matrix (Lingo's prior corporate name) to cease transmitting illegal robocalls that were "imposter campaigns."  Am. Compl. ¶44.  Additionally, the Multistate Task Force, in November 2023, a few months before this case, issued a notice to Lingo that there were 439 suspicious calls transmitted by Lingo, 34% of which were marked with an A-Level STIR/SHAKEN attestation.  *Id.* ¶45.  The Task Force expressed concern over Lingo's acceptance of these calls despite the upstream call sources' failure to affix an A- or B- attested signature of their own and found it was evidence of Lingo's culpability.  *Id.*

Lingo's role is not, as Lingo argues, comparable to the role of a provider that transmits calls between two single individuals, and their violations were not merely technical. "The STIR/SHAKEN framework . . . is a vital tool designed to give consumers more confidence that caller ID information is accurate," and emerged during "a proliferation in the misuse of spoofing technology by malicious actors." Lingo NAL ¶¶ 2, 7. By blatantly disregarding the laws and regulations that guide providers' responsibilities to call recipients, Lingo enabled precisely the kind of malicious calls contemplated by these laws and regulations. *Id.* ¶ 23.

The cases and laws cited by Lingo are inapposite. For example, *O'Brien v. W. U. Tel. Co.*, 113 F.2d 539 (1st Cir. 1940) is an 84-year-old telegraph case. *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 335 (2020) does not involve robocalls, and relates to plaintiffs' burden of proof under a wholly different statute. And 18 U.S.C. § 2511 is a wiretapping statute. Lingo also cites dicta from *Ashworth v. Albers Med., Inc.*, 410 F. Supp. 2d 471 (S.D. W. Va. 2005) to suggest that "telephone companies are not liable to those defrauded when the telephone lines are used to perpetrate fraudulent schemes." *Ashworth*, 410 F. Supp. 2d at 481. But the *Ashworth* case concerned whether defendants manufactured, distributed, and sold counterfeit drugs and has absolutely nothing to do with telephone companies. Similarly, Lingo's common law defamation and libel cases are irrelevant since "publication" is an express requirement of those claims that does not exist under the VRA. *See Lunny v. Prodigy Servs. Co.*, 723 N.E.2d 539, 542 (N.Y. 1999); *Anderson v. N.Y. Tel. Co.*, 320 N.E.2d 647, 649 (N.Y. 1974). None of these sources support the proposition that Lingo is shielded from liability under the VRA.[4] Nor would holding Lingo liable create "absurd results." Lingo Mem. at 9. Plaintiffs are not asking Lingo to violate the Wiretap

---

[4] *Herrick v. Grindr, LLC*, 306 F. Supp. 3d 579, 584 (S.D.N.Y. 2018), which turns on the application of Section 230 of the Communications Decency Act of 1996, is also inapplicable for the reasons discussed *infra* Section V.

Act or any other legal requirements.  To the contrary, Plaintiffs are asking Lingo to abide by its legal requirements, including the STIR/SHAKEN and Know Your Customer protocols.

### III.   PLAINTIFFS PLAUSIBLY ALLEGE VIOLATIONS OF NEW HAMPSHIRE ELECTION LAW

Plaintiffs have likewise sufficiently pled claims under New Hampshire's election law. Defendants Life, Voice, and Lingo each "deliver[ed] or knowingly caus[ed] to be delivered a prerecorded political message" without the qualifying disclaimers and further "misrepresent[ed] the origin" of the NH Robocalls, which contained misleading and malicious information about the political parties to deter voting.  *See* RSA §§ 664:14-a(II), -b(I).  Lingo served as the originating provider for thousands of robocalls, and it employed its attestation to misrepresent its authority to use the Caller ID of Sullivan, a key New Hampshire election figure a mere two days before the Primary.  *See* Am. Compl. ¶ 54.  Lingo's attestation made it less likely that thousands of unsuspecting New Hampshire citizens would detect the scheme.  Defendants Life and Voice similarly issued thousands of robocalls, purportedly from Sullivan—only after Voice reviewed the deepfake, corresponded with Kramer, the architect of the NH Robocalls scheme, and then ***altered*** the deepfake audio recording.  *Id.* ¶¶ 52-54.  Collectively, these facts plausibly support a claim under New Hampshire law.

Each of Defendants' arguments to the contrary are unavailing.  Lingo's assertion that it cannot be liable because it did not "know" the content or origin of the calls fails for two reasons. ***First***, Section 664:14-a plainly creates liability for either "deliver[ing] ***or*** knowingly caus[ing] to be delivered" a certain prerecorded political message.  § 664:14-a (emphasis added).  No scienter modifies "deliver," and the legislature's use of the word "or" between the actions "deliver" and "knowingly cause to be delivered" "indicate[s] an alternative between different . . . things."  *See Boyle v. City of Portsmouth*, 154 N.H. 390, 392 (2006).  Thus, the statute does not explicitly impose

