# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

**LEAGUE OF WOMEN VOTERS OF**
**NEW HAMPSHIRE, *et al.*,**

Plaintiffs,

v.

**STEVE KRAMER, *et al.*,**

Defendants.

Civil Action No. 1:24-cv-73-SM-TSM

## STATEMENT OF INTEREST OF THE UNITED STATES

# TABLE OF CONTENTS

INTEREST OF THE UNITED STATES ........................................................................ 1

INTRODUCTION ..................................................................................................... 1

FACTUAL AND PROCEDURAL BACKGROUND........................................................ 2

STATUTORY BACKGROUND ................................................................................. 4

LEGAL STANDARD.............................................................................................. 4

ARGUMENT ........................................................................................................ 5

    I.    Private plaintiffs have a private right of action to enforce Section 11(b) of the Voting
Rights Act. ..................................................................................................... 5

        A.    Section 11(b) contains the requisite "rights-creating language" under *Sandoval*........... 5

        B.    Congress manifested an intent for private enforcement of Section 11(b). .................... 6

            i.    The structure of the VRA shows Congress intended to create a private right of action
for Section 11(b). ............................................................................................... 6

            ii.    The history of the VRA also indicates that Congress intended to create a Section
11(b) private right of action. ............................................................................... 9

    II.    Section 11(b) prohibits any conduct that intimidates, threatens, or coerces voters—or
attempts to do so—including robocalls that engage in such conduct. ....................... 11

        A.    Section 11(b) analysis focuses on categories of conduct defined by their impact or
potential impact............................................................................................... 11

            i.    The plain language of the statute and relevant case law supports this focus............ 11

            ii.    Section 11(b) requires fact- and context-specific analysis to determine whether the
challenged conduct intimidated, threatened, or coerced a voter—or could have. ............ 13

        B.    Section 11(b) contains no causation element and does not require proximate cause. .. 14

        C.    Robocalls may constitute intimidation, threats, or coercion under Section 11(b). ....... 15

CONCLUSION.................................................................................................... 20

# TABLE OF AUTHORITIES

**Cases**

*Alexander v. Sandoval*,
  532 U.S. 275 (2001) ............................................................................................ 5

*Allco Renewable Energy Ltd. v. Mass. Elec. Co.*,
  875 F.3d 64 (1st Cir. 2017) .............................................................................. 9

*Allen v. City of Graham*,
  2021 WL 2223772 (M.D.N.C. June 2, 2021) ...................................................... 10

*Allen v. State Bd. of Elections*,
  393 U.S. 544 (1969) .................................................................................... 8, 9, 10

*Andrews v. D'Souza*,
  2023 WL 6456517 (N.D. Ga. Sept. 30, 2023) ................................................. 5, 7

*Ariz. Democratic Party v. Ariz. Republican Party*,
  No. CV-16-03752, 2016 WL 8669978 (D. Ariz. Nov. 4, 2016).......................... 10

*Burlington N. & Santa Fe Ry. Co. v. White*,
  548 U.S. 53 (2006)............................................................................................ 13

*Burson v. Freeman*,
  504 U.S. 191 (1992)........................................................................................... 15

*Cannon v. Univ. of Chicago*,
  441 U.S. 677 (1979)............................................................................................ 8

*Colo. Mont. Wyo. State Area Conf. of NAACP v. U.S. Election Integrity Plan*,
  653 F. Supp. 3d 861 (D. Colo. 2023).......................................................... passim

*Council on Am.-Islamic Rels.—Minn. v. Atlas Aegis, LLC*,
  497 F. Supp. 3d 371 (D. Minn. 2020)............................................................... 19

*Daschle v. Thune*,
  No. 4:04-cv-4177, ECF No. 6 (D.S.D. Nov. 2, 2004) ...................................... 19

*Democratic Nat'l Comm. v. Republican Nat'l Comm.*,
  673 F.3d 192 (3d Cir. 2012)............................................................................. 19

*Fair Fight Inc. v. True the Vote*,
  No. 2:20-CV-00302, 2024 WL 24524 (N.D. Ga. Jan. 2, 2024)......................... 7, 12

*Jackson v. Riddell*,
  476 F. Supp. 849 (N.D. Miss. 1979)................................................................... 4

*Krabach v. King Cnty.*,
  No. 2:22-CV-1252, 2023 WL 7018431 (W.D. Wash. Oct. 25, 2023)................... 7

*League of United Latin Am. Citizens -Richmond Region Council 4614 v. Pub. Int. Legal Found.*,
  No. 1:18-cv-00423, 2018 WL 3848404 (E.D. Va. Aug. 13, 2018) ................. 5, 7, 12

*Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*,
  263 F.3d 208 (2d Cir. 2001).............................................................................. 17

*Mass. Ret. Sys. v. CVS Caremark Corp.*,
  716 F.3d 229 (1st Cir. 2013).............................................................................. 5

*Mich. Welfare Rts. Org. v. Trump*,
   600 F. Supp. 3d 85 (D.D.C. 2022) ........................................................................ 7
*Morse v. Republican Party of Va.*,
   517 U.S. 186 (1996) .............................................................................. 8, 9, 10
*Nat'l Coal. on Black Civic Participation v. Wohl*,
   498 F. Supp. 3d 457 (S.D.N.Y. 2020) (*Wohl I*) ........................................ passim
*Nat'l Coal. on Black Civic Participation v. Wohl*,
   512 F. Supp. 3d 500 (S.D.N.Y. 2021) (*Wohl II*) ............................................ 4, 7
*Nat'l Coal. on Black Civic Participation v. Wohl*,
   661 F. Supp. 3d 78 (S.D.N.Y. 2023) (*Wohl III*) ...................................... passim
*Newman v. Piggie Park Enters.*,
   390 U.S. 400 (1968) ............................................................................................ 8
*Olagues v. Russoniello*,
   770 F.2d 791 (9th Cir. 1985) ............................................................................ 11
*Oliveira v. New Prime, Inc.*,
   857 F.3d 7 (1st Cir. 2017) ................................................................................ 11
*Perrin v. United States*,
   444 U.S. 37 (1979) ............................................................................................ 11
*Purcell v. Gonzalez*,
   549 U.S. 1 (2006) .............................................................................................. 18
*Rhodes v. Siver*,
   No. 19-cv-12550, 2021 WL 912393, (E.D. Mich. Mar. 10, 2021) ...................... 10
*Ruiz v. Bally Total Fitness Holding Corp.*,
   496 F.3d 1 (1st Cir. 2007) .............................................................................. 2, 5
*Schwier v. Cox*,
   340 F.3d 1284  (11th Cir. 2003) .......................................................................... 9
*Shelby Cnty. v. Lynch*,
   799 F.3d 1173 (D.C. Cir. 2015) .......................................................................... 8
*South Carolina v. Katzenbach*,
   383 U.S. 301 (1966) ............................................................................................ 7
*Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*,
   576 U.S. 519 (2015) .......................................................................................... 10
*United States v. Beaty*,
   288 F.3d 653 (6th Cir. 1961) ............................................................................ 13
*United States v. Clark*,
   249 F. Supp. 720 (S.D. Ala. 1965) ................................................................ 7, 15
*United States v. McLeod*,
   385 F.2d 734 (5th Cir. 1967) ...................................................................... 13, 19
*United States v. N.C. Republican Party*,
   No. 91-161-CIV-5-F, (E.D. N.C. Feb. 27, 1992) .......................................... 12, 16
*Vote.Org v. Callanen*,
   89 F.4th 459 (5th Cir. 2023) .............................................................................. 8

