UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

League of Women Voters
of New Hampshire; League of Women
Voters of the United States;
Nancy Marashio; James Fieseher;
And Patricia Gingrich,
    Plaintiffs

    v.                              Case No. 24-cv-73-SM-TSM
                                     Opinion No. 2025 DNH 042

Steve Kramer; Lingo Telecom, LLC;
Voice Broadcasting Corporation;
and Life Corporation,
    Defendants


**O R D E R**


In January of 2024, two days before the New Hampshire Presidential Primary Election, defendants directed approximately 10,000 robocalls to New Hampshire residents they believed were likely Democratic voters. The calls used an AI-generated "deepfake" voice technology to mimic President Biden's voice and were designed to suppress Democratic voter turnout. Specifically, the calls urged recipients to "save" their vote for the November general election and warned that if they cast a vote in the primary election it would "only enable the Republicans in their quest to elect Donald Trump again" (the

"Deepfake Robocall" or "Deepfake Message")).  In addition to
employing an AI-generated voice designed to deceive recipients
into believing that President Biden had recorded the message,
defendants also "spoofed" the caller ID to falsely show that the
call originated from a phone number associated with Kathleen
Sullivan, a prominent attorney and well-known former state
Democratic Party leader.  Sullivan was also the chair of a Super
PAC that led an effort to encourage New Hampshire Democrats to
write in President Biden's name in the state's primary election.

In the wake of those robocalls, the League of Women Voters
of the United States, the League of Women Voters of New
Hampshire, and three individuals who received the Deepfake
Robocall, filed suit against Steve Kramer, Voice Broadcasting
Corporation, Life Corporation, and Lingo Telecom, LLC.
Plaintiffs allege that Kramer conceived of and commissioned the
creation of the misleading robocalls, while the corporate
defendants provided various services to distribute those calls.

Plaintiffs say defendants' conduct violated the Voting
Rights Act of 1965, the Telephone Consumer Protection Act, and
two separate provisions of a New Hampshire statute regulating
political advertising.  They seek statutory damages, punitive

damages, and an award of attorney's fees.  They also seek a
nationwide injunction enjoining all defendants:

> from producing, generating, or distributing AI-
> generated robocalls impersonating any person, without
> that person's express, prior written consent;
>
> from distributing spoofed telephone calls, texts
> messages, or any other form of spoofed communication
> without the express, prior written consent of the
> individual or entity upon whose half the communication
> is being sent; and
>
> from distributing telephone calls, text messages, or
> other mass communications that do not comply with all
> applicable state and federal laws or that are made for
> an unlawful purpose.

Amended Motion for Preliminary Injunction (document no. 71).


Default has been entered against Kramer.  Presently pending
before the court is a motion to dismiss plaintiffs' Amended
Complaint filed by defendants Life Corp. and Voice Broadcasting,
in which they assert that plaintiffs lack standing and that the
Amended Complaint fails to state any viable claims.  Plaintiffs
object.  For the reasons discussed below, that motion to dismiss
is denied.


### Standard of Review

When considering a motion to dismiss, the court accepts all
well-pleaded facts alleged in the complaint as true, disregards

legal labels and conclusions, and resolves reasonable inferences in the plaintiff's favor.  See Galvin v. U.S. Bank, N.A., 852 F.3d 146, 155 (1st Cir. 2017).  The court may also consider documents referenced by or incorporated into the complaint.  See Kando v. Rhode Island State Bd. of Elections, 880 F.3d 53, 56 (1st Cir. 2018).

To avoid dismissal, the complaint must allege sufficient facts to support a "plausible" claim for relief.  See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  To satisfy that plausibility standard, the factual allegations in the complaint, along with reasonable inferences, must show more than a mere possibility of liability – that is, "a formulaic recitation of the elements of a cause of action will not do."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).  See also Lyman v. Baker, 954 F.3d 351, 359–60 (1st Cir. 2020) ("For the purposes of our [12(b)(6)] review, we isolate and ignore statements in the complaint that simply offer legal labels and conclusions or merely rehash cause-of-action elements.") (citation and internal punctuation omitted).

In other words, the complaint must include well-pled (i.e., non-conclusory, non-speculative) factual allegations as to each of the essential elements of a viable claim that, if assumed to

4

be true, allow the court to draw the reasonable and plausible inference that the plaintiff is entitled to the relief sought. See Tasker v. DHL Retirement Savings Plan, 621 F.3d 34, 38-39 (1st Cir. 2010).

## Background

In June of 2024, plaintiffs filed an Amended Motion for Preliminary Injunction (document no. 71), which the court referred to the magistrate judge for a report and recommendation.  On July 31, 2024, the magistrate judge held a hearing, before which the parties submitted a stipulation of facts, as well as memoranda in support of and in opposition to the motion for preliminary injunction.  The following statement of background facts is drawn from the Amended Complaint (document no. 65), the parties' Stipulation of Facts (document no. 87), and the Magistrate Judge's Report and Recommendation (document no. 99).

I.    The Parties.

The three individual plaintiffs in this case, Nancy Marashio, James Fieseher, and Patricia Gingrich, are registered voters in New Hampshire.  Each received the Deepfake Robocall on January 21, 2024, on their home landline.  Each individual plaintiff realized that the message was not from President Biden

5

or his campaign and that the information contained in the call
was false.  And, each individual plaintiff voted in the Primary
despite having received the Deepfake Robocall.

The organizational plaintiffs are the League of Women
Voters of the United States and the League of Women Voters of
New Hampshire (collectively, "the League" or the "League
entities").  According to the League, its mission is "to
encourage informed and active participation in the government,
increase understanding of major public policy issues, and
influence public policy through education and advocacy."
Memorandum in Support of Preliminary Injunction (document no.
71-1), at 17.  Additionally (and importantly for purposes of
standing), another core function of the League is to combat
voter suppression efforts and counsel "citizens to register to
vote, participate in elections, and engage with the civil
process."  As discussed below, that "core function" of the
League was adversely impacted when defendants attempted to
suppress Democratic voter turnout by discouraging Democratic
voters from casting a ballot in the September Primary.

The League-US states that in response to the Deepfake
Robocalls it changed its VOTE411.org website which provides
election-related information to voters and it created a new

alert to inform voters about deceptive, threatening, or
intimidating robocalls – all of which required diversion of
staff and money.  See, e.g., Affidavit of Celina Stewart, Chief
Counsel at the League of Women Voters of the U.S. (document no.
71-30) at para. 12 ("[The League] diverted staff resources to
create the new alert, and will dedicate staff time to updating
the website and translating alerts into Spanish to alert voters
about similar harmful robocall campaigns.").  The League-US also
says it "has expended, and continues to expend, resources
providing additional guidance and training to staff to track
inauthentic or deepfake robocalls" and planned to expend even
more funds to amend its "printed information about voter
registration to include warnings about inauthentic robocalls."
Memorandum in Support of Preliminary Injunction (document no.
71-1), at 12-13.

