**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE**

|  |  |
|---|---|
| **LEAGUE OF WOMEN VOTERS OF NEW HAMPSHIRE**, *et al.*, <br><br> Plaintiffs, <br><br> **STEVE KRAMER**, *et al.*, <br><br> Defendants. | Civil Action No. 1:24-cv-73-SM-TSM |

**PLAINTIFFS' RENEWED MOTION FOR DEFAULT JUDGMENT AGAINST STEVE
KRAMER AND MEMORANDUM IN SUPPORT THEREOF**

In accordance with the Court's Individual Rules, Local Civil Rule 55.2(b) and Federal Rule of Civil Procedure 55(b)(2), Plaintiffs respectfully submit that a default judgment against Defendant Steve Kramer is appropriate and seek the following relief: (1) the entry of final judgment and a permanent injunction by default; and (2) individual statutory damages awards pursuant to 47 U.S.C. § 227(b)(3) of the Telephone Consumer Protection Act ("TCPA"), RSA 664:14a(IV)(b), and RSA 664:14-b(II)(B), in an amount to be determined by the Court upon conclusion of the case, plus post-judgment interest calculated pursuant to the statutory rate.

## <u>INTRODUCTION</u>

On January 21, 2024, two days before the New Hampshire Presidential Primary, Defendants Steve Kramer, Life Corporation ("Life"), Voice Broadcasting Corporation ("Voice"), and Lingo Telecom, LLC ("Lingo") (collectively, "Defendants") sent thousands of robocalls (the "NH Robocalls") to individuals they believed to be likely Democratic voters, including, but not limited to, Plaintiffs Nancy Marashio, James Fieseher, and Patricia Gingrich (the "Individual Plaintiffs"), and members of the League of the Women Voters of the United States and the League of Women Voters of New Hampshire (collectively, the "League"). The NH Robocalls featured a voice generated with voice-cloning artificial intelligence ("AI") technology, also known as a

"deepfake," that simulated the voice of President Joe Biden.  To add to the deception, the NH Robocalls "spoofed" a personal phone number associated with a prominent former state Democratic Party leader known to be organizing a write-in campaign for President Biden.  The NH Robocalls urged recipients not to vote in the primary to "save" their vote for the November 2024 U.S. Presidential Election (the "General Election"), falsely and maliciously stating that casting a vote in the New Hampshire Primary would "only enable[] the Republicans in their quest to elect Donald Trump again."  Declaration of Joseph T. DiPiero ("DiPiero Decl."), Ex. A (Kramer Notice of Apparent Liability), ¶ 5, ECF No. 71-3.  On March 14, 2024, Plaintiffs filed the instant lawsuit against the Defendants, seeking pecuniary and injunctive relief pursuant to Section 11(b) of the Voting Rights Act ("VRA"), the TCPA, and New Hampshire election laws.

To date, Kramer has failed to appear in this case, despite being aware of the existence of this lawsuit the day that it was filed and having been successfully served with both the Original and Amended Complaint.  The Clerk recognized as much in his order granting Plaintiffs' Motion for Entry of Default against Kramer on August 29, 2024.  *See* ECF No. 92.  And Plaintiffs have alleged concrete, specific facts demonstrating that Kramer orchestrated, paid for, and, along with the other Defendants, disseminated thousands of deepfake, spoofed robocalls that used disinformation and deceit in an attempt to intimidate, threaten, and coerce New Hampshire voters.  Plaintiffs have sufficiently alleged that Kramer violated the VRA, TCPA and New Hampshire election laws.  A default judgment against Kramer, therefore, is warranted under Federal Rule of Civil Procedure 55(b).

## STATEMENT OF FACTS[1]

### I.    The Clerk's Entry of Default Against Steve Kramer

On August 7, 2024, Plaintiffs moved for entry of default against Kramer pursuant to Fed. R. Civ. P. 55(a).  *See* ECF No. 90.  On August 29, 2024, the Clerk of the Court entered a default against Kramer.  *See* ECF No. 92 at 1 ("Defendant Kramer having failed to respond within the time and in the manner provided by Fed. R. Civ. P. 12, the plaintiffs' motion for default (Doc. No. 90) is granted. Default is herewith entered as to Defendant Kramer in accordance with Fed. R. Civ. P. 55(a) and Local Rule 55.1.").  The following day, Plaintiffs served a true and correct copy of the Clerk's entry of default as to Kramer by regular mail upon Kramer at his Connecticut address.  *See* ECF No. 94.

### II.    The Court's Denial of Plaintiffs' Motion for Default Judgment Against Kramer

On September 16, 2024, Plaintiffs filed a Motion for Default Judgment against Steve Kramer.  *See* ECF No. 98.  The Court denied Plaintiffs' Motion for Default Judgment on several grounds.  *See* ECF No. 105.  ***First***, the Court noted that "[t]he plaintiffs did not address the issue of whether they have standing to bring [their] claims" against Kramer, and "[i]f the plaintiffs lack standing, the court lacks jurisdiction over the claims against Kramer."  ECF No. 105 at 3.  ***Second***, the Court determined default judgment was inappropriate at this juncture because the then-active defendants were challenging the sufficiency of Plaintiffs' allegations to state a cognizable claim. *Id.*  As the Court explained, "[i]f the [C]ourt were to conclude that the [P]laintiffs' allegations were insufficient in the context of deciding the [D]efendants' motions, that outcome likely would

---

[1] The facts in this matter have been briefed extensively in Plaintiffs' Amended Motion for Preliminary Injunction (ECF No. 71) and Plaintiffs' Consolidated Opposition to Defendants Lingo, Voice, and Life's Motion to Dismiss Amended Complaint (ECF No. 85), among other filings.  Additionally, the factual allegations that are specific to Defendant Kramer have been briefed in Plaintiffs' Motion for Default Judgment Against Steve Kramer (ECF No. 98), and these factual allegations are incorporated herein.  Plaintiffs focus here on the procedural history that is directly relevant to the subject of this motion.

undermine a default judgment entered against Kramer." *Id.* **Third**, given that there were multiple parties in the action, the Court observed that "[t]he plaintiffs did not address the requirements under Rule 54(b) for a separate final judgment and, as a result, failed to show that there is no just reason for delay." *Id.* at 5. As the Court explained, "[i]n determining whether there is no just reason for the delay, the court must consider the interrelationship of the claims and whether early entry of judgment will result in piecemeal appeals." Importantly, the Court noted that the "pending motions to dismiss preclude[d] entering a final judgment against Kramer." *Id.* at 4 (citation omitted).