a "knowing" standard, let alone an intent to violate it.  Lingo's delivery of falsely authenticated political robocalls alone satisfies the statute.  ***Second***, Lingo's pattern of conduct only reinforces its knowing violation.  "[T]he requirement of knowing action requires proof of a voluntary act proceeding neither from mistake nor inadvertence."  *Ives v. Manchester Subaru, Inc.*, 126 N.H. 796, 803 (1985).  The FCC has already concluded that Lingo's active involvement in the NH Robocalls scheme was "willful[] and repeated[]."  *See* Lingo NAL ¶ 16.  Other regulators, too, have put Lingo on notice of its longstanding misconduct.  *See, e.g.,* ECF Nos. 71-12 at 2 (documenting "high-volume illegal and/or suspicious robocalling campaigns" "since at or before January 2020"); 71-13 at 1 (documenting "illegal robocall traffic" over seventeen months)).  Lingo's actions here—combined with its multi-year track record—belie any suggestion of mistake or inadvertence.  *See Ives*, 126 N.H. at 803.

For the same reasons, Lingo's conduct satisfies the requisite causality.[5]  "Causation focuses on the mechanical sequence of events."  *Carignan v. N.H. Int'l Speedway*, 151 N.H. 409, 414 (2004).  Lingo cannot seriously dispute its causal connection to the harm here.  As the FCC made fully apparent, Lingo played an essential role in effectuating the NH Robocalls scheme: Lingo's false authentication made it difficult for recipients of the spoofed robocalls to discern the political messages' artificiality, leading to Plaintiffs' injury.  *See* Lingo NAL ¶ 1.

Finally, Defendants' reliance on non-binding dicta from *O'Brien v. N.H. Democratic Party*, 166 N.H. 138 (2014), likewise fares no better.  Contrary to Defendant Lingo's assessment, *O'Brien*'s central holding does not even apply here, let alone "compel[]" dismissal (Lingo Mem at 16).  The sole case citing to the pertinent sections of New Hampshire election law, *O'Brien*

---

[5] Lingo's references to *Walsh* and *Lexmark* are misplaced.  *Walsh* interpreted an unfair competition statute under Massachusetts law, *see Walsh v. TelTech Sys., Inc.*, 821 F.3d 155 (1st Cir. 2016), while *Lexmark* interpreted a false advertising claim under the Lanham Act, *see* 572 U.S. at 132 ("We have thus construed ***federal*** causes of action in a variety of contexts to incorporate a requirement of proximate causation." (emphasis added)).

announced "three elements" of standing, which the court determined a political candidate plaintiff failed to satisfy. *O'Brien*, 166 N.H. at 143. Further discussion of a non-plaintiff voter's confusion was "nonessential" to the court's evaluation of the political candidate plaintiff's standing—it is thus "truly dicta." *See In re Est. of Norton,* 135 N.H. 62, 64 (1991). That discussion, therefore, "does not control" this case. *See Appeal of Town of Lincoln*, 172 N.H. 244, 253 (2019); *Arcam Pharm. Corp. v. Faria*, 513 F.3d 1, 3 (1st Cir. 2007);[6] *see also Lord v. Lovett*, 146 N.H. 232, 238 (2001) (courts are "not required [] to give dicta the deference accorded by *stare decisis* to actual holdings" (quotations omitted)).

Rather than follow *O'Brien*'s dicta, this court should look directly to RSA 664:14-a and -b. Plaintiffs' injury satisfies *O'Brien*'s requirements and is of the type that the New Hampshire legislature intended to prevent by promulgating that law. As its legislative history makes clear, RSA 664:14 counters the precise nuisance present here: "offensive" messages that intruded on Plaintiffs' "rights to privacy" and rendered Plaintiffs "unable to determine who made the recording" or "who paid for the message[.]" *See* House Comm. on Election Law, Public Hearing on HB 332, at 56 (N.H. Feb. 4, 2003) (Statement of Rep. Paul Spiess, Prime Sponsor of HB 332). Because of Defendants' conduct, the Individual Plaintiffs received spoofed, misappropriated, and unconsented-to robocalls while at home around dinner time. *See* Am. Compl. ¶¶ 59-62. For at least one Individual Plaintiff, it took several moments to realize the call was fake. *Id.* ¶ 60. Because of Defendants' conduct, the League was injured: it expended its own funds to combat the increased threat of robocalls and diverted resources away from its other core activities in favor of educating voters of the risks of spoofed election-based schemes. *See id.* ¶¶ 73-82. Accordingly,

---

[6] Lingo's cherry-picked reference to *United Nurses & Allied Pros v. NLRB*, 975 F.3d 34, 40 (1st Cir. 2020) for the proposition that federal courts are "bound by" "considered dicta" is also misleading. To be sure, courts in the First Circuit are "bound by the ***Supreme Court's*** 'considered dicta.'" *Id.* (emphasis added). But that principle does not apply here. *O'Brien* is not a decision from the United States Supreme Court.

Plaintiffs have suffered the very circumstances that the New Hampshire legislature sought to remedy.