**Statutes**

1 U.S.C. § 1 ................................................................................................................... 7
28 U.S.C. § 2403 (a) ................................................................................................... 16
28 U.S.C. § 517 ............................................................................................................ 1
52 U.S.C. § 10101(a)(2)(B) ........................................................................................ 15
52 U.S.C. § 10301(a) .................................................................................................. 15
52 U.S.C. § 10302(a), (c) ............................................................................................. 6
52 U.S.C. § 10307(b) ...................................................................................... 4, 6, 14, 15
52 U.S.C. § 10308(d) .................................................................................................... 1
52 U.S.C. § 10308(f) ..................................................................................................... 7
52 U.S.C. § 10310(c)(1) ............................................................................................... 6
52 U.S.C. § 10310(e) .................................................................................................... 8

**Other Authorities**

H.R. Rep. No. 89-439 (1965), *as reprinted in* 1965 U.S.C.C.A.N. 2437 ...................... 4
S. Rep. No. 94-295 (1975), *as reprinted in* 1975 U.S.C.C.A.N. 774 ......................... 6, 7
*Voting Rights Act of 1965: Hearing Before the H. Comm. on the Judiciary*, 89th Cong. 3 .......... 7
*Webster's Third New International Dictionary* (1966) ............................................... 12

**Rules**

Fed. R. Civ. P. 12(b)(6) ................................................................................................. 4
Fed. R. Civ. P. 5.1(a) .................................................................................................. 16

**Constitutional Provisions**

U.S. Const. Art. I, § 4 .................................................................................................. 7

**INTEREST OF THE UNITED STATES**

The United States respectfully submits this Statement of Interest pursuant to 28 U.S.C. § 517, which authorizes the Attorney General "to attend to the interests of the United States in a suit pending in a court of the United States." This case presents important questions regarding the interpretation of Section 11(b) of the Voting Rights Act, 52 U.S.C. § 10307(b). Congress has vested the Attorney General with authority to enforce Section 11(b) on behalf of the United States. *See* 52 U.S.C. § 10308(d). Accordingly, the United States has a substantial interest in ensuring the proper interpretation of Section 11(b).

The United States expresses no view on any factual dispute before the Court, nor on any legal questions presented other than those set forth in this brief.

**INTRODUCTION**

The United States submits this Statement of Interest to address issues related to the scope and enforcement of Section 11(b), which Defendants Lingo Telecom, LLC, Life Corporation and Voice Broadcasting Corporation raise in their motions to dismiss. *See* Defs. Life Corp. and Voice Broad. Corp.'s Mot. Dismiss, ECF No. 76; Defs. Life Corp. and Voice Broad Corp.'s Mem. Supp. Mot. Dismiss (Life and Voice Mot. Mem.), ECF No. 76-1; Def. Lingo's Mot. Dismiss, ECF No. 79; Def. Lingo's Mem. Supp. Mot. Dismiss (Lingo Mot. Mem.), ECF No. 79-1. First, Section 11(b) is enforceable by private plaintiffs. The Supreme Court has regularly held that private litigants can enforce other provisions of the Voting Rights Act (VRA) that also lack an express private right of action. Given the text, structure, and legal context of the VRA, nearly every court to consider the issue has concluded that Congress clearly intended to allow private parties to enforce Section 11(b) as well. Second, Section 11(b) prohibits any conduct that attempts to or does intimidate, threaten, or coerce voters—including robocalls that engage in

1

such conduct. The crux of a Section 11(b) claim is whether the challenged conduct was objectively intimidating, threatening, or coercive to voters (or could have been intimidating, threatening, or coercive to voters). To determine whether a challenged conduct, such as a robocall, violated Section 11(b), courts must apply a fact- and context-specific analysis evaluating multiple factors.

## FACTUAL AND PROCEDURAL BACKGROUND[1]

Plaintiffs League of Women Voters of New Hampshire, League of Women Voters of the United States, Nancy Marashio, James Fieseher, and Patricia Gingrich (collectively, Plaintiffs) allege that, two days before the 2024 New Hampshire Primary, Defendants Steve Kramer, Lingo Telecom, LLC, Life Corporation, and Voice Broadcasting Corporation (collectively, Defendants) violated Section 11(b) of the VRA, and other laws, by sending robocalls to thousands of New Hampshire voters. Am. Compl. ¶¶ 1-4, ECF. No. 65. Plaintiffs allege that Defendants' robocalls intimidated, threatened, or coerced recipients from voting in the New Hampshire Primary—or, at the very least, attempted to do so. Am. Compl. ¶ 3.