    According to the Amended Complaint, "Defendants Voice
Broadcasting and Life Corp are part of a constellation of
companies owned, controlled, or operated by Walter Monk, via the
holding company Voice Ventures Inc.  Monk's companies provide
robocalling, political advertising, polling, fundraising and
text messaging services."  Id. at para. 29.  Voice Broadcasting
leases equipment and software to clients who wish to conduct
election-related and other calling campaigns.  Additionally,

Voice Broadcasting "advertises its ability to help clients 'create a powerfully persuasive set of recorded phone messages' and that its team 'will call a targeted list of your prospects and play your message to them.' Voice Broadcasting also offers to 'furnish a phone list to dial to, for free,' and maintains a 'database with hundreds of millions of records, which we will search through to find the people most likely to be interested in talking to you.'" Id. at para. 31.

The Amended Complaint alleges that "Defendant Life Corp provides communications services to Voice Broadcasting to enable calling capabilities on the Voice Broadcasting platform," id. at para. 36, and claims that Life Corp has been cited in the past for "failing to comply with federal laws and regulations governing the dissemination of robocalls," id. at para. 37.

The third corporate defendant, Lingo Telecom, LLC, is "a telecommunications voice service provider, registered in the Federal Communication Commission's ("FCC") Form 499 Filer Database as Filer ID No. 802572. It is registered to provide telecommunication services in all 50 states, Washington, D.C., and Puerto Rico." Id. at para. 39. The Amended Complaint alleges that, as a voice service provider, Lingo is required to employ an authentication system designed to verify that the

party transmitting a call has the authority to use the Caller ID
information they designate.  Id. at para. 40.  That system,
which is known as the "STIR/SHAKEN framework," helps inform and
protect consumers "from illegal spoofed calls by enabling
authenticated caller ID information to travel securely with the
call itself through the entire call path."  In the Matter of
Lingo Telecom, LLC, FCC Notice of Apparent Liability (May 28,
2024) (document no. 71-11), at para. 4.  Despite those
requirements, the FCC found that "Lingo signed Life's spoofed
traffic with an A-level attestation without having established a
verified association with the telephone number used in the
calls."  Id. at para. 19.  The FCC proposed a penalty of
$2,000,000 against Lingo for its role in the illegal robocall
campaign that is the subject of this litigation.  Id. at para.
1.

     Finally, defendant Steve Kramer is a political consultant
who provided services, including automated calls, to political
campaigns.  Kramer worked with an associate to create the audio
message through artificial intelligence that mimicked or "deep
faked" the voice of President Biden.  On May 24, 2024, the FCC
issued a "Notice of Apparent Liability for Forfeiture" in which
it proposed "a penalty of $6,000,000 against Steve Kramer for
perpetrating an illegal robocall campaign targeting potential

New Hampshire voters two days before the state's 2024 Democratic Presidential Primary Election in apparent violation of [several federal statutes]."  <u>In the Matter of Steve Kramer</u>, Notice of Apparent Liability (May 24, 2024) (document no. 71-3), at para. 1.

II.  <u>The "Deepfake Message" and Robocalls</u>.

     In November 2023, Defendant Steve Kramer asked an associate if he could create an AI-generated voice recording of President Biden, and the associate said that he could.  On January 19, 2024, just days before the New Hampshire Primary, Kramer provided a script to the associate, who then created an AI-generated recording, mimicking President Biden's voice, of the following message:

> This coming Tuesday is the New Hampshire Presidential Preference Primary.  Republicans have been trying to push nonpartisan and Democratic voters to participate in their primary.  What a bunch of malarkey.  We know the value of voting Democratic when our votes count. It's important that you <u>save your vote</u> for the November election.  We'll need your help in electing Democrats up and down the ticket.  <u>Voting this Tuesday only enables the Republicans in their quest to elect Donald Trump again.  Your vote makes a difference in November, not this Tuesday</u>.

FCC Notice of Apparent Liability – Kramer (document no. 71-3), at para. 5 (emphasis supplied).

In addition to the deepfake message itself, Kramer needed a caller identification number to associate with the call.  He wanted to use the "603" New Hampshire area code, to make it more likely that the call would be answered by New Hampshire residents.  So, he decided to use the telephone number of Kathy Sullivan, a prominent attorney and well-known former state Democratic Party leader who was associated with President Biden's campaign in New Hampshire.  Kramer then contacted Voice Broadcasting to set up a robocall, using the Deepfake Message, and arranged to have it distributed to approximately 25,000 telephone numbers in the evening of Sunday, January 21, just two days before the New Hampshire Primary.  Id. at para. 11.  Kramer instructed Voice Broadcasting to use Kathy Sullivan's telephone number as the caller ID for the Deepfake Robocall.  He did not secure Sullivan's permission to use her telephone number in association with that call.

At Voice Broadcasting's suggestion, Kramer agreed to add a final sentence to the Deepfake Message, in a different voice, stating: "If you would like to be removed from future calls, please press two now.  Call [the personal telephone number of Kathy Sullivan] to be removed from future calls."  Id.  This, of course, strongly implies that Voice Broadcasting was familiar with the content of the Deepfake Message and realized that it

11

lacked any reference to a required opt-out mechanism.  According

to the FCC, "By 7:12 p.m. on the night of Sunday, January 21,

Voice Broadcasting - using Life's services and equipment - had

<u>initiated</u> 9,581 calls carrying the Deepfake Message to potential

New Hampshire voters using the Spoofed Number as the caller ID

number."  FCC Notice of Apparent Liability – Kramer, at para. 11

(emphasis supplied).[1]


        Voice Broadcasting and Life Corporation are affiliated

companies – indeed, plaintiffs claim Life Corp. is an "alter

ego" of Voice Broadcasting.  <u>See</u> Plaintiffs' Consolidated

Objection (document no. 85) at 11.  Voice Broadcasting used Life

Corporation's services and equipment to initiate thousands of

the Deepfake Robocalls to telephone numbers in New Hampshire.

Life Corporation also routed some calls to Lingo Telecom, which

originated several thousand calls.  New Hampshire voters

received at nearly 10,000 (perhaps more) robocalls with the

deepfake message.[2]  Notice of Apparent Liability – Lingo

(document no. 71-11), at 5.

---

[1]    The question of which party(s) "initiated" the illegal
robocalls at issue is central in determining which party(s) may
be liable under the Telephone Consumer Protection Act and is
discussed more fully below.

[2]    In the FCC's "Notice of Apparent Liability for Forfeiture"
against Lingo Telecom (document no. 71-11), the FCC attributes

The Deepfake Robocalls generated a significant amount of media coverage and, on February 25, 2024, Kramer publicly acknowledged that he had orchestrated the scheme and sent the Deepfake Robocalls.  In May, Kramer was indicted on 13 charges of felony voter suppression and 13 charges of misdemeanor impersonating a candidate.  In this proceeding, default was entered against him in August of 2024.

Meanwhile, the Federal Communications Commission, in conjunction with the New Hampshire Attorney General and the United States Department of Justice, opened an investigation into the Deepfake Robocalls.  On May 23, 2024, the FCC issued a "Notice of Apparent Liability for Forfeiture" to Lingo Telecom that proposed a penalty of $2,000,000 for violations of 47 C.F.R. § 64.6301(a) (document no. 71-11), at para. 1.  The next day, the FCC issued a "Notice of Apparent Liability for Forfeiture" to Kramer that proposed a $6,000,000 penalty "for perpetrating an illegal robocall campaign targeting potential New Hampshire voters two days before the state's 2024 Democratic

---

9,581 robocalls with the deepfake message to Lingo.  Plaintiffs assert that Lingo Telecom actually originated and provided A-level attestation to 13,235 robocalls from Life Corp. – a number apparently based on Lingo Telecom's response to an FCC subpoena, but not verified by the FCC.  Id. at para. 14, n.59.