### III.    The Court's Denial of Plaintiffs' Motions to Dismiss

On June 25, 2024, Defendants filed Motions to Dismiss Plaintiffs' Amended Complaint, asserting that Plaintiffs lack standing and that the Amended Complaint fails to state any viable claims. *See* ECF No. 76; ECF No. 79. The Court ultimately denied Defendants Motions to Dismiss. *See* ECF No. 116. In its Order, the Court held that, Plaintiffs had established standing at this juncture, and that the allegations of the Amended Complaint are sufficient to state viable claims under the Voting Rights Act, the Telephone Consumer Protection Act, and New Hampshire Election Laws. *See id.*

### IV.    Removal of the Active Defendants

On March 26, 2025, Plaintiffs and Defendant Lingo Telecom jointly stipulated, pursuant to Rule 41(a)(1)(A)(ii) of the Federal Rules of Civil Procedure, that this action with respect to Defendant Lingo, and all claims asserted in the action against Defendant Lingo, are dismissed with prejudice. *See* ECF No. 117. On May 9, 2025, Plaintiffs and Defendants Life and Voice filed a Consent Judgment with the Court. *See* ECF No. 120. On May 23, 2025, the Court granted the

Consent Judgment requested by Plaintiffs and Defendants Life and Voice. *See* ECF No. 121. Consequently, as of May 23, 2025, all active defendants were removed from this action.

## **LEGAL STANDARD**

The entry of default judgment in federal court is governed by Federal Rule of Civil Procedure 55. *Hoyos v. Telecorp Commc'ns, Inc.*, 488 F.3d 1, 5 (1st Cir. 2007). After default is entered and when the amount at issue is not a sum certain, "the party must apply to the court for a default judgment." Fed. R. Civ. P. 55(b)(1), (b)(2); *see also Universitas Educ., LLC v. Granderson*, 98 F.4th 357, 377 (1st Cir. 2024); *KPS & Assocs., Inc. v. Designs by FMC, Inc.*, 318 F.3d 1, 19 (1st Cir. 2003). This same process applies when a party seeks a default judgment ordering injunctive relief. *See, e.g.*, *S.E.C. v. New Futures Trading Int'l Corp.*, No. 11-CV-532-JL, 2012 WL 1378558, at *1 (D.N.H. Apr. 20, 2012) ("Because default has entered . . . the SEC is entitled to its sought-after permanent injunctive relief. . . ."); *Scarcelli v. Gleichman*, No. 2:12-CV-72-GZS, 2012 WL 1965681, at *3 (D. Me. May 31, 2012) (granting permanent injunction on motion for default judgment).

A motion for default judgment "shares the same standard of review as that of a motion to dismiss for failure to state a claim." *Auctus Fund, LLC v. Sauer Energy, Inc.*, 444 F. Supp. 3d 279, 284 (D. Mass. 2020) (citing *Ramos-Falcon v. Autoridad de Energia Electrica*, 301 F.3d 1, 2 (1st Cir. 2002)); *United States v. Sullender*, No. 16-cv-523-LM, 2018 WL 1368040, at *1 (D.N.H. Mar. 16, 2018). That is, the Court "may examine a plaintiff's complaint, taking all well-pleaded factual allegations as true, to determine whether it alleges a cause of action." *Ramos-Falcon*, 301 F.3d at 2; *Quirindongo Pacheco v. Rolon Morales*, 953 F.2d 15, 16 (1st Cir. 1992); *Sullender*, No. 16-cv-523-LM, 2018 WL 1368040, at *1 ("The defaulted party is 'taken to have conceded the truth of the factual allegations in the complaint'") (citing *Ortiz-Gonzalez v. Fonovisa*, 277 F.3d 59, 62-63 (1st Cir. 2002)). Where a claim is actionable or viable, the entry of a default judgment is

appropriate. *P.C. Hoag & Co. v. Man Lift Mfg., Co.*, No. 15-CV-498-JL, 2018 WL 4298343, at *1 (D.N.H. Jan. 10, 2018) ("Before entering default judgment, the court must determine whether the admitted facts state actionable claims."); *see Sushi Ave., Inc. v. Philbrick's Fresh Mkt., LLC*, No. 19-CV-428-JD, 2019 WL 4894367, at *1 (D.N.H. Oct. 3, 2019) (adopting and accepting magistrate judge's report and recommendation that default judgment be entered as to the breach of contract claim because "that claim was viable.").

The Court can enter a default judgment against a defaulting party without notice and a hearing, particularly if the defaulting party has not made any appearance in the case. *See Universitas Educ., LLC*, 98 F.4th at 377; *see also* Fed. R. Civ. P. 55(b)(2). This is because Rule 55 is intended "to protect diligent parties whose adversaries are clearly unresponsive." *Universitas Educ., LLC*, 98 F.4th at 377.

**ARGUMENT**

## I. THE COURT HAS JURISDICTION OVER PLAINTIFFS' CLAIMS AGAINST KRAMER

Before the Court addresses Plaintiffs' motion for default judgment, Plaintiffs must first establish that they have standing to bring their claims against Kramer, and that this Court therefore has jurisdiction over these claims. *See Select Portfolio Servicing, Inc. v. Leung*, No. 1:21-cv-00218-NT, 2022 WL 3369222, at *4 (D. Me. Aug. 16, 2022) ("Without the Plaintiff establishing standing, not only can I not grant default judgment for the Plaintiff, but I must question whether I have jurisdiction over the case at all.").

As the First Circuit has explained, "standing is a prerequisite to a federal court's subject matter jurisdiction." *Hochendoner v. Genzyme Corp.*, 823 F.3d 724, 730 (1st Cir. 2016). "When a federal court concludes that it lacks subject matter jurisdiction over a case, it is precluded from rendering any judgments on the merits of the case." *Christopher v. Stanley-Bostitch, Inc.*, 240 F.3d

95, 100 (1st Cir. 2001); *see Willy v. Coastal Corp.*, 503 U.S. 131, 137 (1992) ("A final determination of lack of subject-matter jurisdiction of a case in a federal court, of course, precludes further adjudication of it."). Therefore, any orders relating to the merits of the action "are void if issued without subject matter jurisdiction." *Christopher*, 240 F.3d at 100.

Previously, the Court denied Plaintiffs' Motion for Default Judgment because, in part, "[t]he plaintiffs did not address the issue of whether they have standing to bring the claims," after the then-active defendants had raised the issue in their motions to dismiss. ECF No. 105 at 3. As the Court explained, "[i]f the plaintiffs lack standing, the court lacks jurisdiction over the claims against Kramer." ECF No. 105 at 3. At this point in the litigation, however, Plaintiffs have established standing to bring the claims asserted in their Amended Complaint.

To establish standing, "a plaintiff must meet a familiar three-part test" showing "(i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *Wiener v. MIB Grp., Inc.*, 86 F.4th 76, 84 (1st Cir. 2023) (citations omitted). Organizational plaintiffs like the League can also have standing in their own right to redress particular injuries that they have suffered. *See generally Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000). An organization suffers a particularized injury when the defendants' action "directly affected and interfered with [the organization]'s core business activities . . ." *See FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024).