IV. **PLAINTIFFS PLAUSIBLY ALLEGE VIOLATIONS OF THE TCPA**

     *a. The Court Must Consider the Totality of the Facts and Circumstances, As Well As Congressional Intent, in Assessing TCPA Liability*

Defendants argue that Plaintiffs have failed to plausibly allege that the Defendants "initiated" the NH Robocalls pursuant to the TCPA. *See* Life/Voice Mem. at 8-12, Lingo Mem. at 21-25. The TCPA imposes liability on those who "initiate" telephone calls to residential phone lines using a prerecorded voice to a landline without the recipient's consent. *See* 47 U.S.C. § 227(b)(1)(B). However, neither the TCPA, nor the FCC's implementing regulations, define the term "initiate."

In 2015, the FCC issued a declaratory ruling and order to clarify who "initiates" a call for the purpose of TCPA liability. *In the Matter of Rules and Reguls. Implementing the Tel. Consumer Prot. Act of 1991*, FCC 15-72, 30 FCC Rcd. 7961 (July 10, 2015) (the "2015 FCC Order"). In its ruling, the FCC emphasized it was seeking to align the definition of "initiate" with Congress's intent in enacting the TCPA, namely, "to protect consumers from the nuisance, invasion of privacy, cost, and inconvenience that . . . prerecorded calls generate." *Id.* at ¶ 29. Accordingly, the FCC confirmed that the term "initiate" is not limited to individuals who "take the steps necessary to physically place a telephone call," but also extends to entities who are "'so involved in the placing of a specific telephone call' as to be deemed to have initiated it." *Id.* at ¶ 30 (*quoting Dish Declaratory Ruling*, 28 FCC Rcd. 6574, 6583 ¶¶ 26-27 (2013)). In making this determination, the FCC directed the adjudicator to "look to the totality of the facts and circumstances surrounding the placing of a particular call to determine . . . whether another person or entity was so involved

in place the call as to be deemed to have initiated it, considering the goals and purposes of the TCPA." *Id.*

The 2015 FCC Order identified certain factors that adjudicators should consider in assessing who "initiates" a call for the purpose of TCPA liability, including: (1) the extent to which the defendant controls the call's message; (2) the extent to which the defendant "willfully enables fraudulent spoofing of telephone numbers," and (3) whether the defendant "who offers a calling platform service for the use of others has knowingly allowed its client(s) to use that platform for unlawful purposes[.]" *Id.* at ¶¶ 30-37. The 2015 FCC Order made clear that its list of factors was not exhaustive. *Id.* at ¶ 30-31, n.115; *Cunningham v. Montes*, 378 F.Supp.3d 741, 748 (W.D. Wis. 2019). Rather, the FCC stated it would "consider all facts and circumstances surrounding any possible violation(s) before determining how liability, if any, should be applied." 2015 FCC Order at ¶ 30 n.110.

Consistent with the 2015 FCC Order, federal courts examining potential TCPA violations on a Rule 12(b)(6) motion, as well as other dispositive pleadings, have considered a variety of factors in assessing liability. In *Off. of the Att'y Gen. v. Smartbiz Telecom LLC*, a federal court denied a motion to dismiss TCPA claims, concluding a plaintiff's allegations supported a plausible inference the defendant was liable where the plaintiff alleged: (1) "[d]efendant was notified approximately 250 times of fraudulent calls it had transmitted"; (2) defendant continued to transmit the calls despite having knowledge of prior fraudulent calls; (3) defendant profited from fraudulent calls; (4) defendant refused to implement a means to check for unlawful robocalls; and (5) "the calls would not have connected but for defendant's decision to allow them to transmit on its network." 688 F. Supp. 3d 1230, 1237 (S.D. Fla. 2023).

In a case with a similar posture, *Hurley v. Messer*, a federal court refused to dismiss TCPA claims where defendants: (1) "offered a calling platform for others to use"; (2) knew about illegal conduct occurring on their platform; (3) had a right to control the conduct; and (4) nevertheless permitted unlawful robocalls to be broadcast through their systems. *See* 2018 WL 4854082, at *4 (S.D. W. Va. Oct. 4, 2018). Other courts to have examined the issue have considered factors such as whether the defendant (1) "actively helped" another initiator of a telephone call "bypass spam filters," *see Bauman v. Saxe*, No. 2:14-cv-01125-RB-PAL, 2019 WL 591439, at *3 (D. Nev. Feb. 13, 2019); (2) knew a client's calls likely violated the TCPA and "helped [the client] avoid the consequences," *see Cunningham v. Montes*, 378 F.Supp.3d 741, 749 (W.D. Wis. 2019); and (3) provided the "avenue and means" for a spoofer to "generate scores of robocalls from an obviously spoofed number," *Mey v. All Access Telecom Inc.*, No. 5:19-CV-00237-JPB, 2021 WL 8892199, at *5 (N.D.W. Va. Apr. 23, 2021).