Defendant Kramer hired Paul Carpenter to create the robocall recording and provided Carpenter with the robocall script. Am. Compl. ¶ 48. Kramer also sent Defendant Voice Broadcasting a list of likely Democratic voters for the robocall, instructed Voice Broadcasting to spoof the cell phone number of former New Hampshire Democratic Party Chair, Kathy Sullivan, for the robocalls, and directed Voice Broadcasting to make the robocalls at a certain time. Am. Compl. ¶¶ 50-53. Voice Broadcasting, with Kramer's permission, added a sentence to the robocall script that instructed potential voters to call the cell phone number associated with

---

[1] For Federal Rule of Civil Procedure 12(b)(6) purposes, the United States assumes all well-pleaded facts to be true. *See Ruiz v. Bally Total Fitness Holding Corp.*, 496 F.3d 1, 5 (1st Cir. 2007). All facts in this section are exclusively from the amended complaint.

Kathy Sullivan to opt out of future calls. Am. Compl. ¶ 52. Then, using service and equipment provided by Defendant Life Corp, Voice Broadcasting initiated 9,851 robocalls. Am. Compl. ¶ 53. Defendant Life Corporation routed a portion of the calls to Defendant Lingo, who served as the originator for 3,978 robocalls. Am. Compl. ¶ 54. Defendant Lingo, a voice and broadband provider, attested that Life Corporation was authorized to use Ms. Sullivan's phone number. Am. Compl. ¶¶ 54.

The robocalls simulated the voice of President Joe Biden when delivering the following message:

> This coming Tuesday is the New Hampshire Presidential Preference Primary. Republicans have been trying to push nonpartisan and Democratic voters to participate in their primary. What a bunch of malarkey. We know the value of voting Democratic when our votes count. It's important that you save your vote for the November election. We'll need your help in electing Democrats up and down the ticket. Voting this Tuesday only enables the Republicans in their quest to elect Donald Trump again. Your vote makes a difference in November, not this Tuesday. If you would like to be removed from future calls, please press two now. Call [personal cell phone of Kathy Sullivan] to be removed from future calls.

Am. Compl. ¶¶ 2, 55.

Plaintiffs filed an amended complaint on May 28, 2024, and an amended preliminary injunction motion on June 7, 2024. Am. Compl.; Pls.' Am. Mot. Prelim. Inj., ECF No. 71. On June 25, 2024, Defendants Lingo, Life Corporation, and Voice Broadcasting moved to dismiss Plaintiffs' amended complaint. Defs. Life Corp. and Voice Broad. Corp.'s Mot. Dismiss, ECF No. 76; Def. Lingo's Mot. Dismiss, ECF No. 79. Three days later, Defendants Lingo and Life Corporation also filed objections to Plaintiffs' amended preliminary injunction motion. Def. Life Corp.'s Objs. to Pls.' Am. Mot. Prelim. Inj., ECF No. 80; Def. Lingo's Objs. to Pls.' Am. Mot. Prelim. Inj., ECF No. 81 (Lingo Mem. Opp. Prelim. Inj.). Plaintiffs replied to those objections on July 12, 2024 and filed a consolidated response to Defendants' motions to dismiss on July 23,

2024. Pls.' Reply in Support of Am. Mot. Prelim. Inj., ECF No. 83; Pls.' Consol. Opp. to Defs.'

Mot. Dismiss, ECF No. 85.

## STATUTORY BACKGROUND

Section 11(b) of the Voting Rights Act states:

No person, whether acting under color of law or otherwise, shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote, or intimidate, threaten, or coerce any person for urging or aiding any person to vote or attempt to vote, or intimidate, threaten, or coerce any person for exercising any powers or duties under [certain sections of the Voting Rights Act].

52 U.S.C. § 10307(b). This broad prohibition against intimidation, threats, and coercion, and

attempts of such conduct, contains no exceptions or limitations. Section 11(b) does not require

proof of racial motivation or "subjective purpose or intent." H.R. Rep. No. 89-439, at 30 (1965),

*as reprinted in* 1965 U.S.C.C.A.N. 2437, 2462. Nor does Section 11(b) require proof that a

defendant caused a voter to refrain from casting a ballot or to vote contrary to their preferences:

the provision applies equally to prohibit an "attempt to intimidate, threaten, or coerce" as it does

to the completed act. 52 U.S.C. § 10307(b); *see Nat'l Coal. on Black Civic Participation v.

Wohl*, 512 F. Supp. 3d 500, 516 (S.D.N.Y. 2021) (*Wohl II*). Section 11(b) "is to be given an

expansive meaning," *Jackson v. Riddell*, 476 F. Supp. 849, 859 (N.D. Miss. 1979), and

incorporates the comprehensive definition of "vote" and "voting" in Section 14 of the Voting

Rights Act, 52 U.S.C. § 10310(c)(1).

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a party may seek dismissal of "a claim

for relief in any pleading" if that party believes that the pleading fails "to state a claim upon

which relief can be granted." Fed. R. Civ. P. 12(b)(6). In assessing the motion, a court "must

assume the truth of all well-plead[ed] facts and give the plaintiff[] the benefit of all reasonable

inferences therefrom." *Ruiz*, 496 F.3d at 5. To defeat the motion, the nonmoving party must establish that her allegations raise a plausible basis for a fact finder to conclude that the defendant is legally responsible for the claims at issue. *Mass. Ret. Sys. v. CVS Caremark Corp.*, 716 F.3d 229, 237 (1st Cir. 2013).

## ARGUMENT

### I.  Private plaintiffs have a private right of action to enforce Section 11(b) of the Voting Rights Act.

To determine whether Congress intended to create a private right of action, courts must (1) make the "critical" determination of whether the statute in question contains "rights-creating language"; and, if so, (2) evaluate whether Congress has "manifest[ed] an intent to create a private remedy." *Alexander v. Sandoval*, 532 U.S. 275, 286, 288-89 (2001). Section 11(b) meets both criteria. The right of private citizens to bring suit to enforce Section 11(b) is inherent in the text, structure, and history of the Voting Rights Act, and Defendant Lingo relies only on a single district court case from another jurisdiction to contend otherwise. *See* Lingo Mot. Mem. at 14 (citing *Andrews v. D'Souza*, 2023 WL 6456517, at *11 (N.D. Ga. Sept. 30, 2023)); *accord League of United Latin Am. Citizens -Richmond Region Council 4614 v. Pub. Int. Legal Found.*, No. 1:18-cv-00423, 2018 WL 3848404, at *3 (E.D. Va. Aug. 13, 2018) (*LULAC*)).