Presidential Primary Election in apparent violation of the Truth in Caller ID Act of 2009."  Document no. 71-3, at para. 1.  The FCC later entered a Consent Decree with Lingo Telecom that requires Lingo Telecom to pay a $1,000,000 civil penalty and "to implement a robust compliance plan."  Notice of Settlement with FCC (document no. 91-1), at 2.

In their First Amended Complaint (document no. 65), plaintiffs advance four claims: violation of Section 11(b) of the Voting Right Act, 52 U.S.C. § 10307(b); violation of Telephone Consumer Protection Act, 47 U.S.C. § 227(b)(1)(B); violation of N.H. Rev. Stat. Ann. ("RSA") 664:14-a; and violation of RSA 664:14-b.

**Discussion**

I.  <u>Standing</u>.

Defendants Life Corporation and Voice Broadcasting Corporation assert that neither the organizational plaintiffs nor the individual plaintiffs have standing to bring the claims asserted in the Amended Complaint.  Specifically, defendants argue that plaintiffs have not sufficiently alleged an injury-in-fact or plausibly alleged that their injuries were caused by Life and Voice.  The court disagrees.

To establish standing, a plaintiff must demonstrate three things: injury in fact, causation, and redressability. That is to say, a plaintiff must show that: (1) they have suffered (or likely will suffer) an actual injury; (2) the injury was likely (or will likely be) caused by the defendant; and (3) the requested judicial relief would likely redress that injury. See, e.g., Food & Drug Admin. v. Alliance for Hippocratic Med., 602 U.S. 367, 380 (2024); In re Fin. Oversight & Mgmt. Bd. for Puerto Rico, 110 F.4th 295, 308 (1st Cir. 2024). Organizational plaintiffs, like the League, can either have standing in their own right, or they can have what is known as "associational standing," to redress an injury suffered by their members. See generally Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc., 528 U.S. 167, 181 (2000). Here, the League entities assert that they have organizational standing in their own right to redress particular injuries that they have suffered.

For the individual plaintiffs, establishing standing is relatively straight forward. The Voting Rights Act provides, in pertinent part, that no person "shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote." 52 U.S.C. § 10307(b) (emphasis supplied). The individual plaintiffs received the

Deepfake Robocalls.  And, there can be little debate that those calls were specifically designed to dissuade potential Democratic voters from casting a ballot in the primary election by means of a "threat" and/or "intimidation."  The "threat" communicated by the Deepfake Robocalls was that if an individual voted in the primary, their subsequent vote in the general would be invalidated ("save your vote for the November election"). The calls also threatened that if the recipient voted in the primary, they would undermine President Biden's re-election efforts ("Voting this Tuesday only enables the Republicans in their question to elect Donald Trump again.").

As the United States District Court for the Southern District of New York has noted,

> There is limited precedent discussing what "threaten" and "intimidate" mean in the context of Section 11(b). But the plain meaning of those terms, the few cases that interpret Section 11(b), and cases that interpret the same or similar language in other civil rights statutes all indicate that intimidation <u>includes messages that a reasonable recipient, familiar with the context of the message, would interpret</u> as a threat of injury - whether physical or nonviolent - <u>intended to deter</u> individuals from exercising their voting rights.  Threats, intimidation or coercion may take on many forms.  As the Court explained previously, actions or communications that inspire fear of economic harm, legal repercussions, privacy violations, and even surveillance can constitute unlawful threats or intimidation under the statute.

16

<u>Nat'l Coal. on Black Civic Participation v. Wohl</u>, 512 F. Supp.
3d 500, 509 (S.D.N.Y. 2021) ("<u>Wohl II</u>") (citation and internal
punctuation omitted).  <u>See also</u> <u>Id</u>. at 511 ("The robocall
message communicates threats of adverse legal, economic, and
even physical consequences stemming from mail-in voting.  These
threats undoubtedly engender a "chilling effect" on voting-
related activity and, as such, plausibly constitute
intimidation."); <u>Fair Fight Inc. v. True the Vote</u>, 710 F. Supp
3d 1237, 1289 (N.D.Ga. 2024) (noting that conduct prohibited by
the VRA includes "making a voter fearful, compelling voter
action or inaction, promising reprisal or distress, or
restraining, controlling, or dominating a voter");  <u>Nat'l Coal.</u>
<u>on Black Civic Participation v. Wohl</u>, 661 F. Supp. 3d 78, 113
(S.D.N.Y. 2023) ("<u>Wohl III</u>") ("[At prior stages of this
litigation], the Court determined that intimidation includes
messages that a <u>reasonable recipient</u>, <u>familiar with the context</u>
of the communication, would view as a threat of injury to deter
individuals from exercising their right to vote.  The Court
explained that unlawful threats or intimidation under the
statute <u>need not be violent or physical</u>, and may include
communications inspiring <u>fear of legal consequences</u>,[3] economic

---

[3]     In this case, the "legal consequence" threatened by the
Deepfake Robocall was the loss (or dilution) of the individual's
vote in the general election if he or she cast a ballot in the
primary election.

harm, dissemination of personal information, and surveillance.")
(emphasis supplied); Nat'l Coal. on Black Civic Participation v.
Wohl, 498 F. Supp. 3d 457, 467 (S.D.N.Y. 2020) ("Wohl I")
(concluding that the robocalls' statements about potential legal
consequences of voting by mail were false and misleading and "as
a consequence, in the minds of reasonable voters, would produce
a substantial intimidating effect").  See generally United
States v. Tan Duc Nguyen, 673 F.3d 1259, 1265 (9th Cir. 2012)
(noting that under the California state analogue to the VRA,
which prohibits the use of threats of force, violence, and
tactics of coercion or intimidation to dissuade a person from
voting, the term "intimidation" is "not limited to displays or
applications of force, but can be achieved through manipulation
and suggestion"); League of United Latin Am. Citizens - Richmond
Region Council 4614 v. Pub. Int. Legal Found., No. 1:18-CV-
00423, 2018 WL 3848404, at *4 (E.D. Va. Aug. 13, 2018)
(interpreting the term "intimidation" under the VRA and citing a
civil rights case for the proposition that, "Intimidation means
putting a person in fear for the purpose of compelling or
deterring his or her conduct.").

Here, the Deepfake Robocall's combination of false and
misleading statements, including the suggestion that voting in
the primary would nullify/dilute any vote cast in the subsequent

18

general election and undermine President Biden's reelection
efforts, was undeniably intended to have a chilling effect on
recipients' willingness to vote in the primary election and
plausibly constitutes an attempt to intimidate, threaten, or
coerce.  See Wohl II, 512 F. Supp. 3d at 511.