The individual plaintiffs were harmed by receiving threatening, intimidating, and coercive robocalls—an injury plainly particular and actual enough to confer standing. *See Gibbs v. SolarCity Corp.*, 239 F. Supp. 3d 319, 395 (D. Mass. 2017) (finding that unwanted telemarketing calls comprise a concrete injury, following many other courts); *Laccinole v. Students for Life*

*Action Inc.*, No. CV 21-252 WES, 2022 WL 3099211, at \*3  (D.R.I. Aug. 4, 2022) ("unwanted, solicitous text messages" sufficient to establish injury for standing purposes) (collecting cases). That is particularly true where, as here, the unwanted robocall interfered with the exercise of people's right to vote in the New Hampshire Primary.  *See League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014); *see also Williams v. Salerno*, 792 F.2d 323, 326 (2d Cir. 1986) ("The registration applicants in this case would certainly suffer irreparable harm if their right to vote were impinged upon.").

Recent Supreme Court precedent establishes that the League also has organizational standing because Kramer's actions interfered with its core business activities. *See All. for Hippocratic Med.*, 602 U.S. at 395.  Other courts have found that needing to respond to a harmful robocall frustrating an organization's core business activity is sufficient grounds for organizational standing.  *Nat'l Coal. on Black Civic Participation v. Wohl*, 498 F. Supp. 3d 457, 471 (S.D.N.Y. 2020) ("*Wohl I*") (explaining that the organization's goal of promoting civic participation especially encouraging Census participation among the Black community was frustrated as the co-chair had to stop Census work to respond to robocalls); *see also Victim Rights Law Ctr. v. Cardona*, 552 F. Supp. 3d 104, 126 (D. Mass. 2021) ("*Victims Rights*") (finding that an organization to help victims in the Title IX process had organizational standing, seeking injunction, to challenge a regulatory action by the U.S. Department of Education which caused unwillingness from victims to continue with their complaints, frustrating the purpose of the organization).

The League's core business is to encourage informed and active participation in the government, which they facilitate by encouraging citizens to register to vote and participate in elections.  *See* First Amended Complaint ("Am. Compl.") ¶ 11, ECF No. 65.  Just like in *Wohl I* and *Victim Rights*, the illegal robocalls directly interfered with the League's ability to continue this

core business, as it has been forced to divert human and other resources that would have gone to voter registration. *Id.* ¶¶ 4, 72–78. The League has been harmed already, and without an injunction, the League will be forced to continue these costly diversions to combat future illegal robocall campaigns. *Id.* ¶¶ 79–82; *see also Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378–79 (1982) ("*Havens*") (finding it was improper to dismiss for lack of organizational standing for injunctive relief, where organization had to divert its resources from providing counseling and referral services to combatting allegedly discriminatory steering practices); *Victim Rights*, 552 F. Supp. 3d at 115 (finding organizational standing for injunctive relief and merits review based on frustrated purpose).

The injuries to all plaintiffs are fairly traceable to Kramer, who orchestrated, paid for, and contracted to disseminate the NH Robocalls, *see supra* at 1, *infra* at 14–15, 16–17, 20–21, and redressable by judicial relief.

After carefully considering the standing inquiry, as well as the legal memoranda submitted by the parties, the Court addressed this issue in its March 26, 2025, Order denying Defendants' Motion to Dismiss.[2] ECF No. 116 at 14–27. There, the Court concluded that Plaintiffs have adequately and plausibly alleged that both the Individual Plaintiffs and the League have standing, sufficient to survive Defendants' motion to dismiss. *See id.* As the Court observed, the Amended Complaint "alleges sufficient facts to vest both the institutional and individual plaintiffs with standing to bring the claims set forth in the Amended Complaint." ECF No. 118 at 4; *see also* ECF No. 116 at 14–27. Because the Plaintiffs have established standing to bring their claims against

---

[2] Plaintiffs have extensively briefed this issue in various filings in this case, such as (1) Plaintiffs' Consolidated Reply in Support of Their Motion for Preliminary Injunction (ECF No. 83); (2) Plaintiffs' Consolidated Opposition to Defendants Lingo, Voice, and Life's Motion to Dismiss (ECF No. 85); and (3) Plaintiffs' Objections to Magistrate Judge's Report and Recommendation (ECF No. 104). Plaintiffs incorporate these arguments herein.

Kramer, the Court has jurisdiction over this case and may properly grant default judgment to Plaintiffs, should it decide to do so.

## II.    A DEFAULT JUDGMENT AGAINST KRAMER IS WARRANTED

The allegations in Plaintiffs' Amended Complaint support default judgment against Kramer. In particular, the allegations in the Amended Complaint demonstrate that Kramer, who orchestrated the NH Robocall scheme, violated Section 11(b) of the VRA, Section 227 of the TCPA, and New Hampshire election laws. These claims were further supplemented in Plaintiffs' Amended Motion for Preliminary Injunction filed on June 7, 2024. *See* ECF No. 71. Given that Kramer has failed to appear, he has likewise failed to present any meritorious defenses to the allegations presented against him in the Amended Complaint. Moreover, Plaintiffs have adduced more than sufficient allegations, supported by evidence, to establish all of their claims in the Amended Complaint.

Additionally, the law of the case doctrine bars any reconsideration of the viability of Plaintiffs' claims. As articulated by the First Circuit, "the law of the case doctrine forecloses reconsideration of issues that were decided—*or that could have been decided*—during prior proceedings." *AngioDynamics, Inc. v. Biolitec AG*, 823 F.3d 1, 5 (1st Cir. 2016). Although the Court initially expressed reservations about the viability of Plaintiffs' claims,[3] those concerns have since been resolved. In its subsequent ruling, the Court explicitly held that the allegations set forth in the Amended Complaint are legally sufficient to state viable claims under each of the relevant statutory provisions. Specifically, the Court found that Plaintiffs have adequately alleged

---

[3] In its prior ruling on the Motion for Default, the Court expressed concerns that, "[i]f the court were to conclude that the plaintiffs' allegations were insufficient in the context of deciding the defendants' motions [to dismiss], that outcome likely would undermine a default judgment entered against Kramer." ECF. No. 105 at 3.

violations of: (1) Section 11(b) of the VRA, *see* ECF No. 116 at 29; (2) Section 227 TCPA, *id.* at 39; and (3) New Hampshire election law RSA 664:14-a, *id.* at 47.

These determinations are now binding and preclude any argument that Plaintiffs' claims lack legal merit. Any attempt to relitigate the sufficiency of the pleadings would be contrary to established precedent and judicial efficiency. The Court's prior findings affirm that Plaintiffs' claims are not only viable, but also grounded in well-pleaded factual allegations that, if proven, would entitle them to relief. Accordingly, it is appropriate for this Court to enter a default judgment against Kramer, who has failed to appear or contest the claims in any meaningful way in the sixteen months since this case began.