Lingo asks the Court to ignore the 2015 FCC Order and adopt a "plain meaning" definition of "initiate." *See* Lingo Mem. At 21-22. Alternatively, Defendants argue that they cannot be held liable because they did not "control the recipients, timing, or content" of the NH Robocalls. *See* Lingo Mem. at 21-22; Life/Voice Mem. at 11-12 (raising similar arguments). These arguments have been considered and rejected before. *See Spiegel v. EngageTel Inc.*, 372 F.Supp. 3d 672, 682 (N.D. Ill. 2019). In *Spiegel*, the court refused an invitation to disregard the 2015 FCC Order and determine liability by "looking to the TCPA's plain language." *Id.* The court similarly rejected an effort to read the 2015 FCC Order as creating a "bright line" test, requiring defendants to control four factors before TCPA liability attaches, namely, "whether a call was made, when it was made, who was called, and the call's content." *Id.* at 683-4. The court explained that such a test was a "poor fit for phone calls to residential customers and cell phones," noting, particularly with respect

to control over content, that "a ringing phone can be intrusive regardless of the message delivered after the party answers." *Id* at 684. Accordingly, the court interpreted the 2015 FCC Order as requiring a "fact-specific inquiry," with the "most relevant" factors varying depending on the "facts and circumstances of the case." *Id.*

> b. *Plaintiffs Allegations Support Plausible Inference that Defendants Initiated the NH Robocalls*

Plaintiffs' allegations plausibly establish that each of the Defendants are liable as "initiators" of the NH Robocalls under the TCPA, considering the totality of the facts and circumstances of the case, as well as Congressional intent in enacting the TCPA. With respect to Voice and Life, two entities under common ownership and control, the Plaintiffs allege:

- Voice and Life have delivered tens of millions of political robocalls in recent years, generating millions in profits for their common owner. *See* Am. Compl. ¶ 29.

- Through its calling platform, Voice provides its clients the functionality to spoof Caller ID information. *Id.* ¶ 33.

- Voice relies on Life's services to enable calling capabilities on Voice's platform. *Id.* ¶ 36.

- Voice and Life do not employ any controls to prevent clients from misusing their platforms or services. *Id.* ¶ 86.

- Voice and Life do not have any controls in place to ensure clients have legal authorization to use the phone number and contact information that appears on the Caller ID display before transmitting that information. *Id.*

- Voice and Life do not deploy any technology to screen for AI-generated audio recordings. *Id.*

- Life was previously cited for delivering prerecorded phone calls to residential telephone lines without their consent. *Id.* ¶ 38.

- Voice has worked with Defendant Steve Kramer on "hundreds of projects involving millions of election-related calls." *Id.* ¶ 35.

- Voice input the spoofed telephone number that appeared on recipients of the NH Robocalls Caller ID displays. *Id.* ¶ 51.

- Voice received the deepfake audio recording of President Biden warning voters not to participate in the New Hampshire Primary prior to its distribution. *Id.*

- Voice asked to edit the deepfake audio recording of President Biden to include a falsified opt-out number, which matched the spoofed number that appeared on call recipients' Caller ID displays. *Id.* ¶ 52. The falsified opt-out number appeared in the NH Robocalls. *Id.* ¶ 55.

- Voice, having had the chance to review and modify the deepfake audio recording of President  Biden to include a falsified opt-out number, initiated, through its partner Life, thousands of robocalls to New Hampshire residents. *Id.* ¶¶ 53, 97.

- Life falsely represented that it had the legal authority to use the personal cell phone number of Kathy Sullivan when it transmitted thousands of robocalls to Lingo. *Id.* ¶ 97.

- Voice and Life's spoofing of Kathy Sullivan's personal cell phone number was critical to ensuring that the NH Robocalls reached voters and had their intended effect. *Id.*

With respect to Lingo, Plaintiffs allege:

- Lingo has been the subject of multiple investigations, cease-and-desist orders, and a civil penalty for facilitating and profiting from unlawful robocall activity. *Id.* ¶¶ 41-45.

- Lingo recently agreed to pay a $20,000 civil penalty for profiting from fraudulent robocalls. *Id.* ¶ 42.

- Lingo received hundreds of traceback notices from the USTelecom Industry's Traceback Group ("ITG") notifying Lingo that it was facilitating illegal robocall traffic. *Id.* ¶¶ 42-43.

- Certain of the ITG notices determined that Lingo has been "routing and transmitting illegal robocall traffic knowingly." *Id.* ¶ 43.

- Lingo has failed to take corrective action in response to repeated warnings from regulators and law enforcement that it was facilitating unlawful robocall activity. *Id.* ¶¶ 42-45.

- Lingo served as the originator for thousands of the NH Robocalls. *Id.* ¶ 54.

- Lingo provided each of the NH Robocalls an "A-level" attestation, the highest level of attestation under the STIR/SHAKEN framework. *Id.* In other words, Lingo attested that it had verified a relationship between Kathy Sullivan's phone number and Life that did not exist. *Id.*

- Despite providing the A-level attestation, Lingo did not take any steps to verify that Life was authorized to use Kathy Sullivan's phone number. *Id.*

- By affixing an A-level attestation to the NH Robocalls, Lingo made it less likely that providers could detect the calls as potentially spoofed. *Id.* ¶ 98.