### A.  Section 11(b) contains the requisite "rights-creating language" under *Sandoval*.

First, Section 11(b) indisputably contains rights-creating language, and Lingo does not argue otherwise. *See Colo. Mont. Wyo. State Area Conf. of NAACP v. U.S. Election Integrity Plan*, 653 F. Supp. 3d 861, 868 (D. Colo. 2023) ("The statute contains rights-creating language that pertains to any individual citizen."). The text provides that no one "shall . . . intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote," "any person for urging or aiding any person to vote or attempt to vote," or

"any person for exercising any powers or duties under" certain provisions of the VRA. 52 U.S.C. § 10307(b). The text of Section 11(b) thus grants individual citizens a right to be free from intimidation, threats, and coercion in voting, and it specifies individuals protected by the provision—those who are "voting or attempting to vote," "urging or aiding any person to vote or attempt to vote," or "exercising any powers or duties under" the VRA. *Id.*; *see also U.S. Election Integrity Plan*, 653 F. Supp. 3d at 868. The VRA's definitions of "vote" and "voting" further delineate the beneficiaries of the provision: anyone who is taking any "action necessary to make a vote effective" is entitled to be free from intimidation, threats, and coercion while engaging in those activities. 52 U.S.C. § 10310(c)(1).

**B. Congress manifested an intent for private enforcement of Section 11(b).**

Second, the structure and history of VRA show that Congress manifested an intent for a private right of action under Section 11(b).

    i.  <u>The structure of the VRA shows Congress intended to create a private right of action for Section 11(b).</u>

The VRA's structure demonstrates that Congress intended to create a private remedy for enforcement of Section 11(b). Section 3 of the VRA provides for certain remedies in actions brought by "the Attorney General *or an aggrieved person* . . . under any statute to enforce the voting guarantees of the fourteenth or fifteenth amendment." 52 U.S.C. § 10302(a), (c) (emphasis added); S. Rep. No. 94-295, at 40 (1975), *as reprinted in* 1975 U.S.C.C.A.N. 774, 807 ("An 'aggrieved person' . . . may be an individual or an organization representing the interests of injured persons."). That Section 3 provides remedies for aggrieved persons to enforce the voting guarantees of the Reconstruction Amendments evinces Congress's intent to allow private enforcement of Section 11(b), which aimed at ensuring that the "theoretical right to vote was [not] successfully thwarted by intimidation." *See Voting Rights Act of 1965: Hearing Before the*

*H. Comm. on the Judiciary*, 89th Cong. 3; *see also* S. Rep. No. 94-295, at 40 (1975 ("The Committee concludes that it is sound policy to authorize private remedies to assist the process of enforcing voting rights.").[2]

Likewise, Section 12(f) of the VRA provides that United States district courts "shall have jurisdiction of proceedings instituted pursuant to [Section 12] and shall exercise the same without regard to whether *a person* asserting rights under the provisions of [the VRA] shall have exhausted any administrative or other remedies that may be provided by law." 52 U.S.C. § 10308(f) (emphasis added). The statutory term "person" "include[s] corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as *individuals*." 1 U.S.C. § 1 (emphasis added). The relief from any obligation to exhaust administrative remedies further contemplates private enforcement. *Vote.Org v. Callanen*, 89 F.4th 459, 475 (5th Cir.

---

[2] Defendant Lingo's argument that Section 11(b) lacks a private right of action because the section "stems from the Elections Clause rather than the 14th and 15th Amendments" is without merit. *See* Lingo Mot. Mem. at 15 (citation omitted). Congress passed the VRA pursuant to its powers under the Fifteenth Amendment. *South Carolina v. Katzenbach*, 383 U.S. 301, 307 (1966). Section 11(b) could not stem from the Elections Clause because the Elections Clause only concerns federal elections, and Section 11(b) prohibits certain conduct for *all* elections. *Cf.* U.S. Const. Art. I, § 4. Further, Defendant Lingo's argument flouts "persuasive authority across multiple districts" holding otherwise. *See Mich. Welfare Rts. Org. v. Trump*, 600 F. Supp. 3d 85, 105-106 (D.D.C. 2022) (holding that Section 11(b) passes *Sandoval* test because it is, like Section 10, a "statute designed for enforcement of the guarantees of the Fourteenth and Fifteenth Amendments") (citation omitted); *see also Krabach v. King Cnty.*, No. 2:22-CV-1252, 2023 WL 7018431, at *3 (W.D. Wash. Oct. 25, 2023) (collecting cases); *Wohl II*, 512 F. Supp. 3d at 509 ("[T]his statute sweeps broadly in accordance with Congress's goal of realizing, enforcing, and protecting the Fifteenth Amendment's right to vote[.]"); *United States v. Clark*, 249 F. Supp. 720, 727 (S.D. Ala. 1965) (holding that "the right of qualified Negroes to register to vote is guaranteed by the Fifteenth Amendment," and, under Section 11(b), "any intimidation or attempts to intimidate any person for the purpose of interfering with this right to register to vote is prohibited"). Moreover, the sole case Defendant Lingo cites for support, *Andrews*, 2023 WL 6456517, relied on *LULAC*, which assumed a private cause of action existed for Section 11(b). *See LULAC*, 2018 WL 3848404, at *3. Further, at least one court in the same district has declined to extend *Andrews's* conclusion on this issue. *See Fair Fight Inc. v. True the Vote*, No. 2:20-CV-00302, 2024 WL 24524, at *38 n.58 (N.D. Ga. Jan. 2, 2024).

2023) (finding similar language in the 1957 amendments to the Civil Rights Act to correspond with a private right). Section 12(f) therefore reflects Congress's intent that federal courts have subject matter jurisdiction over suits to enforce the VRA's substantive provisions—including Section 11(b)—brought by both private plaintiffs and the United States. *See Allen v. State Bd. of Elections*, 393 U.S. 544, 555 n.18 (1969) (finding "force" to the argument that Section 12(f) "necessarily implies that private parties may bring suit under the Act").