But, say defendants, even if the Deepfake Message did
attempt to threaten and/or intimidate recipients, each of the
named plaintiffs "acknowledge in the Amended Complaint that they
realized the calls were fake and voted anyway, thereby conceding
that they suffered no concrete, particularized or actual
injury."  Defendants' Memorandum (document no. 76-1) at 5.
Defendants read the VRA's proscriptions too narrowly.  Although
the individual plaintiffs were unpersuaded by the Deepfake
Robocalls and actually voted in the primary election, they were
still the victims of an unlawful attempt to intimidate,
threaten, or coerce them into not voting in the primary
election.  Consequently, they still have standing to bring the
claims advanced in the Amended Complaint and defendants'
arguments that they suffered "no injury" are unavailing.  In
short, that defendants' attempts to suppress plaintiffs' votes
were clumsy and unsuccessful does not immunize defendants from
liability, nor does it divest the individual plaintiffs of
standing.  See generally Wohl III, 661 F. Supp. 3d at 108

(citing <u>Leyse v. Lifetime Ent. Servs., LLC</u>, 679 F. App'x 44, 46
(2d Cir. 2017)).  The same is true for plaintiffs' claims under
the Telephone Consumer Protection Act.  <u>See, e.g.,</u> <u>Gibbs v.</u>
<u>SolarCity Corp</u>, 239 Fed.Supp.3d 391, 395 (D.Ma. 2017)
(collecting cases and concluding that "a mere technical
violation of the [Telephone Consumer Protection Act] is, by
itself, a concrete injury sufficient to confer standing").

And, finally, the amended complaint plausibly and
adequately alleges that the injuries sustained by the individual
plaintiffs are fairly traceable to defendants' conduct.  Those
allegations are certainly sufficient to survive defendants'
motions to dismiss.

As for the League plaintiffs, the question of standing is
more difficult and, in light of recent Supreme Court precedent,
a much closer call.  Defendants assert that the League entities
have failed to meet their burden to show a "'concrete and
demonstrable injury to the organization's activities'
attributable to Life or Voice that is 'more than simply a
setback to the organization's abstract social interests.'"
Memorandum in Support of Motion to Dismiss (document no. 76-1)
at 5 (quoting <u>Havens Realty Corp. v. Coleman</u>, 455 U.S. 363, 378–
79 (1982)).

In <u>Havens Realty</u>, the plaintiff - a public interest organization known as HOME - operated a housing counseling service and investigated and referred complaints concerning housing discrimination.  <u>Id</u>. 369.  According to HOME, the defendants (which owned and operated apartment complexes) engaged in a practice known as "racial steering" by lying to black renters, including a member of HOME, about the availability of rental units.  HOME brought suit, alleging that the defendants' practices violated provisions of the Fair Housing Act of 1976 and claiming that it had "to devote significant resources to identify and counteract the defendants' racially discriminatory steering practices."  <u>Id</u>. at 379.  In addressing defendants' challenge to HOME's standing, the Supreme Court noted that:

> In determining whether HOME has standing under the Fair Housing Act, we conduct the same inquiry as in the case of an individual: Has the plaintiff alleged such a personal stake in the outcome of the controversy as to warrant his invocation of federal-court jurisdiction? In the instant case, HOME's complaint contained the following claims of injury to the organization:
>
>> "Plaintiff HOME has been frustrated by defendants' racial steering practices in its efforts to assist equal access to housing through counseling and other referral services.  Plaintiff HOME has had to <u>devote significant resources to identify and counteract</u> the defendants' racially discriminatory steering practices."

<u>Havens Realty Corp. v. Coleman</u>, 455 U.S. 363, 378–79 (1982)

(citations, internal punctuation, and footnotes omitted)

(emphasis supplied).  The court then held that:

> If, <u>as broadly alleged</u>, petitioners' steering practices
> <u>have perceptibly impaired HOME's ability to provide</u>
> <u>counseling and referral services</u> for low-and moderate-
> income homeseekers, <u>there can be no question that the</u>
> <u>organization has suffered injury in fact</u>.  Such
> <u>concrete and demonstrable injury</u> to the organization's
> activities - with the consequent drain on the
> organization's resources - constitutes far more than
> simply a setback to the organization's abstract social
> interests.  We therefore conclude, as did the Court of
> Appeals, that in view of HOME's allegations of injury
> it was improper for the District Court to dismiss for
> lack of standing the claims of the organization in its
> own right.

<u>Id</u>. at 379 (citations omitted; emphasis supplied).

More recently, however, the Court cautioned that, "<u>Havens</u>
was an unusual case, and this Court has been careful not to
extend the <u>Havens</u> holding beyond its context."  <u>Food & Drug</u>
<u>Admin. v. Alliance for Hippocratic Med.</u>, 602 U.S. 367, 370
(2024) ("<u>Alliance</u>").  But, <u>Alliance</u> presented a factual scenario
quite different from the one presented in both <u>Havens</u> and this
case.  In <u>Alliance</u>, doctors and medical associations who were
"unregulated parties" challenged a government regulation that
impacted <u>other</u> parties – that is, although the plaintiffs did
not prescribe or use the regulated drug at issue, they

nonetheless challenged the FDA's regulation of those who did

prescribe the medication.  Not surprisingly, the Court observed

that:

> Because the plaintiffs do not prescribe, manufacture,
> sell, or advertise mifepristone or sponsor a competing
> drug, the plaintiffs suffer no direct monetary
> injuries from FDA's actions relaxing regulation of
> mifepristone.  Nor do they suffer injuries to their
> property, or to the value of their property, from
> FDA's actions.  Because the plaintiffs do not use
> mifepristone, they obviously can suffer no physical
> injuries from FDA's actions relaxing regulation of
> mifepristone.

Id. at 385-86.  Nevertheless, the plaintiffs claimed to have

demonstrated a concrete financial injury stemming from the FDA's

conduct and "far more than simply a setback to the

organizations' abstract social interest" based upon a mere

disagreement with the FDA's actions.  Id. at 394.  Specifically,

the medical associations invoked the holding in Havens and

argued that:

> they have demonstrated something more here.  They
> claim to have standing not based on their mere
> disagreement with FDA's policies, but based on their
> incurring costs to oppose FDA's actions.  They say
> that FDA has "caused" the associations to conduct
> their own studies on mifepristone so that the
> associations can better inform their members and the
> public about mifepristone's risks.  They contend that
> FDA has "forced" the associations to "expend
> considerable time, energy, and resources" drafting
> citizen petitions to FDA, as well as engaging in
> public advocacy and public education.  And all of that
> has caused the associations to spend "considerable

> resources" to the detriment of other spending
> priorities.

<u>Id</u>. (citations omitted; emphasis supplied).  But, said the

Court, "an organization that has not suffered a <u>concrete injury</u>

caused by a defendant's action cannot spend its way into

standing simply by expending money to gather information and

advocate against the defendant's action.  An organization cannot

manufacture its own standing in that way."  <u>Id</u>. (emphasis

supplied).

 

The Court went on to distinguish the facts presented in

<u>Havens</u> from those presented in <u>Alliance</u>:

> The medical associations respond that under <u>Havens</u>,
> standing exists when an organization diverts its
> resources in response to a defendant's actions.  That
> is incorrect.  . . ..
>
> The relevant question in <u>Havens</u> was whether a housing
> counseling organization, HOME, had standing to bring a
> claim under the Fair Housing Act against Havens
> Realty, which owned and operated apartment complexes.
> Havens had provided HOME's black employees false
> information about apartment availability – a practice
> known as racial steering.  Critically, HOME not only
> was an issue-advocacy organization, <u>but also operated
> a housing counseling service</u>.  And when Havens gave
> HOME's employees false information about apartment
> availability, HOME sued Havens because Havens
> "perceptibly impaired HOME's ability to provide
> counseling and referral services for low- and
> moderate-income homeseekers."  In other words,
> <u>Havens's actions directly affected and interfered with
> HOME's core business activities</u> – not dissimilar to a

retailer who sues a manufacturer for selling defective
goods to the retailer.