### A. The Court Should Enter Default Judgment Against Kramer on Count I for Violations of the VRA

Section 11(b) of the VRA provides in relevant part: "No person, whether acting under color of law or otherwise, shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote[.]" 52 U.S.C. § 10307(b).[4] To succeed on a claim under Section 11(b), "a plaintiff must show that the defendant has intimidated, threatened, or coerced someone for voting or attempting to vote, or has attempted such intimidation, threat, or coercion." *Nat'l Coal. on Black Civic Participation v. Wohl* (*Wohl I),* 498 F. Supp. 3d 457, 477 (S.D.N.Y. 2020).[5] *Wohl I* described the meanings of these terms:

---

[4] Section 11(b) of the VRA "undoubtedly applies to private conduct, and private individuals are subject to its prohibitions." *Wohl*, 498 F. Supp. 3d at 476; *see also Rhodes v. Siver*, No. 19-12550, 2021 WL 912393 (E.D. Mich. Mar. 10, 2021); *Mich. Welfare Rights Org. v. Trump*, 600 F. Supp. 3d 85, 104 (D.D.C. 2022) ("The Court concludes that precedent and direction from the Court of Appeals for the District of Columbia Circuit [] and the Supreme Court support a finding of a private right of action."); *Ariz. Democratic Party v. Ariz. Republican Party*, No. 16 Civ. 03752-PHX-JJT, 2016 WL 8669978, at *11 (D. Ariz. Nov. 4, 2016).

[5] Section 11(b) does not contain an intent requirement. *Nat'l Coal. on Black Civic Participation v. Wohl* (*Wohl II)*, 661 F. Supp. 3d 78, 116 (S.D.N.Y. 2023). In fact, Congress deliberately omitted any intent requirement and prohibited voter intimidation regardless of an actor's motives. *See* Voting Rights, Part 1: Hearings on S. 1564 Before the S. Comm. on the Judiciary, 89th Cong. 16 (1965) (Attorney General Nicholas Katzenbach, a drafter of § 11(b), testifying before the Senate Judiciary Committee that, "Under [the VRA] no subjective 'purpose' need be shown

> The words "intimidate," "threaten," and "coerce," have familiar and somewhat overlapping definitions. To "intimidate" means to "make timid or fearful," or to "inspire or affect with fear," especially "to compel to action or inaction (as by threats)." To "threaten" means to "utter threats against" or "promise punishment, reprisal, or other distress." And to "coerce" means to "restrain, control, or dominate, nullifying individual will or desire (as by force, power, violence, or intimidation)."

*Id.* (citations omitted).

Courts have made clear that the VRA in general, and Section 11(b) in particular, should be read expansively.  Its application is not limited to any particular act.  *See, e.g.*, *Allen v. State Bd. of Elections,* 393 U.S. 544, 565-67 (1969) (noting that Congress intended "to give the [Voting Rights] Act the broadest possible scope"), *abrogated on other grounds by Ziglar v. Abbasi,* 582 U.S. 120 (2017); *Wohl I,* 498 F. Supp. 3d at 476 ("Section 11(b)'s reach is extensive, in accordance with the VRA's ambitious aims of encouraging true enforcement of the Fifteenth Amendment's promise of unencumbered access to the vote . . ."); *Jackson v. Riddell,* 476 F. Supp. 849, 859 (N.D. Miss. 1979) (explaining that even where a court finds "no case precisely on point," Section 11(b) should "be given an expansive meaning").  Indeed, courts have regularly found that any actual or attempted action to instill fear in connection with one's exercise of his or her right to vote violates the VRA.  *See, e.g.*, *Wohl I,* 498 F. Supp. 3d at 482 (robocalls stating that personal information would be disclosed to creditors, the CDC, and law enforcement violated VRA); *League of United Latin Am. Citizens - Richmond Region Council 4614 v. Pub. Interest Legal Found.,* No. 18 Civ. 423, 2018 WL 3848404, at *4 (E.D. Va. Aug. 13, 2018) (reports published by defendants that falsely accused Virginia voters of committing felony voting fraud by registering to vote and/or voting violated VRA); Temporary Restraining Order at 2, *Daschle v. Thune,* No. 4:04-cv-4177

---

. . . in order to prove intimidation under the proposed bill. Rather, defendants would be deemed to intend the natural consequences of their acts.").

(D.S.D. Nov. 2, 2004), ECF No. 6 (following Native Americans at polling sites, writing down their license plate numbers, and engaging in loud conversations about Native Americans being prosecuted for voting illegally intimidated prospective Native American voters and merited temporary restraining order); *United States v. Nguyen,* 673 F.3d 1259, 1265 (9th Cir. 2012) (letters mailed to voters warning that if they voted in the upcoming election, their personal information would be collected by the government and shared with organizations who were "against immigration" violated California statute analogous to VRA).

Plaintiffs have adequately pleaded that Kramer attempted to intimidate, threaten, and coerce New Hampshire voters. The voter-intimidation threat created by Kramer was the loss of the right to vote in the General Election, which Courts have repeatedly held to be sufficient to establish a violation of the VRA. Courts have recognized that voter intimidation encompasses not only "forcefully coercive" conduct, but also subtler forms of intimidation such as "manipulation and suggestion." *Nguyen,* 673 F.3d at 1265; *see also Wohl I*, 498 F. Supp. 3d at 481 ("[U]nlawful voter intimidation also includes subtler forms of intimidation that do not threaten bodily harm."); Temporary Restraining Order at 1, *Daschle v. Thune,* No. 4:04-cv-4177 (D.S.D. Nov. 2, 2004), ECF No. 6 (following Native American voters to their cars and writing down their license plates intimidated prospective Native American voters and created risk of irreparable harm by "improperly dissuad[ing] [them] from voting"). In the specific context of voting rights and robocalls, at least one court has concluded that "messages that a reasonable recipient, familiar with the context of the communication, would view as a threat of injury to deter individuals from exercising their right to vote" violate the VRA. *Wohl II*, 661 F. Supp. 3d at 113. The threat of injury need not be violent or physical, and may include communications inspiring fear of other types of harm, such as legal consequences or economic harm. *Id.*

The *Wohl* case is particularly instructive.  In *Wohl*, thousands of voters in the United States received robocalls falsely claiming that voting by mail would result in voters' personal information becoming part of a public database, which would be available to police departments and credit card companies to execute old warrants and collect outstanding debt.  *Wohl I*, 498 F. Supp. 3d at 465.  The robocall came from a woman who identified herself as "Tamika Taylor"—a name that has been used incorrectly by media outlets to refer to the mother of Breonna Taylor, Tamika Palmer, a well-known civil rights activist—and stated it was from "Project 1599, the civil rights organization founded by Jack Burkman and Jacob Wohl."  *Id.*  The *Wohl* court concluded that the robocalls violated Section 11(b) of the VRA, explaining that the use of this name in the script of the call, in addition to framing Project 1599 as a civil rights organization, "dressed the call with a veil of legitimacy to mislead its listeners into believing the statements made in the call were true."  *Wohl II*, 661 F. Supp. 3d at 123.  The *Wohl* court also emphasized, in a previous ruling granting the plaintiffs a temporary restraining order, that the defendants had specifically targeted areas with large populations of Black voters, with whom the defendants' false statements were intended to resonate most.  *Wohl I*, 498 F. Supp. 3d at 466.