- Lingo's regulator, the FCC, concluded that it had willfully and repeatedly violated FCC rules requiring voice service providers to implement the STIR/SHAKEN authentication framework.  *Id.* ¶ 71.

- Lingo's failure to implement an adequate STIR/SHAKEN and reasonable KYC protocols was knowing and willful.  *Id.* ¶ 98.

As reflected above, Plaintiffs have pled that Defendants were aware of unlawful conduct occurring on their respective calling platforms, had an opportunity to detect and stop that unlawful activity from occurring, not only failed to stop the unlawful conduct but "actively helped" to ensure the it achieved its intended harm, profited from the unlawful activity, and ultimately provided the "avenue and means" to generate thousands of robocalls from an "obviously spoofed number." Allowing Defendants to evade liability under these circumstances would run directly counter to Congress' objectives under the TCPA, namely, to protect consumers from the nuisance, invasion of privacy, cost, and inconvenience associated with robocalls.  As one court has observed, calling platform services "cannot blithely sit back and blame [their] customers for any TCPA violations that result from [the] use of [their] service."  *See Cunningham*, 378 F.Supp.3d at 748.  A dismissal under these facts and circumstances would allow Defendants to do just that.

### c. *Defendants Life Corp and Voice Broadcasting Do Not Qualify for an Exemption Under the TCPA*

Voice and Life contend that they did not need prior consent to transmit the NH Robocalls to the Individual Plaintiffs because the robocalls were "political."  *See* Life/Voice Mem. at 12-13. They cite FCC guidance exempting certain calls from the prohibition on prerecorded messages to residences, including "political polling or similar activities."  *Id.* at 13 (quoting *In re Rules & Reguls. Implementing the Tel. Consumer Prot. Of 1991*, 7 FCC Rcd. 8752, 8774 ¶ 41 (1992)). They further contend the exemption extends to all "election-related calls." *Id.* (citing FCC's public guidance, which exempts "[p]olitical campaign-related . . . prerecorded voice calls," FCC, *Rules*

*for Political Campaign Calls and Texts*, https://www.fcc.gov/rules-political-campaign-calls-and-texts.)

Voice and Life do not, however, make any effort to explain how a deepfake, spoofed robocall warning voters *not* to participate in an election is akin to the political robocalls contemplated by FCC guidance. The NH Robocalls did not seek to poll voters, nor have Plaintiffs alleged that the calls were transmitted in connection with a political campaign. Rather, Voice and Life effectively ask the court to extend the FCC exemption to any robocall that can claim some nexus to politics, even where that nexus is the unauthorized impersonation of a political candidate, or the communication of threats and misinformation related to an election.

More importantly, the FCC recently issued a declaratory ruling and order clarifying that NH Robocalls are precisely the type of harmful robocalls that the FCC considers violative of the TCPA. *See In the Matter of Implications of Artificial Intelligence Technologies on Protecting Consumers from Unwanted Robocalls and Robotexts*, CG Docket No. 23-362, Declaratory Ruling, FCC 24-17, 2024 WL 519167 (Feb. 8, 2024). In that order, the FCC confirmed that the TCPA's existing restrictions on the use of prerecorded voices "encompass current AI technologies that generate human voices." *Id.* ¶ 2. As a result, "callers must obtain prior express consent from the called party before making a call that utilizes artificial or prerecorded voice simulated or generated through AI technology." *Id.* ¶ 5. In explaining its ruling, the FCC emphasized it was seeking to prevent entities from "exploit[ing] any perceived ambiguity in our TCPA rules," adding, "we have already seen [voice cloning] use[d] in ways that can uniquely harm consumers and those whose voice is cloned." *Id* ¶ 6. **Critically, the FCC cited the NH Robocalls at issue in this case as one such example.** *Id.* ¶ 6 n. 22 (citing Ali Swenson and Will Weissert, *New Hampshire investigating fake Biden robocall meant to discourage voters ahead of primary,* ASSOCIATED PRESS

(Jan. 24, 2024) https://apnews.com/article/new-hampshire-primary-biden-ai-deepfakerobocall-f3469ceb6dd613079092287994663db5).  In other words, Voice and Life are contending that the FCC intended to exempt the same robocalls from TCPA liability that the FCC specifically identified as examples of "uniquely harm[ful]" robocalls, in an FCC order whose stated intent was to prevent bad actors from seeking to exploit any perceived ambiguity in TCPA rules.  Exploiting that ambiguity is precisely what Voice and Life seek to do here to avoid liability.

Voice and Lingo also stunningly argue that they cannot be held liable under the TCPA because the NH Robocalls contained an "adequate opt-out mechanism."  *See* Life/Voice Mem. at 13.  They point to the fact that the NH Robocalls advised recipients, "If you would like to be removed from future calls, please press two now."  *Id.* 13 (quoting Am. Compl. ¶ 55).  They neglect to mention, however, that immediately thereafter, the NH Robocalls quoted a knowingly false opt-out number, Am. Compl. ¶ 55 ("Call [personal cell phone of Kathy Sullivan] to be removed from future calls."), which Voice requested to be added (and then did add) to the audio recording, *id.* ¶¶ 52, 55.  Upset voters then proceeded to call Ms. Sullivan at that number.  *Id.* ¶ 129.  It is patently absurd to suggest that providing conflicting opt-out numbers—at least one of which was knowingly false—somehow rises to the level of adequacy or otherwise insulates Voice and Life from TCPA liability.