Section 14(e) of the Voting Rights Act similarly allows for "the prevailing party, *other than the United States*" to seek attorneys' fees "[i]n any action or proceeding to enforce the voting guarantees of the fourteenth or fifteenth amendment." 52 U.S.C. § 10310(e) (emphasis added). That the VRA provides for fees to non-governmental parties prevailing in voting rights litigation supports the existence of a private cause of action to enforce its core provisions, including Section 11(b). *See Morse v. Republican Party of Va.*, 517 U.S. 186, 233-34 (1996) (opinion of Stevens, J.) (finding that Section 10 of the VRA is privately enforceable because, in part, the VRA allowed the prevailing party to collect attorneys' fees); *Cannon v. Univ. of Chicago*, 441 U.S. 677, 699–701 (1979) (finding an implied private cause of action under Title VI of the Civil Rights Act of 1964 based on the existence of an attorneys' fees provision); *see also Shelby Cnty. v. Lynch*, 799 F.3d 1173, 1185 (D.C. Cir. 2015) ("Congress intended for courts to award fees under the VRA . . . when prevailing parties helped secure compliance with the statute."); *Newman v. Piggie Park Enters.*, 390 U.S. 400, 402 (1968) ("Congress therefore enacted the provision for counsel fees . . . to encourage individuals injured by racial discrimination to seek judicial relief.").

Defendant Lingo argues that the VRA's express mechanisms allowing enforcement by the Attorney General "strongly 'cut against finding an implied private right of action.'" Lingo

Mot. Mem. at 15 (quoting *Allco Renewable Energy Ltd. v. Mass. Elec. Co.*, 875 F.3d 64, 70 (1st Cir. 2017)). However, the Attorney General's enforcement authority over other provisions of the VRA has not been interpreted as precluding a private right of action. For instance, the Supreme Court in *Allen* determined that the possibility of Section 5 enforcement by the Attorney General did not preclude enforcement by private citizens and held that Section 5 contains an implied private right of action. *Allen*, 393 U.S. at 556-57. The Supreme Court noted that because "[t]he Attorney General has a limited staff and often might be unable to uncover quickly" new violations, "[i]t is consistent with the broad purpose of the Act to allow the individual citizen standing to insure that his city or county government complies with the s[ection] 5 approval requirements." *Id.* at 556-57. The Supreme Court also found that Section 10 of the VRA contains an implied private right of action, even though it contains an express right of action for the Attorney General. *Morse*, 517 U.S. at 230-35 (opinion of Stevens, J.); *id.* at 240 (Breyer, J., concurring in the judgment); *see Schwier v. Cox*, 340 F.3d 1284, 1294-95 (11th Cir. 2003). VRA provisions granting enforcement authority to the Attorney General do not "cut against" finding an implied private right of action; rather, these provisions merely reflect that Congress had to explicitly provide such authority to the Attorney General, who cannot otherwise sue to enforce individual rights. *See Allen*, 393 U.S. at 555 n.18 (finding "merit in the argument that the specific references to the Attorney General [in the VRA] were included to give the Attorney General power to bring suit to enforce what might otherwise be viewed as 'private' rights").

    ii.   <u>The history of the VRA also indicates that Congress intended to create a Section 11(b) private right of action.</u>

The "contemporary legal context" surrounding the VRA's enactment—including that it was passed "against a 'backdrop' of decisions in which implied causes of action were regularly found," *Morse*, 517 U.S. at 231 (opinion of Stevens, J.)—also shows that Congress contemplated

private enforcement of Section 11(b). When Congress reenacted and extended the VRA in 1975, it confirmed its intent to maintain "a dual enforcement mechanism" that has "given enforcement responsibility to a governmental agency, and . . . has also provided remedies to private persons acting as a class or on their own behalf." S. Rep. No. 94-295, at 40. Moreover, "during the 1960s[,] the [Supreme] Court had consistently found [private rights of action] notwithstanding the absence of an express direction from Congress," *Morse*, 517 U.S. at 231 (opinion of Stevens, J.). Congress was "aware of this unanimous precedent" when it enacted Section 11(b). *Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 536 (2015). Following the passage of the VRA, the Supreme Court has consistently recognized that Congress intended the VRA to empower private citizens to secure their own rights. *See Allen*, 393 U.S. at 554–57.

Against this backdrop, the overwhelming majority of courts have properly recognized that a private right of action exists to enforce Section 11(b). *See, e.g.*, *Colo. Mont. Wyo. State Area Conf. of NAACP v. U.S. Election Integrity Plan*, 653 F. Supp. 3d 861, 868 (D. Colo. 2023) ("Section 11(b) can be enforced through a civil action by a private individual."); *Mich. Welfare Rts. Org.*, 600 F. Supp. at 104-106 (conducting an exhaustive analysis and holding that Section 11(b) "creates a private right of action"); *Allen v. City of Graham*, Nos. 1:20-CV-997, 1:20-CV-998, 2021 WL 2223772, at *7 (M.D.N.C. June 2, 2021) (noting that "multiple courts" have deemed Section 11(b) to "establish[] a private cause of action"); *Rhodes v. Siver*, No. 19-cv-12550, 2021 WL 912393, at *2 (E.D. Mich. Mar. 10, 2021) (holding that private plaintiffs can sue under Section 11(b)); *Nat'l Coal. on Black Civic Participation v. Wohl*, 498 F. Supp. 3d 457, 476 (S.D.N.Y. 2020) *(Wohl I)* ("Consistent with Section 11(b)'s broad reach, both the government and private parties may sue to enforce Section 11(b)."); *Ariz. Democratic Party v. Ariz. Republican Party*, No. CV-16-03752, 2016 WL 8669978, at *4 (D. Ariz. Nov. 4, 2016)

(stating that Section 11(b) "does not exclude a private right of action for injunctive relief");

*Olagues v. Russoniello*, 770 F.2d 791, 805 (9th Cir. 1985) (finding an implied private right of

action for equitable relief under Section 11(b)).

II.    **Section 11(b) prohibits any conduct that intimidates, threatens, or coerces voters—**
       **or attempts to do so—including robocalls that engage in such conduct.**

The plain language of Section 11(b) and relevant case law demonstrate that the crux of a

Section 11(b) claim is whether the challenged conduct intimidated, threatened, or coerced a

voter—or could have.[3] Defendant Lingo's argument that "deceptive" robocalls do not violate

Section 11(b) misses the mark because a deceptive message can intimidate, threaten, or coerce a

voter. *See* Lingo Mot. Mem. at 10. To determine whether a challenged conduct, such as

robocalls, violated Section 11(b), courts must apply a fact- and context-specific analysis using an

objective voter standard. This Section 11(b) analysis does not require proximate cause or any

causation element.