That is not the kind of injury that the medical
associations have alleged here.  FDA's actions
relaxing regulation of mifepristone have not imposed
any similar impediment to the medical associations'
advocacy businesses.

Id. at 395 (citations omitted; emphasis supplied).


Here, perhaps the most significant distinction from

Alliance is this: the League entities do not challenge a

government policy or regulation they oppose.  Nor have they

simply expended money to counter political ideas or policies

with which they disagree.  That is to say, their interests are

not limited to public advocacy expressing "only a general legal,

moral, ideological, or policy objection" to defendants' conduct.

Alliance, 602 U.S. at 381.[4]

---

[4]    The Alliance court was undeniably concerned with
maintaining limits on the standing of individuals and
organizations to challenge governmental policy and regulatory
decisions.  See, e.g., Id. at 392 ("We decline to start the
Federal Judiciary down that uncharted path.  That path would
seemingly not end until virtually every citizen had standing to
challenge virtually every government action that they do not
like - an approach to standing that this Court has consistently
rejected as flatly inconsistent with Article III.").  See also
Id. at 395 (making clear that the decision in Havens did not
stand for the "expansive theory of standing" under which an
organization has standing whenever it "diverts its resources in
response to a defendant's actions."  If that were the case, the
Court reasoned, "all the organizations in America would have
standing to challenge almost every federal policy that they

Rather, the League entities challenge defendants' private, unlawful conduct that caused them to suffer a concrete harm. Defendants' Deepfake Robocalls directly interfered with the League's core activities – that is, among other things, its efforts to combat voter suppression, as well as its citizen counseling function with respect to voter registration and where and how to vote, and its efforts to encourage citizens to actually cast a ballot in various elections.  In direct response to defendants' conduct and the false information conveyed in the Deepfake Robocalls, the League entities diverted resources and incurred additional costs to counsel affected citizens that, contrary to the false information and implicit threats conveyed in the Deepfake Robocalls, voting in the September primary election would not adversely affect their vote in November, nor would it undermine President Biden's ongoing re-election efforts.

Accepting the factual allegations of the Amended Complaint as true, the League entities have adequately and plausibly alleged that defendants caused them to suffer a "concrete injury" to core functions, at least one of which is combating

---

dislike, provided they spend a single dollar opposing those policies.").

Such concerns are not at issue in this case.

voter suppression efforts.  See, e.g., https://www.lwv.org/
voting-rights/fighting-voter-suppression.  See also Havens, 455
U.S. at 379 ("If, as broadly alleged, petitioners' steering
practices have perceptibly impaired HOME's ability to provide
counseling and referral services . . . there can be no question
that the organization has suffered injury in fact."); Alliance,
602 U.S. at 395 (noting that HOME had standing because
defendant's "actions directly affected and interfered with
HOME's core business activities").  See generally Voto Latino v.
Hirsch, 712 F. Supp. 3d 637, 658 (M.D.N.C. 2024) (collecting
cases involving the standing of organizations focused on voting
rights).

     In light of the foregoing, and interpreting all factual
inferences in the light most favorable to the plaintiffs, the
Amended Complaint adequately and plausibly alleges sufficient
facts to withstand defendants' motion to dismiss on grounds that
plaintiffs lack standing.

II.  Claims under the Voting Rights Act.

     Even if the plaintiffs have standing, defendants assert
that they have failed to state a viable claim under the Voting
Rights Act because the Deepfake Robocall was "not intimidating,
coercive, or threatening on its face."  Defendants' Memorandum

(document no. 76-1) at 7.  According to defendants, "At most, the call involved misinformation – which is not actionable without more.  This is particularly true when not a single plaintiff has said that they were misled – in fact, they have all said they knew the subject call was a fake and did not rely on it."  Id.

Defendants misconstrue the nature of the Deepfake Robocall, as well as the scope of the Voting Rights Act's prohibitions.  As discussed more fully above, it is plain that the message was designed to make voters fearful of voting in the primary by suggesting that their primary vote could somehow dilute or invalidate their vote in the November general election and/or generally undermine President Biden's re-election efforts.  It was, in short, an effort to suppress their vote.  Regardless of its actual impact upon the plaintiffs, the Amended Complaint plausibly alleges that the Deepfake Robocall represents an attempt to intimidate or coerce the recipients into not voting in the primary election.  If proved at trial, that would constitute a violation of the Voting Rights Act.  See 52 U.S.C. § 10307(b) ("No person shall . . . attempt to intimidate, threaten or coerce any person for voting or attempting to vote.").

Next, defendants say the Amended Complaint fails to plausibly allege that Voice Broadcasting or Life Corp. knew the contents or purpose of the Deepfake Robocall.  Instead, say defendants, Steve Kramer was solely responsible for the content of the Deepfake Robocall.  That claim is, however, undermined by the allegation that Voice Broadcasting sought Kramer's permission to alter the Deepfake Robocall by adding an "opt out" statement at the end, instructing recipients call the private phone number associated with Kathy Sullivan if they wished to opt out of future calls.  See Amended Complaint at para. 52.  See also FCC Notice of Apparent Liability – Steve Kramer (document no. 71-3), at para. 11 ("With Kramer's permission, Voice Broadcasting added a sentence to the end of the Deepfake Robocall that instructed potential voters to call the Spoofed Number to be removed from future calls.").

At this juncture, the allegations of the Amended Complaint are sufficient to state a viable claim under the VRA against defendants Voice Broadcasting and Life Corporation.

III. Claims under the Telephone Consumer Protection Act.

The Telephone Consumer Protection Act ("TCPA") makes it unlawful "to initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to

deliver a message without the prior express consent of the called party, unless [a specified exemption applies].  47 U.S.C. § 227(b)(1)(B) (emphasis supplied).  In support of their motion to dismiss, defendants make two arguments.  First, they claim that they did not "initiate" any of the robocalls.  Second, they say that the robocalls did not violate the TCPA because they were "political campaign-related calls," which are permitted when made to landlines, even without the recipient's prior consent.

A.    Liability for "Initiating a Call"

The TCPA does not define the term "initiate."  But, the FCC has interpreted that term to mean that "a person or entity 'initiates' a telephone call when it takes the steps necessary to physically place a telephone call, and generally does not include persons or entities, such as third-party retailers, that might merely have some role, however minor, in the causal chain that results in the making of a telephone call."  In the Matter of the Joint Petition filed by Dish Network, Federal Communications Commission Declaratory Ruling, 2013 WL 1934349 at para. 26 (May 9, 2013) (the "DISH Declaratory Ruling").  In this case, the FCC has described that "causal chain" as follows:

> Two days before the Primary Election, illegal spoofed
> and malicious robocalls carrying a deepfake audio
> recording of President Biden's voice told the state's
> voters not to vote in the upcoming primary.  These
> calls, carrying the deepfake generative AI-produced
> cloned voice of the president of the United States,
> were made at the behest of a political consultant
> named Steve Kramer, who engaged Voice Broadcasting
> Corp., which used the services and equipment of Life
> Corp. to transmit the calls. Life, in turn, used Lingo
> to originate the traffic onto the public switched
> telephone network (PSTN).  Lingo, in apparent
> violation of the Commission's rules, sent [at least]
> 2,000 calls through its network to potential New
> Hampshire voters, falsely authenticating spoofed
> traffic with the highest level of attestation
> permitted under the STIR/SHAKEN rules.