Similarly, here, Kramer, with the assistance of Defendants, delivered thousands of robocalls telling voters to "save [their] vote for the November election" instead of voting in the New Hampshire Primary, warning them that "[v]oting this Tuesday only enables the Republicans in their quest to elect" the opposing party candidate.  *See* Am. Compl. ¶ 55.  This language falsely told voters that exercising their right to vote in the New Hampshire Primary would carry serious adverse consequences: they would be unable to vote in the General Election.  *Id.*

As in *Wohl*, Kramer shrouded the NH Robocalls in a "veil of legitimacy" designed to "mislead its listeners into believing the statements made in the call were true."  *Wohl II*, 661 F.

Supp. 3d at 123.  This was accomplished in part by using voice-cloned audio of President Biden to convey the message.  As the FCC has stated, voice-cloning technology can "uniquely harm consumers" because of its capacity to "convince a called party that a trusted person . . . wants or needs them to take some action that they would not otherwise take."  *In re Implications of Artificial Intel. Techs. on Protecting Consumers from Unwanted Robocalls and Robotexts*, CG Docket No. 23-362, Declaratory Ruling, FCC 24-17, 2024 WL 519167, at *2 (Feb. 8, 2024).  That is precisely why President Biden's voice was chosen, as there were "potentially thousands" of New Hampshire voters who "would care what the president of the United States has to say."  *See* Kramer NAL ¶ 29.

This veil of legitimacy was further bolstered by the unlawful misappropriation of Kathy Sullivan's personal phone number—both through its inclusion as an opt-out number for voters, and its appearance on voters' Caller ID information.  As the FCC has previously acknowledged, the legitimacy conferred by Caller ID spoofing is "often the key to making robocall scams work." *In re Advanced Methods to Target and Eliminate Unlawful Robocalls*, CG Docket No. 17-59, ¶ 3 (Nov. 17, 2017).  That is because call recipients presume Caller ID is "ironclad," 156 Cong. Rec. H2522, H2524 (2010) (remarks of Rep. Engel), and rely on that information to decide "whether to answer a phone call and trust the person on the other end of the line," 155 Cong. Rec. S170-02, S173 (2009) (remarks of Sen. Nelson).  Kramer deliberately and maliciously chose this number because "New Hampshire Primary Election voters would pay attention to a call from . . . a well-known figure" like Kathy Sullivan.  *See* Kramer NAL ¶ 29.

Kramer's actions "not only harmed potential voters but also interfered with the Primary Election and potentially could have interfered with the November 2024 General Election."  *Id.* ¶ 27.  The loss of a vote is a significant and severe injury.  *See Smith v. Meese*, 821 F.2d 1484, 1494 (11th Cir. 1987) ("If individuals fail to vote because of intimidation . . . whether or not specifically

targeted at the individuals, the individuals have been injured, especially in light of the importance

of the vote in our political system."). The threat of the loss of the vote violates the VRA. *See*

*Wohl I*, 498 F. Supp. 3d at 476; Temporary Restraining Order at 1, *Daschle v. Thune*, No. 4:04-cv-

4177 (D.S.D. Nov. 2, 2004), ECF No. 6, at 1-2 ("[T]here clearly is the threat of irreparable harm

to the Movant in that if Native Americans are improperly dissuaded from voting . . . even if

identified, they can't vote later.").

### B.    The Court Should Enter Default Judgment Against Kramer on Count II for Violations of the TCPA

The TCPA prohibits any person or entity from initiating any telephone call to any

residential telephone line using an artificial or prerecorded voice to deliver a message without the

prior express consent of the called party—unless the call is initiated for emergency purposes, or

some other exemption applies. *See* 47 U.S.C. § 227(b)(1)(B). The TCPA applies to creators of

robocalls that violate the TCPA. *Maryland v. Universal Elections, Inc.*, 729 F.3d 370, 374 (4th

Cir. 2013) (affirming the district court's decision that the political consultant who created and

directed the distribution of a political robocall, which failed to identify the sponsor of the call, had

violated the TCPA); *see also Cunningham v. Montes*, 378 F. Supp. 3d 741, 742–43 (W.D. Wis.

2019) ("No one disputes that businesses who were TollFreeZone.com clients made unsolicited

robocalls to Cunningham's cell phones and that those calls violated the TCPA.").

Here, Kramer created the robocall by providing a script and directing Carpenter to use

President Biden's voice for a deepfake recording of the script. *See* Am. Compl. ¶ 48. Kramer then

orchestrated a scheme to send the artificial prerecorded-voice telephone calls to the Individual

Plaintiffs, who did not consent to receive calls, by soliciting Voice to procure "a Sunday night

robo[call], probably 25k [calls] range." *Id*. ¶ 50. Kramer emailed Voice a list of names and

numbers for the robocall. *Id*. Kramer instructed Voice to use the AI-generated audio created by

Carpenter and to include the personal cell phone number of Sullivan, without her permission. *Id.* at ¶¶ 50-51. Kramer did not initiate the artificial or prerecorded-voice telephone calls for "emergency purposes" nor does any statutory exemption apply. *See, e.g.*, *id.* §§ (b)(2)(B)(i) (exempting certain calls not made for a commercial purpose); *id* § (b)(2)(B)(ii) (exempting certain commercial calls). The NH Robocalls, created by and disseminated at the direction of Kramer, did not meet specific TCPA requirements, including identifying any individual or entity responsible for the call at the beginning of the message, or including a telephone number of the entity or individual responsible for the message. *See* Am. Compl. ¶ 55. For these reasons, Kramer violated the TCPA.

  **C.**  **The Court Should Enter Default Judgment Against Kramer on Counts III and IV for Violations of RSA 664:14-a and 664:14-b.**

New Hampshire law prohibits any person from "knowingly misrepresent[ing] the origin of a telephone call which expressly or implicitly advocates the success or defeat of any party, measure, or person at any election, or contains any information about any candidate or party." RSA 664:14-b(I). "Such knowing misrepresentation shall include, *but shall not be limited to,*" spoofing the person originating the call. *Id.* (emphasis added). New Hampshire law also requires all "prerecorded political messages" to provide within the first 30 seconds of the message: (i) "[t]he name of the candidate or of any organization or organizations the person is calling on behalf of"; and (ii) "[t]he name of the person or organization[s] paying for the delivery of the message and the name of the fiscal agent, if applicable." RSA 664:14-a(II).