Lingo argues that its involvement in the NH Robocalls amounted to nothing more than a "fail[ure] to comply with technical standards" enforced by the FCC, and that its failure to comply with STIR/SHAKEN rules are "irrelevant" to Plaintiffs' TCPA claims.  *See* Lingo Memo. at 1. Lingo cites no authority to suggest that the FCC intended to preclude consideration of STIR/SHAKEN violations in assessing TCPA liability.  On the contrary, the FCC specifically advised adjudicators to consider whether a defendant "willfully enable[d] fraudulent spoofing of

telephone numbers" in assessing TCPA liability.  *See* 2015 FCC Order, at ¶ 30.  The very purpose of the STIR/SHAKEN framework is to preempt spoofed phone calls from reaching consumers to "give Americans more confidence that the caller ID information they receive is accurate."  *See* FCC, *Combating Spoofed Robocalls with Caller ID Identification* (last visited July 22, 2024), https://www.fcc.gov/call-authentication.  The FCC concluded that Lingo "willfully and repeatedly violated" rules requiring the company to implement the STIR/SHAKEN framework by providing false, A-level attestations to the spoofed NH Robocalls.  *See*  Lingo NAL ¶ 16.  It is thus precisely the type of willful enabling of fraudulent spoofing that the FCC advised adjudicators to consider in the 2015 FCC Order.

## V.     DEFENDANT LINGO DOES NOT QUALIFY FOR SECTION 230 IMMUNITY

Defendant Lingo argues that it has statutory immunity from Plaintiffs' federal and state law election claims under Section 230 of the Communications Decency Act ("Section 230" or the "CDA").  *See* Lingo Mem. at 18.  Section 230 provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider," 47 U.S.C. § 230(c)(1), and that "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section," *id.* § 230(e)(3).  Under Section 230, a defendant only receives immunity from a state law claim if: (1) the defendant is a "provider or user of an interactive computer service"; (2) the claim is based on "information provided by another information content provider"; and (3) the claim would treat the defendant "as the publisher or speaker" of that information.  *Universal Commun. Sys. v. Lycos, Inc.*, 478 F.3d 413, 416 (1st Cir. 2007).  In order to prevail on its affirmative defense, Defendant's entitlement to Section 230 immunity "must be clear on the face of the

plaintiff's pleadings." *Blackstone Realty LLC v. FDIC*, 244 F.3d 193, 197 (1st Cir. 2001) (internal quotation marks omitted).  Here, it most certainly is not.

> a. *Plaintiffs Have Not Alleged Lingo Provided Interactive Computer Services in Connection with NH Robocalls*

Plaintiffs have not alleged facts sufficient to conclude that Lingo is an "interactive computer service."  Congress defines interactive computer service as "any information service, system, or access software provider that provides or enables access by multiple users to a computer server." *See* 47 U.S.C. § 230(f)(2).  Lingo plainly does not meet this criteria.  In enacting Section 230 protections, Congress found that "interactive computer services" offer users a "great degree of control over the information that they receive," as well as "a forum for a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity." *Id.* §§ 230(a)(2)-(3).  Consistent with Congress's findings, federal courts "typically have held that internet service providers, website exchange systems, online message boards, and search engines fall within" the definition of interactive computer services. *See FTC v. LeadClick Media, Ltd. Liab. Co.*, 838 F.3d 158, 174 (2d Cir. 2016) (collecting cases); *see also Dryoff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093, 1097 (9th Cir. 2019) ("The protypical service qualifying for [CDA] immunity is an online messaging board (or bulletin board) on which Internet subscribers post comments and response to comments posted by others.").

The services that Lingo provides are plainly dissimilar to an online message board or search engine.  The Plaintiffs do not allege, nor is there any basis in the Amended Complaint to conclude, that the Individual Plaintiffs had access to a computer server via the receipt of phone calls on their residential landlines.  Similarly, Plaintiffs have not alleged that the Individual Plaintiffs exercised a "great deal"—much less *any*—control over the information that they received, nor did they seek to participate in a forum political discourse or any other form of intellectual activity.

Rather, Lingo is more akin to a "telecommunications carrier," *see* 47 U.S.C. § 153(51), i.e., a provider of "telecommunications services," which Congress defines as offering "telecommunications for a fee directly to the public, or to such classes of users as to be effectively available directly to the public, regardless of the facilities used," *id* § 153(53).  This is confirmed by Lingo's own regulatory filings.  As acknowledged in the FCC's Notice of Apparent Liability, Lingo holds a Section 214 authorization, *see* Lingo NAL ¶ 8 n.33 (citing Lingo Telecom, LLC, International Section 214 Authorization, ITC-214-19900713-00004 (Dec. 12, 1990)), which the FCC requires "carrier[s]" of telecommunications services to obtain before "operat[ing] any line."  *See* 47 U.S.C. 214(a); *see also* FCC, *International Section 214*, https://www.fcc.gov/general/international-section-214 ("The Commission acts on applications filed by carriers to provide international telecommunications service and to transfer or assign existing authorizations pursuant to section 214 of the Communications Act of 1934.").  Notably, Lingo's Section 214 license dates to December 1990—two and a half years before the advent of the internet,[7] and six years before the enactment of the CDA.