   A.  **Section 11(b) analysis focuses on categories of conduct defined by their impact or**
       **potential impact.**

       i.    The plain language of the statute and relevant case law supports this focus.

When interpreting a statute, courts first look to the ordinary meaning of the plain

language of a statute. *Perrin v. United States*, 444 U.S. 37, 42 (1979) ("A fundamental canon of

statutory construction is that, unless otherwise defined, words will be interpreted as taking their

ordinary, contemporary, common meaning.") (citation omitted); *Oliveira v. New Prime, Inc.*, 857

F.3d 7, 20 (1st Cir. 2017). Here, intimidation, threats, and coercion are categories of conduct

defined largely by their impact rather than the specific means by which they are executed. At the

---

[3] As discussed, in addition to protecting the person voting or attempting to vote, Section 11(b) also protects "any person for urging or aiding any person" voting or attempting to vote, and those who are exercising powers or duties under certain sections of the Voting Rights Act. 52 U.S.C. § 10307(b). For simplicity, "voter" is used in this Statement to include all three groups.

time Congress passed Section 11(b), to "intimidate" meant "to 'make timid or fearful,' or to 'inspire or affect with fear,' especially 'to compel to action or inaction (as by threats).'" *Wohl I*, 498 F. Supp. 3d at 477 (quoting *Webster's Third New Int'l Dictionary*, 1183 (1966)); *Fair Fight*, 2024 WL 24524, at *38. To "threaten" meant "to utter threats against or promise punishment, reprisal, or other distress." *Wohl I*, 498 F. Supp.3d at 477 (internal citation omitted). And to coerce meant "to restrain, control, or dominate, nullifying individual will or desire (as by force, power, violence, or intimidation)." *Id.* (internal citation omitted).

Courts have applied Section 11(b) to a wide variety of conduct based on their intimidating, threatening, or coercive impact, or potential impact, on voters. For instance, courts have found that: sending robocalls that contained several false statements to voters violates Section 11(b) because "a reasonable recipient, familiar with the context of the communication" would find the robocall intimidating, threatening, or coercive (*Nat'l Coal. on Black Civic Participation v. Wohl*, 661 F. Supp. 3d 78, 112-16 (S.D.N.Y. 2023) (*Wohl III*)); accusing voters of committing felonies and publishing their personal information would violate Section 11(b) because such conduct put voters "in fear of harassment and interfere[s] with their right to vote" (*LULAC*, 2018 WL 3848404, at *4); visiting a voter's home and asking invasive questions about her voting history would constitute a Section 11(b) violation because a voter could, and did, feel intimidated (*U.S. Election Integrity Plan*, 653 F. Supp. 3d at 870); and sending postcards that contained false information about voting eligibility requirements, including a false 30-day minimum residency requirement, violated Section 11(b) because "the postcard mailing had the effect of intimidating such voters" (*United States v. N.C. Republican Party*, No. 91-161-CIV-5-F, slip op. at 1, 4 (E.D.N.C. Feb. 27, 1992) (entering a consent decree under Section 11(b) to enjoin the Republican National Party from "engaging in any activity or program which is

12

designed, in whole or in part, to intimidate, threaten, coerce, deter, or otherwise interfere with a qualified voter's lawful exercise [of their right to vote]")).

    ii.  <u>Section 11(b) requires fact- and context-specific analysis to determine whether the challenged conduct intimidated, threatened, or coerced a voter—or could have.</u>

Because "threats, intimidation or coercion may take on many forms," Section 11(b) requires fact- and context-specific legal analysis when determining whether the challenged conduct was intimidating, threatening, or coercive to voters. *See Wohl I*, 498 F. Supp. 3d at 477, 482-84 (quoting *United States v. Beaty*, 288 F.3d 653, 654 (6th Cir. 1961)). Challenged "acts cannot be viewed in isolation," but must be considered as a whole and "against the background of contemporaneous events[.]" *United States v. McLeod*, 385 F.2d 734, 740 (5th Cir. 1967) (discussing Section 131(b) of the Civil Rights Act of 1957, a predecessor to Section 11(b), which contains the same phrase, "intimidate, threaten, or coerce").

To determine whether a voter was intimidated, threatened, or coerced, Section 11(b) uses an objective standard that does not depend on the subjective reaction of targeted voters. *Wohl I*, 498 F. Supp. 3d at 477 (applying a "reasonable recipient familiar with the context" standard to determine whether the challenged conduct would have "deter[red] individuals from exercising their voting rights"). Such an objective standard "avoids the uncertainties and unfair discrepancies that can plague a judicial effort to determine a plaintiff's unusual subjective feelings." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68-69 (2006) (holding that Title VII's retaliation provision employs an objective standard).[4] That said, evidence that voters

---

[4] This objective standard is also consistent with courts' interpretation of other similar statutory language prohibiting intimidation, threats, or coercion. *Cf. McLeod*, 385 F.2d at 741 (5th Cir. 1967) (reversing the district court's decision that defendants did not violate 1957 Civil Rights Act's section prohibiting intimidation, threats, or coercion to interfere with the right to vote because defendants arresting and prosecuting Black voters attempting to register "had a coercive

subjectively felt intimidated, threatened, or coerced, though not required, remains relevant under this objective standard. *Wohl III*, 661 F. Supp.3d at 93-95; *U.S. Election Integrity Plan*, 653 F. Supp. 3d at 870.

Evolution in the tactics to intimidate, threaten, or coerce voters does not undermine the vitality of Section 11(b)'s prohibition. As the *Wohl I* court stated, "the forces and conflicts that animated Congress's adoption of the . . . voting rights legislation are playing out again . . . though with a difference." *Wohl I*, 498 F. Supp. 3d at 460. Defendants perhaps no longer use "guns, torches, burning crosses, and other dire methods perpetrated under the cover of white hoods" to intimidate, threaten, or coerce voters, but modern tactics "using telephones, computers, and modern technology . . . serve the same deleterious ends." *Id.* Indeed, "[b]ecause of the vastly greater population they can reach instantly with false and dreadful information, contemporary means of voter intimidation may be more detrimental to free elections than the approaches taken for that purpose in past eras[.]" *Id.* The central question for Section 11(b) remains whether the challenged conduct objectively intimidates, threatens, or coerces a reasonable voter—or attempted to do so. If the answer is "yes," then a Section 11(b) violation occurred.