In the Matter of Lingo Telecom, LLC, FCC Notice of Apparent

Liability (May 28, 2024) (document no. 71-11) at para. 3

(emphasis supplied).  See also Id. at 11 ("The investigation

determined that Lingo was the originating provider for a number

of these calls, i.e., the first provider in the call path.

Lingo identified Life as the party that transmitted the calls to

Lingo.  In turn, Life identified that Voice Broadcasting Corp.

used Life's services and equipment to transmit the calls to an

originating provider.") (emphasis supplied).


     Those descriptions of the events, while somewhat

illuminating, do not use the term "initiate" with regard to any

of the defendants.  So, for purposes of resolving the pending

motion to dismiss, the court will assume – without deciding –

that neither Life Corporation nor Voice Broadcasting actually "initiated" the robocalls.  The court notes, however, that as the record in this case is more fully developed, plaintiffs may establish that one or both of those defendants did, in fact, initiate some of the robocalls.[5]

But, even assuming that neither Voice Broadcasting nor Life Corp. initiated any of the robocalls, that does not end the court's inquiry.  The FCC has also concluded that intermediary parties other than those that actually initiate an unlawful call can also be liable under the TCPA.

> Our conclusion that a seller does not necessarily initiate a call that is placed by a third-party telemarketer on the seller's behalf does not end our inquiry.  For even when a seller does not "initiate" a call under the TCPA, we conclude that it may be held vicariously liable for certain third-party telemarketing calls.  In particular, we find that the seller may be held vicariously liable under federal common law principles of agency for TCPA violations committed by third-party telemarketers.  In this regard, we explain below that a seller may be liable for violations by its representatives under a broad range of agency principles, including not only formal agency, but also principles of apparent authority and ratification.

---

[5]    Indeed, as noted above, the FCC's investigation revealed that, "By 7:12 p.m. on the night of Sunday, January 21, Voice Broadcasting - using Life's services and equipment - had initiated 9,581 calls carrying the deepfake message to potential New Hampshire voters using the Spoofed Number as the caller ID number.  FCC Notice of Apparent Liability – Kramer, at para. 11 (emphasis supplied).

Dish Declaratory Ruling, 2013 WL 1934349, at para. 28 (emphasis
in original).  See also Id. at paras. 33-38 (discussing
circumstances under which an entity might be vicariously liable
for another party's violations of section 227(b) of the TCPA).
More recently, the FCC expounded upon its interpretation of the
term "initiate," noting the following:

> As the Commission recognized in the DISH Declaratory
> Ruling, neither the TCPA nor the Commission's rules
> define "make" or "initiate," nor do they establish
> specific factors to be considered in determining who
> makes or initiates a call, but noted that "initiate"
> suggests some "direct connection between a person or
> entity and the making of a call."  In issuing the
> guidance that we provide today, we account for changes
> in calling technology that inure to the benefit of
> consumers while fulfilling the intent of Congress to
> prohibit nuisance calls that cause frustration and
> harm.
>
> Specifically, a "direct connection between a person or
> entity and the making of a call" can include "taking
> the steps necessary to physically place a telephone
> call."  It also can include being "so involved in the
> placing of a specific telephone call" as to be deemed
> to have initiated it.  Thus, we look to the totality
> of the facts and circumstances surrounding the placing
> of a particular call to determine:
>
> > 1) who took the steps necessary to physically
> > place the call; and
> >
> > 2) whether another person or entity was so
> > involved in placing the call as to be deemed to
> > have initiated it, considering the goals and
> > purposes of the TCPA.
>
> In discussing below how these standards apply in the
> context of factual circumstances presented in
> petitions before us, we identify factors that are

relevant to the DISH Declaratory Ruling analysis.
Depending upon the facts of each situation, these and
other factors, such as the extent to which a person
willfully enables fraudulent spoofing of telephone
numbers or assists telemarketers in blocking Caller
ID, by offering either functionality to clients, can
be relevant in determining liability for TCPA
violations.  Similarly, whether a person who offers a
calling platform service for the use of others has
knowingly allowed its client(s) to use that platform
for unlawful purposes may also be a factor in
determining whether the platform provider is so
involved in placing the calls as to be deemed to have
initiated them.

In the Matter of Rules & Reguls. Implementing the Tel. Consumer

Prot. Act of 1991, 30 F.C.C. Rcd. 7961, 7980-81, 2015 WL 4387780

at paras. 29-30 (2015) (the "2015 Declaratory Ruling") (emphasis

supplied).  See also Off. of the Att'y Gen. v. Smartbiz Telecom

LLC, 688 F. Supp. 3d 1230, 1237 (S.D. Fla. 2023) ("one can

violate the TCPA either by taking the steps necessary to

physically place a telephone call, or by being so involved in

the placing of a specific telephone call as to be deemed to have

initiated it."); Cunningham v. Montes, 378 F. Supp. 3d 741, 748

(W.D. Wis. 2019) ("The 'totality of the circumstances' approach

set out in the 2015 FCC Order will not provide easy answers in

close cases.  But it makes one thing clear: a provider of auto-

dialing services cannot blithely sit back and blame his

customers for any TCPA violations that result from their use of

his service.  At a higher level of abstraction, two principles

emerge from the 2015 FCC Order: TCPA liability attaches to those

who control or are deeply involved in making specific calls, and
to those who knowingly allow an auto-dialing system to be used
to make prohibited robocalls.").

So, even if one were to assume that neither Voice
Broadcasting nor Life Corp. actually "initiated" the Deepfake
Robocalls, they might still be liable for TCPA violations,
depending upon their knowledge of, and involvement in, the
scheme to make those illegal calls to New Hampshire voters.  Of
course, resolution of that question will turn upon the facts
presented by the plaintiffs and is more properly addressed
either at trial or in the context of summary judgment.  At this
juncture, however, the Amended Complaint adequately and
plausibly alleges sufficient knowledge and involvement by Voice
Broadcasting and Life Corp. to survive the motion to dismiss.
See, e.g., Amended Complaint at para. 52 (alleging that Voice
Broadcasting was sufficiently familiar with the deepfake message
and spoofed caller ID that it recommended to Kramer that he add
a sentence with an opt out option, using the spoofed telephone
number).  See also Id. at para. 33 (alleging Voice Broadcasting
uses Caller ID spoofing technology to conceal the true identity
of its clients); and para. 36 (alleging that "Life Corp provides
communications services to Voice Broadcasting to enable calling
capabilities on the Voice Broadcasting platform").  See

35

generally Hurley v. Messer, No. CV 3:16-9949, 2018 WL 4854082,
at *4 (S.D.W. Va. Oct. 4, 2018) ("Callcentric and RingCentral
are the VoIP providers and, thus, offered a calling platform for
others to use.  Additionally, Plaintiff alleges these Defendants
knew about the illegal conduct, had a right to control the
conduct but, nevertheless, permitted the robocalls to be
broadcast through their assigned telephone numbers.  Although
Callcentric and RingCentral insist they were just a conduit, the
Court finds these allegations, at the very least, are sufficient
to state a plausible claim that Callcentric and RingCentral
offered a calling platform and 'knowingly allowed its client(s)
to use that platform for unlawful purposes.'") (citing the 2015
Declaratory Ruling at para. 30) (emphasis supplied); Smartbiz
Telecom LLC, 688 F. Supp. 3d at 123 (denying defendant's motion
to dismiss on grounds that it did not "initiate" calls, finding
that the defendant "was notified approximately 250 times of
fraudulent calls it has transmitted, despite having this
knowledge it continued to connect these calls, profited from
these fraudulent calls, refused to implement a means to check
for these robocalls, and the calls would not have connected but
for Defendant's decision to allow them to transit its network.
Looking to the totality of the circumstances, the Defendant not
only demonstrated a high involvement, but also had actual notice
of transmitting fraudulent calls.")