As established in the Amended Complaint and above, the NH Robocalls that Kramer created and disseminated lacked the required disclosures to inform the Individual Plaintiffs that the Defendants—not President Biden's campaign, Kathy Sullivan, Granite for America, or any other person affiliated with the Democratic Party—were responsible for the NH Robocalls. Not

only that, but the Individual Plaintiffs' right to privacy and quiet enjoyment of the home was violated by Kramer's offensive robocalls. These calls left recipients unable to determine who made and paid for the message, and it is clear that the Individual Plaintiffs have suffered the type of injury from which the RSA 664:14-a and RSA 664:14-b were designed to protect.[6]

### D.    A Separate Final Judgment Is Not Required Because All Other Defendants Have Been Removed

When there are multiple parties in an action, "the court may direct entry of a final judgment as to one or more, but fewer than all, … parties only if the court expressly determines that there is no just reason for delay." Fed. R. Civ. P. 54(b). Before entering a judgment under Rule 54(b), the district court "must go through two steps:" (1) first, it must "determine that it is dealing with a 'final judgment' that provides an ultimate disposition on a 'cognizable claim for relief'"; and (2) second, it must "determine whether there is any just reason for delay." *Boston Prop. Exch. Transfer Co. v. Iantosca*, 720 F.3d 1, 7 (1st Cir. 2013) (internal quotation marks omitted) (quoting *Curtiss-Wright Corp. v. Gen. Elec. Co.*, 446 U.S. 1, 7–8 (1980)). In determining whether there is no just reason for delay, the court must consider the interrelationship of the claims and whether early entry of judgment will result in piecemeal appeals. *Amyndas Pharms., S.A. v. Zealand Pharma A/S*, 48 F.4th 18, 28 (1st Cir. 2022).

As discussed earlier, *see supra* Sections II.A., I.B, and I.C, the court is dealing with a "'final judgment' that provides an ultimate disposition on a 'cognizable claim for relief'" for Kramer's violations of the VRA, violations of the TCPA, and violations of RSA 664:14-a and 664:14-b. *Boston Prop. Exch. Transfer Co.*, 720 F.3d at 7 (internal quotation marks omitted). Further, there

---

[6] As reflected in the legislative history, RSA 664:14-a was enacted to address "offensive" pre-recorded telephone messages, which interfere with "rights to privacy and the [quiet] enjoyment of [the] home," and leave recipients "unable to determine who made the recording, who paid for the message, and which political candidate (if any) they were endorsing." *See* House Committee on Election Law, Public Hearing on HB 332 (N.H. Feb. 4, 2003) (Statement of Rep. Paul Spiess, Prime Sponsor of HB 332).

is no just reason for the delay in entry of final judgment against Kramer because all other defendants in this cause of action have been removed, and the Court denied the parties' motions to dismiss. *See* ECF No. 116; ECF No. 117; ECF No. 121. Consequently, there is no risk that the Court will deploy its judicial resources on piecemeal appeals. *See Amyndas Pharms., S.A.*, 48 F.4th at 28. Because there are no longer "pending motions to dismiss," and because all other defendants have been removed, there is no just reason for the delay and default judgment is warranted. ECF No. 105 at 5.

## III.  PLAINTIFFS ARE ENTITLED TO A PERMANENT INJUNCTION AGAINST KRAMER WITHOUT THE NEED FOR A HEARING[7]

### A.    Plaintiffs Have Established the Need for Injunctive Relief

The VRA, TCPA and New Hampshire statutes each authorize courts to grant preliminary and other equitable or declaratory relief as may be appropriate. 47 U.S.C. 227(b)(3)(A); RSA 664:14-a(IV)(b); RSA 664:14-b(II)(b); 52 U.S.C. 10308(d). A permanent injunction against Kramer is warranted for all of the reasons discussed in Plaintiffs' Memorandum of Law in Support of its Amended Motion for Preliminary Injunction, ECF No. 71-1 ("Am. PI MOL"), and Plaintiffs' Objections to Magistrate Judge's Report and Recommendation, ECF No. 104 ("Plaintiffs' Objections").[8]

---

[7] The Individual Plaintiffs also seek, and are entitled to, monetary damages against Kramer for his violations of the TCPA and NH State Election laws. Specifically, the Individual Plaintiffs are entitled to $500 for each violation of the TCPA, as authorized by 47 U.S.C. § 227(b)(3), and $1,000 for each violation of RSA 664:14-a and RSA 664:14-b. The Individual Plaintiffs are also entitled to treble and punitive damages because Kramer's violations were knowing and willful. However, Plaintiffs defer to the Court's sound judicial discretion to determine whether such damages are warranted here. Plaintiffs also understand from the Court's July 9, 2025, Notice that the Court plans to hold a hearing on monetary damages. Thus, Plaintiffs focus on their request for injunctive relief for purposes of this motion, which Plaintiffs contend does not require a further hearing.

[8] The factors required for a permanent injunction are similar to the factors necessary to establish a preliminary injunction. In particular, a plaintiff must demonstrate: "(1) that the [plaintiff] has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between [the plaintiff and defendant], a remedy in equity is warranted; and (4) that the public interest will not be [compromised by the issuance of] a permanent injunction." *Compare Esso Standard Oil Co. v. Lopez-Freytes*, 522 F.3d 136, 148 (1st Cir. 2008), *with Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

In particular, Plaintiffs have demonstrated that they have and will suffer irreparable harm that cannot be compensated through monetary damages. *See Esso Standard Oil Co.*, 522 F.3d at 148. Specifically, the infringement of the Individual Plaintiffs' right to vote caused by the NH Robocalls is likely to recur if Kramer—an admittedly prolific distributor of robocalls who was seeking to profit from the surreptitious distribution of AI-generated and spoofed robocalls—is not enjoined. *See* Am. PI MOL at 27; *see also Arlene Ocasio v. Comision Estatal de Elecciones,* 486 F. Supp. 3d 478, 484 (D.P.R. 2020); *see also Colón-Marrero v. Conty-Pérez,* 703 F.3d 134, 145 (1st Cir. 2012) (Torruella, J., dissenting) (explaining that infringement on the right to vote constitutes irreparable harm per se); *League of Women Voters of N.C. v. North Carolina,* 769 F.3d 224, 247 (4th Cir. 2014) ("Courts routinely deem restrictions on fundamental voting rights irreparable injury."); *Williams v. Salerno,* 792 F.2d 323, 326 (2d Cir. 1986) ("The registration applicants in this case would certainly suffer irreparable harm if their right to vote were impinged upon."); *Fish v. Kobach,* 840 F.3d 710, 752 (10th Cir. 2016) ("Because there can be no 'do-over' or redress of a denial of the right to vote after an election, denial of that right weighs heavily in determining whether plaintiffs would be irreparably harmed absent an injunction.").