Critically, Congress had the opportunity to include providers of traditional telephony services like Lingo within the scope of Section 230's protections but declined to do so.  In the Telecommunications Act of 1996, Congress comprehensively overhauled its regulation of "telecommunications services" and "telecommunications carriers" as those terms are defined above.  *See* Pub. Law. No. 104-104, tit. I, §§ 102-104, 251-261 (1996).  Simultaneously, Congress created Section 230 protections for a "rapidly developing" new class of services, "interactive computer services."  *Id.* tit. V, § 230.  In so doing, Congress codified a statement of policy clarifying that Section 230 protections were intended to extend to the latter category, i.e., services

---

[7] Julian Ring, *30 years ago, one decision altered the course of our connected world*, NPR (April 30, 2023), https://www.npr.org/2023/04/30/1172276538/world-wide-web-internet-anniversary.

that were "presently . . . unfettered by Federal or State regulation[.]"  *See* 47 U.S.C. § 230(b)(2). As Lingo's Section 214 authorization dating to 1990 makes clear, the services that it provides were not unfettered by federal or state regulation at the time the CDA was enacted, and were not intended to be within the scope of Congress's Section 230 protections.

Lingo cites to a footnote from a 2004 FCC Order for the proposition that VoIP services "fall[] squarely within the phrase 'Internet and other interactive computer services'" as defined by the CDA.  *See* Lingo Mem. at 19 (citing *Vonage Holdings Corp.*, Memorandum Opinion and Order, 19 FCC Rcd. 22404, 22425 ¶ 34 n.115 (2004)) ("*Vonage*").  However, the FCC's declaration that the Vonage service in question fell within the scope of Section 230 was simply an assertion of the FCC's federal jurisdiction over interstate communications.  *Id.* at 22406, at ¶ 1. There, a state regulator had imposed state regulations on a federally-regulated service, which the Commission preempted by citing to the interstate nature of the Internet.  *Id.*

In the 20 years since this order, the FCC has consistently treated VoIP as the functional equivalent of traditional telephony, which is not immune from Section 230, *see, e.g., 2007 CPNI Order*, 22 FCC Rcd. 6927, 6929, ¶ 3 (2007) (FCC applying same rules to VoIP as it does traditional telephony); *Universal Service Contribution Methodology*, Report and Order, 21 FCC Rcd 7518, 7539, ¶ 39 (2006) (same) ("*Universal Service*"), while the FTC has routinely enforced the law against unwanted robocalls made through VoIP—Section 230 notwithstanding, *see, e.g., FTC v. Educare Ctr. Servs. Inc.*, No. 3:19-cv-00196-KC (W.D. Tex. Am. Compl. filed Dec. 3, 2019) (FTC enforcement action against robocaller using VoIP).  In *Universal Service*, the FCC conducted a painstaking analysis to determine that "interconnected VoIP providers provide telecommunications," reasoning that VoIP services involve "transmission of [voice] by aid of wire, cable, or other like connection" and/or "transmission by radio" of voice.  *See Universal Service,*

¶ 41 (internal quotations and citations omitted).  The FCC further concluded that "by definition" interconnected VoIP services are those "permitting users to receive calls from and terminate calls to the [public switched on telephone network]."  *Id.*

Lingo also cites to *United States v. Stratics Networks Inc.*, No. 23-CV-0313-BAS-KSC, 2024 WL 966380 (S.D. Cal. Mar. 6, 2024), in support of its broad interpretation of "interactive service provider."  There, a district court determined that a voiceless voicemail delivery service qualified as an "interactive service provider" for the purpose of Section 230 immunity.  *Id.* at *11-13.  Acknowledging the marginal nature of the case, the court concluded that a provider "need not be the prototypical example to still be an interactive computer service," explaining, in part, "any information service . . . provider capable of being accessed by multiple users qualifies under the CDA."  *Id.* at 11 (citations omitted).  The *Stratics* court suggested the "plain text of the CDA" dictated its result.  *Id.* at *12.  Even were that the case, the plain text of the CDA does not speak to the situation presented here, namely, where the "user" of the service *has not* been provided access to a computer server, but rather simply answered a telephone call on a residential landline.

### b. Lingo Is Not Entitled to Immunity Because of Its Key Role in Developing the NH Robocalls' Offensive Content

Regardless of whether Lingo qualifies as an "interactive computer service," Lingo separately is not entitled to immunity because it took an active role in developing the unlawful NH Robocalls.  Section 230 "immunity only applies when the information that forms the basis for the [] claim[s] has been provided by 'another information content provider.'"  *Universal Commc'ns*, 478 F.3d at 419 (quoting 47 U.S.C. § 230(c)(1)).  The statute's "broad definition" of "information content provider" applies to "even those who are responsible for the development of content only 'in part.'"  *Id.*; *see also* 47 U.S.C. § 230(f)(3).