**B. Section 11(b) contains no causation element and does not require proximate cause.**

Contrary to Defendant Lingo's argument (Lingo Mot. Mem. at 13-14), Section 11(b) does not require proximate causation or any kind of causation. The plain language of Section 11(b) includes no causation element. 52 U.S.C. § 10307(b). Because the statute specifically

---

effect" and a severe "chilling effect . . . on a voter registration drive"); *Geraci v. Union Square Condo. Ass'n*, 891 F.3d 274, 277 (7th Cir. 2018) (interpreting the Fair Housing Act's anti-intimidation provision by analyzing whether defendants engaged in "conduct that a person of normal fortitude would view as coercive, intimidating, threatening, or interfering with the exercise of her protected right").

prohibits any "*attempt* to intimidate, threaten, or coerce," a defendant need not actually cause a particular voter to feel intimidated, threatened, or coerced. *Id.* (emphasis added); *see*, *e.g.*, *Wohl III*, 661 F. Supp. 3d at 110, 115-16; *United States v. Clark*, 249 F. Supp. 720, 728 (S.D. Ala. 1965) (discussing Section 131(b)). Under Section 11(b), any conduct that foreseeably would intimidate, threaten, or coerce a reasonable person is actionable.[5]

When Congress wants to require that a defendant cause a particular injury, it knows how to do so. For instance, Section 2 of the VRA prohibits procedures "*which result[]* in a denial or abridgment of the right of any citizen of the United States to vote." 52 U.S.C. § 10301(a) (emphasis added). And the Materiality Provision of the 1964 Civil Rights Act prohibits state actors from "deny[ing] the right of any individual to vote in any election *because of* an error or omission on any record or paper relating to . . . voting, if such error or omission is not material [.]" 52 U.S.C. § 10101(a)(2)(B) (emphasis added). Section 11(b) lacks similar causation language.

### C. Robocalls may constitute intimidation, threats, or coercion under Section 11(b).

Defendant Lingo's claim that robocalls are not within the reach of Section 11(b) because they are merely "deceptive," and not intimidating, threatening, or coercive, is incorrect.[6] Section

---

[5] To be clear, causation remains relevant in determining whether a party has standing to bring a Section 11(b) claim, but causation is not an element of a Section 11(b) violation itself.

[6] To the extent that Defendant Lingo is arguing that Section 11(b) violates the First Amendment by impermissibly regulating speech (*see* Lingo Mem. Opp. Prelim. Inj. at 29), it does not. As discussed, Section 11(b) is focused on conduct, not speech, and thus does not implicate the First Amendment. Even if the conduct prohibited by Section 11(b) were to fall within the First Amendment, Section 11(b) survives any level of scrutiny because it is narrowly tailored to further a compelling interest—the fundamental right to vote. *See Wohl III*, 661 F. Supp. 3d at 121 ("This statute is narrowly tailored to ensure that mistaken false utterances are not penalized because the context of the speech itself is critical to determining whether speech is intimidating, threatening or coercive to voters."); *see also Burson v. Freeman*, 504 U.S. 191, 208 (1992)

11(b) applies if the "deceptive" message intimidated, threatened, or coerced a voter, or could have. *See Wohl I*, 498 F. Supp. 3d at 467 (finding plaintiffs were likely to succeed on the merits of a Section 11(b) claim where the robocall "statements are false and misleading and that as a consequence, in the minds of reasonable voters, would produce a substantial intimidating effect"); *see also N.C. Republican Party*, No. 91-161-CIV-5-F, slip op. at 4 (enjoining defendants under Section 11(b) from sending postcards that provided false information concerning voter eligibility).

Several factors may help a court determine whether a robocall violated Section 11(b). For example, the content of the robocall, including whether it contained explicit or implicit warnings or other messages about possible negative consequences, such as legal consequences, may be intimidating, threatening or coercive. [7] *Wohl III*, 661 F. Supp. 3d at 112 ("[U]nlawful threats or intimidation under the statute need not be violent or physical, and may include communications inspiring fear of legal consequences, economic harm, dissemination of personal information, and surveillance"). Legal consequences may include losing the right to vote or other adverse legal

---

(plurality op.) (recognizing the government's "compelling interest in securing the right to vote freely and effectively"). If Defendant Lingo does intend to assert that Section 11(b) violates the First Amendment as applied here, it must certify to the Attorney General that the constitutionality of Section 11(b) is in question so that the Attorney General may decide whether to intervene to defend the statute. *See* 28 U.S.C. § 2403(a); Fed. R. Civ. P. 5.1(a).

[7] Other negative consequences may be criminal, economic, or personal. *See e.g.*, *Wohl III*, 661 F. Supp. 3d at 119 ("The Robocall . . . put a reasonable recipient familiar with the context of the Robocall in fear that an injury of a legal (arrest), economic (debt collection), or physical (mandatory vaccination) nature would occur if the recipient voted by mail."); *N.C. Republican Party*, No. 91-161-CIV-5-F, slip. op. at 3 (enjoining the Republican National Party from intimidating, threatening, or coercive conduct, including sending a postcard that warned it is a felony to "knowingly give false information about your name, residence, or period of residence to an Election Official"); *Nguyen*, 673 F.3d at 1265 (finding fair probability that distributing a letter to Latino immigrants warning that their information could be provided to anti-immigration organizations constituted voter intimidation under California law, in the context of a federal search warrant).

actions against the voter. *See e.g.*, *United States v. Nguyen*, 673 F.3d 1259, 1265 (9th Cir. 2012) (finding fair probability that a letter sent to Latino voters that warned "if they voted in the upcoming election their personal information would be collected . . . [and] provided to organizations who are 'against immigration'" constituted voter intimidation under California law, in the context of a federal search warrant); *Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 222 (2d Cir. 2001) (jury could reasonably find that the threat of legal action violated the Americans with Disabilities Act section making it unlawful to "coerce, intimidate, threaten").