36

B.   TCPA Exemption for Political Calls.

Next, Voice Broadcasting and Life Corp. assert that the
Deepfake Robocalls are exempt from the provisions of the TCPA
because they were "political calls."  In support of that
position, defendants point to a recent FCC publication
addressing political campaign robocalls.  See FCC Consumer
Guide, Political Campaign Robocalls and Robotexts Rules,
https://www.fcc.gov/rules-political-campaign-calls-and-texts
(Oct. 22, 2024) (the "Consumer Guide").  As defendants correctly
note, that publication states that, "Political campaign-related
autodialed or prerecorded voice calls are permitted when made to
landline telephones, even without prior express consent."[6]

---

[6]    Parenthetically, the court notes that the very next
sentence of the Consumer Guide makes reference to the very
robocalls at issue in this case and states that:

> Regarding artificial intelligence (AI), the FCC recently
> declared that calls made with AI-generated voices are
> considered "artificial" under the TCPA, making voice
> cloning technology used in common robocall scams targeting
> consumers illegal in many cases.  The ruling followed an
> investigation into illegal robocalls made to New Hampshire
> voters that used AI-generated deepfake voice technology.
> The calls mimicked President Biden's voice with a message
> telling voters not to vote in the New Hampshire primary
> election.

Id. (emphasis supplied).

Returning to defendants' point, it is plain that while qualifying "political" robocalls may be exempt from the consent requirement of the TCPA – the court need not decide whether the Deepfake Robocalls constitute exempt "political calls" - such calls still remain subject to other TCPA provisions, including the requirement that the call include a functioning "opt out" provision.  See generally 47 C.F.R. § 64.1200.  But, say defendants, the robocalls at issue did have an appropriate opt-out mechanism.  See Defendants' Memorandum (document no. 76-1) at 13 ("the transcription of the Subject Call quoted in the Complaint contradicts Plaintiffs' claim that the Subject Call lacked an adequate opt-out mechanism.").

The pertinent TCPA regulations addressing opt-out mechanisms provide that:

> In every case where the artificial or prerecorded-voice telephone message is made pursuant to an exemption under paragraphs (a)(3)(ii) through (v) of this section . . . and is delivered to a residential telephone line, [it must] provide an automated, interactive voice- and/or key press-activated opt-out mechanism for the called person to make a do-not-call request, including brief explanatory instructions on how to use such mechanism, within two (2) seconds of providing the identification information required in paragraph (b)(1) of this section.  When the called person elects to opt out using such mechanism, the mechanism must automatically record the called person's number to the caller's do-not-call list and immediately terminate the call.

> When the artificial or prerecorded-voice telephone
> message is left on an answering machine or a voice
> mail service, such message must also provide a <u>toll
> free number that enables the called person to call
> back at a later time</u> and connect directly to the
> automated, interactive voice- and/or key press-
> activated <u>opt-out mechanism and automatically record
> the called person's number to the caller's do-not-call
> list</u>.

47 C.F.R. § 64.1200(b)(3).  In this case, the Deepfake Robocall

provided that if the recipient wished to opt out of future

calls, they should call the private phone number associated with

Kathy Sullivan.  Little more need be said other than to note

that such an opt-out mechanism plainly fails to comply with the

governing regulations and is not, as defendants suggest,

"adequate."


For the foregoing reasons, as well as those set forth in

plaintiffs' legal memoranda, the court concludes that the

Amended Complaint plausibly and adequately alleges a viable

claim against defendants Voice Broadcast and Life Corp. under

the TCPA.


IV.  <u>Claims under New Hampshire Election Laws</u>.

Finally, defendants claim that the Amended Complaint fails

to allege the essential elements of viable claims under RSA

664:14-a ("Prerecorded Political Messages") and 664:14-b

("Misrepresenting the Origin of Campaign Call"). Specifically, defendants say that neither the individual plaintiffs nor the League has alleged any injury flowing from the asserted violations of New Hampshire law. That, say defendants, means none of the plaintiffs has standing.

The relevant portions of the New Hampshire statutes at issue provide as follows:

> **Prerecorded Political Messages.** No person shall deliver or knowingly cause to be delivered a prerecorded political message unless the message contains, or a live operator provides, within the first 30 seconds of the message, the following information:
>
>> (a) The name of the candidate, measure, or of any organization or organizations the person is calling on behalf of.
>>
>> (b) The name of the person or organization paying for the delivery of the message and the name of the treasurer, if applicable.

RSA 664:14-a.

> **Misrepresenting Origin of Campaign Call.** No person shall knowingly misrepresent the origin of a telephone call which expressly or implicitly advocates the success or defeat of any party, measure, or person at any election, or contains any information about any candidate or party. Such knowing misrepresentation shall include, but shall not be limited to, causing the displayed caller identification information, as defined in RSA 359-E:1, I-a, to indicate that a telephone call originates from a number, person, or organization other than the number, person, or

organization originating the call, or making a call
knowing that some other person has caused said
misrepresentation, except if the displayed caller
identification number is a number at which the person
or organization responsible for sponsoring or making
the call may directly receive a return call.

RSA 664:14-b.  Each statute provides that "Any person injured by
another's violation of this section may bring an action for
damages and for such equitable relief, including an injunction,
as the court deems necessary and proper.  If the court finds for
the plaintiff, recovery shall be in the amount of actual damages
or $1,000, whichever is greater."  RSA 664:14-a(IV)(b) and
664:14-b(II)(b) (emphasis supplied).


Defendants contend that none of the plaintiffs has
adequately alleged that they were "injured" by defendants'
alleged statutory violations and, as a result, lack standing.
Defendants' Memorandum (document no. 76-1) at 14-15 (citing
O'Brien v. New Hampshire Democratic Party, 166 N.H. 138, 141
(2014)).  In O'Brien, the New Hampshire Supreme Court considered
whether a candidate for political office who was the subject of
a misleading robocall had standing to bring an action under RSA
644:14-a.  The candidate/plaintiff did not actually receive the
challenged robocall, so he did not (and could not) allege that
he was personally confused by the misleading call or
inconvenienced by its receipt.  Instead, he claimed that:

the defendants delivered "false prerecorded political
messages" in violation of the Robocall Statute because
the "audio message failed to contain" the required
disclosures.  RSA 664:14-a, II.  Specifically, the
plaintiff alleged that the message failed to contain
either the name of the person or organization paying
for the delivery of the message, or the name of the
fiscal agent.

The plaintiff did not allege that he had sustained an
injury as a result of the putative statutory
violation.  Nor did he allege any quantifiable
damages.

Id. at 140-41 (2014).