The League similarly suffered, and is likely to suffer further, irreparable harm if Kramer is not enjoined. *See* Am. PI MOL at 11-12 (citing Declaration of Elizabeth Tentarelli, ECF No. 47-4 ("Tentarelli Decl."); Declaration of Celina Stewart, ECF No. 47-19 ("Stewart Decl.")). The League has had to divert resources from its core functions to respond to the NH Robocalls, including by training and guiding staff. *See* Tentarelli Decl. ¶ 11; Stewart Decl. ¶ 10. If and when Kramer executes a similar scheme shortly before future elections, the League will be forced to deploy a rapid response protocol to mitigate the impact of Kramer's voter suppression efforts, which cannot be anticipated ahead of time. *See* Tentarelli Decl. ¶ 12; Stewart Decl. ¶ 13. These

rapid-response efforts severely tax and strain the League's volunteer time and resources—precisely at the time the League should be focusing on its core functions, namely, maximizing Americans' civic engagement through voting. *See* Tentarelli Decl. ¶¶ 11-13; Stewart Decl. ¶¶ 13-14. The League will also be forced to divert monetary resources that it will not be able to recover to disabuse voters of the false, threatening, intimidating, and coercive messages contained in the robocalls. *See* Tentarelli Decl. ¶ 13; Stewart Decl. ¶ 13. This includes changing the League's existing printed voting literature, paying for unforeseen voter education promotions on social media, and purchasing newspaper advertisements for those who do not use social media. *Id.*

The harm described above is similar to the harm alleged in *Wohl I*, which the court found to be irreparable because the plaintiff was forced to divert resources away from its work related to the Census, and the Census had concluded at the time of the injunction. 498 F. Supp. 3d at 475. Here, too, the League cannot recover the time and resources it has already diverted—and will need to divert—to combat the harm caused by Kramer. The League's harms in defending against Kramer's false and malicious tactics are clearly irreparable, and the League cannot be adequately compensated purely with monetary damages.

Given that robocall campaigns are generally conducted shortly before elections, the League's mitigation efforts will also have to be implemented on an extremely short time period—to reach voters before they decide to exercise (or not exercise) their right to vote, based on deliberately and maliciously false robocalls. Kramer, with the help of the Defendants, was able to disseminate over 13,000 robocalls to voters in a single state, less than 48 hours before a primary election. With the resources and call centers at Kramer's disposal, the next scheme could easily target hundreds of thousands (if not millions) of voters, in dozens of states, with next to no time for the League to design and implement an actual mitigation plan. On June 13, 2025, Kramer was

acquitted for his involvement in the NH Robocalls scheme, so there is not currently anything stopping him from engaging in this conduct in the future, consistent with his past behavior.[9]

While testifying at his criminal trial, Kramer made it clear that he has no regrets for his actions, and that he believes he can violate the law without suffering any consequences. Specifically, Kramer testified that creating and disseminating these Robocalls was "the right thing to do.[10]  Kramer was later asked, "With all that you're going through now," referring to the regulatory, civil, and criminal proceedings filed against him, "do you regret what you did or do you think it was worth it?"[11]  Kramer replied, "I don't [regret it].  I know it was worth it."[12]  Kramer continues to see himself as "one of the few people in the country . . . [who] could make a difference."[13]  Kramer's proud, boastful testimony reveals that he remains a risk to Plaintiffs and the public at large.  This testimony illustrates the urgent need for an injunction to enjoin Kramer from concocting additional political robocall schemes that will threaten voters' rights.

---

[9] *See* Holly Ramer, *New Hampshire jury acquits consultant behind AI robocalls mimicking Biden on all charges*, AP News (June 13, 2025), https://apnews.com/article/ai-robocalls-biden-kramer-new-hampshire-02de549e5d82bce4cd7622b8bef2d587 (last visited July 3, 2025).  Kramer was acquitted of criminal charges separate and distinct from the state law claims brought in this action; Kramer was indicted and acquitted for charges of voter suppression under RSA 659:40,III, and impersonating a political candidate under RSA 666:7-a. Notice of Arraignment, *State of New Hampshire v. Steven Kramer*, No. 211-2024-CR-00211 (Belknap Sup. Ct. May 22, 2024) (listing 3 counts each of 659:40,III Bribing Voter Suppression and 666:7-a Impersonation of Candidates.).  It is well established that an acquittal does not bar nor undermine the civil claims brought here. *See, e.g.*, *United States v. One Assortment of 89 Firearms*, 465 U.S. 354, 362-63 (1984) ("[A]n acquittal on criminal charges does not prove that the defendant is innocent; it merely proves the existence of a reasonable doubt as to his guilt . . . It is clear that the difference in the relative burdens of proof in the criminal and civil actions precludes the application of the doctrine of collateral estoppel."); *Murray & Sorenson v. United States*, 207 F.2d 119, 122 (1st Cir. 1953) ("the difference in degree of the burden of proof in criminal and civil cases precludes application of the doctrine of res judicata as a bar to a civil suit subsequent to an acquittal in a criminal prosecution grounded on the same facts"). This is particularly true where, as here, the defendant has averred to the relevant facts of the civil suit in his own criminal trial testimony.

[10] Steve Kramer, Trial Testimony, State of New Hampshire v. Steven Kramer, No. 211-2024-CR-00211, June 12, 2025, Belknap Superior Court, AUDIO RECORDING at 9:36.  Attached as **Exhibit A**.

[11] Steve Kramer, Trial Testimony, State of New Hampshire v. Steven Kramer, No. 211-2024-CR-00211, June 11, 2025, Belknap Superior Court, AUDIO RECORDING at 1:21:07.  Attached as **Exhibit B**.

[12] *Id.*

[13] *Id*. at 30:48.

Since Kramer's testimony at trial, his actions continue to reflect his belief that he is apparently above the law.  On July 2, 2025, Ms. Amira Mattar, Counsel at Free Speech for People, emailed Kramer a copy of her motion to withdraw on behalf of Plaintiffs in this matter.  Within an hour and a half, Kramer immediately replied with the following message: "I was found not guilty in New Hampshire on June 13[.]  There is nothing you can do to me[.]  Have a nice day[.]"[14] E-mail from Steve Kramer to Amira Mattar, Counsel, Free Speech for People (July 2, 2025, 11:02:36 AM) (Attached as **Exhibit C**).  As noted earlier, *see supra* p. 21 n.9, Kramer was acquitted of criminal charges separate and distinct from the civil state law claims brought in this action.  Yet Kramer apparently views his acquittal as absolving him of any liability for his actions in this case.  Again, Kramer's words and actions since his criminal trial demonstrate that he will continue to illegally intimidate, coerce, and confuse voters absent a court injunction.

The balance of hardships and the public interest also favors injunctive relief.  *See* Am. PI MOL at 25-26.  Plaintiffs have an overwhelmingly strong interest in protecting the unimpaired right to vote—free of intimidation, threats, or coercion.  The interest in "protecting voters from confusion and undue influence" is "compelling," *Burson v. Freeman,* 504 U.S. 191, 199 (1992) (plurality opinion), and indeed, "the right … regardless of [] political persuasion, to cast [] votes effectively" is voters' "most precious" right.  *Williams v. Rhodes,* 393 U.S. 23, 30-31 (1968).