28

A platform "develop[s]" content when it "contributes materially to the alleged illegality," *Ayyadurai v. Floor64, Inc.*, 270 F. Supp. 3d 343, 368 (D. Mass. 2017), or "draw[s] [the content] out, making it 'visible,' 'active,' or 'usable,'" *FTC v. Accusearch Inc.*, 570 F.3d 1187, 1198 (10th Cir. 2009). Just so, a platform that "specifically encourages development of what is offensive about the content" is not immune. See *Accusearch*, 570 F.3d at 1199.

Here, Plaintiffs allege that Lingo "served as the originator for 3,978 calls, providing each call with the highest level of attestation available," meaning that Lingo "verified a relationship between [Kathy] Sullivan's phone number and Life Corp that did not exist," "made it less likely that providers could detect the calls as potentially spoofed," and therefore failed to "prevent[] the false and malicious calls from being detected before they could reach voters." *See* Am. Compl. ¶ 54. Lingo acted as a crucial linchpin in the scheme by providing the key means and methods to deliver the NH Robocalls. By doing so, Lingo enabled and "developed" the NH Robocalls in that it "contribute[d] materially" to the malicious spread of misinformation to voters in New Hampshire. *See Ayyadurai*, 270 F. Supp. 3d at 368. Lingo's role in developing the NH Robocalls scheme plainly falls within Section 230's "broad definition" of "information content provider." *See Universal Commc'ns*, 478 F.3d at 419. Lingo is thus not immune under Section 230.

## CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss should be denied.

Dated:  July 23, 2024                    Respectfully submitted,

                                         */s/   Mark R. Herring*

William C. Saturley (NH Bar #2256)       Mark R. Herring* (DC Bar #90013124)
Nathan R. Fennessy (NH Bar #264672)      Matthew R. Nicely* (DC Bar #430564)
Nicholas A. Dube (NH Bar #27464)         Caroline L. Wolverton* (DC Bar #496433)
                                         Amanda S. McGinn* (DC Bar #1049085)
**PretiFlaherty**                        Joseph T. DiPiero* (DC Bar #1618536)
57 N Main Street                         Maria Julia Hershey* (DC Bar #90020162)
New Hampshire 03301                      Sara M. Hanna* (DC Bar #90017864)
(603)-410-1500
WSaturley@preti.com                      **Akin Gump Strauss Hauer & Feld LLP**
Nfennessy@preti.com                      2001 K Street, N.W.
Ndube@preti.com                          Washington, DC 20006-1037
                                         (202)-887-4000
*Counsel for Plaintiffs*                 mherring@akingump.com
                                         mnicely@akingump.com
Courtney Hostetler* (MA Bar #683307)     cwolverton@akingump.com
John Bonifaz* (MA Bar #562478)           amcginn@akingump.com
Ben Clements* (MA Bar #555802)           jdipiero@akingump.com
Amira Mattar* (NY Bar #5774450)          mhershey@akingump.com
                                         shanna@akingump.com
**Free Speech For People**
48 N. Pleasant St., Suite 304            *Counsel for Plaintiffs*
Amherst, MA 01002                        *Admitted Pro Hac Vice*
617-244-0234
chostetler@freespeechforpeople.org
jbonifaz@freespeechforpeople.org
bclements@freespeechforpeople.org
amira@freespeechforpeople.org

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

The undersigned hereby certified that on July 23, 2024, the foregoing was electronically filed with the Court and served upon the following:

Michele E. Kenney
**PIERCE ATWOOD LLP**
One New Hampshire Avenue, Suite 350
Portsmouth, NH 03801
603-433-6300

Helgi C. Walker
Jacob T. Spencer
**GIBSON, DUNN & CRUTCHER LLP**
1050 Connecticut Ave., N.W.
Washington, D.C. 20036
202-955-8500

Boyd Garriott
Frank Scaduto
Thomas M. Johnson, Jr.
**WILEY REIN LLP**
2050 M Street NW
Washington, DC 20036
210-833-5573

*Counsel for Defendant Lingo Telecom, LLC*
***Via ECF System***

Wayne E. George
Ezra D. Church
Terese M. Schireson
**MORGAN LEWIS & BOCKIUS LLP**
One Federal St
Boston, MA 02110-4104

Benjamin T. King
**DOUGLAS, LEONARD & GARVEY P.C.**
14 South Street, Suite 5
Concord, NH 03301
603-224-1988

*Counsel for Defendants Life Corporation and Voice Broadcasting Corporation*
***Via ECF System***

A hard copy of the above document will be sent via U.S. Mail to Defendant Steve Kramer at the following address:  20 Cloverfield, Drive, New Fairfield CT 06812 on the following business day.

*/s/*Mark R. Herring
Mark R. Herring