Second, deceptive features of the robocall that make it appear legitimate can also make it more likely to intimidate, threaten or coerce a voter, such as claiming the call was from a credible source or casting the speaker of the message "as a seemingly familiar figure." *Wohl I*, 498 F. Supp. 3d at 485 (finding it "highly relevant that . . . the speaker of the message was cast as a seemingly familiar figure" and that "the message was falsely framed as originating from a 'civil rights organization'"); *see also Wohl III*, 661 F. Supp. 3d at 115 (holding that defendants violated Section 11(b) and noting that "the features of the Robocall making it appear legitimate, such as its claim that it was being made from a civil rights organization, demonstrate that the Robocall was a calculated attempt to deter Black voters"). By falsely framing a robocall as from a credible source, such as a civil rights organization or a recognized political leader, the call may suggest "gravity and [give] a fake appearance of credibility to the warnings it convey[s]." *Wohl I*, 498 F. Supp. 3d at 485. In addition, portraying the message as from a familiar figure, like the President of the United States, may also lend the robocall legitimacy. For instance, the speaker in *Wohl's* robocall identified herself as "Tamika Taylor," a name incorrectly attributed by the media to the mother of Breonna Taylor, Tamika Palmer. *Id.* at 467. There, the court found that using "this name in the script of the call is suggestive of an effort to provide an aura of

legitimacy to the robocall message." *Id.* The more legitimate a deceptive robocall appears, the more likely a voter will believe the false information provided and be intimidated, threatened, or coerced.

Third, the context of the timing of the robocall can also be a factor in determining whether it is intimidating, threatening or coercive. Robocalling thousands of voters with inaccurate information shortly before an election could create voter confusion (if not fear) that would incentivize voters to remain away from the polls. *See Purcell v. Gonzalez*, 549 U.S. 1, 4-5 (2006) (discussing how "voter confusion" can create a "consequent incentive to remain away from the polls"). Public officials and others may not have enough time to provide corrective information. Unlike intimidating, threatening, or coercive robocalls made well ahead of elections, courts will likely lack an opportunity to cure any problematic robocalls made close to an election, such as by issuing injunctive relief to stop further harm ahead of an election. *Cf. Wohl I*, 498 F. Supp. 3d at 489-90 (granting a TRO and ordering defendants to send a "curative" robocall message to recipients of the original robocall informing them that "a federal court has found that the message you previously received . . . contained false information that has had the effect of intimidating voters, and thus interfering with the upcoming presidential election, in violation of federal voting-rights laws").

Fourth, although Section 11(b) does not require targeting of a particular group, such as a racial or ethnic minority, evidence of such targeting is relevant because it is more likely to be perceived as particularly intimidating, threatening, or coercive. *See Wohl III*, 661 F. Supp. 3d at 113-14 (holding that defendants violated Section 11(b) and noting that the robocall's "message is particularly threatening to the Black community given the well-documented and longstanding history of racially discriminatory practices it has endured"); *Council on Am.-Islamic Rels.—*

18

*Minn. v. Atlas Aegis, LLC*, 497 F. Supp. 3d 371, 379 (D. Minn. 2020) (granting a preliminary injunction under Section 11(b) against defendants who planned to use armed civilians to stop "'antifa,' an organization with a known political organization," from being at the polls); *Daschle v. Thune*, No. 4:04-cv-4177 (D.S.D. Nov. 2, 2004) (temporary restraining order enjoining campaign workers who were targeting Native American voters by following Native American voters, recording their license plates, and loudly discussing how other Native Americans were prosecuted for illegally voting); *Democratic Nat'l Comm. v. Republican Nat'l Comm.*, 673 F.3d 192 (3d Cir. 2012) (discussing a Section 11(b) consent decree that proscribed voter challenge campaigns targeting precincts with a high percentage of racial or ethnic minorities); *Nguyen*, 673 F.3d at 1265 (fair probability that, in the context of a federal search warrant, "the contents of the letter and the circumstances of its distribution[,]" including the fact that the letter was sent to and targeted Latino immigrants, were sufficient to conclude that the letter constituted voter intimidation under California law).

And finally, the historical and social context in which the robocall took place might be relevant for determining Section 11(b) violations. *See McLeod*, 385 F.2d at 744 ("We note that Selma's history of systematic racial discrimination is an ingredient in each of the criteria"); *Wohl III*, 661 F. Supp. 3d at 113-14 ("The Court has previously recognized and taken judicial notice of the history of discriminatory lending and debt collection practices in the Black community and does so again here."). Specific historical and social context for robocalls will vary depending on the relevant geographic location, the voters targeted, and other relevant factors that may help determine whether reasonable voters would be intimidated, threatened, or coerced by the challenged conduct.

**CONCLUSION**

The United States respectfully submits this Statement of Interest to assist the Court in

evaluating Plaintiffs' claims under Section 11(b) of the Voting Rights Act.


Date: July 25, 2024


|  | Respectfully submitted, |
|---|---|
| JANE E. YOUNG | KRISTEN CLARKE |
| United States Attorney | Assistant Attorney General |
| District of New Hampshire | Civil Rights Division |
|  |  |
| /s/ *Matthew Vicinanzo* | /s/ *Judy Bao* |
| MATTHEW VICINANZO | R. TAMAR HAGLER |
| New Hampshire Bar No. 277123 | TIMOTHY MELLETT |
| Assistant United States Attorney | JUDY J. BAO |
| United States Attorney's Office | California Bar No. 305560 |
| 53 Pleasant Street, 4th Floor | KELLI M. SLATER |
| Concord, NH 03301 | Mississippi Bar No. 106157 |
| Phone: (603) 225-1552 | Attorneys, Voting Section |
| Fax: (603) 225-1470 | Civil Rights Division |
| matt.vicinanzo@usdoj.gov | U.S. Department of Justice |
|  | 950 Pennsylvania Avenue NW |
|  | Washington, D.C. 20530 |
|  | Phone: (800) 253-3931 |
|  | Fax: (202) 307-3961 |
|  | timothy.f.mellet@usdoj.gov |
|  | judy.j.bao@usdoj.gov |
|  | kelli.slater@usdoj.gov |

## <u>CERTIFICATE OF SERVICE</u>

I certify that on July 25, 2024, I filed the foregoing via the CM/ECF system, which sends

notice to all counsel of record.

*/s/ Judy Bao*_____
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, D.C. 20530