In considering whether the plaintiff had alleged sufficient

facts to establish with standing, the court first held that to

assert a viable claim under RSA 664:14-a, a plaintiff must

"allege each of the following three elements in order to have

standing: (1) a violation of the statute; (2) an injury; and (3)

that the violation of the statute caused the injury."  Id. at

143 (emphasis in original).  Next, the court turned to the

plaintiff's specific factual allegations and found them wanting.

In essence, the plaintiff argues that he has standing
to sue merely because he is the subject of a
prerecorded political message that did not include the
required disclosures.  We reject this argument.  The
adoption of the construction advanced by the plaintiff
would render meaningless the word "injured," and

42

      improperly conflate a statutory violation with an
      injury.

O'Brien, 166 N.H. at 144-45 (emphasis supplied).


     The facts in this case are, of course, decidedly different.
As noted earlier, the plaintiff in O'Brien did not receive the
robocall it issue; he merely took issue with its content and
lack of statutorily-mandated disclosures.  Here, each individual
plaintiff alleges that they actually received the Deepfake
Robocall at home, on a landline, around dinner time; that it
intruded upon their private time; that they did not give prior
consent to receive that call; that due to the spoofed caller ID
number, they were unable to determine the party who had made or
was responsible for the call; and there was not a viable means
by which to opt out of future calls.  See generally Amended
Complaint at paras. 59-63.


     While the New Hampshire Supreme Court has yet to consider
whether such allegations are sufficient to constitute an
"injury" under New Hampshire's election laws (and thus vest
plaintiffs with standing), several federal courts have done so
in the context of assessing claims under the TCPA.  A
significant number of those courts have concluded that the
receipt of a telephone call that violates the TCPA is sufficient

43

injury to confer standing.  See, e.g., Gibbs v. SolarCity Corp.,

239 F. Supp. 3d 391, 395-96 (D. Mass. 2017) ("This court agrees

with the majority of courts finding that Congress, when it

enacted the TCPA, recognized receiving unsolicited telemarketing

calls is a legally cognizable harm and comprises a "concrete"

injury.  The telemarketing calls alleged here present the

precise harm and infringe the same privacy interests Congress

sought to protect in enacting the TCPA.  Unsolicited

telemarketing phone calls . . . by their nature, invade the

privacy and disturb the solitude of their recipients.")

(collecting cases) (citations and internal punctuation omitted;

emphasis supplied).


     The Court of Appeals for the Ninth Circuit reached a

similar conclusion in Van Patten v. Vertical Fitness Grp., LLC,

847 F.3d 1037 (9th Cir. 2017), noting that:

> As the Supreme Court [has] explained . . . "both
> history and the judgment of Congress play important
> roles" in supporting our conclusion that a violation
> of the TCPA is a concrete, de facto injury.  Actions
> to remedy defendants' invasions of privacy, intrusion
> upon seclusion, and nuisance have long been heard by
> American courts, and the right of privacy is
> recognized by most states.  And in enacting the TCPA,
> Congress made specific findings that "unrestricted
> telemarketing can be an intrusive invasion of privacy"
> and are a "nuisance."  Congress sought to protect
> consumers from the unwanted intrusion and nuisance of
> unsolicited telemarketing phone calls and fax
> advertisements. . . ..

> The TCPA establishes the substantive right to be free
> from certain types of phone calls and texts absent
> consumer consent.  Congress identified unsolicited
> contact as a concrete harm, and gave consumers a means
> to redress this harm. . . ..
>
> Congress aimed to curb telemarketing calls to which
> consumers did not consent by prohibiting such conduct
> and creating a statutory scheme giving damages if that
> prohibition was violated. . . . [T]he telemarketing
> text messages at issue here, absent consent, present
> the precise harm and infringe the same privacy
> interests Congress sought to protect in enacting the
> TCPA.  Unsolicited telemarketing phone calls or text
> messages, by their nature, invade the privacy and
> disturb the solitude of their recipients.  A plaintiff
> alleging a violation under the TCPA need not allege
> any additional harm beyond the one Congress has
> identified.

847 F.3d at 1042-43 (citations and internal punctuation omitted;

emphasis supplied).


So it is in this case.  Representative Paul Spies, one of

the primary sponsors of House Bill 332 (which was eventually

enacted as RSA 664:14-a), testified that the bill was designed

to protect against caller ID spoofing in political robocalls –

conduct which prevented voters from knowing who made the call,

who paid for the call, if a political candidate was endorsing

it, or how to opt out of future calls.  He described robocalls

without accurate caller-ID information or an opt-out mechanism

as representing an interference with citizens' right to privacy

and the quiet enjoyment of their homes.  See House Committee on

Election Law, Written Testimony of Rep. Paul Sies (Jan. 29,
2003), available at https://gc.nh.gov/bill_status/legacy
/bs2016/sos_archives.aspx?lsr=76&sy=2003&sortoption=&txtsessiony
ear=2003&txtbillnumber=hb332, "House Actions."  Those rights
were plainly invaded when defendants directed the Deepfake
Robocalls to the individual plaintiffs' landlines.

Whether the League entities have standing to assert claims
under RSA 664:14-a and/or RSA 664:14-b is a closer question.  In
particular, those organizations have not clearly articulated how
they were injured by defendants' failure to state the name of
the candidate, measure, or organization(s) on whose behalf the
robocall was made.  Nor have they clearly stated the harm they
suffered as a result of defendants' failure to state the name of
the person or organization paying for the delivery of the
message.  See generally RSA 664:14-a.  Perhaps a stronger case
can be made that, for the reasons discussed above, the League
entities were directly and demonstrably injured by defendants'
use of the spoofed caller ID information, the confusion that
caused on the part of voters, and the economic cost that imposed
on the League entities.  See generally RSA 664:14-b.

But, at this juncture at least, the court need not resolve
whether the League entities have standing to advance the state

statutory claims set forth in the complaint.  It is enough that the individual plaintiffs plainly have standing to bring those claims.  And, when multiple plaintiffs file suit, it is sufficient if at least one plaintiff has standing to assert each claim advanced.  See generally Town of Chester v. Laroe Estates, Inc., 581 U.S. 433, 439-40 (2017) (When there are multiple plaintiffs, "[a]t least one plaintiff must have standing."); Village of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 264 & n.9, (1977) ("[We] have at least one individual plaintiff who has demonstrated standing . . . Because of the presence of this plaintiff, we need not consider whether the other plaintiffs have standing to maintain the suit."); Children's Health Def., Inc. v. Rutgers, the State Univ. of New Jersey, 93 F.4th 66, 75 (3d Cir. 2024) ("When multiple plaintiffs sue, at least one plaintiff must have standing to assert each claim."); Hyland v. Navient Corp., 48 F.4th 110, 117–18 (2d Cir. 2022) ("Standing is satisfied so long as at least one named plaintiff can demonstrate the requisite injury.") (collecting cases).

Consequently, even if the League entities lack standing to bring the claims under RSA 664:14-a (and perhaps even 664:14-b), the presence of the individual plaintiffs – who plainly do have standing – is sufficient to allow those claims to proceed.

47

## Conclusion

For the foregoing reasons, as well as those set forth in plaintiffs' legal memoranda (documents no. 85 and 104), the motion to dismiss filed by defendants Voice Broadcasting and Life Corp. (**document no. 76**) is denied.

**SO ORDERED.**

_____

Steven J. McAuliffe
United States District Judge

March 26, 2025

cc:  Counsel of Record