It is beyond debate that the public interest would be served by enjoining the illegal and immoral activities at issue in this case.  Kramer is a prolific disseminator of robocalls, having delivered millions of calls to U.S. voters over the past decade.  *See* Am. Compl. ¶ 84.  He was actively seeking ways to profit from AI-generated technology immediately prior to his creation of the NH Robocalls.  *See* Am. PI MOL at 32.  He has significant resources at his disposal,

---

[14] It is worth noting that counsel for Plaintiffs have repeatedly sent emails to Kramer's email address concerning this case, but this is the first time he has responded.

purportedly operating three U.S. call centers, and reportedly having anywhere from 18 to 50 employees at his disposal. *Id.* Most critically, he has stated that AI-generated robocalls are cheap, easy to produce, and effective, and that there is a market for delivering these types of unlawful, malicious robocalls to voters. *Id.*

Without an injunction, Kramer remains a risk to Plaintiffs and the public at large. An injunction enjoining Kramer from creating additional political robocalls would protect voters from future intimidation, threats, and coercion. Ensuring that all voters can participate freely and fairly in elections is essential for the integrity of the election process. An injunction would help maintain public trust in the electoral system by demonstrating that measures are in place to protect voters from intimidation and ensure fair elections. This is essential for upholding the democratic process and ensuring that every eligible voter can cast their ballot without fear.[15]

**B.    The Court Should Grant The Requested Injunctive Relief Without A Further Hearing**

Plaintiffs respectfully request that the Court issue a default judgment ordering injunctive relief against Kramer, without the need for a further hearing. The First Circuit has made clear that

---

[15] In its Order denying Plaintiffs' motion for a preliminary injunction, the Court concluded that Plaintiffs' request for injunctive relief was "not sufficiently specific." Order (Mar. 27, 2025), ECF No. 118 at 4. The Court cited to the magistrate judge's Report and Recommendation, which took issue with the fact that Plaintiffs' proposed preliminary injunction would have required the then-active defendants to obey the law, without specifically "list[ing] the laws [Plaintiffs] intend to have defendants obey." ECF No. 99 at 14. As Plaintiffs explained in their Objections to the Report & Recommendation, however, although some courts have questioned "obey-the-law" injunctions, courts "continue to order such injunctions under what appear to them appropriate circumstances." *Sec. & Exch. Comm'n v. McLellan*, 737 F. Supp. 3d 95, 107 (D. Mass. 2024) (collecting cases). Under the circumstances of this case—where Kramer spearheaded a scheme to deliver thousands of unlawful robocalls to New Hampshire voters on the eve of an election—Plaintiffs maintain that the proposed injunction is justified.

In any event, even if the Court determines that the scope of Plaintiffs' proposed injunction is overbroad, the Court can exercise its discretion to award an injunction that is narrower in scope. *See Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 580 (2017) ("In the course of [granting injunctive relief], a court 'need not grant the total relief sought by the applicant but may mold its decree to meet the exigencies of the particular case.'" (quoting 11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2947, at 115 (3d ed. 2013))); *Three Blind Mice Designs Co. v. Cyrk, Inc.*, 892 F. Supp. 303, 313 (D. Mass. 1995) ("A district court has broad discretion to fashion an injunction to suit the circumstances in the particular case. The Supreme Court has repeatedly made clear that this is generally true even when the injunctive remedy is congressional in origin." (citations omitted)).

a hearing is not necessary when a party fails to appear.  *See* Fed. R. Civ. P. 55(b)(2); *Universitas*

*Educ., LLC*, 98 F.4th at 377.  As explained above and in further detail in Plaintiffs' Motion for

Entry of Default, Kramer has not made any effort to appear in this case whatsoever.  Moreover,

Plaintiffs have already briefed in detail, with supporting evidence, why an injunction is warranted

in this case, and notice of that request for injunctive relief was provided to Kramer.

Per the local rules, a copy of this motion has been mailed to the last known address of the

Kramer at 20 Cloverleaf Drive, New Fairfield, CT 06812, and his attorney in the related criminal

matters, Tom Reid at 67 S Main St #2, Concord, NH 03301.  A copy of this motion has also been

sent to one of Kramer's residences, Steve Kramer, 2100 Napoleon Ave., New Orleans, LA 70115,

and the email address Kramer provided to Kathleen Sullivan the day that the Original Complaint

was filed, gotvcalls@gmail.com.

## **<u>CONCLUSION</u>**

For the reasons stated herein, Plaintiffs respectfully request that the Court enter default

judgment against Kramer on all Counts in the Amended Complaint.  Plaintiffs further request that

the Court permanently enjoin Kramer from (1) producing, generating, or distributing AI-generated

robocalls impersonating any person, without that person's express, prior written consent;

(2) distributing spoofed telephone calls, spoofed text messages, or any other form of spoofed

communications without the express, prior written consent of the individual or entity upon whose

behalf the communication is purportedly being sent; and (3) distributing telephone calls, text

messages, or other mass communications that do not fully comply with all applicable state and

federal law or that are made for an unlawful purpose.

Dated:  August 1, 2025                                      Respectfully submitted,

                                                                                    */s/   Mark R. Herring*

William C. Saturley (NH Bar #2256)
Nathan R. Fennessy (NH Bar #264672)
Nicholas A. Dube (NH Bar #27464)
**PRETIFLAHERTY**
57 N Main Street
Concord, NH 03301
(603) 410-1500
WSaturley@preti.com
Nfennessy@preti.com
Ndube@preti.com

Courtney Hostetler (MA Bar #683307)
John Bonifaz (MA Bar #562478)
Ben Clements (MA Bar #555802)
**FREE SPEECH FOR PEOPLE**
28 S. Main St., Suite 200
Sharon, MA 02067
(617) 244-0234
chostetler@freespeechforpeople.org
jbonifaz@freespeechforpeople.org
bclements@freespeechforpeople.org

Mark R. Herring (DC Bar #90013124)
Matthew R. Nicely (DC Bar #430564)
Caroline L. Wolverton (DC Bar #496433)
Joseph T. DiPiero (DC Bar #1618536)
Maria Julia Hershey (DC Bar # 90020162)
Sara M. Hanna (DC Bar #90017864)
**AKIN GUMP STRAUSS HAUER & FELD LLP**
2001 K Street, N.W.
Washington, DC 20006-1037
(202) 887-4000
mherring@akingump.com
mnicely@akingump.com
cwolverton@akingump.com
jdipiero@akingump.com
mhershey@akingump.com
shanna@akingump.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 1st day of August, 2025, a true and correct copy of the above was electronically filed with the Court and served upon the following:

Boyd Garriott
Frank Scaduto
Michele E. Kenney
Thomas M. Johnson, Jr.
Wiley Rein LLP
2050 M Street NW
Washington, DC 20036
210-833-5573
*Counsel for Defendant Lingo Telecom, LLC*
***Via ECF System***

Wayne E. George
Morgan Lewis & Bockius LLP
One Federal St
Boston, MA 02110-4104
*Counsel for Defendant Life Corporation*
***Via ECF System***

Steve Kramer
2100 Napoleon Ave.,
New Orleans, LA 70115
AND
20 Cloverleaf Drive,
New Fairfield, CT 06812
***Via US Mail on August 1, 2025***

Tom Reid
67 S Main St #2,
Concord, NH 03301
***Via US Mail on August 1, 2025***

A true and correct copy was also transmitted via electronic mail to Steve Kramer at gotvcalls@gmail.com.

Respectfully submitted,
*/s/   Mark R. Herring*
C*ounsel for Plaintiffs*